**In re NWFX, INC., Northwest Financial Express, Inc., and Gold Financial Express, Inc., Debtors.**

**No. 86–15148F.**

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

June 22, 2001.

Isaac A. Scott, Jr. and Charles T. Coleman, Wright, Lindsey & Jennings, LLP, Little Rock, AR, for Trustee.

Thomas A. Creekmore III and Steven W. Soulé, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, for Equity Security Holder.

## MEMORANDUM OPINION

ROBERT F. FUSSELL, Bankruptcy Judge.

## I. BACKGROUND OF THE CASE AND APPLICATIONS, MOTIONS, AND OBJECTIONS PENDING BE-FORE THE COURT

NWFX, Inc. [NWFX], Gold Financial Express, Inc. [Gold], and Northwest Financial Express, Inc. [Northwest], together referred to as the Debtor Corporations, were incorporated by Larry Shaffer in the early 1980s for the purpose of selling money orders. NWFX and Gold sold money orders in a number of states in the United States. Northwest sold money orders in the Commonwealth of Puerto Rico. Shaffer gained expertise in the money order business while employed with the American Express Company, and is the sole shareholder of the Debtor Corporations.

Generally speaking, the Debtor Corporations conducted business by entering into contracts with convenience stores, grocery stores, and other retail concerns that acted as agents in selling money orders on behalf of the Debtor Corporations. Pursuant to their contract agreements with the Debtor Corporations, the retail businesses sold the money orders to their customers, retained a small fee for their services, and remitted the balance of the money order proceeds to the Debtor Corporations. After sale by the retail businesses to their customers, the money or-

ders were processed through the Federal Reserve System and ultimately ended up for payment at the banks where the Debtor Corporations had accounts.

During 1986, the Debtor Corporations began experiencing financial difficulties. Their bank account balances became overdrawn and the money orders began to be returned for insufficient funds. In 1986, the State of Arkansas Security Commissioner issued a cease and desist order that had the effect of closing down the Debtor Corporations' operations.

On August 1, 1986, the Debtor Corporations filed voluntary petitions under chapter 11 of the bankruptcy code. On August 5, 1986, the Debtor Corporations filed a "Motion For Appointment of Trustee" pursuant to 11 U.S.C. § 1104(a)(2). On August 11, 1986, John Folgeman, a former Chief Justice of the Supreme Court of Arkansas, was appointed trustee. He subsequently disqualified himself from the position. On August 12, 1986, Allen W. Bird, II [Bird or Trustee] was appointed trustee in the three cases. The cases were consolidated for purposes of administration on September 5, 1986. There has been ongoing litigation in the consolidated case for the past fourteen years.

Pending before the Court are the following applications and motions filed by the Trustee:

(1) "Final Report and Account and Application For Final Decree," filed on July 29, 1999;

(2) "Motion for Final Approval of All Professional Fees and Expenses," filed on July 29, 1999;

(3) "Trustee's Application For Approval of Employment of Special Counsel Pursuant to 11 U.S.C. § 327(e)," filed on December 1, 1999, to employ Wright, Lindsey & Jennings LLP;

(4) "Amended Chapter 11 Final Report and Account and Application For Final Decree," filed on December 15, 1999;

(5) "Motion For Approval of Professional Fees and Expenses," filed on June 29, 2000, to pay the Rose Law Firm as counsel for the Trustee. The application seeks $72,181.50 in legal fees and $5015.90 in expenses;

(6) "First Application For Allowance of Fees and Expenses by Wright, Lindsey & Jennings LLP, Counsel for Trustee," filed on June 29, 2000. The application seeks $194,574.00 in legal fees and $22,896.30 in expenses;

(7) "Second Application For Allowance of Fees and Expenses by Wright, Lindsey & Jennings LLP, Counsel For Trustee," filed on September 20, 2000. The second application seeks $105,671.00 in legal fees and $16,228.14 in expenses.

Shaffer, as the equity security holder of the Debtor Corporations and a party in interest, filed objections to all of the above-listed applications and motions. Also pending before the Court are the following applications and motions filed by Shaffer:

(8) "Application for Allowance and Surcharge of Attorneys Fees and Expenses [Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.]," filed on June 30, 2000. The application seeks $289,065.50 in legal fees and $18,629.69 in expenses for Shaffer's counsel.

(9) "First Interim Application of D.R. Payne & Associates as Financial Experts and Accountants For Larry Shaffer ('Shareholder') For Allowance of Compensaion For Actual, Necessary Services Rendered and For Reimbursement of All Actual, Necessary Expenses Incurred For the Period October 21, 1999 Through February 26, 2000," filed on July 10, 2000. The application seeks $42,280.00 in fees and $2827.11 in expenses for services rendered from October 21, 1999, through February 26, 2000.

(10) "Supplement To Application For Allowance and Surcharge of Attorneys Fees and Expenses [Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.]," filed on September 20, 2000. The supplemental application seeks $50,518.75 in fees and $11,449.50 in expenses.

The Trustee filed objections to Shaffer's applications and motions. Following an evidentiary hearing in the case and the submission of post-trial briefs by the parties, the Court took the matter under advisement. The Court will enter separate orders as to each of the applications and motions pending in this case.

## II. JURISDICTION

This Court has jurisdiction over the pending matters pursuant to 28 U.S.C. § 1334. The above proceeding is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A) and (O).

## III. ISSUES BEFORE THE COURT

The issues in this litigation are voluminous—the hearing lasted ten days, the transcript is over 2,000 pages, and the Court received twelve volumes of exhibits into evidence. The issues include,

A. The timeliness of Shaffer's objections.

B. Whether the Trustee breached his fiduciary duty of care in the administration of the Debtor Corporations' estates, and, if so, what damages resulted to the estates or to Shaffer as equity security holder of the estates?

 1. Alleged delay in closing the estates;

 2. Trustee's refraining to pursue collection of judgments on behalf of the Debtor Corporations' estates;

3. Sales of personal property of the Debtor Corporations' estates;

4. Alleged sharing and paying of employees of the Debtor Corporations with the Rose Law Firm;

5. Alleged improper employment of and payment to employee Penny Scharmberg;

6. Alleged improper payments to Victoria Mason as accountant in the Debtor Corporations's cases;

7. Alleged improper payments of legal fees to the Rose Law Firm without Court orders.

C. Whether the Trustee knowingly and intentionally made overpayments of trustee's fees to the Rose Law Firm or himself; whether the Trustee filed false, misleading, or inaccurate final reports and accounts; and whether the Trustee failed to timely provide or reveal information regarding his trustee's fees as requested by Larry Schaffer, as a party in interest, and breached his fiduciary duty?

D. 11 U.S.C. § 326(a) issues raised by the parties.

1. Is the Trustee entitled to a fee for claims that were compromised or set off?

2. Is the Trustee entitled to a fee for state bond proceeds that were distributed through the Debtor Corporations' estates?

3. Is the Trustee entitled to a fee for money distributed to Shaffer as the equity security claimant in the Debtor Corporations' cases?

E. Conclusions of law as to the appropriate 11 U.S.C. § 330 and § 326(a) compensation to be paid to the Trustee in the Debtor Corporations' cases.

F. Appropriate compensation pursuant to 11 U.S.C. § 330 for professionals employed by the Trustee in the Debtor Corporation's cases.

1. What is the appropriate compensation for accountant Victoria Mason?

2. What is the appropriate compensation for the Rose Law Firm as counsel for the Trustee in the Debtor Corporations' cases?

3. Is Wright, Lindsey & Jennings LLP entitled to compensation as special counsel for the Trustee in the Debtor Corporations' cases? If so, can, and should, the Trustee be surcharged for the legal fees and costs incurred by Wright, Lindsey & Jennings LLP?

4. Can, and should, the Trustee be surcharged for the legal fees and costs incurred by Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C. in this litigation, including the fees and expenses of Shaffer's expert witness and financial consultant, D.R. Payne & Associates, or should Shaffer be required to pay for his own legal fees and costs incurred?

5. Is the Rose Law Firm vicariously liable for the acts of the Trustee in the Debtor Corporations' cases?

## A. *The timeliness of Shaffer's objections*

### 1. *Positions of the parties*

The Trustee's position is that Shaffer's objections, which raise issues of negligence, fraud, and breach of fiduciary duty as to the Trustee's July 29, 1999, "Final Report and Account and Application For Final Decree," and December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final De-

cree," are barred by the three year statute of limitations in Arkansas under Arkansas law and the doctrine of latches.[1] The Trustee further contends that Shaffer's objections to the Trustee's "Application For Allowance of Final Compensation and Expenses For Counsel For the Trustee," filed on November 9, 1998, and the Trustee's "Motion For Final Approval of All Professional Fees and Expenses," filed on July 29, 1999, are also time barred by the doctrine of laches.

Shaffer's position is that the three year statute of limitations in Arkansas is not applicable to the above listed applications because the subject matter of the applications are administrative matters before the Court. There is no statutory limitation contained in the bankruptcy code as to these administrative matters. The code specifically requires that the Trustee file a final report and account in the Debtor Corporations' cases.[2] Until a final report and account is actually filed and the contents made known, an interested party cannot file an objection to the final report and account. Shaffer submits that even if the three year statute of limitations in Arkansas was applicable, the statute is tolled when a party has concealed or failed to disclose his or her wrong-doing. Further, the three year statutory period would not begin to run until Shaffer knew or had

reason to know of the Trustee's wrong-doing. Likewise, the legal doctrine of laches is not applicable for the same reasons—until a final report is filed and the contents known, an interested party does not have knowledge of the accounting contained in such a final report. Regarding the Trustee's applications for final payment of fees and expenses of the Rose Law Firm, the legal doctrine of laches is not applicable because the Trustee specifically waived Shaffer's objections in the pending litigation before the Court.

### 2. Findings of fact and conclusions of law

a. *Statute of limitation and doctrine of latches issues relating to the Trustee's July 29, 1999, and December 15, 1999, final reports; and Shaffer's objections*

 Bird was appointed as the chapter 11 Trustee in the Debtor Corporations' bankruptcy cases on August 12, 1986. Bird, as trustee, paid himself or the Rose Law Firm trustee fees during the years 1989 through 1993. Bird filed operating reports beginning in 1986, and going through and including August 6, 1991, that reflected the trustee fees that had been paid by the Debtor Corporations' estates. No operating reports were filed beyond

---

1. The Arkansas code provides:

 The following actions shall be commenced within three (3) years after the cause of action accrues:
 (1) All actions founded upon any contract, obligation, or liability not under seal and not in writing, excepting such as are brought upon the judgment or decree of some court of record of the United States or of this or some other state;
 (2) All actions for arrearages of rent not reserved by some instrument in writing, under seal;
 (3) All actions founded on any contract or liability, expressed or implied;

 (4) All actions for trespass on lands;
 (5) All actions for libels;
 (6) All actions for taking or injuring any goods or chattels.
 Ark.Code Ann. § 16–56–105 (1987).

2. Section 704(9) states that the trustee shall "make a final report and file a final account of the administration of the estate with the court and with the United States trustee." 11 U.S.C. § 704(9).

 Section 1106 states that a chapter 11 trustee shall perform the same duties of a chapter 7 trustee under § 704(9). 11 U.S.C. § 1106(a)(1).

August 6, 1991, in the Debtor Corporations' cases.

On November 15, 1999, Bird, as trustee, filed his "Response to Larry Shaffer's Objections to Trustee's Final Report and Account." Bird's response was to Shaffer's September 10, 1999, objection to the Trustee's July 29, 1999, final report. At that time, Bird disclosed that he or the Rose Law Firm had been overpaid $133,220.00. At the hearing in February 2000, Bird testified that discovering the overpayments had been a difficult and torturous process.

The Court finds that the three year statute of limitations in Arkansas is not applicable to the pending administrative matters before the Court. The Trustee's motions for approval of final reports and accounts, and applications for final payments to the Rose Law Firm for professional legal services to the Trustee, and Shaffer's objections to these motions and applications, are core proceedings as defined in 28 U.S.C. § 157(b)(2)(A).[3] Until the trustee files the final report and applications as required by §§ 1106(a)(1) and 704(9), a statute of limitation is not applicable to these proceedings. Until the motions and applications are filed, a party in interest does not know what the report or applications will contain, and whether the statements and information contained therein are accurate, misleading, or fraudulent. Further, the parties agreed in a "Joint Stipulation" filed with the Court on January 12, 1999, that Shaffer would have the opportunity to review and object to all fees and expenses awarded or requested in this case.

The cases relied upon by the Trustee in his post trial brief are factually dissimilar to the present proceedings. In *Nagle v. Alspach*, 1992 WL 308457 (E.D.Pa.), *aff'd*, 8 F.3d 141 (3d Cir.1993), shareholders of a debtor corporation filed a civil action against the debtor corporation's bankruptcy trustee and the trustee's attorneys alleging the trustee had negligently failed to file lawsuits on behalf of the debtor corporation within the limitation period. In *Stumpf v. Albracht*, 982 F.2d 275 (8th Cir. 1992), a chapter 11 trustee brought suit against the debtor's former attorney based on the debtor's claim that the attorney advised them to conceal assets belonging to the bankruptcy estate. The proceedings pending before this Court are neither civil actions or adversary proceedings filed by a party in interest; rather, they are objections filed to the final reports based on the accuracy of the reports and the performance of the Trustee in administering the Debtor Corporations' estates. According to the First Circuit Court of Appeals, "[t]he very purpose of a final report and account is to insure that trustees disclose and be held accountable for their handling of the estate." *Lopez–Stubbe v. Rodriguez–Estrada, (In re San Juan Hotel Corp.)*, 847 F.2d 931, 939 (1st Cir.1988); *see also*, 6 Collier on Bankruptcy ¶ 704.13, at 704–23 to 24 (15th ed. rev.)(2000). Therefore, only after having filed a final report can the Trustee be absolved from his fiduciary duties to the Debtor Corporations' estates in this proceeding.

Finally, the January 27, 1989, order allowing an interim trustee's fee of $38,000.00, and the January 26, 1990, order

---

**3.** 11 U.S.C. § 157(b) states, in relevant part:
(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.
(2) Core proceedings include, but are not limited to—
(A) matters concerning the administration of the estate.

allowing an interim trustee's fee of $50,000.00, contained the following specific language regarding the interim trustee's fees: "which amount shall be subject to final review by this Court and a final accounting of all Trustee's fees."

The Court further concludes and finds that even if the three year statute of limitation in Arkansas was applicable to these proceeding, the statute is tolled when a party has concealed his wrongdoing. *Gibson v. Herring*, 63 Ark.App. 155, 975 S.W.2d 860, 862 (1998); *see also Stoltz v. Friday*, 325 Ark. 399, 926 S.W.2d 438 (1996). In the present proceedings before the Court, the Trustee either failed to disclose, or avoided disclosing, the overpayment of trustee's fees until he filed a response on November 15, 1999. Therefore, the statute of limitation would not begin to run until November 15, 1999, the date of the disclosure by the Trustee of the overpayments of trustee's fees, which is also the date Shaffer knew or had reason to know of the Trustee's alleged wrongdoing. *Gibson*, 975 S.W.2d at 862; *see also O'Mara v. Dykema*, 328 Ark. 310, 942 S.W.2d 854, 858 (1997); *Swink v. Ernst & Young*, 322 Ark. 417, 908 S.W.2d 660, 663 (1995). Bird has testified that discovering the overpayment of trustee's fees in issue was difficult and tedious.

The Court also rejects the Trustee's position that the doctrine of laches should be applied to Shaffer's objections to the Trustee's final reports. Laches is based on the legal theory that a party seeking relief may not do so if the party has unreasonably delayed seeking such relief to the detriment of the party's adversary. *J.W. Reynolds Lumber Co. v. Smackover State Bank*, 310 Ark. 342, 836 S.W.2d 853, 856 (1992); *see also Briarwood Apts. v. Lieblong*, 12 Ark.App. 94, 671 S.W.2d 207 (1984). Again, there is a lack of evidence that Shaffer had knowl-

edge of the Trustee's overpayment of trustee's fees until the Trustee filed a response on November 15, 1999, disclosing the overpayment. The Trustee decided to stop filing monthly operation reports in August of 1991, which, if reported accurately, would have reflected the amount of trustee's fees that had been paid by the Debtor Corporations in these cases.

b. *Doctrine of latches issues relating to the Trustee's July 29, 1999, motion for final approval of all professional fees; and Shaffer's objections*

Bird, as trustee, filed applications for allowance of legal fees and expenses on behalf of the Rose Law Firm, as counsel for the Trustee in the Debtor Corporations' cases, beginning December 30, 1986, and going through December 24, 1997. No objections to these applications were filed by Shaffer. The Court entered orders approving twelve applications through January 23, 1998.

On November 9, 1998, the Trustee filed his "Application For Allowance of Final Compensation and Expenses For Counsel For the Trustee." The application sought unbilled legal fees and expenses for the Rose Law Firm as counsel for the Trustee in the amounts of $21,136.50 and $325.81, respectfully. Also, the application sought a legal fee enhancement of $50,000.00. The application was noticed by the Trustee to Larry Shaffer on November 9, 1998, at the following address: Larry D. Shaffer, 2704 American Street, Suite 3, Springdale, AR 72764. The notice provided that if no objections were filed by December 1, 1998, the Court may enter an order approving such application without a further hearing.

On December 8, 1998, the Court filed an order approving the November 9, 1998, application. On December 18, 1998, Shaffer filed a "Motion For New Trial or Alternatively to Alter or Amend Order Filed

December 8, 1998." In his motion, Shaffer stated that the November 9, 1998, application and notice were not received by Shaffer until December 3, 1998. Attached to the pleading were the affidavits of Shaffer and Moldenhauer, and a Federal Express shipment slip that noted delivery of the November 9, 1998, application and notice to Shaffer on December 3, 1998. Shaffer requested a hearing on the application, and that the December 8, 1998, order be set aside.

On January 12, 1999, Bird and Shaffer filed a "Joint Stipulation." The stipulation provided that the Rose Law Firm anticipated filing a renewed application for final allowance of all fees awarded to the firm during the pendency of the cases, including those fees sought in the pending application. In order to avoid duplicative litigation costs, the Trustee, the Rose Law Firm, and Shaffer stipulated and agreed that, (1) the law firm would file a renewed application for final allowance of fees and expenses awarded or requested in the case, including those covered by the pending application; (2) Shaffer would have the opportunity to review and object to all fees and expenses awarded or requested in the case, including those covered by the pending application, and despite his failure to timely object to any application for interim allowance thereof; (3) subject to the Court's approval of the preceding stipulations, Shaffer's motion would be withdrawn, and (4) also subject to the Court's approval of the preceding stipulations, the hearing on Shaffer's motion set for January 15, 1999, would be stricken. The parties requested the Court to enter its order approving the stipulations, and on January 14, 1999, the Court filed its order approving the January 12, 1999, joint stipulation.

On July 26, 1999, Bird, as trustee, signed a "Motion For Final Approval of All Professional Fees and Expenses," which was subsequently filed on July 29, 1999. The motion sought legal fees in the amount of $589,633.41, and reimbursement of expenses in the amount of $57,682.42 for the Rose Law Firm as counsel for the Trustee, and payment of legal fees to other law firms in the amount of $86,871.94 as compensation for reasonable and necessary services rendered in the Debtor Corporations' cases. On September 10, 1999, Shaffer filed his "Objection to Motion For Final Approval of All Professional Fees and Expenses." On October 21, 1999, Shaffer filed his "Supplement to Objection to Motion For Final Approval of All Professional Fees and Expenses."

As to the doctrine of laches asserted by the Trustee, the Court finds that the Trustee and Rose Law Firm expressly waived the doctrine by filing a joint stipulation on January 12, 1999, and agreeing to permit Shaffer to have the opportunity to review and object to all fees and expenses awarded and requested in this case including the November 9, 1998, application, despite Shaffer's previous failure to timely object to any application for interim fees. Shaffer is not barred from objecting to all of the Rose Law Firm's applications for legal fees and expenses as counsel for the Trustee in the Debtor Corporations' cases.

**B. *Whether the Trustee breached his fiduciary duty of care in the administration of the Debtor Corporations' estates, and, if so, what damages resulted to the estates or to Shaffer as equity security holder of the estates***

**1. *Alleged delay in closing the estates***

a. *Positions of the parties*

Shaffer maintains that beginning in 1992, the Trustee delayed closing the Debtor Corporations' estates at substantial

cost to the estates and the parties in interest, including Shaffer. He contends that the Trustee should have fully administered the consolidated case by no later than the end of 1995. Shaffer asserts that the Trustee should have paid out the last distribution to money order claimants pursuant to the confirmed plan, as amended, by mid–1993, and to non-money order claimants by as early as 1995.

The Trustee's position is that he did not negligently delay the closing of the Debtor Corporations' consolidated case. The Trustee submits that because the July 1992 amended plan required him to attempt to locate all money order claimants who had filed proofs of claims and pay their claims in full if funds were available, all of 1993 was consumed by processing the checks that were issued to claimants in 1992 and 1993. The Trustee also asserts that some delay he experienced in closing the case is attributable to computer and computer personnel problems he encountered in administering the case. The Trustee asserts that during the years 1994 and 1995, he continued to locate money order holders and make distributions, and that approximately 20,000 more checks were issued and processed during that time. During the latter part of 1995, the Trustee became convinced that there would be sufficient funds remaining after paying all the money order claimants to pay the unsecured creditors of the Debtor Corporations, so he began reviewing all of the unsecured creditors' proof of claims that had been filed in the case. In 1996, the Trustee filed objections to numerous unsecured claims, including that of City National Bank, whose claim totaled $1,500,000.00. The years 1996 through 1998 were spent in extensive discovery and discovery disputes regarding the City National Bank claim. That claim was eventually settled for $500,000.00 through mediation, despite Shaffer's objection to the settlement. The Trustee notes that he filed his final report in November 1998, after which, he asserts, Shaffer vastly expanded the issues in this litigation.

### b. *Findings of fact*

#### (1) *Findings of fact—1986 through 1990*

Although Shaffer asserts that the Trustee's delay in administering the Debtor Corporations' estates occurred beginning in 1992, in order to resolve the issue of delay, an overview of the entire administration of the Debtor Corporations' estates by the Trustee is necessary. A summary of the history of the case follows.

As stated above, the Debtor Corporations filed their chapter 11 petitions on August 1, 1986. With the filing of the bankruptcy petitions, the Debtor Corporations filed an emergency complaint for turnover naming as defendants over eight hundred agents who sold money orders for the Debtor Corporations. The emergency complaint sought turnover of blank money orders, money order imprint machines, proceeds from the sales of the Debtor Corporations' money orders, and sales records of the money orders sold. The complaint alleged that those items were property of the Debtor Corporations' estates pursuant to 11 U.S.C. § 541(a) and subject to turnover under 11 U.S.C. § 542. The complaint asserted that an emergency existed in that millions of dollars of blank money orders had been printed by the Debtor Corporations and delivered to the agent defendants, and that the potential for fraud was substantial if the blank money orders and the money order imprint machines were not immediately recovered. The sales records were necessary to determine the serial number of each outstanding money order and the amount for which each money order was sold. Only by utilizing the sale records could the Debtor

Corporations identify money order purchasers, the potential claimants in the Debtor Corporations' bankruptcy cases.

The Debtor Corporations requested an emergency hearing, which the Court granted. The hearing was held on August 5 and 6, 1986. Following the conclusion of the hearing, the Court issued a "Protective Order" requiring the agents to turn over to the Court and interplead into the pending bankruptcy cases the blank money orders, the imprint machines, the records of sales of money orders by agents, and the proceeds from the sales of money orders previously sold. The Court required that notice be given to all parties in interest in the pending cases and all parties who claimed ownership or an interest in the proceeds of the sales of money orders. The Court set a subsequent hearing on the merits of the issues raised in the complaint. Approximately one-half of the defendants did not comply with the turnover order. The Court issued an "Order to Show Cause" on August 27, 1986, and the Trustee eventually filed a second complaint in the matter on May 24, 1988. That amended complaint and the resultant judgments in favor of the Trustee against the agents are the subject of section III. B.2. of this opinion.

On August 1, 1986, the Debtor Corporations also filed a "Motion For Joint Administration" of their bankruptcy cases. The Court entered an order granting that motion on September 5, 1986. On August 5, 1986, the Debtor Corporations filed a "Motion For Appointment of Trustee" in the three cases. This Court entered an order on August 12, 1986, appointing Bird as the Trustee for the three Debtor Corporations. Until the appointment of the trustee, the Debtor Corporations remained in possession and control of the affairs of their estates as debtors-in-possession. Separate bank accounts were maintained for Gold, Northwest, and NWFX for the duration of the Debtor Corporations' cases.

At the February 2000 hearing in this matter, Bird testified that he is a partner at the Rose Law Firm, where he has been employed for the past twenty-five years. He practices in the areas of commercial law, commercial litigation, banking, and bankruptcy. Through the years, he has appeared on numerous bankruptcy seminar panels and at meetings of the Arkansas Bar Association. He has been involved in several significant bankruptcy cases both within and outside the State of Arkansas. He is a member of the American College of Bankruptcy Lawyers, an organization that recognizes members of the bankruptcy bar who have bankruptcy experience and expertise and who contribute by writing and appearing at educational seminars.

Bird testified that he learned about the Debtor Corporations' bankruptcy through the Arkansas Gazette newspaper and that he wrote the Court requesting that he be considered for appointment as trustee in the cases. Shortly after his appointment, Bird traveled to Fayetteville, Arkansas, where the Debtor Corporations' offices were located. He spent the first couple of weeks orienting himself to the business operations of the Debtor Corporations.

Based upon his investigation of the Debtor Corporations' business affairs, he concluded that the reason the Debtor Corporations had filed for bankruptcy protection was because the Arkansas State Securities Department had issued orders to the companies to cease and desist from further operations in the state. Bird testified that Shaffer requested he sue the State of Arkansas Securities Commissioner to set aside the cease and desist order. However, because the Debtor Corporations had already been shut down and "money orders were bouncing everywhere," Bird ul-

timately decided there was no particular reason to engage the Arkansas State Securities Department. He determined that to do so would be expensive and would not lead to any asset he could liquidate and distribute to the holders of the money orders. Because the only purpose in pursuing such a cause of action would be to vindicate the officers of the Debtor Corporations, and there would be no financial value to the companies if he was successful, he decided not to pursue the litigation.

Bird testified that, initially, he gave some thought to whether a reorganization of the Debtor Corporations' business was possible. He concluded that because of the animosity of the agents, the hostility of the money order purchasers, and the general reputation of the Debtor Corporations in the states in which they did business, a reorganization would be unsuccessful. He determined he could not sell the business because the Debtors Corporations' business affairs were in disarray and there was no "good will" to sell.

Bird testified that at the early stages of the case, the Debtor Corporations were receiving hundreds of telephone calls per day from irate money order claimants who demanded immediate payment of the money orders they had purchased. During that period, he and his staff spent a lot of time answering those calls and trying to explain to the callers that immediate payment of their claims would not be possible.

Shaffer also insisted that Bird file a cause of action against City National Bank. Bird investigated the basis and facts for a claim against City National Bank and determined that a case against the bank would be difficult to prove. He considered how much of the estates' assets would be consumed by the litigation and concluded that it would not be cost efficient to pursue the claim. Ultimately, he abandoned the claim to Shaffer.

Bird testified that in the process of administering the Debtor Corporations' estates, he had to determine which of the employees of the Debtor Corporations he should retain and which employees were not needed. Bird did not retain Shaffer. Greg Moldenhauer, a financial officer of the Debtor Corporations, was astute as to the business operations. Bird retained him for some time, and he helped Bird become familiar with the operations of the business. Bird also retained the services of John Brown, who was head of the Debtor Corporations' computer operations.

Prior to their filing for bankruptcy protection, the Debtor Corporations' volume of money orders being sold was overwhelming. The Debtor Corporations were utilizing a computer system manufactured by Data Point and referred to as the "Agent Money Master" to track the money orders. Brown was very knowledgeable about the computer operations of the business and appeared to be the only employee who could operate the Debtor Corporations' entire computer system.

At the time Bird took over the business operations, the Debtor Corporations also employed dozens of individuals who did data entry; specifically, keying the money order entries into the computer system. Bird did not retain the services of those employees.

Bird generally described the Debtor Corporations' money order business during his testimony. The Debtor Corporations would mail blocks of the money order forms the Debtor Corporations had printed to agents. Each money order form consisted of two pages. The top page was the negotiable instrument, and attached to it was a copy referred to as the "reporting copy." The money orders were sent out in blank to the agents. When an agent sold a money order to a customer, the agent

would put the money order onto the imprint machine, turn the tumblers on the imprint machine to show the amount of the money order, and then move the bar of the imprint machine across the top of the money order so it would imprint the amount of the money order on the face of the money order form. At the same time, a carbon copy—the reporting copy—would be made. The agent would tear the top copy off and give it to the customer, who would pay the agent the imprinted amount plus a service charge. The customer would use the money order to pay a third party. The payee would endorse the money order and deposit it in the bank. The money order would move through the Federal Reserve System just like any other check. Ultimately, the money order would come back to the Debtor Corporations' bank accounts.

After the agent sold a money order, the agent would collect the reporting copies for a period of time, deduct a fee of anywhere between $0.25 and $0.50 per money order, and send the reporting copies back to the Debtor Corporations along with a check for the amount due to the Debtor Corporations.

Each of the money orders had a serial number on it. When the reporting copies came back to the Debtor Corporations, their employees would locate the serial number that had already been keyed into the computer system and key in the amount for which the money order had been sold. After the money order had been negotiated and cleared the bank, the bank would report to the Debtor Corporations the serial number and the face amount of the money order. The Debtor Corporations would match that information with the information in its computer system to verify the amount for which the money order had been sold, and to confirm that no one had subsequently altered that amount. Once that information was veri-

fied, and the person processing the money order determined that the agent had remitted the funds owing the Debtor Corporation, that money order would be set aside and the next one processed.

Bird determined that the purchasers of money orders were likely to be people of lower socioeconomic means. They were generally individuals who could not afford a checking account. They purchased money orders to pay their necessities in life such as rent, car payments, gas, utilities, and groceries. Bird prepared a special claims form, which was subsequently approved by the Court, to make it as simple as possible for potential money order claimants to prepare and file a claim. Notices were posted at the locations of the agents with which the Debtor Corporations did business, and proof of claim forms were left with the agents. Bird also advertised in newspapers in each location where agents sold the money orders, informing whomever had purchased a money order to get a proof of claim form and file a claim for their money order purchase.

In January of 1987, Bird filed his complaints for turnover naming as defendants Puerto Rico and all of the states that had required the Debtor Corporations to obtain bonds as a condition of doing business in their states and Puerto Rico. The bonds had been posted by the Debtor Corporations previously to serve as security for money order purchasers in the states and Puerto Rico. The Trustee contended that these bonds proceeds were property of the Debtor Corporations' estates under 11 U.S.C. § 541(a). The defendants contended that the bond proceeds were property of each state and Puerto Rico, to be held in trust for purchasers of money orders in each state and Puerto Rico. This Court determined that the bonds proceeds were not property of the Debtor Corporations'

estates. The Trustee did not appeal this decision.

Subsequently, the Trustee, with Court approval, entered into agreements with the various states and Puerto Rico to administer all the money order claims against the Debtor Corporations that arose in each state and Puerto Rico. Through extended negotiations, the Trustee convinced the state and Puerto Rican officials that it would be impractical and costly for them to implement their own systems to administer the money order claims in their jurisdictions. The Trustee already had in place a computer system that identified by name each money order purchaser, the jurisdiction in which the purchaser lived, the serial number of the money order purchased, and the amount for which the money order was purchased. Bird testified that his settlement with the states and Puerto Rico resolved two critical problems: it eliminated any duplication of claims, and allowed him to have control over the administration of all of the money order claims. This resulted in his not having to wait for the states and Puerto Rico to develop a claims system to pay money order claimants, which, Bird testified, would have taken an inordinate amount of time.

In summary, under the terms of the agreement between the Trustee and the various states and Puerto Rico, the following would occur: (1) the states and Puerto Rico would turn over the bond proceeds and any other collateral pledged as security to the Trustee; (2) the Trustee would set up a separate bank account for each state and Puerto Rico and would use the bond proceeds and security pledged in each state or Puerto Rico to pay the money order purchaser claimants from those states or Puerto Rico; (3) Bird would charge each state or Puerto Rico, on an individual basis, generally, a three percent (3%) commission for administering and paying the claim filed in the Debtor Corporations' bankruptcy case; (4) Bird would utilize his experience as trustee and the facilities and equipment of the Debtor Corporations to administer the claims; and (5) in return, the Debtor Corporations' estates would receive all of the unused funds from the bond proceeds or collateral pledged as security to pay other money order claimants in the Debtor Corporations' estates.

Bird testified that based on the negotiated agreements, he brought approximately an additional $1,200,000.00 into the Debtor Corporations' estate to pay creditors. Had this not occurred, Bird testified, there would have been no money available to pay unsecured creditors or Shaffer. Based upon the negotiated agreements, this Court entered an order extending the deadline for filing proof of claims until February 15, 1997. Ultimately, over 60,000 proofs of claims were filed in the case.

On June 15, 1988, Bird filed a "Plan of Reorganization Submitted by the Trustee" [the Plan] in the consolidated case. He testified that he never thought that there would be a 100% payout, because, even if the Debtor Corporations had been solvent at the time of bankruptcy, the cost of administration and other expenses would have eaten into the funds available to pay money order claimants, leaving little or nothing for unsecured creditors and Shaffer. As reflected in the June 1988 plan, Bird believed that the money order purchasers claims should be paid ahead of the claims of other unsecured creditors. No objections to the Plan were filed on this ground.

The relevant portions of the Plan are set forth below:

I. *DEFINITIONS*

1.1 "Agent" shall mean an entity of any nature which sold money orders issued

by one of the Debtors and shall include all subagents.

1.2 "Claim" shall mean a duly listed or timely filed claim which is allowed and ordered paid by the Court pursuant to Section 502 of the Code.

1.8 "Creditors" shall mean all creditors of the Debtors holding claims for unsecured debts, liabilities, demands or claims of any character whatsoever.

1.9 "Debtors" shall mean collectively, Northwest Financial Express, Inc., NWFX, Inc. and Gold Financial Express, Inc.

1.10 "Distribution Account" shall mean the account authorized by the Court to actually disburse funds at UNB.

1.12 "Equity Security Claim" means a claim of an equity security holder as that term is defined in § 101(16) of the Code.

1.13 "Gold Account" shall mean that account at UNB, which shall include all Gold Funds, less the Costs of Administration and Costs of Distribution.

1.15 "Money Order Claim" shall mean a claim based upon liability of one of the Debtors arising from the purchase of a money order issued by one of the Debtors and the subsequent nonpayment of the instrument. This definition also covers assignees by the original purchasers of money orders. Inserting the name of the state before this term shall mean that the claimant purchased the money order from an agent located and authorized to do business in that state, i.e., "Michigan Money Order Claim" shall mean a claim based upon the sale of a money order from an agent in Michigan.

1.16 "Northwest Account" shall mean that account at UNB, which shall contain Puerto Rico Funds, and shall also include all funds located at Banco Popular in San Juan, Puerto Rico, and collected by U.S. Marshals in Puerto Rico,

and less Costs of Administration and Costs of Distribution.

1.17 "NWFX Account" shall mean that account at UNB, which shall include all NWFX Funds, less the Costs of Administration and Costs of Distribution.

1.18 "NWFX Funds" shall mean all funds collected or to be collected from Agents located and authorized to do business in all states other than Puerto Rico, Louisiana, Mississippi and Alabama, which represents the proceeds from sale of money orders.

1.19 "NWFX Money Order Claim," "Northwest Money Order Claim," and "Gold Money Order Claim" shall mean a Money Order Claim based upon money orders sold by Agents located and authorized to do business in the following states:

| | |
|---|---|
| Gold: | Louisiana, Mississippi and Alabama |
| Northwest: | Puerto Rico |
| NWFX: | All other Money Order Claims (Savings & Checking) |

1.20 "Operating Account" shall mean those accounts at UNB, which the Trustee has established and has been paying the on going expenses of the estate (Nos. 17–4196–00–06 and 78–882–731), and which shall be used to pay all claims in class I and all Costs of Administration and Costs of Distribution. All funds received by the estates of the Debtors which are not from agents who were actively selling money orders within a month of August 1, 1986, shall be credited to this account.

1.22 "Priority Claim" shall mean all claims entitled to a priority pursuant to Section 507 of the Bankruptcy Code.

1.23 "Puerto Rico Funds" shall mean all funds collected or to be collected from agents located and authorized to do business in Puerto Rico which represents the proceeds from the sale of money orders.

1.24 "Secured Claim" shall mean a claim secured by a lien, security interest or other encumbrance which has been properly perfected as required by law with respect to property of one of the Debtors, up to the value of property in which the claimant had a security interest.

1.25 "Segregated Fund Accounts" shall mean jointly the Northwest Account, Gold Account and NWFX Account.

1.26 "State Indemnity Fund" shall mean the amount of indemnity provided by one of the Debtors in each state in the form of cash or negotiable securities and indemnity bonds issued by Travelers Indemnity Company (or in Puerto Rico, by the Puerto Rican—American Insurance Company), plus interest earned on such amount since the filing of the petition by the Debtors. In the event no interest has been earned on such amounts, then interest at the rate of 6% per annum since August 1, 1986, shall be imputed in determining such amount.

1.27 "UNB" shall mean Union National Bank of Little Rock, Arkansas.

1.28 "Unsecured Claim" shall mean a claim against one of the Debtors other than Secured, Priority, and Money Order Claims.

The original principal amounts of the indemnity are as follows:

| State | Security Pledge | Indemnity Bond |
|---|---|---|
| Alabama | $ 10,000 | –0– |
| Arkansas | $175,000 | $ 75,000 |
| Kansas | $200,000 | –0– |
| Michigan | –0– | $100,000 |
| Louisiana | $ 50,000 | –0– |
| Mississippi | $ 25,000 | –0– |
| Ohio | $130,000 | –0– |
| Oklahoma | $175,000 | $ 75,000 |
| Tennessee | –0– | $250,000 |
| Texas | –0– | $250,000 |
| Puerto Rico | –0– | $105,000 |

## II. CLASSIFICATION OF CLAIMS

2.1 Class I.—Claims entitled to a priority pursuant to Section 507 of the Bankruptcy Code as the same are allowed, approved and ordered paid by the Court. Claims in this class, not paid in the ordinary course of business, shall be paid from the Operating Accounts of the Trustee. In the event the Operating Accounts are insufficient to pay such claims, each Segregated Funds Account shall be charged a pro-rata amount to fund all such claims in this class, plus an amount equal to the Cost of Disbursement allocated to that Debtor.

2.2 Class II.—Secured Claims, excluding all tax liens and judgment liens, up to the value of the collateral in which the claimant has or had a security interest.

2.3 Class III.—All NWFX Money Order Claimants except Michigan Money Order Claimants and Oklahoma Money Order Claimants.

2.4 Class IV.—All Northwest Money Order Claimants.

2.5 Class V.—All Gold Money Order Claimants.

2.6 Class VI.—All Michigan Money Order Claimants.

2.7 Class VII.—All Oklahoma Money Order Claimants.

2.8 Class VIII.—All Unsecured Claims.

2.9 Class IX.—All Equity Security Claims.

## IV. TREATMENT OF CLASSES THAT ARE IMPAIRED UNDER THE PLAN

4.1 Class II—(Secured Creditors) shall be paid the value of the Secured Claim from the Operating Accounts.

4.2 Class III—(NWFX Money Order Claimants) shall be paid pro-rata from, and only from, the NWFX Account.

4.3 Class IV—(Northwest Money Order Claimants) These claims shall be paid pro-rata from, and only from, the Northwest Account.

4.4 Class V—(Gold Money Order Claimants) These claims shall be paid pro-rata from, and only from, the Gold Account.

4.5 Class VI—(Michigan Money Order Claimants) shall be paid pro-rata from, and only from, the NWFX Account, on the same basis as Class III Claims; provided, however, that the pro-rata share will be calculated as if each Claimant had already received a pro-rata share of the Michigan State Indemnity Fund, and each such Claim shall be reduced by that pro-rata share before calculating the share of the NWFX Account.

4.6 Class VII—(Oklahoma Money Order Claimants) shall be paid pro-rata from, and only from, the NWFX Account, on the same basis as Class III Claims; provided, however, that the pro-rata share shall be calculated as if each claimant had already received a pro-rata share of the Oklahoma State Indemnity Fund, and such Claim shall be reduced by the pro-rata share before the calculating the share of the NWFX Account.

4.7 Class VIII—(Unsecured Creditors) shall be paid only from the Operating Accounts, and then only after all claims in Classes I & II are paid in full. Such claims shall be paid pro-rata from such funds as are available for such payment.

4.8 Class IX—(Equity Security Claims) shall be paid pro-rata from funds remaining on hand with the Trustee after all claims in all other Classes have been paid in full.

## V. *MEANS FOR EXECUTION OF THE PLAN*

5.1 The execution of the Plan will be accomplished by determining the pro-rata share each claim bears to the appropriate account and pay that portion of the claim. The pro-rata calculation will be performed by dividing the balance of the Segregated Funds Account by the Money Order Claims in the appropriate Class and obtaining a percentage. The percentage would then be multiplied times the claim amount, and the result paid on that Claim (not to exceed 100%). For example, the total of all NWFX Money Order Claims as allowed will be divided into the NWFX Account to determine a percentage. That percentage figure (not to exceed 100%) will then be multiplied times the amount of the Money Order Claim and the resulting dollar figure paid. A pro-rata share of the necessary Costs of Administration and Costs of Distribution will be subtracted from the Segregated Funds Account before the pro-rata calculation is performed. In the event all claims are paid from a Segregated Funds Account in full, the balance shall be split evenly between the other of the Segregated Funds Accounts remaining with payment of less than 100%, or deposited in a single remaining such Account. All funds in Segregated Funds Accounts shall be transferred to the Distribution Account for the purposes of actual disbursement to the claimant.

5.2 The Money Order Claims from each state shall be reduced by the amount actually distributed from that stated State Indemnity Fund to that Claimant if distribution of at least eighty-five percent (85%) of the total State Indemnity Fund has occurred or the Claimants' pro-rata share of the amount set aside to be distributed, but not less than 85% of such State Indemnity Fund. If no such distribution of the State Indemnity Fund has occurred then such claim shall be reduced by the

Claimant's pro-rata share of the State Indemnity Fund calculated as stated above in paragraph 1.26.

## VI. *UNCLAIMED FUNDS*

Any check issued to a claimant not paid at UNB within ninety days of its issuance, shall have a stop payment order entered by the Trustee. The Trustee shall make reasonable efforts to determine the current address of claimants where checks are returned by the post office, and mail new checks to such new addresses as he is able to locate. All funds not disbursed because of stopped checks shall be held by the Trustee for a period of one hundred eighty days after such stopped payment. During that one hundred eighty day period the Trustee may issue replacement checks to claimants who are located during that time. All unclaimed funds in the Distribution Account after all checks are stopped on that account shall be transferred by the Trustee to the Operating Accounts and be available for payment of additional Administrative Claims upon order of the Court. All funds in the Operating Account after payment of all Administrative Claims shall be paid into the Court and disposed of under Chapter 129 of Title 28 (28 U.S.C. § 2041, et seq.).

Carl's Grocery Company, Northwest National Bank, and the Commissioner of Financial Institutions of Puerto Rico filed objections to the Plan. Those objections were subsequently resolved. Shaffer did not file any objections to the Plan. The Court entered an "Order Confirming Plan" on October 17, 1988.

(2) *Findings of fact—1991 through 1998*

On June 26, 1991, the Trustee filed a "Motion to Amend Plan." Notably, Section VI. of the original plan, which required that "unclaimed funds" be paid over to the clerk of the bankruptcy court, was eliminated in the amended plan. Instead, the amended plan contained the following provisions:

6.1 After all initial distribution checks issued by the Trustee have become stale (issued for more than 90 days), the Trustee shall repeat the distribution described in Article V. above by using the funds remaining on hand to make a second distribution to those claimants who negotiated their initial distribution checks. The claims of those claimants to whom checks were sent, but failed to negotiate the checks within the 90 days of the date of the check, shall be ignored for purposes of the second distribution calculations. The second distribution shall be made by using the same means described in Article V, but the calculations shall be made ignoring the claims of those claimants who failed to negotiate the initial distribution checks. In the event it is necessary, the Trustee shall make additional distributions using the same method of calculation as described above, until all funds in an account are fully distributed or all claims against that account are paid in full.

6.2 In the event all of the NWFX Money Order Claims, the Northwest Money Order Claims or the Gold Money Order Claims shall be paid in full from the corresponding Account, then the funds remaining in that account shall be divided pro rata among the other accounts based on the pending unpaid claims in the other accounts.

The Trustee served a "Notice of Motion to Amend Plan of Reorganization" on all claimants on August 2, 1991. Objections were due on August 23, 1991. The Commissioner of Financial Institutions of Puerto Rico filed an objection to the amended plan on August 22, 1992, that was subse-

quently withdrawn. Shaffer did not file an objection to the amended plan. The Court entered its order granting the trustee's motion to amend the plan on July 27, 1992.

Bird testified that he amended the original plan to change the method of distribution to money order claimants. Under the original plan there would be only one distribution to money order claimants. The proceeds of checks not cashed by money order claimants would be turned over to the clerk of the bankruptcy court, held for five years, and then escheat to the federal government. In contrast, under the amended plan, there would be a series, or "waves," of distributions to money order claimants until all money order claimants who could be found were paid one hundred percent of their claims. In other words, if the first distribution paid only a certain percentage of a claimant's total claim, as funds became available, another distribution would be made to pay a higher percentage of the claim. Theoretically, as funds continued to become available, subsequent distributions would be made until each money order claim was paid in full. The funds necessary for subsequent distributions would come from checks that had been mailed to money order claimants but had not cleared the bank because the claimants could not be located. The intended result was that additional money would be distributed to the money order claimants who could be located.

Bird testified that distributions were made in the order called for under the amended plan. First, the bond proceeds were paid to claimants in those states in which the Debtor Corporations had posted bonds. After the bond proceeds were paid, Bird began the process of distributing the funds remaining in the Debtors Corporations' estates. Shaffer's exhibit 19, entitled "In re NWFX et al Check Database Checks issued by Year," reflects that 41,938 checks, totaling $5,134,85.00, were issued during 1992 and early January 1993. Bird deferred to Scharmberg, his administrative assistant, for an exact description of the check processing procedures. However, he provided a general explanation regarding what was involved in processing and accounting for the checks issued during that period. Scharmberg's testimony regarding the distribution process closely mirrored that of Bird.

Bird testified that Scharmberg was responsible for the day to day administration of the Debtor Corporations' estates. She was in charge of bookkeeping, data entry, and handling claims filed in the Debtor Corporations' cases. Scharmberg testified that during 1992 and early January 1993 there were large waves of distributions made to individuals who had purchased money orders and filed proofs of claims. In 1992, 5245 checks were mailed on January 25; 9275 on October 5; 3883 on October 14; and 19,118 on December 12. Most of the checks that were mailed out were computer generated checks. However, on some days she issued checks by hand. Scharmberg testified that, as to the computer generated checks, Brown did the computer programming that enabled the checks to be printed. Brown printed the checks, worked on imprinting the Trustee's signature on the checks, and put the checks through the burster and decollating machine. After that was accomplished, Scharmberg would separate the checks by zip code. The checks were sorted by the first three numbers of the zip code, bundled together, and taken to the post office to mail. Scharmberg testified that sometimes the printing machine would malfunction and the checks in the machine would have be to taken from the machine and reissued by hand. She then had to manually change the information in the computer system.

After the first wave of distributions, the checks came back in one of two forms—either they had cleared the bank, or they were returned because the claimant was not found at the address to which the check was sent. Scharmberg organized checks that cleared the bank in numerical order. She would reconcile the check against the bank statement and, if there were any corrections to be made based upon her review of the cleared checks and bank statements, she would call the bank to have the corrections made. All the cleared checks would then be filed.

Bird testified, and Shaffer's exhibit 19 reflects, that out of the 41,938 checks issued in 1992 and between January 1 and 4, 1993, 14,830 checks did not clear the bank. The amount of those checks totaled $1,555,277.00. Bird testified that all of 1993 was consumed with processing and accounting for these checks. Scharmberg testified that as to the checks returned unclaimed, she had to open the envelopes and sort the checks by number. If a check was returned with a forwarding address, Scharmberg would mail the checks to the forwarding address and enter the new information into the computer check data base.

After the distribution in 1992 and early January 1993, the Trustee received numerous phone calls daily. Most claimants did not understand the distribution procedure or why they had received only a portion of their claim. Bird and Scharmberg were required to give explanations to hundreds of people about the distribution process and the payment of their claims. Scharmberg testified that when she received a telephone call, the first thing she would do was bring the caller's claim up on the computer and determine the status of the claim. Next, she would determine whether the check to which the caller was referring had cleared the bank or had been returned by the post office. She would then explain to the caller what happened and deal with the problem. If the address was incorrect and the check had not cleared the bank, she would reissue a check, change the information in the computer, and send the check and a letter of explanation to the caller. If the check had cleared the bank, she would make a copy of the front and back of the check and send it with a letter of explanation to the caller so he or she could see who had endorsed the check.

Bird testified that the checks issued by the Trustee were stamped with a notation that stated they were not valid after 90 days. However, Union National Bank, the bank upon which the checks were drawn, did not recognize the notation that the checks were void after the 90 day period. The bank's position was that the responsibility was either on the maker or the payee of the check to determine if the check was void after 90 days. Bird testified that the bank was going to charge a per item fee of approximately $20.00 to stop payment on a check. Therefore, it was impractical to stop payment on checks that had already been issued. Bird testified that he never refused to honor a check, regardless of when a money order claimant sought to cash it, because the intent of the amended plan was to pay every money order claimant in full. Bird testified that 1993 was consumed by processing over 41,000 checks, more than 14,000 of which had not cleared the bank and triggered a subsequent distribution under the amended plan.

Bird testified that another problem he encountered after the major distribution in 1992 and early January 1993 was that Brown, the Debtor Corporations' computer expert, quit. Brown was the only individual who possessed the expertise and experience to make the computer system work.

The Debtor Corporations' computer operations were dependant on Brown running the system. No one else understood and knew how to make the system work completely. Scharmberg testified that even if Brown had not left the employment of the trustee, and the computer software had continued to operate as it had in the past, it would have taken her, the Trustee, and the rest of the NWFX staff, at least a year after December 1992 to issue the next series of computer generated checks.

On May 13, 1993, Bird wrote the Court regarding the progress of the distribution process. An attachment to the letter stated, "As of May, 1993, *every claimant* who could be found had been paid 100% of their claim, with the exception of claimants in Texas, Michigan, and Tennessee who have been paid 87% to date, with the anticipation that the final distribution will equal approximately 97%." Shaffer's Ex. 92.

In 1993, in order to avoid dependancy on a single computer employee, Bird decided to convert to a computer system that was standard in the marketplace. The estates had previously used a database system called Sun DB Sys. Bird hired Kim Kanakis to convert the Sun DB Sys data to the Paradox data base, and to assist with check processing. During 1993 and early 1994, Kanakis was able to perform and accomplish some of the tasks such as processing the checks and making reports to Bird. However, according to Bird and Scharmberg, Kanakis was never able to accomplish a complete conversion to the Paradox system.

From November 1993 to November 1994, Bird resided in Washington D.C., where he had opened a branch office of the Rose Law Firm. He testified that he kept abreast of the Debtor Corporations' operations while in D.C., and that he was in contact with Scharmberg and talked to her during the week. No significant litigation occurred in the cases during the time Bird was in Washington D.C.

In 1994, Bird terminated Kanakis's employment and hired Joe Patterson. Patterson had been identified by a Paradox user's group as someone in central Arkansas who was familiar with the Paradox system and could do computer programming. Bird testified that Patterson did good work, but was not capable of fully implementing the Paradox System. Subsequently, at the first of 1995, Bird hired Personalized Computing. Personalized Computing had expertise with Paradox and accomplished the job of fully converting to the Paradox system and finishing the processing of the large distribution of checks made in 1995. Shaffer's exhibit 19 reflects that 21,772 checks were issued in 1995, totaling $610,580.00. Of those checks, 15,454 cleared, totaling $460,694.00, and 6,318 did not clear, totaling $149,886.00.

Bird testified that making distributions of 21,000 checks to money order claimants in 1995 was a major undertaking. Scharmberg was the only employee handling and accounting for the distributions. The process was complicated by the fact that the signature machine was not working at the time and the burster and decollater were mutilating checks. Scharmberg was required to manually stamp the Trustee's signature on each check. She then folded each check by hand and separated the checks from each other. After the checks were issued, Scharmberg was required to go through the cleared and uncleared checks and account for them on the Debtor Corporations' books and records.

After processing the checks distributed in 1995, Bird and Scharmberg began reviewing the unsecured claims. Bird testified that he did not take up the unsecured claims until the processing of the money

order claims was complete and he knew how much money would be available for unsecured creditors. After 1995, Scharmberg processed the checks by herself. In the latter part of 1995 and during 1996, she worked on reviewing the unsecured claims and handled inquiries regarding the 1995 distribution. She also continued to handle distributions made in 1997 and 1998 for the estates, and assisted in the preparation of the November 1998 final report.

In July 1996, Bird began filing objections to unsecured claims. He objected to approximately 80 unsecured claims. In October 1996, Bird filed an objection to City National Bank's claim of $1,500,000.00. Substantial discovery took place in the litigation with City National Bank over a two year period. In November 1998, the claim was finally settled for $500,0000 through mediation. Shaffer objected to the settlement. The Court held a hearing on the Shaffer's objection, and ultimately approved the settlement. Shaffer attempted to appeal the Court's decision, but failed to perfect his appeal. The order dismissing Shaffer's objection to the settlement was filed on November 12, 1998.

Bird filed a "Chapter 11 Final Report and Account and Application For Final Decree" on November 9, 1998. Shaffer filed a general objection to the November 9, 1998, final report on December 18, 1998.[4]

The Trustee called James Dowden and qualified him as an expert witness. Dowden is with the law firm of Grobmeyer, Ramsey, and Ross, and has served as a law clerk for United States Bankruptcy Judges Charles Baker and James G. Mixon. He has been in the private practice of law since 1985, and seventy-five to eighty percent of his practice has been in the area of bankruptcy. He has been a panel trustee since 1985 and has served as trustee in excess of 10,000 cases. Further, he has represented most of the trustees in the State of Arkansas as their attorney in bankruptcy cases.

The Trustee also called Thomas E. Robertson and qualified him as an expert witness. Robertson is the senior partner in Robertson, Beasley, Cowan and Ketchum. He started practicing law in 1969, and has served as a panel trustee since 1979. Over one half of his practice has been in the area of bankruptcy.

Dowden and Robertson are both panel trustees in Arkansas. Dowden is presently serving as trustee in a chapter 7 case that was filed in 1990. Robertson is presently serving as trustee in a chapter 7 case that was filed in 1985. Both witnesses acknowledged that the circumstances surrounding each case would determine the length of time the case would remain open.

Shaffer called David R. Payne as an expert witness in support of his position that the trustee was negligent in delaying the closing of the Debtor Corporations' estates. Payne testified that he is a certified public accountant, and that he, or members of his firm under his supervision, have served as a professional for chapter 11 trustees in more than 30 cases. Additionally, Payne has served as a chapter 11 trustee in five cases. Payne was employed

---

4. From January 1999 until December 1999, both Shaffer and the Trustee caused further delay in closing the Debtor Corporations' estates. Shaffer raised specific issues, all of which are addressed in this opinion, and made substantial discovery requests. The Trustee avoided providing counsel for Shaffer with a specific § 326 calculation as to his trustee fees and an accounting of all trustee fees and underlying documents until October and November of 1999. Payne, in his "Actual and Projected Reasonable Timeline," only dealt with the period of time from June 26, 1992, through December 31, 1995, in seeking to establish liability.

by Shaffer in early October 1999 to review the Trustee's final reports and accounts in the Debtor Corporations' cases, and to formulate opinions and conclusions as the issues Shaffer raised in this litigation. The Court received into evidence at the February 1999 hearing, Shaffer's exhibit 5, "Actual and Projected Reasonable Timeline." Payne testified that this exhibit reflected the reasonable period of time in which the Trustee should have administered and closed the Debtor Corporations' cases.

Shaffer's exhibit 5 provides:

### ACTUAL AND PROJECTED REASONABLE TIMELINE

Actual Timeline

| 06/26/92 to | Motion of Trustee for allowance of Trustee's Fee and Authorization for payment of legal fees held back. |
| 07/27/92 | Order granting Motion of Trustee for allowance of Trustee's Fee and Authorization for payment of legal fees held back. |
| 09/8/92 | Letter from Trustee to Judge asking to reduce bond due to Trustee was ". . . in the process of distributing all of the proceeds" and ". . . the fact that within the next 30 days, checks will be mailed equaling almost the total amount in the estate. |

Projected Reasonable Timeline

| 04/30/1993 to 05/30/93 | Reconcile bank statements to determine checks not cleared; determine 100% payments would be made to money order creditors pursuant to plan and determine distribution available to holders of unsecured claims. |
| 06/30/93 | File motion/adversary to determine City National Claim and object to other unsecured claims as appropriate. |
| 03/01/95 | Resolve objection to City National Bank Claim and other unsecured claims. |
| 12/31/95 | Prepare final distributions, write checks, reconcile accounts, prepare Final Report, Final Tax Returns and close case. |

Payne explained that he prepared Shaffer's exhibit 5 based upon his analysis of actual events that occurred in 1992. On September 8, 1992, the Trustee sent a letter to the Court requesting a reduction in the amount of his bond. He advised the Court that he was in the process of distributing all the proceeds of the Debtor Corporations' estate, and within the next 30 days checks would be mailed equaling almost the total amount in the Debtor Corporations' cases. Payne used the September 8, 1992, letter as a starting point to project a reasonable time within which the Trustee should have addressed the remaining issues in the Debtor Corporations' cases and closed the estates.

According to Payne, based on the Trustee's records (data from Quicken data processing records), in June of 1993 there was $1,724,000.00 cash in the Debtor Corporations' checking accounts with which to pay claims. The Trustee could have determined that there were funds available as of that date to pay unsecured creditor. Shaffer believes the Trustee was negligent in not starting a review of the unsecured claims in June 1993. Instead, the Trustee waited until after all the money order claimants were paid 100% in 1995 before

starting to administer the unsecured claims of the Debtor Corporations. There was no provisions in the amended plan requiring all unsecured creditors to be paid 100% before starting to administer the unsecured claims.

Payne testified that the Debtor Corporations' estates were top heavy with expenses as compared to income after 1994. The expenses substantially exceeded the income the longer the cases were delayed. According to Shaffer's exhibit 16, "In re NWFX et al—Receipts and Disbursements—June 1, 1993 through July 26, 1998," total income for this period of time was $740,956.71 and total expenses were $1,350,023.84, for a negative net income of $609,067.13. Payne also questioned whether the full time employment of Penny Scharmberg was justified after the major distribution in 1992 and early 1993. Payne testified that Shaffer, as the equity security holder in the Debtor Corporations' cases, is entitled to lost opportunity costs based on the Trustee's failure to close the Debtors corporations cases by the end of 1995.

c. *Conclusions of law*

■ According to the Eighth Circuit Court of Appeals, a trustee has a fiduciary duty to act in the best interest of the creditors, as well as the shareholders, of a debtor corporation. *Stockholders' Protective Comm. for Moulded Prods., Inc. v. Barry (In re Moulded Prods., Inc.)*, 474 F.2d 220, 224 (8th Cir.1973); *see also In re L & S Indus., Inc.*, 989 F.2d 929 (7th Cir.1993); *Hansen, Jones & Leta, P.C. v. Segal*, 220 B.R. 434, 450 (D.Utah 1998) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985)). The trustee has an absolute obligation to act in the best interest of the estate at all times. *Mosser v. Darrow*, 341 U.S. 267, 71

S.Ct. 680, 95 L.Ed. 927 (1951). However, a trustee is not responsible for mistakes in the exercise of his or her judgment where the judgment was discretionary and reasonable under the circumstances. *Id.* at 272, 71 S.Ct. 680.

■ Negligence is the failure to do something that a reasonably careful person would do. A negligent act arises from a situation where a ordinarily prudent person in the same situation would foresee such appreciable risk of harm to others that he would not act, or at least would act in a more careful manner. *Mason v. Jackson*, 323 Ark. 252, 914 S.W.2d 728, 730 (1996); *see also Dancy v. Hyster Co.*, 127 F.3d 649, 654 (8th Cir.1997).

■ In resolving whether the Trustee improperly or negligently delayed the closing of the Debtor Corporations' estate, the Court will consider the circumstances of the administration of the estates, and whether the Trustee handled the administration of the estates within a reasonable time commensurate with the complexity of the administration and the nature of the tasks to be performed. For this issue, counsel for the Trustee called Bird and Scharmberg as witnesses, and Dowden and Robertson as expert witnesses. Counsel for Shaffer called Payne as his expert witness as to this issue. Numerous exhibits were received into evidence, and the Court has considered all of the exhibits and the testimony of the witnesses. As a result, the Court makes the following findings and conclusions.

The Debtor Corporations' money order business required detailed administration of the sales, processing, and accounting for thousands of money orders that it sold daily while in business. The nature of its business operations required the use of a competent computer system. When the Trustee was appointed, the Debtor Corporations' operations were in disarray, and

money orders were not being honored. The Trustee had no prior experience in the money order business. He educated himself as quickly as possible regarding the business affairs of the companies with the help of Moldenhauer, who the Trustee retained on payroll for several weeks. He also hired Scharmberg as his administrative assistant, and retained Brown for computer assistance.

During 1986, the Trustee moved the Debtors business operations from Fayetteville to Little Rock, scaled back the number of employees, and developed a system for identifying the purchasers of money orders. Over 60,000 proofs of claims were filed after 1986, accompanied by more than 100,000 money orders to be processed by the Trustee in the administration of the Debtor Corporations' cases.

The Trustee filed his Plan of Reorganization (liquidation) for the Debtor Corporations on June 15, 1988. The plan was based on the administrative consolidation of the three Debtor Corporations, but not on the substantive consolidation of their respective business affairs. This was rather sophisticated, requiring a segregated account for each Debtor Corporations' estate and detailed processing and accounting for all funds received and distributed through each account. Also, individual accounts were set up for each state and Puerto Rico so that state bond proceeds could be processed through the Debtor Corporations' plan. The proceeds were to be accounted for, and then paid first to the respective claimants in each state and Puerto Rico, then, if there were additional proceeds, to other money order claimants under the plan. The plan only called for one distribution to money order claimants, who were given priority over other unsecured creditors. The intent of the plan was to pay all the money order purchasers' claims in full after the payment of adminis-

trative claims. At the time the plan was filed, the Trustee did not believe there would be enough money to pay the money order purchasers in full because of the administrative claims that had to be paid first.

On June 26, 1991, the Trustee filed his motion to amend the plan. In the amended plan, the Trustee proposed making a series of distributions to the money order purchasers until all claims were paid in full, assuming there were sufficient funds to pay all claims. The Court entered its order granting the Trustee's motion to amend the plan on July 27, 1992. No substantial distributions had been made to money order claimants prior to the amended plan.

In short, the administration of the Debtor Corporations' plan and amended plan was very complex, requiring extremely detailed job tasks to be performed, recorded, and verified as to accuracy. The issue regarding the alleged delay in closing the estates is one of credibility. Shaffer contends that the Trustee was negligent because the Debtor Corporations' estates should have been closed by the end of 1995. The Trustee contends that the administration of the Debtor Corporations' estates required numerous jobs to be performed, and the Trustee performed these jobs in a reasonable period of time under the circumstances. The Court will briefly revisit Payne's testimony on why he believes the Trustee was negligent in failing to close the Debtor Corporations' estates in a timely manner, and Bird's and Scharmberg's testimony on why the length of time to administer the estates was justified and necessary. The Court will then make its credibility findings and conclusions as to this issue.

Shaffer's counsel called Payne as an expert witness. Payne possesses exceptional qualifications as an expert witness in trust-

ee matters and case administration, and was an impressive witness. He testified that it was his opinion that Bird was negligent by delaying the closing of the Debtor Corporations' cases. He believed that (1) the Trustee should have fully administered this case by the end of 1995, (2) the Trustee should have paid out the final distribution to money order claimants pursuant to the amended plan by mid–1993, and to non-money order claimants by early 1995, and (3) the bankruptcy estate not only had the capacity to process and mail thousands of checks per day to claimants, it did so. In summary, Payne testified that he prepared the timetable used at trial[5] based upon a letter the Trustee wrote the Court on September 8, 1992, requesting a reduction in his bond. The Trustee stated in the letter that within the next thirty days, checks would be mailed equaling almost the total amount of the estate. He requested the Court reduce the bond fee to $100,000.00 to reduce the costs of the bond premium. He testified that he used that date as a starting point to project a reasonable time within which the Trustee could address the remaining issues in the Debtor Corporations' consolidated case.

Payne testified that the first series of distributions were made in December 1992 and early January 1993. According to Payne, there was a period of over 90 days during which time the Trustee could have contacted the bank to determine which checks had been honored by the bank, and which checks were still outstanding. This would have allowed the Trustee to have known by June of 1993 that there were sufficient funds on hand to pay the remaining money order claimants and unsecured creditors. Payne also stated that the Trustee could have filed objections to the claim of City National Bank and other unsecured creditors as early as June of

1993 and, assuming it would take 20 months to resolve those claims, could have been completed by March 1, 1995. Then, the preparation of the final distributions, check writing, account reconciliation, preparation of final reports, preparation of final tax returns, and closing of the estates could have been accomplished by the end of 1995.

Payne testified that in May 1993, money order claimants had been paid 87% of their claims. In December 1993, there was $1,724,000.00 cash on hand in the Debtor Corporations' bank accounts available for distribution. If all the checks that had been written to money order claimants cleared the bank, there would have been money available to pay unsecured creditors in 1993. Because of this, the Trustee was negligent in not beginning to administer the unsecured claims in 1993. Further, the Trustee had moved to Washington D.C. and was working in the Rose Law Firm office there during 1994. The docket sheet reflected little activity during 1994. Payne testified that in his opinion Scharmberg was not needed as a full time employee, especially after 1995, because there were no major distributions remaining. He believed that a part-time bookkeeper could have been hired to perform the remaining work.

Bird testified that all of 1993 was spent handling and processing the 41,498 checks that were issued and mailed out in 1992, 14,619 of which were not presented for payment at the bank. He said that Scharmberg handled and processed the money order checks that were issued. He testified the intent of the amended plan was to pay every money order claimant who could be located in full, and by May 1993 not all of the claimants had been paid in full. In 1995, a second large distribu-

---

**5.** Shaffer's Ex. 5.

tion was made consisting of 21,772 checks in the amount of $610,580.00. Of those checks, 15,454 were presented to the bank and cleared, and 6318 were not presented. Bird testified that he carried out the intent of the plan and amended plan, and had a fiduciary duty to do that first while administrating the Debtor Corporations' estates. He testified that while he was in Washington D.C., he was in daily contact with Scharmberg and continued to work on the Debtor Corporations' estates. He did not know until the second distribution was completed whether any money would be available to pay unsecured creditors. At that time, he instructed Scharmberg to review the unsecured claims and prepare any objections to the claims. This included City National Bank's claim. After extensive discovery disputes, City National Bank's claim was settled through mediation.

Bird testified that after the big distributions in 1992 and early January 1993, Brown, the computer expert he had hired, quit. At that time, Brown was the only one who could operate the existing system effectively. Bird decided to switch to another computer system in order to avoid being dependant on one person. After two unsuccessful attempts, he finally found a computer firm, Personalized Computing, that was able to perform satisfactorily.

Scharmberg testified as to her job tasks during 1991 through, and until she quit in, 1998. She testified in detail as to what happened in the Debtor Corporations' cases during 1992, 1993, 1994, and 1995, and in general from 1996 through 1998; the work that was required; and how she performed that work under the circumstances. She explained that after the distribution of over 41,000 checks in 1992 and early January 1993, the checks had to be processed. As the checks came in, each check would have to be reconciled with the

bank statement. That consisted of verifying the check number, amount of the check, and MICR number on each check to see if it matched the information on the bank statement. Then, information about each check had to be entered into the Debtor Corporations' computer systems after the checks had been sorted by number.

The checks that did not clear the bank required additional processing. Scharmberg would try to locate the claimants in preparation of another distribution. When the post office had a forwarding address, Scharmberg would reissue the check, change the information in the computer, and mail the check to the new address. Scharmberg also said that phone calls were continuous from money order claimants who were confused and did not understand why they were not getting their claim paid in full. Scharmberg had to explain the process, and follow up with a letter of explanation.

Scharmberg stated that she was not aware in 1993 or 1994 that money would be available to pay unsecured creditors. Until the second distribution was made in 1995, the amount of money available to pay unsecured creditors was not known. At that time, the Trustee calculated the amount of claims and the money available for unsecured creditors.

Scharmberg explained that they could not get the new computer system to issue and print checks. For that reason, there were no major fund distributions until 1995, when Personalized Computing was hired. Until then, all checks were issued by hand. Also, during 1994, Scharmberg was the only employee and performed all the work details. In 1995, Scharmberg started reviewing unsecured claims and setting up claims files. She gave the information to the Trustee, who filed objections to the unsecured claims. From 1996

through 1998, Scharmberg kept up with all the litigation involving unsecured claimants, including City National Bank. Finally, in 1998 she assisted in filing the November 9, 1998, final report and account, and finding and gathering the information requested by Schaffer until she left in July of 1999.

As to this issue, the Court finds that the Trustee did not improperly delay the closing of the Debtor Corporations' estates, nor was he negligent or breach his fiduciary duty as to this issue. Bird's and Scharmberg's explanation of the work that was performed is much more persuasive than Payne's opinion as to a reasonable time when the estate should have been closed. Payne's "Projected Reasonable Timeline," after the issuance of over 41,000 checks in 1992 and the first few days in 1993, is premised on the belief that all the work could be performed, and the determination that a 100% payout could be made to the money order claimants, by May 31, 1993. Under this scenario, Payne believed the Trustee should have filed an adversary proceeding to determine the unsecured claim of City National Bank by June 30, 1993. Payne's timeline is a simplification based on a belief that all that had to be done was reconcile the Debtor Corporations' bank statements to determine what checks cleared, and then make another distribution within five months. The projection is based on a perfect business environment with no problems or interruptions. It does not realistically consider the duty of the Trustee to carry out the priorities of the plan and amended plan—to find and pay in full all money order claimants.

Scharmberg testified in detail, and the Court credits her testimony, that it took all of 1993 to process the 41,000 checks that were issued, distributed, and returned to the Debtor Corporations, both cleared and uncleared. Over 14,000 checks had

not cleared, requiring another distribution under the amended plan. These checks had to be reconciled with the bank statements and the pertinent information entered in the computer system. Continuous inquiries were being made by money order claimants who had not been paid their full claim, and there was an on-going requirement that all information that affected a claim be entered into the computer system. The Court is convinced that under the circumstances and given the complexity of the Debtor Corporations' cases and the detail work required, it reasonably took the Trustee almost all of 1993 to process the checks. Payne did not rebut any of the testimony regarding the length of time it took to perform the job tasks. He recognized that with the number of claimants, the administration of the estate would be complex.

Payne surmised that the Trustee had to be aware that, after the major distribution in 1992 and early 1993, funds were going to be available to pay unsecured claims. Further, Shaffer believes the Trustee was negligent for not investigating the unsecured claims, filing objections to the claims, and resolving the claims by early 1995. However, according to Shaffer's exhibit 19, as of January 4, 1993, 21,636 checks in the amount of $1,726,644.00 had not cleared the bank. If all the checks had cleared, there would have been no money available to pay unsecured creditors. The Trustee was not able to determine how many of the checks that had not cleared would clear after a second distribution to the claimants. The Court cannot conclude that the Trustee failed to exercise due diligence in waiting until after the second distribution in 1995 to determine what funds would be available to pay unsecured creditors. The Trustee was aware in 1992 that City National Bank had filed a proof of claim for an unsecured claim in the amount of $1,500,000.00. Until the Trust-

ee could determine what amount of money would be available after the claimants were paid, he would not have been in a position to determine whether substantial sums of money should be spent investigating and litigating the City National Bank claim.

The Court also does not find the Trustee negligent in changing to a more current computer system, or in failing to relieve Kanakis or Patterson more promptly. While hindsight appears to show that the Trustee should have terminated both employees earlier, the Court cannot find that the Trustee was not using his best business judgment at the time. There are no guarantees in employing people, and it is difficult to determine if an employee can do his or her job. Both Kanakis and Patterson were highly recommended to the Trustee, and they possessed skills and were performing work efficiently in some respects; however, evidently neither were able to fully master the program that printed out computer generated checks.

The Court finds that the time Bird spent in Washington D.C. during 1993 and 1994 was inconsequential. Bird and Scharmberg were in regular contact to discuss any specific matters either one of them had at the time, and there was no major litigation during this period. Scharmberg was continuing to run the day to day operations of the Debtor Corporations' administrative affairs. Further, the Court is convinced that Scharmberg needed to continue to be employed as a full time employee until she finally left. She possessed a wealth of information and skills that were needed to help prepare the final reports and accounts, and obtain any information needed by the Trustee, especially during 1998.

While Payne is an impressive witness, his dateline is not realistic in view of the complexity and detail required to perform the necessary work to implement the amended plan. Having determined that the Trustee did not improperly or negligently cause a delay in closing the Debtor Corporations' estates, or breach his fiduciary duty in regard to the same, the Court denies Shaffer's claim for damages as to this issue.

### 2. Trustee's refraining to pursue collection of judgments on behalf of the Debtor Corporations' estates

#### a. Position of the parties

Shaffer contends that the Trustee breached his fiduciary duty by failing to collect on hundreds of default judgments that had been obtained against money-order agents on the Debtor Corporations' behalf. Even assuming that these judgments were worth $416,441.00, and not in excess of the five million dollars as had appeared to be their potential value in 1990, the Trustee still should have made reasonable and timely efforts to collect. Further, if the judgments later appeared to the Trustee to be of no appreciable value, the Trustee should have abandoned them to Shaffer, as the equity security-holder. Shaffer claims that in either event, he was damaged by the Trustee's breach of duty in the amount of $416,441.00.

The Trustee responds that his decision was reasonable not to collect on the judgments. Their value of five million dollars, as had been assessed early in the bankruptcy, represented only potential liability exposure, based on the face value of all money orders outstanding in the agents' possession. The actual value, when adjusted downwards to include only money orders subsequently negotiated and claimed on, or otherwise owed, was $416,441.00. Moreover, this amount was spread over 110 agents in various states, who owed an average of less than $4000.00

per agent, and whose collectibility was questionable. The Trustee concluded the expenses involved in collecting these judgments would exceed their actual value.

As to Shaffer's contention that the Trustee should have abandoned the judgments to him in 1990, the Trustee argues that he was unwilling to pay the commission and fees that Shaffer and his then-counsel sought; he did not know or necessarily trust Shaffer's then-counsel; excepting through that counsel, Shaffer had subsequently neither moved for nor made any other request for such abandonment; and even if he had, the Trustee would largely have opposed the same, because he questioned the wisdom of Shaffer himself seeking to extract proceeds from the very agents who would be least pleased to have further dealings with him. Thus, the Trustee concludes he was not negligent as to the default judgments.

### b. *Findings of fact*

Before Bird was appointed trustee in the Debtor Corporations' cases, the Debtor Corporations filed complaints for turnover against approximately 800 of its money-order agents. The property the Debtor Corporations sought to recover were blank money orders, proceeds from the agents' sale of money orders, and the agents' records of money order sales. When the agents did not answer or appear after service of appropriate notice, the Trustee moved for, and obtained, default judgments. By 1990, the balance due on these judgments totaled $5,577,699.28.

### (1) *Actual value of judgments*

At trial, the Trustee testified that the five million-dollar balance was not a "true" figure. Rather, it generally represented the face value of all blank money orders in the agents' possession. He sought recovery for all such instruments because they

were no longer under the Debtor Corporations' control and might have been released into the open market. The outstanding judgments signified the estates' exposure to liability, not its actual liability. For example, if one agent had in its possession one thousand money orders that it could have sold for $300.00 each, then the estates might have been liable for the full $300,000.00 in unaccounted-for, blank money orders. The Trustee testified that as the administration of the bankruptcy proceeded and actual money-order claims became established with certainty, true losses more accurately emerged.

As an example of the calculation used by Bird to determine the true value of the default judgments, Bird testified regarding the judgment obtained against Scruggs d/b/a Quick Check Grocery. That judgment was in the amount of $332,532.13, based on the agent's possession of 1,100 unreported money orders, the face value of which, at $300.00 each, represented a potential risk to the estate of $330,000.00. Added to that figure were the proceeds of money orders that Quick Check actually sold but failed to remit to the estates, which was $2,532.13. Later, when Bird determined that this agent or its customers would not lodge any further claims, and the outstanding blank money orders would not be negotiated, Bird arrived at a maximum balance this agent owed in the amount of $2,532.13.

Bird testified to three other categories of claims he established to develop the true value of judgments: "X" claims, "P" claims, and "U" claims. "X" claims, or "offset" claims, were those in which the agents had redeemed money orders for their customers and then sought reimbursement from the bankruptcy estates. In such cases, rather than actually paying out the agents' claims, the Trustee simply offset the claims and deducted them from

the amount of the default judgment against the agents. "P" claims, or "compromised" claims, were similar to the offset claims, except that the Trustee compromised with the agents not to pay fully on agents' claims already filed. Finally, "U" claims, or unreported "real-loss" claims, were those in which agents had sold money orders and apparently kept the proceeds. The purchasers themselves subsequently claimed the money from the Debtor Corporation estates. The Trustee added these claims to the judgment amounts against the agents.

After reviewing all of the agent files and making computations, the Trustee calculated the "true" value of the default judgments as $416,441.00. This amount was spread over more than one hundred agents, in various states, who owed an average of less than $4,000.00 per agent.

Shaffer's expert witness, James M. Litzler, declined to express an opinion as to the value of the judgments. He testified that he had not reviewed the issue and had neither seen nor heard any evidence to contradict the Trustee's assessments. Similarly, after reviewing exhibits summarizing the worth of the judgments, Shaffer's expert witness David Payne testified that he, too, was unable to quantify their value.

(2) *Collection of judgments*

The Trustee testified to numerous reasons contributing to his decision not to aggressively pursue collecting these judgments. First, he stated that collection expenses, which would be deemed administrative expenses, would have reduced the money available to pay money-order purchasers already in line for claims. There was little reason to suppose that money expended on enforcing the judgments would yield any return. The defaulting agents had already avoided legal process by failing to respond to two orders for turnover from the Court, and there was nothing to suggest that post-judgment collection efforts would be any more productive.

Second, the Trustee explained that in some cases the Debtor Corporations' estate might have had to pay the agents money it owed them, and not the other way around. This would have occurred in instances in which either the agents had redeemed more money orders than they had claimed from the estate and, thus, would expect those sums to be made good on; or the Trustee had settled many agents' "P" claims for fifty percent less than they would have received under the plan and, if pursued, the agents would likely demand full payout instead.

Finally, the Trustee testified that he did, in fact, make some efforts to collect. He testified to turning over five cases to a national collection agency, which absconded with the money it recovered. Further, he stated he tried to enforce the judgments with minimal expense to the estate by registering them, in hopes that agents would then pay the judgment to protect their credit ratings. He testified that this method proved ineffective.

Shaffer's expert witness, James M. Litzler, who claimed collection expertise only in Texas, testified that he was accustomed to working for a money-order company on an hourly basis. He said that when payment was on that basis, he would be more likely to undertake the case without investigating the ultimate collectibility of the delinquent account in question. He also testified that he would be more willing to forego investigation if he knew that his client customarily made the collectibility assessment before turning over the file to him. He stated that judgments generally were more collectible if they had been defended against than if defaulted, "be-

cause they [had] fought the thing and we know they're out there." He said that if the Trustee had pursued collection in 1990, his chances of success would have been better because it was closer in time to the rendering of the judgments. He also said that the Trustee would have been well advised to hire local counsel to collect out-of-state judgments.

Finally, expert witness James Dowden listened to the Trustee's trial testimony and, based on it and the evidence in support, stated that the Trustee's decision not to expend estate assets in pursuing agents was appropriate.

### (3) *Abandonment of judgments*

The Trustee testified that in 1990 he was approached by Charles A. Wilkes Jr., a Colorado attorney representing Shaffer at the time, who proposed that the Trustee pay him and Shaffer to pursue the judgments at issue. The Trustee declined, for several reasons. First, the Trustee testified that he believed that attempting to collect judgments would cost the estates and would result in no worthwhile return. Further, the Trustee declined to pay contingency fees to counsel, and the three thousand dollars a month that Shaffer sought to pursue collection. Additionally, the Trustee was not willing to deputize the Debtor Corporations' principal, and an out-of-state lawyer who the Trustee did not know, to control the collection efforts. Finally, the Trustee doubted the wisdom of permitting Shaffer contact with the very agents who had reason to object to any further dealings with him.

The Trustee testified that at no time other than through Wilkes had Shaffer suggested that the Trustee abandon the judgments to him. The Trustee stated that in 1999 he had offered to Shaffer's counsel Soulé to abandon the judgments.

Soulé referred the Trustee to Shaffer, but Shaffer never responded.

### c. *Conclusions of law*

■■■ The standard of care applicable to bankruptcy trustees in their official capacity, both as to affirmative and negative duties, is the exercise of due care, diligence, and skill. These are to be evaluated in the light of the information that was, or reasonably should have been, available at the time of the challenged conduct. *In re Haugen Const. Serv., Inc.*, 104 B.R. 233, 234 (Bankr.D.N.D.), *aff'd* 876 F.2d 681 (8th Cir.1989); *United States v. Aldrich* (*In re Rigden* ), 795 F.2d 727, 730–31 (9th Cir.1986), *cited in Armstrong v. Harris* (*In re Harris* ), 886 F.2d 1011, 1013 (8th Cir.1989). The measure is that of "an ordinarily prudent [person] in the conduct of his private affairs under similar circumstances and with a similar object in view." *Haugen Const. Serv., Inc.*, 104 B.R. at 240. Mere mistakes in a trustee's judgment cannot be the basis of liability. *Id.*

■■■ For the reasons stated below, the Court finds that the Trustee's conduct in declining to pursue the default judgments, and in declining to abandon them to Shaffer, was reasonable, and did not breach his fiduciary duty to the Debtor Corporations' estate or Shaffer as the equity security holder. First, the Court credits the Trustee's testimony in its entirety that the sums represented by the default judgments, when properly adjusted downward to include only those liabilities that were subsequently proved real, were of comparatively minimal value. This testimony was amply supported by a voluminous record, and was uncontradicted by either of Shaffer's expert witnesses, both of whom declared themselves unable to quantify the judgments. The defaulting parties were widely scattered across numerous foreign jurisdictions, they were of uncertain collec-

tibility, and their individual liabilities were relatively modest. Further, the cost of collection would have been incurred to the detriment of the money-order claimants the plan sought to pay. Thus, the Court concludes that the Trustee exercised reasonable business judgment in not pursuing the collection of the judgments in issue.

■ Also, the Trustee was under no fiduciary obligation to abandon the judgments to Shaffer. The Trustee's judgment that they were of questionable worth was within the realm of any trustee's reasonable discretion. Moreover, the Court credits the Trustee's testimony and evidence in support that in 1999 he did approach Shaffer's counsel Soulé with an offer to abandon, but that Shaffer did not respond. Finally, the Court notes that the code expressly authorizes motions to abandon by parties in interest.[6] Shaffer did not avail himself of that procedure at any time. Accordingly, the Court finds the Trustee was not negligent nor breached his fiduciary duty by declining to abandon the default judgments to Shaffer.

### 3. Sales of personal property of the Debtor Corporations' estates

#### a. *Position of the parties*

Shaffer contends that in 1996, the Trustee was negligent in selling, disposing of, and donating personal property of the Debtor Corporations' estates. First, Shaffer asserts that the Trustee failed to move for and obtain a Court order authorizing the 1996 sales or donations of property. Second, Shaffer asserts the Trustee failed generally to account for such property in his final reports, as required by the bankruptcy code and rules. Last, Shaffer asserts the Trustee failed to exercise reasonable business judgment in disposing of

assets; specifically, the Agent Money Master [AMM] computer system, which Shaffer alleges the Trustee gave away or destroyed. Shaffer says the AMM system was worth as much as $50,000.00 based on the amount it would have taken to recreate the software system.

The Trustee counters that the sales he conducted in 1996 were properly before the Court and authorized by the Court's order in 1986. Further, the Trustee asserts that he exercised reasonable business judgment in the 1996 sales because the disposed-of assets were of little or no value, and the estate would have had to pay more to advertise those items than to dispose of them by private means. As for the AMM system specifically, the Trustee testified that he had ensured the data it contained had been extracted and retained, and the equipment itself was antiquated and obsolete.

#### b. *Findings of fact*

#### (1) *Failure to seek order for 1996 sales or donations*

On August 28, 1986, the Trustee filed a "Motion to Sell Assets." The motion states, in relevant part:

1. In his capacity as Trustee, he has discovered that the Debtors for whom he is Trustee have miscellaneous office furniture and motor vehicles, which appear to have relatively inconsequential value. Much of the furniture is located in Fayetteville, Arkansas; however, there is also furniture located in Houston, Texas, Dallas, Texas, San Juan, Puerto Rico and Detroit, Michigan. The furniture located at each site is not worth more than $2,000 for each location. The administrative rent which would have to be incurred by the estate

---

6. 11 U.S.C. §§ 363, 554(b); Fed. R. Bankr.P. 6007(b); *Hyman v. Plotkin* (*In re Hyman*), 123 B.R. 342 (9th Cir. BAP 1991), *aff'd* 967 F.2d 1316 (9th Cir.1992).

in order to store such furniture would be more than the value of the furniture. The administrative expense in employing agents of the Trustee to travel to each of these locations to dispose of such assets would cost more than the value of the asset. In addition, the rent required in Fayetteville to store all of the used furniture is more than the value of the furniture.

2. The Trustee believes that he will be able to obtain quotes from used furniture dealers in various locations and to dispose of the furniture and the automobiles efficiently and terminate the expense of storage and administrative rent on the offices in the various locations expeditiously and in a manner most benefitting to the estate.

WHEREFORE, the Trustee prays that the Court will enter an Order authorizing him to immediately dispose of used furniture at the locations mentioned above and dispose of the automobiles while preserving rights of any parties in and to the proceeds of the sales, if any, and for all other proper relief.

On September 4, 1986, the Court approved the sale on the terms as sought, in an order that expressly incorporated the language of the motion.

At trial, the Trustee was questioned whether he had assumed that the 1986 order served to authorize the 1996 sales. He testified that he remembered in 1996 that he had obtained the 1986 order, but that he would not read it to apply definitely to those assets sold in 1996.

Expert witness Thomas E. Robertson stated that the 1986 order did not appear to apply to assets subsequently bought or sold, on grounds that the order specified particular locations and particular value. He further testified that the better practice would have been for the Trustee to apply again to the Court in 1996 for au-

thority to sell different assets. Robertson added, however, that this amount of process might not necessarily be in the best interest of the estates if the value of the assets did not justify it.

Expert witness James Dowden testified to the same effect as to donations, noting that if the assets were of no value, then failure to notice creditors and obtain a prior order would not damage the estates.

### 2. *Failure to report to the Court*

The September 4, 1986, order states that the Trustee was authorized to sell or dispose of furniture, equipment, and automobiles and to "report to the Court such disposition ...." Neither party contests the fact that the Trustee failed to comply with this provision.

### 3. *Reasonable business judgment*

Sometime in 1996, the Trustee began to rid the estate of personal property in order to consolidate storage space so that more files could be accommodated. Scharmberg testified that the Trustee assigned to her the task of disposing of miscellaneous office equipment and furniture that had been moved from various Debtor Corporation offices to storage in the Tower Building, near the Rose Law Firm's offices in Little Rock. Scharmberg testified that she worked with the Tower Building's manager in contacting other Tower Building tenants who might want to buy some of the items. Scharmberg assigned prices to these items based on her own general experience and in consultation with the Tower Building manager.

The Trustee testified that the value of this property would not justify advertising or auctioneer expenses. Scharmberg testified that she had advertised some furniture and used equipment, but "was told that the equipment was so old it didn't

interface with all the new equipment" and "could not even be taken on consignment."

The Trustee testified that he sold some used office furniture to Rose Law Firm employees, but nothing to any Rose Law Firm lawyers. He further testified that he disposed of the property as he did, in part, to avoid storage and transportation charges. He stated that "anyone who was willing to come and haul ... off" the property was welcome to do so, because then the estate would not have to pay to have it removed.

As to the AMM computer system, Shaffer's expert witness, David R. Payne, testified that, generally, software from a debtor's company should be maintained for several reasons: (1) as a source of information about what had been the company's business practices, (2) to preserve an "audit trail," and (3) as a resource to answer questions that might be collateral to the administration of the bankruptcy case. However, John Brown, the Trustee's employee with computer expertise, testified that he could not use the AMM software itself, so he had extracted the necessary data from the AMM system and transferred it to the current system, so the data could be moved from machine to machine. Brown testified in some detail as to the manner in which he stored the data from AMM. He further testified that data not retained from AMM was of only "historical" character, which Brown did not need to track in detail and, thus, was "not relevant" to administering the bankruptcy. Brown asserted that at no time did he ever lose any data that he could not subsequently retrieve through other storage backups. Expert witness James Dowden

agreed that data should be retained if it were relevant to estate receivables. He also testified that the decision to keep software should be taken on a case-by-case basis, and that he lacked computer expertise generally. John Brown testified that he guessed the AMM replacement value would be approximately $50,000.00, referring specifically to recreation of AMM software. The Trustee testified that once data had been obtained from AMM, the software system itself was of no further use. The Court specifically credits the Trustee's testimony as to this issue, and gives more weight to Brown's testimony over Payne's testimony in this instance.

### c. *Conclusions of law*

Section 363 of the bankruptcy code provides that the trustee may use, sell, or lease property of the estate only "after notice and a hearing." 11 U.S.C. § 363(b)(1), Fed. R. Bankr.P. 6007; *see Gekas v. Pipin (In re Met–L–Wood Corp.)* 861 F.2d 1012, 1018 (7th Cir.1988) (invalidating sale taken without proper procedure). Section 102(*l*) provides that the trustee must give "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." *Id.*[7]

 Thus, if a trustee believes property to be of inconsequential value so that the notice-hearing procedure would be unnecessarily burdensome to the estate, he may seek court approval to abandon such property and give notice pursuant to 11 U.S.C. § 554 and Federal Rule of Bankruptcy Procedure 6007. Section 554 anticipates that worthless assets might be

---

7. That procedural irregularities are not necessarily fatal may be inferred from the following: "A sale under section 363(b) that fails to comply with the notice or hearing requirements ... is not void.... Even a reversal on appeal of the order authorizing or confirming the sale will not affect the sale's validity if the buyer was acting in good faith." *Gekas,* 861 F.2d at 1017. There is significant value in bankruptcy sales' finality. *Id.*

abandoned, and provides that the order closing the estate effects abandonment on such left property. In fact, the trustee has an affirmative duty to rid the estate of such inconsequential property. *In re Carter Paper Co.*, 220 B.R. 276, 301 (Bankr. M.D.La.1998). Otherwise, the trustee's failure to abandon property of the estate properly may provide a basis for an action for breach of fiduciary duty, governed by a negligence standard. *Id.* However, negligence liability will not be imposed on trustees for mere mistakes in business judgment. *Naert v. Daff* (*In re Washington Trust Deed Service Corp.*), 224 B.R. 109 (9th Cir. BAP 1998). The reasonableness of a trustee's decisions is evaluated "in light of the information that was, or reasonably should have been, available to him or her at the time. The standard ... is 'reasonable care' and 'due diligence ....'" *United States v. Aldrich* (*In re Rigden*), 795 F.2d 727, 730–31 (9th Cir.1986), *cited in Armstrong v. Harris* (*In re Harris*), 886 F.2d 1011, 1013 (8th Cir.1989).

■ Just as in any other tort case, however, even if a breach of legal or fiduciary duty is found, the objecting party must produce a preponderance of evidence, beyond mere conjecture, to show that the breach proximately caused harm. *See DiStefano v. Stern* (*In re J.F.D. Enterp.*), 223 B.R. 610, 629–30 (Bankr. D.Mass.1998). The harm in the bankruptcy context may be to the plaintiff or to the estate as a whole. *Id.*

■ First, the Court finds that the Trustee breached his fiduciary duty to the Debtor Corporations' estates by failing to give proper notice of the sales in accordance with Federal Rules of Bankruptcy Procedure 2002 and 6004, and failing to obtain a Court order approving the sales. The Court agrees with Shaffer that the Trustee failed to obtain sufficient authorization for the sales and donations in the first instance. The 1986 order authorized disposal of the property set forth in the 1986 motion. The motion identified the property at issue with particularity, as being below two-thousand-dollar value; located in Texas, Puerto Rico, and Michigan; and, in view of the distant locations, worth less than disposition by more formal means would justify. The motion says nothing about Little Rock, which was where the property had been moved prior to 1996. Moreover, the motion seeks authority "to immediately dispose" of the property "at the locations mentioned above." The Court is not prepared to construe the word "immediately" to embrace a period of ten or more years. The order must be read to authorize the 1986 sales only. Ten years later, the Trustee should have sought and obtained new Court approval.

Second, the Court finds the Trustee exercised reasonable business judgment in selling or disposing of the items of personal property in issue. The Court is sufficiently convinced that the items were of inconsequential value and credits the Trustee's and Scharmberg's testimony as to the value of the items.

■ Shaffer has not pled money damages in this context and, in fact, concedes in his brief that the "issue here is not the value of the property sold or given away." [8]

8. Thus, this Court need not address Shaffer's contention that the AMM computer system should have been sold at Brown's valuation of fifty thousand dollars. For the sake of completeness, the Court will simply note that Brown was assessing the value of the software. Elsewhere in his testimony, however, he asserted that he had taken all required data off the software, which then was of no value to the estate. He was never questioned as to the value of the AMM system later, once its usefulness to the estate had terminated,

Instead, he complains only as to the procedure the Trustee did or did not follow. The Court finds that the Trustee's failure to follow proper procedure was flawed, but *de minimis* in its effect on the estates as a whole. Thus, the Trustee did not breach his fiduciary duty to protect the estates' assets in this regard, and exercised reasonable business judgment in disposing of the assets in issue. The Debtor Corporations' estates were not damaged by the Trustee's disposition and sale of these items.

### 4. Alleged sharing and paying of employees of the Debtor Corporations with the Rose Law Firm

#### a. Position of the parties

Shaffer asserts that when the Trustee hired employees with computer expertise to work part-time for the bankruptcy estate and part-time for the Rose Law Firm, this resulted in an appearance of self-interest and impropriety. Because the Trustee failed to furnish notice or seek Court approval, Shaffer contends that this is one more example of the Trustee's repeated abuses of the bankruptcy estates for which he should be held accountable.

The Trustee responds that by sharing these employees with the Rose Law Firm, he reduced estate costs and retained employees who were key to the administration of the bankruptcy estates. These employees' job performance was competent and essential, their compensation was reasonable, and sharing them with the Rose Law Firm was necessary to retain their services. The Trustee concedes that the better course would have been for him to

have given notice and obtained approval, but asserts that failure to do so resulted in no actionable breach. There was no self-interest, and the estates were considerably benefited, not damaged.

#### b. Findings of fact

The Trustee testified that at the time he was appointed to administer the estates in 1986, computer technician John Brown had been employed by the Debtor Corporations in their Fayetteville offices. The Trustee stated that Brown was, and had been, familiar with the Debtor Corporations' daily business operations. He understood the number systems used to track money-order agents and the money-order instruments in their possession, he understood the workings of the AMM software and the Data Point hardware that the companies had used for those purposes, and he possessed the computer capability needed in the liquidation of the Debtor Corporations' assets to write programs and analyze data.

Accordingly, the Trustee stated he hired Brown postpetition to work full-time for the Debtor Corporations' estates. The Trustee paid him by the hour and, if Brown were to work more than forty hours a week, at an overtime rate.

Over the first year postpetition, the Trustee testified that Brown captured the data necessary for liquidation. Brown gathered and logged claims-register data, names and addresses of money-order claimants, and agents' accounts of unsold money orders or proceeds from sold money orders. These operations were complete in the summer of 1987. At that

---

when the system's general commercial value would have been severely impacted by the passage of time. Thus, the record is insufficient to assess value, even if such valuation were to be properly placed at issue in this case. Generally, the Court notes that the

evidence was persuasive that once the data was transferred from AMM, the equipment itself was of inconsequential value to the Debtor Corporations' estates and was not marketable, because it was outdated and antiquated.

point, the Trustee decided to consolidate operations in Little Rock to save estate money on Fayetteville office space and on leases of computer hardware systems there. Because Brown had worked with the Debtor Corporations before bankruptcy, and had subsequently worked with the Trustee on the liquidation efforts, the Trustee testified that in his judgment, Brown was uniquely qualified to continue to assist him in Little Rock.

The Trustee testified that in his estimation, the work remaining in the estates would no longer justify keeping Brown on a full-time basis. At the same time, the Trustee was aware that the Rose Law Firm had a computer position that needed filling for an employee to maintain and administer its Wang word-processing and accounting programs. The Trustee believed that both the Debtor Corporations' estates and the Rose Law Firm would benefit by assigning both entities' work to one person. The estate would benefit by keeping Brown, the person most qualified to continue administering its computer operations. The Rose Law Firm would benefit by acquiring Brown as an in-house computer expert.

According to Bird, Brown was willing to move himself and his family from Fayetteville to Little Rock, even though Brown knew that the estate job would eventually end. Brown himself testified that he found the time-sharing proposal with the Rose Law Firm actually to be an incentive to move because of the Rose Law Firm's good reputation. Thus, Brown and the Rose Law Firm agreed to the Trustee's proposal and, in August 1987, Brown began work in Little Rock.

Brown spent two-thirds of his time working for the Rose Law Firm and one-third for the Debtor Corporations' estate. The Trustee testified that Brown was paid by two separate checks, one from the Rose

Law Firm and one from the Debtor Corporations' estate. The Trustee further testified that he reviewed the time records periodically to ensure that the pay arrangement accurately reflected the time Brown actually spent on each account, and that Brown was fairly paid as to both entities. By paying Brown on a salary basis instead of an hourly basis, Brown's payment could be stabilized to a regular amount that the Trustee would then be able to predict on an annualized basis. Also, by the Rose Law Firm paying the larger part of Brown's salary, the Debtor Corporations' estate could pay less, especially on Brown's overtime.

The Trustee also employed Donna Collins–Ellison, a Rose Law Firm employee whom the Trustee paid $3560.63 for computer work that she performed for the estate from January to August 1985. When Brown left in December 1992, the Trustee replaced him with Kim Kanakis.

At no time did the Trustee notice interested parties or seek the Court's approval to employ John Brown, or other computer employees, on the Debtor Corporations' behalf.

### c. *Conclusions of law*

■ As earlier stated, Shaffer takes issue only with the appearance of impropriety and the absence of notice and approval before the Trustee engaged the employees. The argument must fail, in this particular context, for infirmities of pleading and proof.

First, the case law Shaffer offers here applies the willfulness standard governing personal liability for improper and exploitive employment arrangements. *See Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). However, as noted earlier, in a suit alleging negligent official-capacity liability, the courts defer to a

trustee's exercise of reasonable business judgment. *Naert v. Daff* (*In re Washington Trust Deed Service Corp.*), 224 B.R. 109 (9th Cir. BAP 1998).

Second, as a factual matter, Shaffer concedes that the employment arrangements challenged here did not substantively damage the bankruptcy estate. However, the law requires the proofs to show actual, substantive injury. *See DiStefano v. Stern* (*In re J.F.D. Enterp.*), 223 B.R. 610, 629–30 (Bankr.D.Mass.1998). Specifically, if failure to notice and obtain approval results in no harm to the estate, then there is no ground for sanction.

Thus, in *Mosser*, the case to which Shaffer cites this Court, the United States Supreme Court affirmed personal liability on a trustee for having agreed to employ promoters of reorganizing trusts and, at the same time and without notice or approval, knowingly having permitted the promoters to continue trading in trust-corpus bonds. These employees made "substantial" profits by selling bonds back to trusts. *Mosser*, 341 U.S. at 270, 71 S.Ct. 680. The Court clarified that "the prohibition is not merely against injuring the estate—it is against profiting out of the position of trust." *Id.* at 273, 71 S.Ct. 680.

As noted, and in contrast, it is undisputed that neither the employees in the case at bar, nor Bird himself, profited by exploiting their positions of trust. Rather, the reverse occurred—the Debtor Corporations' estate profited from the Trustee's decision to employ qualified people, who performed well and who were paid from estate funds commensurate with their contribution to the estate's benefit. The evidence supports a conclusion that the Trustee exercised reasonable business judgment in the hiring arrangements at issue here.

### 5. *Alleged improper employment of and payment to employee Penny Scharmberg*

#### a. *As a full time employee*

##### (1) *Position of the parties*

Shaffer's position is that Sharmberg's full time employment was not justified after early 1993. The Trustee kept Scharmberg on as a full time employee after the major distribution of checks were issued in 1992 and early 1993 until July 1999. Shaffer contends that Scharmberg had far less to do after the major distribution in 1992 and early 1993 and, therefore, her full time employment was not warranted.

The Trustee's position is that Scharmberg's full time retention until June 1999 was necessary. During the time after the major distribution in 1992 and early January 1993, Scharmberg was busy processing the 41,000 money order checks that were issued during that distribution. She continued to process checks in 1994 and prepared for another major distribution of over 21,000 money order checks in 1995. Without any other staff assistance, she spent 1995 processing the 21,000 checks issued using the same job tasks as performed in 1993. In late 1995 and early 1996, she reviewed unsecured claims and turned her review over to the Trustee, who filed at least 80 objections to unsecured claims by October 1996. She also handled the daily operations of the Debtor Corporations, including continuing to process checks, answering phone calls, updating unsecured claims files, assisting with the preparation of the November 1993 final report, and, in 1999, assisting with the gathering of all the information Shaffer had requested from the Trustee, which was voluminous and time consuming.

##### (2) *Findings of fact*

The Court adopts and incorporates its findings of fact as to Bird, Scharmberg,

and Payne found in section III.B.1.b. (1) and (2) of this opinion. In summary, Bird testified that Scharmberg was needed as a full time employee until she left in June 1999. She was a key employee who possessed full working knowledge of the administration of the Debtor Corporations' estates and her skills were needed to perform the daily operations of the Debtor Corporations. Bird stated that Scharmberg could explain in much more detail regarding the many daily job tasks she performed. Bird testified that after 1994, Sharmberg was the lone employee of the Debtor Corporations, and was responsible for performing all of the operations of the Debtor Corporations. She continued to process money order checks, reconcile bank statements, and answer phone calls and inquiries from money order claimants. In 1995, after all of the money order claimants who could be found were paid in full, she began to handle the unsecured claims. From 1996 through 1998, she continued to process claims, answer phone calls, and handle the unsecured claim files. In 1999, she assisted the Trustee in gathering information for Shaffer's document request.

Scharmberg testified that it took her all of 1993 to process and account for the 41,000 checks issued and distributed in 1992 and early January 1993. There were no short cuts in processing each check. Each check had to be entered into the Debtor Corporations' records and computer system, verified as to correctness, and reconciled with the Debtor Corporations' bank statements. During 1994, she continued to process checks, answer phone calls and inquiries, write letters, and prepare for another major check distribution to be made in 1995. In 1995, over 21,000 checks were issued, and she alone had to process each check following the same procedures that were used in 1993.

In the later part of 1995, after all the money order claimants had been paid in full, she began to review unsecured claims and sort them into stacks based on the objections the Trustee would make. From 1996 through June 1999, she continued to process checks and account for them, answer phone calls, write letters to money order purchasers answering their questions, maintain the unsecured claims files, assist the Trustee in preparing the November 1998 final report and account, and, in 1999, assist the Trustee in gathering the information needed to respond to the voluminous document requests made by Shaffer.

Payne testified that, in his opinion, after the major distribution of checks in 1992 and early January 1993, Scharmberg was not needed as a full time employee of the Debtor Corporations. Her work load was substantially reduced and the longer the Debtor Corporations' cases drew out, the less work there was for Scharmberg to perform. Payne testified that in managing businesses, he has terminated full time employees if the work load did not justify the employment. He believes the Trustee was negligent in keeping Scharmberg on as a full time employee when the work load of the Debtor Corporations no longer justified full time employment.

### (3) *Conclusions of law*

The Court finds that, based on the evidence, the Trustee was justified in retaining Scharmberg as a full time employee until the time she left the Debtor Corporations' employment in June 1999. The Court credits Scharmberg's testimony in this instance as to the detail work she performed. While Scharmberg may not have been as busy after 1995 as she was prior to that time, the Court is convinced that there remained substantial work to be performed in administering the estates of

**168**

the Debtor Corporations, and Scharmberg was the most able person to do that work.

### b. *The payment of a $10,000.00 bonus by the Trustee to Scharmberg*

#### (1) *Position of the parties*

Shaffer's position is that the Trustee improperly paid Scharmberg a $10,000.00 bonus without Court order. Further, Shaffer believes that either the Trustee or Scharmberg should be required to remit the $10,000.00 back to the Debtor Corporations' estates.

The Trustee's position is that Scharmberg was the key employee who could maintain the day to day operations of the Debtor Corporations' estates, and her retention was essential. She had an out of state job offer that she was going to accept so he offered her a bonus of $10,000.00 in order to assure her continued employment until the Debtor Corporations' estates were closed. The Trustee believes it was in the best interest of the Debtor Corporations' estates to secure her continued employment.

#### (2) *Findings of fact*

The facts are undisputed that on February 8, 1999, the Trustee paid Scharmberg a $10,000.00 bonus to stay on as an employee of the Debtor Corporations. The facts are also undisputed that Bird, as trustee, did not file a motion to pay Scharmberg a $10,000.00 bonus, give notice to all parties in interest of his intent to pay Scharmberg a $10,000.00 bonus, or obtain a Court order authorizing the payment. Even the Trustee's own witnesses, Dowden and Robertson, testified that as a trustee they would have obtained a Court order authorizing the payment of a bonus.

During Bird's testimony, Bird explained that Scharmberg was his administrative assistant and the only employee of the Debtor Corporations in 1999. She had a job offer to go out of state and was going to accept that job offer. She was completely knowledgeable as to the Debtor Corporations' books and records, and the administration of the Debtor Corporations' estates; and she was the only person who could perform the day to day operations of the Debtor Corporations. If she was not retained to perform the necessary work, more time and money would be expended to bring in someone to learn and do Scharmberg's job. In short, it would have had been more costly to the Debtor Corporations' estates to have replaced her, and taken more time to bring about a close to the Debtor Corporations' estates. Her retention was critical and necessary and because of that, he offered her a $10,000.00 bonus to insure her continued employment, which she accepted. The Court finds Bird's testimony more creditable than Payne's as to this issue.

#### (3) *Conclusions of law*

The Court concludes that Bird, as trustee, breached his fiduciary duty by not filing a motion to pay Scharmberg a $10,000.00 bonus, give notice to all parties in interest, and obtain a Court order approving the employment arrangement. However, the Court is also convinced that the retention of Scharmberg was in the best interest of the Debtor Corporations' estates. The $10,000.00 bonus given to retain Scharmberg far outweighs the economical costs of replacing her with a new employee with no knowledge of the Debtor Corporations' business and, even more importantly, familiarity with the Debtor Corporations' records and computer system. At the beginning of 1999, numerous requests for information were being made by Shaffer. Scharmberg's knowledge and ability to locate the records and information requested was essential at that time and until she quit. The Trustee exercised

reasonable business judgment in paying her a $10,000.00 bonus and retaining her as an employee. The Debtor Corporations benefitted by her retention. Accordingly, the Court will deny Shaffer's request that the $10,000.00 bonus be remitted back to the Debtor Corporations' estates. The Trustee's breach of fiduciary duty will be considered later in this opinion under the topic of appropriate compensation for the Trustee pursuant to § 326(a) and § 330.

### 6. *Alleged improper payments to Victoria Mason as accountant in Debtor Corporation's cases*

On March 26, 1991, Bird filed an application to employ Victoria Mason, a Little Rock CPA, to prepare tax returns and give accounting advice. The purpose of the application was to obtain authorization to fill John D. Toney's vacancy. Toney was an accountant appointed by order of the Court on February 27, 1990, but who did not perform any services. The motion stated that Mason's area of responsibility would be primarily income tax returns, and the Trustee believed she could prepare the returns at less cost than other accountants for the estate. It further stated that there would be no duplication of services. Mason's compensation, like Toney's, would be on a general retainer basis.

Mason lived in Little Rock, Arkansas, and was the Assistant Financial Officer for Crews and Associates. Mason also engaged in part time work as a CPA while working at Crews and Associates. Bird told Mason that given his experience with Arthur Young & Co., he was concerned about an accountant charging an hourly rate, and he wanted to employ her on a fixed rate to prepare the tax returns of the Debtor Corporations' and give tax advice regarding accounting matters. The Court's order appointing Mason as an additional accountant was filed on April 3, 1991.

In Bird's opinion, Mason's fees for the preparation of the tax returns over the course of her employment were reasonable. He formed that opinion based on conferences with other accountants in the Little Rock area and his experience in the employment of accountants. Bird determined that Mason's proposed fee in each instance was reasonable. Bird admitted he did not obtain a Court order authorizing payments to Mason in all instances.

The following checks were received into evidence reflecting the fees paid to Mason for preparing the Debtor Corporations' tax returns:

- Check number 2666 in the amount of $3960.00, dated April 15, 1992, for the preparation of the 1990 tax returns.
- Check number 2712 in the amount of $4200.00, dated April 21, 1992, for the preparation of the 1991 tax returns.
- Check number 2976 in the amount of $4500.00, dated May 10, 1992, for the preparation of the 1992 tax returns.
- Check number 3263 in the amount of $4700.00, dated August 1, 1994, for the preparation of the 1993 tax returns.
- Check number 3403 in the amount of $4700.00, dated June 28, 1995, for the preparation of the 1994 tax returns.
- Check number 3607 in the amount of $4400.00, dated September 17, 1996, for the preparation of the 1995 tax returns.
- Check number 3769 in the amount of $4800.00, dated September 16, 1997, for the preparation of the 1996 tax returns.
- Check number 3836 in the amount of $2000.00, dated March 11, 1998, for the preparation of the 1997 tax returns.
- Check number 3909 in the amount of $2800.00, dated September 16, 1998,

for the preparation of the 1997 tax returns.

- Check number 3938 in the amount of $5000.00, dated December 14, 1998, for the preparation of the 1998 tax returns.

Of the ten checks, the Trustee issued checks numbered 2666 and 2712 pursuant to Court orders. The Trustee issued the remaining eight checks without Court orders. Although he could not recall specifics of any of the payments made without Court order, he was under the impression at the time the payments were made that he had the authority to make those payments.

The Court finds that Bird, as trustee, breached his fiduciary duty when he failed to file motions seeking compensation for Victoria Mason as a professional pursuant to 11 U.S.C. § 330 and failed to obtain Court orders in eight instances when he paid Mason without Court order. The Court will address the reasonableness of Mason's compensation as an accountant for the Debtor Corporations' estates later in this opinion under section III.F.1.

### 7. *Alleged improper payments of legal fees to the Rose Law Firm without Court orders*

The facts are undisputed that the following billing statements by the Rose Law Firm were paid without Court orders:

| | |
|---|---|
| October 6, 1992 | $4850.25 in legal fees, $2039.56 in expenses; |
| April 28, 1993 | $2810.00 in legal fees, $1454.95 in expenses; |
| March 8, 1995 | $307.50 in legal fees, $708.13 in expenses; and |
| January 17, 1997 | $10,494.75 in legal fees, $723.73 in expenses. |

The Court finds that Bird, as trustee, breached his fiduciary duty in four instances by paying the Rose Law Firm as attorney for the Trustee without Court orders pursuant to 11 U.S.C. § 330. The Court will address the issue of whether the Rose Law Firm is entitled to compensation in these instances under section III.F.2.c. of this opinion.

### C. *Whether the Trustee knowingly and intentionally made overpayments of trustee's fees to the Rose Law Firm or himself; whether the Trustee filed false, misleading, or inaccurate final reports and accounts; and whether the Trustee failed to timely provide or reveal information as to his trustee's fees as requested by Larry Schaffer, as a party in interest, and breached his fiduciary duty*

#### 1. *Position of the parties*

First, Shaffer contends that Bird, as trustee, knowingly and intentionally overpaid trustee's fees either to himself or the Rose law Firm without Court authorization or Court orders on numerous occasions. Further, Bird, as trustee, knowingly and intentionally paid trustee's fees to himself or the Rose Law Firm as a duplicate payment in the amount of $88,000.00 by pre-

paring and filing a "Motion For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back," and obtaining an order granting the motion on July 27, 1992. Shaffer argues that Bird knew at the time of the motion and order that he had already filed two previous applications for interim allowance of trustee's fees totaling $88,000.00, orders authorizing the payments of these interim trustee's fees had been entered, and Bird had been paid these trustee's fees. Shaffer also argues that Bird, as trustee, knowingly and intentionally paid himself or the Rose Law Firm a second payment of state surety bond proceeds in the amount of $41,527.00 from the money of the Debtor Corporations' estates.

Second, Shaffer contends that Bird, as trustee, filed a false, misleading, or incorrect final report and account on November 9, 1998, and a false, misleading, or incorrect final report and account on July 29, 1999, which was dated July 26, 1999.

Third, Shaffer contends that Bird, as trustee, engaged in a course of conduct from around January 1999 through October 1999 to avoid providing Shaffer, as a equity security holder and party in interest, information Shaffer had requested as to Bird's § 326 calculation of a trustee's fee entitlement, and an accounting of trustee's fees paid and owing. Further, Bird breached his fiduciary duty to the Debtor Corporations' estates and continued in a course of conduct to mislead or not reveal to the Court and Shaffer his overpayments of trustee's fees in the Debtor Corporations' cases. Shaffer argues that Bird's intent and course of conduct to avoid disclosing the overpayment of trustee's fee to

himself or the Rose Law Firm is manifested by his ceasing to file operating reports in 1991, which, if he had continued to do, would have reflected and tracked the overpayments of the trustee's fees in issue. Additionally, Bird had previously made § 326 calculations as to his trustee's fee entitlement in his interim applications for trustee's fees filed on January 3, 1989, and December 26, 1989, but failed to perform a § 326 calculation and give an accounting of trustee's fees paid and owing in his November 9, 1998, final report and account, and July 29, 1999, final report and account.

Bird's position is that he did not knowingly or intentionally make overpayments of any trustee's fees. At the time he applied for and obtained trustee's fees in the Debtor Corporations' cases, he believed he had Court orders authorizing payment of the fee. Further, in regard to the duplicate payment of the $88,000.00 in trustee's fee at the time he prepared and filed his June 25, 1992, "Motion For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back," and obtained an order approving the same, he had forgotten that he had been paid $88,000.00 in interim trustee's fees. According to Bird, it was a honest mistake.

Bird argues that a duplicate payment of $41,600.00 in state surety bond fees from the Debtor Corporations' estate happened because the employee who entered the data into the Debtor Corporations' records mistakenly coded a payment of state surety bond fees of $41,600.00 in the wrong category under "legal fees," and a second payment of $41,527.00 of state surety bond fees under the category "Trustee's Bond." [9] Further, Bird contends that he had forgotten that he had been paid

---

**9.** The first payment of state surety bond fees was not subject to a § 326 calculation because the Court had approved agreements between various states and Bird, as trustee, that allowed Bird to handle, process, and distribute the state surety bond proceeds. This payment was made out of segregated bond accounts maintained by Bird as trustee, and, under the agreements with the regulators of the various states, Bird was to be

$41,600.00 in state surety bond fees at the time he signed the October 29, 1992, check for $141,527.00, which resulted in a duplicate payment of state surety bond fees out of proceeds from the Debtor Corporations' estates.

Bird contends that the November 9, 1998, final report and account did contain an error; specifically, a wrong total distribution figure was used because of a mistake in addition made by adding administrative expenses. This was not intentional, and the final report and account was later withdrawn. He also contends that he thought the July 29, 1999, final report was correct as to the trustee's fees set forth as approved and paid at the time he filed the report. Even though Shaffer had objected to his November 1998 final report and July 1999 final report, Shaffer never identified specifically what he thought was the source of the overpayment of any trustee's fees. Bird made available and provided all the books and records of the Debtor Corporations' to Shaffer.

Further, Bird argues that Bird, not Shaffer, discovered all of the mistakes as to the overpayment of trustee's fees in the amount of $133,220.00, and immediately remitted the overpayment to the Debtor Corporations' estates, with interest. There was never any concealment of any transactions by the Trustee, alteration of records, or any intent to obtain overpayments of trustee's fees in the Debtor Corporation' cases. Bird states that although honest mistakes did occur in overpayments, the Debtor Corporations' estates have been properly reimbursed.

### 2. *Applicable law as to fraudulent intent*

In order to determine if the Trustee committed fraud upon the Debtor Corporations' estates or the Court, the Court must look at the Trustee's intent to defraud in the performance of his job as trustee. Intent is rarely provable by one's admission to an act, so the Court has to look at the circumstances surrounding the performance or conduct of the Trustee in order to arrive at the Trustee's intent as to the allegations asserted against him in this case. Fraud can then be inferred through the circumstantial evidence. *See Ramsay v. Hall (In re Hall)*, 216 B.R. 17, 19 (Bankr.E.D.Ark.1997)(finding that a court must look to all of the circumstances to determine if the evidence suggests that a debtor had the necessary intent from which the court could draw an inference); *see also Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1353 (8th Cir.1995)(recognizing that courts infer fraudulent intent from the circumstances surrounding the event). The existence of actual fraudulent intent is a matter of federal law. *Sherman*, 67 F.3d at 1354.

A single indication of fraud is not enough to establish actual fraudulent intent. However, " 'the confluence of several can constitute conclusive evidence of an actual intent to defraud.' " *Id.* (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir.1991)). The Court must consider the totality of the circumstances in arriving at its decision. In the present case, the facts involve a substantial period of time with numerous transactions and correspondence between the litigants. Because of this, it is necessary for the Court to review a chronology of events that have occurred since the inception of this case. The Court believes that this chronological review will assist the reader in understanding the testimony of the witnesses and the Court's findings and conclusions.

---

paid individually for his services. This payment was not out of money that was properly of the Debtor Corporations' estates.

### 3. *Findings of fact*

Because of the length of the findings of fact, and the difficulty of following the numerous transactions and correspondence between the litigants, the findings of facts are set out under two topics: first, a calendar sequence of events based on exhibits received into evidence to give a background and overview of what transpired as to the issues that have been raised; second, a review of the testimony of the witnesses, including the pertinent exhibits relating to their testimony.

a. *Exhibits/chronology based on documents received into evidence, including docket sheet* [10]

*Because the document chronology consists of approximately 100 pages, it appears in a separate Appendix I.*

b. *Testimony of witnesses*

(1) *Testimony of Allen W. Bird II and related exhibits to his testimony*

(a) *Overpayment of trustee's fees*

In order to follow Bird's testimony as to the issue of overpayment of trustee's fees, a date sequence of all applications or motions for trustee's fees, orders approving trustee's fees and disbursements, and all checks signed by Bird, as trustee, and subsequently paid by the Debtor Corporations' estates is set forth below. All checks were drawn on the Operating Account of NWFX, Inc., located at Union National Bank of Little Rock, Arkansas.

January 3, 1989

"Application For Interim Allowance of Trustee's Fees." The Trustee has disbursed $859,924.00 to parties in interest through September 30, 1988. Pursuant to § 326, the Trustee is entitled to a maximum trustee's fee of $48,000.00. The Trustee has received no interim fee payments to date, and requests an eighty percent distribution of fees earned, which is $38,000.00, subject to a final accounting of trustee's fees.[11]

January 27, 1989

"Order Allowing Interim Trustee's Fee." The Trustee is authorized to pay himself a trustee's fee of $38,000.00, which is eighty percent of the maximum allowed trustee fee based on actual disbursements, and subject to final review by the Court.[12]

February 2, 1989

Check number 001589 payable to Allen W. Bird II, Trustee, in the amount of $38,000.00. Notation on face of the check states "Interim Trustee's Fees." This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [13]

December 26, 1989

"Application For Second Interim Allowance of Trustee's Fees." The Trustee has disbursed to parties in interest over $3,500,000.00 through the date of the petition. Pursuant to § 326, the Trustee is entitled to a maximum fee of $105,000.00. The Trustee has received one interim payment of $38,000.00, and believes a second interim distribution of $50,000.00 is proper at this time, subject to a final review and final accounting of all trustee's fees.[14]

---

10. Bird's Ex. 17.

11. Bird's Ex. 133.

12. Bird's Ex. 134.

13. Shaffer's Exs. 97, 94.

14. Bird's Ex. 135.

| | |
|---|---|
| January 29, 1990 | Check number 002004 payable to Allen W. Bird in the amount of $50,000.00. Notation on the face of the check states "Trustee's Fees/NWFX, Inc." This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [15] |
| January 30, 1990 | "Order Allowing Interim Trustee's Fees." The Trustee is authorized to pay himself a second interim distribution of a trustee's fee in the amount of $50,000.00 at this time, which is eighty percent of the maximum allowed trustee fee based on actual disbursements, and subject to final review by the Court.[16] |
| May 5, 1991 | Check number 02424 payable to Allen W. Bird II in the amount of $1500.00. There is no notation on the face of the check as to the purpose of the payment. This check is recorded in Quickzoom Report under the category "Trustee's Fees." [17] |
| December 8, 1991 | Check number 02569 payable to Allen W. Bird II in the amount of $2000.00. There is no notation on the face of the check as to the purpose of the payment of the check. This check is recorded in Quickzoom Report under the category "Trustee's Fees." [18] |
| June 15, 1992 | Check number 2707 payable to the Rose Law Firm in the amount of $41,600.00. Notation on the face of the check states "NWFX 99031–1." This check was entered in Quickzoom Report under the category "Legal Fees."<br><br>At the hearing, Bird testified that this check was in payment of fees owed by state regulators to him personally pursuant to agreements with various states to pay him a three percent commission for handling, processing, and distributing proceeds from state surety bonds, which the Court had held were not property of the Debtor Corporations' estates and not subject to a fee by the Debtor Corporations' estates pursuant to § 326. Bird testified that no Court order was necessary in connection with these fees. Bird further testified at the hearing that this check was coded or entered in error in the Quicken Records as a "Legal Fee." [19] |
| June 25, 1992 | "Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back." The Trustee recognizes that compensation of the trustee is limited to fifteen percent of the first $1000.00, six percent of the next $3000.00, and three percent of the amount in excess of $3000.00 of all moneys disbursed or turned over to the parties in interest. The following funds are property of the debtors' estates: Northwest Financial Express, Inc., $800,000.00; NWFX, Inc., $4,296,000.00; Gold Financial Express, Inc., $162,000.00. In addition to the sums above, the Trustee had collected funds that were also assets of the estate but were not in the hands of the agents at the date of the petition. These include funds in the corporate bank accounts, unsegregated by debtor. These funds have been used to pay all of the expenses of the estate and have been (or will have been) disbursed when the case is closed. The total of these funds is $2,296,000.00. These funds are also property of the estate and are subject to an allocation of trustee's |

15. Shaffer's Exs. 97, 94.

16. Bird's Ex. 136.

17. Shaffer's Exs. 97, 94.

18. Shaffer's Exs. 97, 94.

19. Shaffer's Ex. 96.

fees. The maximum amount of trustee's fees as allowed by the code as applied to these debtors would be: Northwest Financial Express, Inc., $24,000.00; NWFX, Inc., $128,880.00; Gold Financial Express, Inc., $4,860.00; and property of the estate not otherwise specifically allocated to one of the three debtors, $69,140.00; for a total trustee's fee of $226,880.00. The Trustee believes he should be awarded the maximum statutory trustee's fee in these cases, and attorney fees of $40,000.00 previously held back and not paid to the Rose Law Firm.

The motion further stated that the Court should be aware that as a result of the negotiations and agreements with the state regulators the Trustee was allowed a three percent commission of the non-estate funds distributed in various states to money order claimants in those states totaling $1,223,970.00, for a total fee of $41,527.00. In each case, the Trustee negotiated a contract that called for the Trustee to distribute those funds to claimants, and the expenses of distribution to be paid from bond funds proceeds, including a three percent allowance for trustee's fees, postage, and other administrative expenses. The estate paid none of the expenses in distributing the bond funds.[20]

Bird testified that at the time of this motion, he forgot he had previously paid interim trustee's fees in the amounts of $38,000.00 and $50,000.00, and forgot to deduct these amounts from the $226,800.00 in total trustee's fees that he was seeking in the Motion.

| | |
|---|---|
| July 9, 1992 | Check number 02726 payable to Allen W. Bird II in the amount of $10,000.00. Notation on the face of the check states "Trustee's Fees." This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [21] |
| July 20, 1992 | Check number 02732 payable to Allen W. Bird II in the amount of $2000.00. There is no notation on the face of the check as to the purpose of the payment of the check. This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [22] |
| July 27, 1992 | "Order Granting Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fee Held Back." The Trustee is allowed a trustee's fee in the case of Northwest Financial Express, Inc. in the amount of $24,000.00; in the case of NWFX, Inc. in the amount of $128,880.00; in the case of Gold Financial Express, Inc. in the amount of $4860.00; and as to unallocated funds in the amount of $69,140.00; for a total trustee's fee of $226,880.00. The Trustee is also authorized to disburse $40,000.00 in legal fees held back to the Rose Law Firm.[23] |
| July 28, 1992 | Check number 2733 payable to Allen W. Bird II in the amount of $5000.00. Notation on the face of the check states "Trustee's Fees." This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [24] |
| August 20, 1992 | Check number 02755 payable to Allen W. Bird II in the amount of $5000.00. Notation on the face of the check states "Trustee's Fees." |

20. Bird's Ex. 137.

21. Shaffer's Exs. 97, 94.

22. Shaffer's Exs. 97, 94.

23. Bird's Ex. 138.

24. Shaffer's Exs. 97, 94.

This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [25]

October 28, 1992 Check number 02806 payable to Allen W. Bird II in the amount of $5000.00. Notation on the face of the check states "Trustee's Fees." This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [26]

October 29, 1992 Check number 02813 payable to the Rose Law Firm in the amount of $141,527.00. There is no notation on the face of the check as to the purpose of the payment. This check was recorded in the Quickzoom Report in two places: $100,000.00 was recorded under the category "Trustee's Fees," and $41,527.00 was recorded under the category "Trustee's Bond." Bird testified at the hearing that the $41,527.00 amount was recorded in the wrong category in error.

The $41,527.00 amount was in payment of state bond fees owed to him personally for processing and distributing state surety bond proceeds, which the Court held were not property of the Debtor Corporations' estates. Through negotiations and agreement with state regulators, he agreed to process and disburse the bond proceeds to money order claimants in the individual states for a three percent commission to be paid out of the bond proceeds, and not by the Debtor Corporations' estates. Because the states were paying these fees to him personally out of non-estates funds, no Court order was required to authorize these payments. Bird testified that at the time of this check he did not recall having been paid the $41,600.00 on June 15, 1992.[27]

January 27, 1993 Check number 02891 payable to the Rose Law Firm in the amount of $100,000.00. There is no notation on the face of the check as to the purpose of the payment. This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [28]

May 24, 1993 *Sua sponte* order awarding the Trustee a $20,000.00 fee enhancement. The order recognizes that the Trustee in the Debtor Corporations' cases achieved a remarkable financial recovery for the Debtor Corporations' estates in view of the financial disaster of the Debtors' businesses at the time of the filing of the bankruptcies in 1986. The Trustee was successful in paying all money order claimants who could be found 100% of their claims, except money order claimants in the states of Texas, Michigan, and Tennessee, who had been paid approximately 87% of their claims, and likely will be paid up to 97% of their claims.[29]

May 24, 1993 Check number 2985 payable to the Rose Law Firm in the amount of $5000.00. Notation on the face of the check states "Trustee's Fees." This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [30]

May 24, 1993 Check number 2986 payable to Allen W. Bird II in the amount of $5000.00. Notation on the face of the check states "Trustee's Fees."

25. Shaffer's Exs. 97, 94.

26. Shaffer's Exs. 97, 94.

27. Shaffer's Exs. 97, 95, 94.

28. Shaffer's Exs. 97, 94.

29. Shaffer's Exs. 92, 93.

30. Shaffer's Exs. 97, 94.

This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [31]

June 29, 1993 Check number 3011 payable to Allen W. Bird in the amount of $2500.00. Notation on the face of the check states "Trustee's Fees." This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [32]

July 30, 1993 Check number 3036 payable to Allen W. Bird II in the amount of $2500.00. Notation on the face of the check states "Trustee's Fees." This check was recorded in the Quickzoom Report under the category "Trustee's Fees." [33]

September 22, 1993 Check number 3064 payable to Allen W. Bird in the amount of $5000.00. Notation on the face of the check states "Trustee's Fees." This check was recorded in the Quickzoom Report under the category "Trustee's Fees."[34]

Bird testified as to the overpayment of trustee's fees: "I don't recall ever having any intent to write any check that I didn't believe was authorized and proper under the bankruptcy code." [35] Bird further testified that he did not believe he wrote any checks to the Rose Law Firm or himself at a time when there was not a Court order authorizing payment.[36] Bird acknowledged that a trustee should always have a Court order before he or she pays a professional or trustee's fee.

Bird testified as to the procedure used in writing and recording checks written for trustee's fees. Generally, one of the administrative persons would prepare the check for Bird's signature, and be responsible for entering the data into the Quicken record system. Most of the time the administrative person would not write a check for trustee or legal fees unless Bird told them to. If they had an invoice from the Rose Law Firm, the administrative person would prepare the check and bring it to Bird for his signature. If Bird believed there was an order authorizing the check, then Bird would sign it. Bird also stated that sometimes he would call or walk up to somebody and tell them a check needed to be prepared in a certain amount.

According to Bird, it was not his practice to write a check immediately for the full amount of any trustee's fee after an order had been entered. Bird testified that there was no specific system in place for matching checks with Court orders. The Rose Law Firm kept Court orders in a central location. Bird kept a file on attorney fees, which primarily contained bills, so Bird had a history of all bills that were issued. He also kept a trustee's fee file where he kept whatever calculations he had made. He said there was no other system of specifically matching up a check with a particular Court order other than his memory.[37]

Bird was asked about check numbered 2424 dated May 5, 1991, in the amount of $1500.00. Bird testified that as of May 1991, there were funds being held in the estate accounts to which he was entitled a

---

31. Shaffer's Exs. 97, 94.

32. Shaffer's Exs. 97, 94.

33. Shaffer's Exs. 97, 94.

34. Shaffer's Exs. 97, 94.

35. Tr. 493–94.

36. Tr. 1909.

37. Tr. 499–500.

fee either from the Debtor Corporations' estates or from state bond fund fees. As of May 1991, Bird had received over a million dollars from state bond funds out of which fees were payable, but had not been paid. Bird could not recall what he was thinking on May 5, 1991, when he wrote check number 2424, other than there were funds in the account from the state bonds.

Bird was next asked about check numbered 2569 dated December 8, 1991, in the amount of $2000.00. Bird testified that again, as of December 1991, he would have received state bond funds in excess of a million dollars out of which fees were payable, but had not been paid. He could not tie this check to a specific order. In June 1992, he wrote a check for $41,600.00 for the payment of state bond fees.

Bird testified that when he wrote check number 2726 dated July 9, 1992, in the amount of $10,000.00, he had been paid $41,600.00 toward the state bond fees. He further testified that he thought there was an order authorizing the $10,000.00 to be paid. Bird was also asked about check numbered 2732 dated July 20, 1992, in the amount of $2000.00. Bird replied that his answer was the same as check numbered 2726, he thought there was an order authorizing payment. Bird acknowledged that the checks numbered 2726 and 2732 were apparently written after the June 25, 1992, motion for allowance of trustee's fees had been filed, but before the order was entered. Bird further testified that as to each of the above checks, at the time they were written he believed he had authority to make those payments.

Explaining further, Bird testified that he spent a lot of time trying to figure out and recreate what was going on in July 1992, and what he was thinking when the checks were written. He stated that in going through the attorneys' fee applications, orders, fees, and mistakes made, that he was confused between trustee's fees, attorneys' fees, what was payable, what had been earned, and what was not earned.

When asked about writing eleven smaller checks for trustee's fees, Bird replied that he could not recall the significance in doing so. Bird further stated that he had an order back in July 1992 authorizing the payment of approximately $226,000.00. He realized that as of January 1993, he had not disbursed the total amount of that order. According to Bird, $215,000.00 worth of checks were written from July 28, 1992, to July 27, 1993. During that period of time, Bird testified that he forgot one check two years earlier and one check three years earlier, check numbers 1589 and 2004.[38] Bird again stated that he did not have a running total of trustee's fees with dates.[39]

Bird said that after Shaffer filed his September 10, 1999, objection to the July 29, 1999, final report and account alleging overpayment of trustee's fees, he asked Gary Garrett, a partner in the Rose Law Firm, to review the records as to the trustee's fees in the Debtor Corporations' cases. According to Bird, Garrett did the calculations on the trustee's fees and told Bird that it appeared to him that based on the numbers that appeared in Quicken, the Rose Law Firm had been overpaid in trustee's fees, possibly as much as

---

**38.** Check number 1589 is a check dated February 2, 1989, in the amount of $38,000.00 payable to Allen W. Bird II, Trustee, and entered in the Quickzoom Report under the category "Trustee's Fees." Check number 2004 is a check dated January 29, 1990, in

the amount of $50,000.00 payable to Allen W. Bird II and entered in the Quickzoom Report under the category "Trustee's Fees."

**39.** Tr. 1928.

$30,000.00 or $40,000.00. At the time, Bird believed that amount of overpayment would require a mistake of a million dollars in gross distribution.[40] Bird testified that at first he was assuming that the payment fees were correct and that the number he was multiplying times three percent was the error.[41] After two or three days of going back through the data, Bird and Garrett started analyzing and looking at all the checks they identified as possible trustee's fees, totaled those checks, and realized that, in fact, there were trustee's fees written for amounts in excess of what had been approved.

Bird testified that he finally realized the bulk of the overpayment consisted of the two interim trustee's fees totaling $88,000.00 that he failed to deduct from the fee application that was approved in 1992. He had a Court order authorizing payment of $226,880.00, and paid that amount in due course as a result of that order; he did not recall the $38,000.00 interim fee in 1989 or the $50,000.00 interim fee in 1990, and failed to deduct the interim payments from the $226,880.00 that was approved in 1992. He testified that at the time he prepared the July 27, 1992, order authorizing trustee's fees in the amount of $226,880.00. he believed that was the total amount of trustee's fees to which he was entitled.

Bird also testified that they discovered an overpayment in state bond fees. In June of 1992, a check was written for $41,600.00, and it was coded in the Quicken

Records category as "Legal Fees," which was in error.[42] This check was in payment of state bond fees and not subject to Court order. Also, on October 29, 1992, a check was written for $141,527.00, of which $41,527.00 was in payment of state bond fees.[43] $100,000.00 of that check was recorded in the Quicken Records under the category "Trustee's Fees." The remaining $41,527.00 was recorded under the category "Trustee's Bond" in error. Bird testified that, "Apparently in retrospect, looking back at it, it appears I simply didn't realize that the—didn't remember that the forty-one, six had already been paid and I don't recall calling and asking, you know, has this been done. But in looking back at it I now realize that that was categorized for whatever reason as legal fees." [44]

Bird stated that he did not make the allocation into the Quicken Record; he guessed that Whitby (nee Bajorek) was doing the checkbook at that point in time. According to Bird, check number 2707 dated June 15, 1992, in the amount of $41,600.00, and check number 2813 dated October 29, 1992, in the amount of $41,527.00, were intended to represent fees paid by the states and not by the estate.[45]

Bird testified that it was difficult to discover the overpayment of state bond fees and trustee's fees: "It was not a simple thing to do. We have continually gone back, looked back through numbers, found numbers posted in areas where we did not expect them to be posted, identified pay-

40. Tr. 486.

41. *Id.*

42. Check number 2707 payable to the Rose Law Firm in the amount of $41,600.00 and dated June 15, 1992.

43. Check numbered 2813 payable to the Rose Law Firm in the amount of $141,527.00 dated October 29, 1992.

44. Tr. 1925.

45. Even though the first payment of state bond fees were not subject to a § 326 trustee fee calculation because the various states were paying Bird's or the Rose Law Firm's fees, the second payment came out of funds of the Debtor Corporations' estates and constituted an overpayment of estate funds.

ments made that were recorded in one category that should have been in another category."[46] As an example, Bird said they found the $41,600.00 state bond payment fees recorded on the trustee's fee side, and a fee for the same purpose recorded as a payment of a premium for the trustee's bond. Bird testified that it was not until after Scharmberg left that he started actually going into Quicken and looking precisely at what was there and how it was recorded.[47]

The Rose Law Firm reimbursed the overpayments of state bond fees and § 326 fees on November 12, 1999, with interest. Bird testified that he and Garrett discovered the overpayments, not Shaffer: "I don't think any information ever provided Mr. Shaffer uncovered any objection or any mistake anywhere. I think Gary Garrett and I uncovered every single mistake that was made in all of these calculations, and nothing from you or anyone else assisted in that process."[48]

On November 15, 1999, the Trustee filed a response to Larry Shaffer's September 10, 1999, "Objection to Chapter 11 Final Report and Account and Application For Final Decree." The response states that Shaffer alleged the Trustee miscalculated and substantially overpaid trustee's fees in this case. The Trustee admitted that the trustee's fees were overpaid, and the Trustee received $133,220.00 erroneously. This is the amount that has been returned to the estates, with interest from October 28, 1992, at the estates' average earnings rate of five percent. The amount of the refund was determined as follows. First,

the total of the four orders approving fees for the Trustee is $338,500.00.[49] Second, the order dated July 27, 1992, approving $226,880.00, subsumes the two prior orders. As a result, the total of all approved fees is $246,880.00, resulting in an overpayment of § 326 fees in the amount of $91,620.00. Third, Bird testified to a mistake in payment of state bond fees in the amount of $41,600.00, for a total of overpayments or mistaken payments in the amount of $133,229.00. Finally, interest was added to that amount at the rate of five percent from October 28, 1992. The result was a reimbursement by the Rose Law Firm to the estates in the amount of $180,120.74.

(b) *November 9, 1998, final report and account*

Bird testified that he prepared and filed a "Chapter 11 Final Report and Account and Application For Final Decree" on November 9, 1998. He also testified that he made a mistake on the final report as to the figures for Northwest Financial Express, Inc. Bird, referring to a "Paid Claims" document prepared by Scharmberg at Bird's request,[50] explained that he mistakenly added the wrong line of "total" figures that appear on the Paid Claims report, and used that errant figure on the November 9, 1998, final report. Instead of a distribution of $5,423,033.51 from Northwest Financial Express, Inc., the correct figure should have been $898,026.86. Bird stated that he simply dropped down one line too far when he added the figures for Northwest Financial Express, Inc. The

46. Tr. 485.

47. Scharmberg left her employment the first week of July 1999.

48. Tr. 1716.

49. The four orders are: (1) an order dated January 27, 1989, approving $38,000.00, (2)

an order dated January 30, 1990, approving $50,000.00, (3) an order dated July 27, 1992, approving $226,880.00, and (4) an order dated May 24, 1993, approving $20,000.00.

50. Shaffer's Ex. 58.

mistake carried forward to paragraph 5 of the final report, which reflected a total distribution to both creditors and holders of money orders in the amount of $10,527,178.38.[51]

Bird testified that the trustee compensation that appears in the November 9, 1998, final report and account came from the Quicken report. The Quicken figures were used to create the Paid Claims document, Shaffer's exhibit 58, which reflects trustee compensation in the amount of $338,500.00.

(c) *July 29, 1999, final report and account*

Bird testified as to the preparation of his July 26, 1999, "Final Report and Account and Application For Final Decree," which was filed on July 29, 1999.[52] He stated that the distribution to creditor's figure of $9,104,717.62 that appears in the final report came from information contained in a memo from Scharmberg entitled "Breakdown of All Paid Claims as of 7–3–99."[53] From that document, Bird calculated the administrative expenses and the claims paid.

Bird testified that the trustee's compensation approved and paid figure of $296,973.00 that appears on the final report was based on an adjustment to the Quicken report. In order to reach the amount paid from the estate as trustee compensation, Bird reduced the Quicken report by $41,527.00, which is the amount he believed was paid to him out of the state bond fees by the various states. However, Bird discovered that the $41,527.00 was never recorded under the category "Trustee's Fees" in Quicken, and never should have been deducted from the trustee's compensation figure. According to Bird, the amount of trustee's fees paid by the estate as of the date of the report was $338,500.00.

The July 29, 1999, final report and account also stated that the Trustee was eligible for an additional $42,313.49 as fees for his services as trustee pursuant to 12[sic] U.S.C. § 326.[54] Bird testified at the hearing that the request for additional fees pursuant to § 326 is probably incorrect. Bird explained that the $42,313.49 represented the maximum allowed trustee's fees minus the trustee's fees that he believed were paid to date.

(d) *Bird's October 1, 1999, letter to Soulé with § 326 calculation*

Bird testified that he wrote attorney Soulé a letter dated October 1, 1999, reflecting his calculation in reaching what he believed to be the maximum allowable trustee's fee under the bankruptcy code. Bird stated he prepared a spreadsheet that reflected the figures and a breakdown by company of how he arrived at the total amount upon which the fees should be calculated. In preparing the breakdown of the allocation of total distributions between the three companies, Bird testified that he divided the City National Bank claim, distributions to Shaffer, cash on hand, and administrative expenses one-third to each company. He also credited one-third of the previously paid trustee's fees to each company. When he totaled

---

**51.** The larger figure representing total distribution would have the effect of increasing the maximum allowed trustee's fee under § 326. The Trustee subsequently withdrew his November 9, 1998, final report and account so this mistake is not material. The mistake was corrected in the next final report and account filed on July 29, 1999.

**52.** Shaffer's Ex. 33.

**53.** Shaffer's Ex. 55.

**54.** The correct statutory citation is 11 U.S.C. § 326.

the claims paid to each company, and the specific allocations, he arrived at a figure of $8,984,549.63 as the total of all distributions from the estates. Bird then calculated the maximum allowable trustee fee under § 326 for each company, which totaled $339,286.49.

Bird testified that in preparing the October 1, 1999, calculation he used the statutory percentages set out in the new § 326 calculation authorized by Congress in 1994: twenty-five percent of the first $5000, ten percent of the next $45,000, five percent up to the next million, and three percent of everything over that. He stated that he did not recall when the change had occurred, and later realized that this case, having been filed in 1986, did not qualify for the enhanced trustee's fee award because the change was not retroactive.

(e) *Providing information requested by Shaffer as to trustee' fees and other issues raised by Shaffer's objections to final reports and accounts*

Bird testified that Shaffer had filed a motion asking the Court to direct Bird to provide Shaffer with an accounting of the companies. The Court denied Shaffer's motion, and stated,

On December 9, 1997, Larry D. Shaffer filed a request for an accounting in the above-styled case. The Court has reviewed the request and has determined that said request is premature. Until this Court determines the Motion for Compromise Settlement between the Trustee and City National Bank of Fort Smith, Arkansas, and the Objection thereto filed by Larry D. Shaffer, said request for an accounting should be held in abeyance.

Larry D. Shaffer's request for an accounting at this juncture is denied without prejudice. If City National Bank of Fort Smith's proof of claim goes to trial on the merits, Larry D. Shaffer can file a request for an accounting and the Court will set the same for a hearing pursuant to proper notice.

Order, filed December 17, 1997. Even though the Court denied Shaffer's request, Bird testified that he thought it was fair to give Shaffer the figures requested in case he had any questions concerning the figures. Bird wrote Shaffer a letter dated December 30, 1997, in which he stated,

You recently filed a request for an accounting of the estate of Northwest Financial Express, Inc. Although Judge Fussell has denied your motion for the time being, I want you to know that the books and records of the estate are always open to your [sic] or your representatives. I only ask that you give me a few days notice if you or someone on your behalf desires to review the financial records of the estate.

In the mean time, an unaudited review of the current records reveals the following amount to date:

| | |
|---|---|
| Paid to claimants: | $5,493,047.52 |
| Cost of administration: | $1,644,322.31 |
| Professional fees paid: | $ 782,856.83 |
| Cash on hand: | $1,233,183,47 |

If you have any questions, please call me or Penny Scharmberg.

Letter from Bird to Shaffer dated December 30, 1997.[55] Bird testified that he wrote the letter because he wanted Shaffer to know that any time Shaffer wanted to know anything about the financial records of the estate, the records were open to him. Shaffer was welcome to come look at the records, and bring Moldenhauer, his accountant, and anybody else he wanted to see anything regarding the estates.

55. Shaffer's Ex. 70.

Bird further testified that in early 1999, he provided to Shaffer or his counsel a printout of all of the material contained in Quicken, which had a complete register of every check written, and provided the information in both a written form and on a disk. By doing so, Shaffer could run any report he wanted to run and look at any data in any way he wanted to. Bird also testified that in mid–1999, he provided Shaffer with all the database information on all the claims paid in its current form so that he could look at every check written in payment of every money order and claim. According to Bird, the books and records have always been available to any party in interest.

Bird testified that after he withdrew the November 1998 final report and account, he began to respond to requests from Shaffer's lawyers, Shaffer, and Moldenhauer for additional information, copies of documents, and whatever they wanted. Bird sent a letter to attorney Creekmore on January 7, 1999, in which he listed pending judgments in favor of the estate that Scharmberg had prepared. The letter was in response to questions about the pending judgments from Shaffer. On February 1, 1999, in another letter to attorney Creekmore, Bird sent a copy of the balance sheet and cash flow report of the three estates printed from Quicken as of December 31, 1998, which showed all of the expenses and cash on hand. On February 19, 1999, Bird prepared a new draft motion in the form of a final report to close the case. He sent that to Creekmore and asked him to review it and let Bird know if any further information was needed before he filed it. Bird said he never received a response from Creekmore to that letter.

Bird testified that on April 5, 1999, he responded to a letter dated April 2, 1999, from attorney Soulé, who also represented Shaffer. Bird provided Soulé with additional information, and answered questions that Soulé had posed in the letter. Bird said that rather than trying to draft a 20 page letter answering all of the questions, he suggested that Soulé take his deposition, and he would try to bring all the information Soulé needed.

Bird testified that he repeatedly made available to Shaffer. Moldenhauer, and all of Shaffer's lawyers over the years, all the information in all of his files. He said he never withheld a single thing from them. He gave them copies of any documents they wanted, and filled them in completely on everything contained in Quicken, including the check number, payee, and amount of every check that Bird had written in this case, which included checks written out of the operating account and to money order holders.

On April 13, 1999, Bird sent a letter to attorney Soulé that included a memo prepared by Scharmberg showing the remaining assets in the estate. Bird testified that he sent Soulé copies of all of the statements from all of the accountants, with the exception of Victoria Mason's statement for the preparation of the 1998 tax return, which had not been prepared. He also said he sent Soulé all of the time records of Scharmberg from 1994 forward, and sent him the disks with the Quicken program that contained every check written in the case.

Bird stated that on April 15, 1999, he received a letter from Soulé saying that Moldenhauer wanted to come to Little Rock to review the documents in the case. Moldenhauer gave Bird a list of information that he wanted, and Bird provided boxes of information and access to the Rose Law Firm conference room where Moldenhauer could review the information. Bird said Moldenhauer spent the better part of a day looking through documents.

On May 13, 1999, Bird wrote another letter to attorney Soulé and sent him information that he wanted, including account agreements between Bird and Union National Bank, copies of all tax returns that Bird had filed, and correspondence between Bird and Brad Jesson, who was the mediator in the claim dispute with City National Bank. Bird also explained the mistake in the November 1998 final report and account as to the $10,000,000.00 figure, and confirmed that he would sit for a deposition so Soulé could ask all the questions he wanted to. On May 25, 1999, Bird again wrote Soulé and sent him more information, copies of all the Trustee's bonds, the invoices for all the premiums, and the checks paying the premiums. He also sent Soulé all of the copies of correspondence Bird had with the attorneys for City National Bank.

Bird sent another letter to Soulé on June 7, 1999, that included a Compaq disk that had all of the claimant database information. Bird said that apparently, Moldenhauer was unable to operate the disk. Soulé called Bird and said that Moldenhauer did not think Bird sent him everything on the claimant database. Bird assured Soulé that he had. In June 1999, Moldenhauer went back to Little Rock and Bird took him into the NWFX office and showed him the NWFX computer and how Bird ran the reports. Bird said that he guessed he convinced Moldenhauer there was nothing else to give him.

On June 14, 1999, Bird provided Soulé with a calculation of the amount of money received on judgments entered by the bankruptcy court. He also sent Soulé a list of all the assets that had been disposed of and that remained. Bird also testified that on June 15, 1999, he believes he sent Soulé another copy of the Paradox information that contained the claimant database information.

Bird testified that when Creekmore took his deposition, Creekmore told him that he thought Bird had miscalculated and overpaid the trustee's fees. Bird assured Creekmore he would take a look and see if there were any errors. Bird said that Creekmore did not provide him with any specific errors. Bird testified that, to the best of his recollection, he had provided Shaffer all of the Quicken material showing all of the checks, payees, and amounts.

(2) *Testimony of David R. Payne and related exhibits to his testimony*

Shaffer called and qualified Payne as an expert witness in the area of providing a forensic analysis of certain actions of the Trustee. Payne testified that a forensic analysis is an evaluation of business records based upon information gathered that either supports or disproves a hypothesis, assertion, or claim. Payne stated that a forensic analysis can give a person insight into a pattern that may be present in transactions indicating or establishing a scheme. The forensic analysis may assist a court in determining whether there was an intent to perpetrate certain actions. Payne testified that he had performed a forensic analysis in excess of 30 occasions and has utilized them in court proceedings using the standards promulgated by the American Institute of Certified Public Accountants, and the Association of Certified Fraud Examiners. Payne made a forensic analysis in the present case as to the issues of overpayment of trustee's fees, and the Trustee's performance in providing, or not providing, information about the trustee's fees in issue. In preparing his forensic analysis, Payne testified that he had reviewed the estates' records, which included Quicken files, claims files, claims data base files, information furnished by the Trustee, and pleadings received into evidence. He was also present in the

courtroom during the entire hearing and listened to the testimony of the witnesses, including the Trustee's expert witnesses.

Payne testified that he is familiar with the Quicken accounting system used by the Debtor Corporations. He said he first learned how to utilize the Quicken accounting system when he was employed at Pete Marwick, and that David R. Payne & Associates uses the Quicken accounting system. According to Payne, the Quicken accounting system can be used to track cash receipts and disbursements, used to write checks and payrolls, and expanded to provide all the accounting services needed by a small business firm.

Payne's testimony will be divided into two general subject matter topics: (a) overpayment of trustee's fees, and (b) the November 9, 1998, and July 29, 1999, final reports and accounts, including the failure of Bird, as trustee, to disclose and account for trustee's fees due and owing.[56]

### (a) Overpayment of trustee's fees

Payne testified that he prepared Shaffer's exhibit 24, "Schedule of Trustee's Fees Awarded by Court or Agreed Upon With State Regulators." Shaffer's exhibit 24 states that a total of $288,407.00 was awarded by the Court or state regulators. This amount includes $226,880.00 from the

July 27, 1992, "Order Granting Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back"; $20,000.00 from the Court's May 21, 1993, order granting Bird an enhancement; and $41,527.00 as fees payable from the surety bond proceeds by agreement with the state regulators.

Payne also testified that he prepared Shaffer's exhibit 23, consisting of five pages. Page one of the exhibit, entitled "Checks for Trustee Fees and State Bond Fees from Quicken and Endorsements on Checks," shows that 14 checks were made payable to Bird and coded to "Trustee's Fee," for a total amount of $133,500.00. Of this $133,500.00, two checks totaling $88,000.00 were endorsed by the Rose Law Firm; the remaining checks were not. Page one also shows that another five checks were made payable to the Rose Law Firm and coded either "Legal Fees" (check number 2707, dated June 15, 1992, in the amount of $41,600.00), "Trustee's Bond" (check number 2813, dated October 29, 1992, in the amount of $41,527.00), or "Trustee's Fee."[57]

Contained on pages two and three of Shaffer's exhibit 23, entitled "Schedule of Trustee's Fees Paid by Estate," is a detailed chart showing the date, payee, check number, amount, cumulative total, and endorsement of each check written by the

---

**56.** Payne refers to the final report filed on July 29, 1999, as the July 26, 1999, final report. July 26, 1999, is the date Bird signed the report. July 29, 1999, is the date the report was filed with the Court and the date the Court uses in this opinion.

**57.** Bird admitted in the Trustee's December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final Decree," and again at trial, that check number 2707, in the amount of $41,600.00 and dated June 15, 1992, was an inadvertent duplicate payment of fees on state bond funds paid to the Trustee. Further, he testified that this check was recorded in the Quicken records as "Legal Fees" in error, and should have been

recorded as "Trustee's Fees." Also, Bird testified that check number 2813, in the amount of $141,527,00 and dated October 29, 1992, was, in part, for trustee's fees on state bond funds owing to the Trustee. This amount was not subject to the § 326(a) calculation because the states had agreed to pay Bird for handling the state bond proceeds and paying the citizens of each state from each state's bond funds. However, $41,527.00 of the check proceeds had been recorded in the Quicken records under the category of "bond premiums" in error, and was paid from money belonging to the Debtor Corporations' estates.

estate for trustee fees or surety bond fees. These checks total $421,627.00.

Payne testified that he compared Shaffer's exhibit 24 with Shaffer's exhibit 23 and made the following conclusions as to whether payments made to Bird, as trustee, or the Rose Law Firm were authorized by Court order:

February 2, 1989 Check no. 1589 in the amount of $38,000.00. Paid pursuant to Court order.

January 29, 1990 Check no. 2004 in the amount of $50,000.00. Paid pursuant to Court order.

May 5, 1991 Check no. 2424 in the amount of $1500.00. Paid without Court order, and appears to be an unauthorized payment of trustee's fee.

December 8, 1991 Check no. 2569 in the amount of $2000.00. Paid without Court order, and appears to be an unauthorized payment of trustee's fee.

June 15, 1992 Check no. 2707 in the amount of $41,600.00. Paid without Court order, and in excess of previous Court orders.

Payne also testified that this payment has been characterized in this case as being a payment for the bond proceeds. The trustee's fee on the state bond proceeds was outside the scope of trustee's fees under § 326(a), and is disclosed in the Trustee's June 25, 1992, "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back." Payne said that the total amount of that disclosure is $41,527.00. The $41,600.00 has been characterized as possibly a payment of bond proceed fees in this case. A review of the record and the subsequent payment of the same $41,527.00 lead Payne to the conclusion that the $41,600.00 paid on June 15, 1992, was without Court order, and in excess of previous Court orders.

July 9, 1992 Check no. 2726 in the amount of $10,000.00. Paid without Court order, and in excess of previous Court orders.

July 20, 1992 Check no. 2732 in the amount of $2000.00. Paid without Court order, and in excess of previous Court orders.

July 28, 1992 Check no. 2733 in the amount of $5000.00. Payne testified that there was an order dated July 29, 1992, which authorized $226,880.00 in trustee's fees. After the order was entered on July 29, 1992, this check was not necessarily without Court order or in excess of Court orders.

August 20, 1992 Check no. 2755 in the amount of $5000.00. Does not appear to be without Court order or in excess of Court orders.

October 28, 1992 Check no. 2806 in the amount of $5000.00. Does not appear to be without Court order or in excess of Court orders.

October 29, 1992 Check no. 2813 in the amount of $141,527.00. Appears to be, in part, without Court order. The check is in excess of the allowed fees that had been ordered in the case through that point in time. The cumulative total of all checks as of October 29, 1992 is $301,-627.00;[58] the allowed trustee compensation as of October 29, 1992, was $226,880.00.[59]

---

**58.** Shaffer's Ex. 23, p. 2. **59.** Shaffer's Ex. 24.

Additionally, check no. 2813 was recorded as a split entry in the Quicken records of the Debtor Corporations. $100,000.00 was recorded under the category "trustee's fees," and $41,527.00 was recorded under "bond premiums." Bird testified that the $41,527.00 was his fee for handling the state bond proceeds, as set out in his June 25, 1992, "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back." [60]

January 27, 1993 Check no. 2891 in the amount of $100,000.00. Paid without Court order, and in excess of previous Court orders.

Payne further testified that by January 1, 1993, the total fees paid to the Trustee were $401,627.00. Check no. 2891 exceeded not only the trustee's fees that were allowed in the July 27, 1992, order, but also the sum of the July 27, 1992, order, the disclosure of the bond proceeds fees in the amount of $41,527.00, and the allegedly forgotten interim orders and payments in the amount of $88,000.00.

May 24, 1993 Check no. 2985 in the amount of $5000.00. Paid without Court order, and in excess of previous Court orders.

May 24, 1993 Check no. 2986 in the amount of $5000.00. Paid without Court order, and in excess of previous Court orders.

Payne further testified that, even taking into account that the Court authorized an additional fee of $20,000.00 on May 24, 1993, the total trustee's fees paid through May 24, 1993, totaled $406,627.00. Again, even adding the allegedly forgotten interim orders ($88,-000.00) and the bond proceeds fee ($41,527.00) to the authorized trustee's fees to date ($246,880.00), the May 24, 1993, checks totaling $10,000.00 exceed the total.

June 29, 1993 Check no. 3011 in the amount of $2500.00. Paid in excess of previous Court orders.

July 30, 1993 Check no. 3036 in the amount of $2500.00. Paid in excess of previous Court orders.

September 22, 1993 Check no. 3064 in the amount of $5000.00. Paid in excess of previous Court orders.

Payne also testified that he prepared page five of Shaffer's exhibit 23, entitled "Schedule of Trustee's Fees Remitted to the Rose Law Firm." Page five contains a detailed chart showing the date, payee, check number, amount, cumulative total, and endorsement of each check remitted to the Rose Law Firm for trustee fees or surety bond fees. These checks total $376,127.00.

Payne testified that as of May 24, 1993, Bird, as trustee, had paid the Rose Law Firm a total of $376,127.00 in trustee fees. The last payment to the Rose Law Firm

60. On June 15, 1992, Bird had already received $41,600.00, which he testified and admitted was in payment of state surety bond fees by various state regulators from state bond proceeds.

was on May 24, 1993, in the amount of $5000.00. According to Shaffer's exhibit 24, "Schedule of Trustee's Fees Awarded by Court or Agreed Upon With State Regulators," on July 27, 1992, the Court authorized a payment of $226,880.00. This sum was based on a § 326(a) calculation made by Bird in his June 25, 1992, "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back." Bird, as trustee, in his "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back," had disclosed that he was entitled to a fee of $41,527.00 from state bond proceeds pursuant to an agreement with various states and Puerto Rico. That fee was not to be included in his § 326(a) calculation of trustee's fees due from the Debtor Corporations' estates. Adding the $20,000.00 trustee fee enhancement awarded by Court order and filed on May 24, 1993, and the $88,000.00 that had been omitted as being paid in the June 25, 1992, motion and July 27, 1992, order, to the authorized payment of $226,880.00 totals $376,407.00. This amounts to a $280.00 difference between the June 25, 1992, "Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back" and what Bird had, in fact, paid the Rose Law Firm as of May 24, 1993.[61]

Payne also testified that he prepared page four of Shaffer's exhibit 23, entitled "Schedule of Trustee's Fees Not Remitted to the Rose Law Firm." Page four contains a detailed chart showing the date, payee, check number, amount, cumulative total, and endorsement of each check made payable to Bird that was not remitted to the Rose Law Firm. These checks total $45,500.00.

Payne testified that the $45,500.00 reflects the payments made to Allen W. Bird, individually, that were not remitted to the Rose Law Firm as trustee's fees. This amount is the same as reflected on Bird's amended tax returns that have been provided in this case.[62] Payne testified that Bird wrote a series of small checks over the time period from May 5, 1991, through September 22, 1993, both to the Rose Law Firm and himself, individually. He further testified that, in his experience, if there are sufficient funds in an estate when an order authorizing payment is entered, he would write one check for the entire amount authorized.

Payne noted that Bird, as trustee, had been filing operating reports in the Debtor Corporations' cases, and that, based on his recollection, the last monthly operating report was probably filed in mid–1991. Bird stopped filing monthly operating reports when the payments being made to the Trustee began to exceed the orders allowing trustee's fees in the case.

Payne testified that he heard Bird's testimony that it was Bird's belief that at all times when he received trustee fees in this case he was authorized to pay and receive those payments. Payne testified that based on his review and analysis of the Quicken record, checks, Court orders, and other data available, he could not find sufficient, credible evidence that would lead

---

61. Payne is inferring that Bird knew that he had omitted the $88,000.00 when he prepared his June 25, 1992, motion for allowance of trustee's fee. According to Payne, the last payment of $5000.00 to the Rose Law Firm on May 24, 1993, is further evidence that Bird kept up with what was being paid the Rose

Law Firm as far as his trustee fees were concerned, which he was accounting to the Rose Law Firm as having been paid.

62. Shaffer's exhibit 222 is a copy of the individual tax returns filed by Bird for the years of 1992, 1993, and 1994.

him to believe that all the checks Bird wrote as payments for trustee's fee would lead one to believe that they were pursuant to Court orders: "I don't find any combination of numbers, any combination of orders, any combination of figures in the Quicken that would provide a credible combination of why such acts would occur and how they could occur. Maybe they could occur on, you know on occasion, but the number and frequency of the checks written here and the running balances and available data do not point to a pattern of forgetfulness." [63]

> (b) *The November 9, 1998, final report and account and the July 29, 1999, final report and account, and the failure of Bird, as trustee, to disclose and account for trustee's fees due and owing*

Payne testified that he prepared Shaffer's exhibit 231, "NWFX et al Forensic Document Review Summary." The purpose of this document was to summarize what Payne's testimony would be regarding a number of other documents, including the Trustee's November 9, 1998, "Chapter 11 Final Report and Account and Application For Final Decree," July 29, 1999, "Final Report and Account and Application For Final Decree," October 22, 1999, "Information Provided by the Trustee Pursuant to Stipulated Scheduling Order Regarding Motion For Final Approval of Professional Fees and Objection Thereto," and December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final Decree." Payne testified that Shaffer's exhibit 231 is a summary of the data contained in various pleadings, including pleadings for allowance of fees by the Trustee and objections by Shaffer. Payne stated he prepared Shaffer's exhibit 231 so he could outline

the disclosures that are made in those documents and comment on those disclosures in relation to the facts and data that are available in the case.

Shaffer's exhibit 27 is the first final report, filed by the Trustee on November 9, 1998. Using Shaffer's exhibit 231, Payne testified as to the errors, inconsistencies, or lack of a full disclosure in Shaffer's exhibit 27. Specifically, paragraph 2.c. of the final report sets forth disbursements of $5,423,033.51 for Northwest Financial Express. According to Payne, that number is in error. The Trustee described the error as an error that occurred in relation to a summary of disbursements in which some numbers were transposed. The amount that was actually disbursed by Northwest was $898,026.86. According to Payne, there was also a listing of administrative expenses on Shaffer's exhibit 58 in the amount of $2,049,285.63 that was not included in the November 9, 1998, final report and account. Paragraph 5 of the November 9, 1998, final report totals $10,527,178.38. Payne stated that the figure included the transposition error but omitted the $2,049,000.00 in administrative costs that were paid out in the case.

Payne testified that if one were to look at the $10,527,178.00 in determining the trustee's fee for compensation in paragraph 6 of the final report, the compensation would be in the neighborhood of $316,000.00 (utilizing the 3% basis), which is fairly close to the $338,500.00 that was reported in the November 9, 1998, final report and account as approved and paid to date. However, this pleading would indicate that the Trustee had been overpaid according to the maximum allowed compensation in the case.

Payne further testified that if one had picked up the $2,000,000.00 in administra-

---

**63.** Tr. 2117.

tive expenses, the total disbursements would total around $12,500,000.00. By comparing the November 9, 1998, final report and account with the June 25, 1992. "Motion of Trustee for Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back," one would have known that a $12,500,000.00 disbursement could not have occurred in this case because the funds available had not materially changed since June 1992.

Payne testified that the November 9, 1998, final report and account failed to disclose the following: (1) the amount the Court had previously approved in the three interim trustee fee applications, (2) the $41,600.00 that Bird testified he had received as a duplicate payment of his fee on state bond proceeds, and (3) the portion of check number 2813, dated October 29, 1992, and payable to the Rose Law Firm in the amount of $141,527.00, that was allocated to payment of the state surety bond fees.

Payne stated that it was his opinion that all final reports in which the trustee discloses a trustee's fee, the trustee should include a § 326(a) calculation, especially when monthly operating reports have not been filed for a long period of time.

Payne also testified as to his analysis of Shaffer's exhibit 33, the July 29, 1999, "Final Report and Account and Application For Final Decree." The pertinent portions of the July 29, 1999, final report and account are as follows:

2. The confirmed plan has been implemented and consummated. During the course of such implementation, the Trustee has distributed $9,104,717.62 to all creditors and holds $176,805.00 in cash for payment of final allowable trustee's fees, expenses and distribution to Larry Shaffer, the sole remaining creditor. The distribution to creditors amounted to a 100% distribution to all those holders who could be found after claims were filed, except for Mr. Shaffer.

3. The professional fees and expenses approved and paid to date for all three debtors on a consolidated basis are as follows:

a. Trustee compensation: $296,973.00

. . .

5. The Trustee is eligible for an additional $42,313.49 as fees for his services as trustee pursuant to 12[sic] U.S.C. § 326.

. . .

WHEREFORE having reported and accounted, the debtor [sic] prays that this Court will award him an additional $40,000.00 as trustee's fees, and enter a final decree discharging the Trustee from any further duties in this matter and closing this case.

Again, using Shaffer's exhibit 231, Payne testified that using a three percent rule of thumb calculation for the trustee fee allowance, the listed total disbursements of $9,104,717.62, would indicate a trustee fee allowance of approximately $273,000.00. Paragraph 3.a. shows the trustee fee compensation to be $296,973.00. That number represents the $338,500.00 paid to the Trustee according the Quicken report, less a deduction of $41,527.00 for the bond proceed fees the Trustee claims are his and not subject to the § 326(a) calculation. Payne testified that the $338,500.00 never included the $41,527.00 in the Quicken report to begin with, so there was no reason to deduct that number in making the disclosure of $296,973.00. At that point in time, the trustee fees that had been paid in this case totaled $421,627.00, which amount includes the $41,527.00 in fees that were

claimed for the bond proceeds.[64] Payne pointed out the inconsistency of deducting the bond proceed fee of $41,527.00 in paragraph 3.a., but including the bond proceeds in the amount distributed under paragraph 2. The Trustee is including bond proceeds on one side of the ledger for disclosure and calculation of the § 326 fee, and taking it out in the amount disclosed as being disbursed or paid to the Trustee.

Regarding paragraph 5, Payne testified that for Bird to be eligible for an additional $42,313.49 in trustee's fee, he would have had to have used the 1994 amendment to § 326(a) of the code for his calculation.[65] The attachments to the October 1, 1999, letter from Bird to Soulé include a § 326(a) calculation based on the $9,104,000.00 in disbursements. Bird calculated the maximum allowed trustee fee at $339,286.49. If you reduce this figure by what the Trustee reported as approved and paid in paragraph 3 of the July 29, 1999, final report and account—$296,973.00—you arrive at the additional fee request of $42,313.49 made by the Trustee in his July 29, 1999, final report.

Payne explained that when he read Shaffer's exhibit 54 and Shaffer's exhibit 33 together, he concluded that Bird had to have had the § 326 calculation available on or before he filed the July 29, 1999, final report and account in order to calculate the additional trustee's fee being requested by the Trustee at the time.

Payne surmised that in arriving at the $339,286.49 calculation of maximum allowable trustee's fee due as of October 1, 1999, Bird had to do the following: (1) he had to allocate the administrative expenses to the estates on a pro rata basis of one-third, one-third, one-third, which would have the impact of increasing the trustee's fees by over $40,000.00; (2) he had to use the 1994 amendment to § 326(a) to determine the maximum allowable fee; and (3) he had to eliminate three payments that he had received as trustee—$41,600.00 and $41,527.00 twice—that are not disclosed on the July 29, 1999, final report and account.

Next, Payne testified as to Shaffer's exhibit 43, the Trustee's "Response to Larry Shaffer's Objections to Trustee's Final Report and Account" (the July 29, 1999, final report), which was filed on November 15, 1999. The pertinent portions of the Trustee's response, about which Payne testified, are as follows:

### TRUSTEE FEES

28. Shaffer alleges the Trustee miscalculated and substantially overpaid the Trustee's fees in this case. Objection, par 1B. After reviewing the relevant records, the Trustee admits that the Trustee's fees were overpaid. The Trustee erroneously received $133,220.00, computed as set forth below. This amount has been returned to the estates, with interest from October 28, 1992 at the estates' average earnings rate of 5.00%, as evidenced by the check attached hereto as Exhibit D.

29. The total of all checks in payment of Trustee fees is $338,500.00.

30. As set forth in Exhibit E hereto, there are four orders approving fees for the Trustee: (a) an order dated January 27, 1989 approving $38,000.00, (b) an order dated January 30, 1990 approving $50,000.00, (c) an order dated July 27, 1992 approving $226,880.00, and (d) an

---

64. Shaffer's Ex. 23, pp.2, 3.

65. The 1994 amendment to § 326(a) was not retroactive; therefore, Bird used the wrong basis as a calculation in his October 1, 1999, § 326(a) calculation.

order dated May 24, 1993 approving $20,000.00.

31. The order dated July 27, 1992 approving $226,880.00 subsumes the two prior orders. So, with the approval of an additional $20,000.00, the total of all approved fees is $246,880.00. However, in paying the two subsequent orders the Trustee failed to deduct the $38,000.00 and $50,000.00 sums approved by the two earlier orders.

32. In addition, the Trustee made a duplicate payment unrelated to Trustee fees. The amount of $41,527.00 received by the Trustee from the proceeds of state regulatory bonds by agreement with the various states was mistakenly paid twice. As set forth on Exhibit F, one payment was recorded in Quick Books as a legal fee, and another duplicate payment was recorded in Quick Books as a payment on a Trustee's bond.[66]

33. Accordingly, an accounting of the mistakes made by the Trustee and the resulting reimbursement already made to the estates is as follows:

| | |
|---|---|
| 338,500.00 | Trustee Fees Paid |
| − 246,880.00 | Trustee Fees Approved |
| 91,620.00 | Mistaken Overpayment |
| + 41,600.00 | Mistaken Duplicate Payment [67] |
| $133,220.00 | Total Mistaken Payments |
| 46,900.74 | Interest |
| $180,120.74 | Total Reimbursed to Estates |

Payne testified that the disclosure by the Trustee of $88,000.00 in overpayments that were subsumed by the July 27, 1992, order, and the $41,600.00 duplicate pay-

ment that was disclosed as a mistake, do not add up to the $133,220.00 that was stated in the November 15, 1999, response. The difference in amounts was not explained.

Finally, Payne testified that, in his opinion, Bird, as trustee, had a duty to provide the trustee fee information and, specifically, the trustee fee calculation, that Shaffer had requested as a party in interest.

### (3) Testimony of Penny Scharmberg

Scharmberg testified that either she, Rector, or Whitby (nee Bajorek), as bookkeeper, was responsible for categorizing checks into Quicken. If she had any questions about entering an item into Quicken she would ask the Trustee. She stated that checks for operating expenses were entered into Quicken when the check was written, or, in some cases, before. However, she could not recall ever having questions with regards to coding a check into Quicken. Scharmberg testified that when the Trustee asked her to write a check for trustee's fees, she would write the check and enter it into Quicken.

### (4) Testimony of Thomas Robertson

Robertson, a chapter 7 panel trustee in Arkansas, testified that it is the trustee's duty to prepare a § 326 calculation properly and accurately. If a party in interest has a question about a trustee fee or the calculation of the trustee's fee, then the party in interest has an obligation to express or raise their concern. After some-

---

**66.** Exhibit F is entitled, "Itemized Category Report by Category," which reflects the following entries:

Date: 6/15/92—Check no. 2707—Check payable to Rose Law Firm—Category: Legal Fees—Amount: $41,600.00

Date: 10/29/92—Check no. 2813—Check payable to Rose Law Firm—Memo: State Bond Fees—Category: Trustee's Bond—Amount: $41,527.00

**67.** The June 15, 1992, check to the Rose Law Firm for $41,600.00 was payable out of money belonging to the various states, the source of which was state surety bond proceeds. The October 29, 1992, check to the Rose Law Firm for $41,527.00 was payable out of money from the Debtor Corporations' estate. The second payment, and $63.00 of the first payment, amounts to an overpayment, not a duplicate payment.

body questions his trustee fee or the calculation of his trustee's fee, then Robertson will go back and check his sources for the information, or get assistance in checking the sources that were use to arrive at the calculation.

#### 4. *Findings and conclusions*

a. *$88,000.00 in duplicate payments of § 326 trustee's fees*

 The facts are not in dispute that, Bird, as trustee, paid himself or the Rose Law Firm $88,000.00 in duplicate payments of trustee's fees under § 326 of the bankruptcy code. On January 3, 1989, Bird filed his first "Application For Interim Allowance of Trustee's Fees." The application stated that the Trustee had disbursed to parties in interest a total of $1,609,000.00 through the date of the petition. According to the Trustee, the Trustee would be entitled to a maximum trustee fee of $48,000.00 under § 326. The Trustee requested an interim distribution of eighty percent of the maximum allowed trustee fee in the amount of $38,000.00. On January 27, 1989, this Court's order was entered allowing a distribution of eighty percent of the maximum trustee fee as set forth in the January 3, 1989, application. On February 2, 1989, Bird issued check number 001589, drawn on the operating account of NWFX, Inc. and made payable to Allen W. Bird, Trustee, in the amount of $38,000.00. A notation appears on the face of the check stating, "For Interim Trustee Fees." This check was endorsed by the Rose Law Firm, and honored on February 8, 1989.

On December 26, 1989, Bird filed his "Application For Second Interim Allowance of Trustee's Fees." The second application stated that the Trustee had disbursed to parties in interest the total of $3,500,000.00 through November 30, 1989. According to the Trustee, the Trustee would be entitled to a maximum trustee fee of $105,000.00 under § 326. The Trustee stated that he had received one interim trustee payment in the amount of $38,000.00 to date, and believed that a second interim trustee's fee of $50,000.00 was reasonable and justified, subject to a final review by the Court and a final accounting of all trustee's fees. On January 30, 1990, this Court's order was entered allowing a second interim distribution of trustee fee in the amount of $50,000.00. On January 29, 1990, the day before the order was entered, Bird issued check number 002004, drawn on the operating account of NWFX, Inc., and made payable to Allen W. Bird II, in the amount of $50,000.00. A notation appears of the face of the check stating, "For Trustee's Fees/ NWFX, Inc." This check was endorsed by the Rose Law Firm and honored on February 9, 1990.

On June 25, 1992, Bird filed a "Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back." The motion set forth the following funds of the Debtor Corporations' estates generated from the sales of money orders in different states and held by the agents at the date of filing bankruptcy: Northwest Financial Express, Inc., $800,000.00; NWFX, Inc., $4,296,000.00; and Gold Financial Express, Inc., $162,000.00. The motion further stated that the Trustee had collected funds that were also assets of the estate that were not in the hands of the agents at the date of the petition. These funds had been used to pay all of the expenses of the estate and either were disbursed, or will have been disbursed, when the case was closed. The total amount of these funds was listed as $2,296,000.00. According to the Trustee, the total funds subject to a § 326 calculation was $7,554,000.00. The maximum trustee's fee allowed under

§ 326 as applied to the debtors totaled $226,800.00, which was the amount requested by the Trustee.

The motion also disclosed that, Bird, as trustee, negotiated contracts with various state regulators to distribute state surety bond proceeds to money orders claimants in their respective states.[68] For his services in processing and distributing these funds through the bankruptcy proceedings of the debtors, Bird, individually, would receive a three percent commission. The bankruptcy estates were not to pay a trustee's fee on distribution of the state surety bond proceeds and, as such, the fees to be paid to Bird in his individual capacity were not subject to a § 326 calculation in arriving at the trustee's fee to be paid by the bankruptcy estates. The motion set forth in detail the total of all proceeds distributed through each state and the fee to be paid by each state to Bird, individually. The total fees to be paid to Bird were $41,527.00.

Finally, Bird's June 25, 1992, motion also requested a release of $40,000.00 in legal fees owed to the Rose Law Firm, as attorneys for the Trustee, that had been approved and held back by Court orders in previous fee applications.

On July 27, 1992, the Court filed an "Order Granting Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back." In the order, the Court authorized the disbursement of $226,880.00 in trustee's fees, and $40,000.00 in legal fees previously approved but held back to the Rose Law Firm, as counsel for the Trustee.

At the hearing, Bird testified as to the overpayment of $88,000.00 in trustee's fees. He stated that when he submitted his June 25, 1992, motion he had forgotten that he had received two earlier interim payments. He said, "In 1992 I didn't recall and failed to deduct those interim fees from that fee [$226,880.00] and then ultimately in due course paid that amount out of the estate in trustee's fees." [69] When asked why he paid trustee fees without a Court order, he said, "I didn't realized was doing it. I had a Court order authorizing a payment of $226,000, and I paid that amount in due course in full as a result of that order and didn't recall the $38,000 interim fee in 1989 or the $50,000 interim fee in January of 1990." [70] When asked again, he said, "I didn't realize, as I said, I paid the $38,000 with a Court order. I paid the $50,000 with a Court order. And I ultimately wrote another check for the two ultimately totaled up $226,000, but I failed to deduct the first two interim fees from the $226,000 that was ultimately approved in 1992." [71]

The Court does not believe, or find creditable, Bird's testimony that when he prepared the June 25, 1992, motion seeking to award him $226,880.00 in total trustee's fees as of the date of the motion, that he forgot to deduct the $38,000.00 interim trustee fee and the $50,000.00 interim trustee fee he had paid himself or the Rose Law Firm. The Court finds that Bird, as trustee, in relation to the June 25, 1992, "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back," knowingly and intentionally committed fraud upon the Debtor Corporations' estate and the

---

68. The Court had previously held that the state surety bond proceeds held by various state regulators were not property of the Debtor Corporations' estates.

69. Tr. 327–28.

70. Tr. 328.

71. *Id.*

Court in his fiduciary capacity as trustee of the Debtor Corporations' estates. Bird formulated his fraudulent intent when he prepared his June 25, 1992, motion, and executed his fraudulent intent when he obtained the July 27, 1992, order and subsequently paid himself or the Rose Law Firm $88,000.00 in duplicate payments of § 326 trustee's fees. The preponderance of the evidence clearly establishes that Bird knew at the time he prepared the June 25, 1992, motion that he had previously paid himself or the Rose Law Firm $88,000.00 in interim Trustee's fees, that he did not simply forget that he had received those payments, and that he intentionally omitted those payments from his trustee fee request of $226,800.00. The circumstances leading up to, and including, the filing of the June 25 motion defy Bird's testimony that he forgot receiving the interim trustee fee payments. Bird not only had to forget receiving the $88,000.00, he also had to forget that he prepared two previous motions for payment of interim trustee's fees, and obtained orders authorizing the payments of the two interim trustee's fees.

The Court will review the evidence of Bird's acts and observations as to the overpayments of $88,000.00 in trustee's fees in this instance, and, specifically, what he would have had to have forgotten when he prepared the June 25, 1992, motion.

* Bird had to forget that he prepared and filed his first "Application For Interim Allowance of Trustee's Fees" on January 3, 1989, in which he calculated a maximum allowed trustee fee of $48,000.00 pursuant to § 326.

* Bird had to forget that he was only requesting an eighty percent disbursement of the maximum allowed trustee fee, and that he received a Court order authorizing that disburse-

ment in the amount of $38,000.00 on January 27, 1989.

* Bird had to forget that he signed a check on February 2, 1989, payable to Allen W. Bird II, Trustee in the amount of $38,000.00.

* Bird had to forget that he prepared and filed his "Application For Second Interim Allowance of Trustee's Fees" on December 26, 1989, in which he calculated a maximum allowed trustee fee of $105,000.00 pursuant to § 326.

* Bird had to forget that he disclosed payment of the initial interim trustee's fee of $38,000.00, and was requesting a second disbursement in the amount of $50,000.00 as of the date of the application.

* Bird had to forget that he received a Court order authorizing that disbursement in the amount of $50,000.00 on January 30, 1990.

* Bird had to forget that he signed a check on January 29, 1990, payable to Allen W. Bird II, Trustee in the amount of $50,000.00.

* Bird had to forget that he had hold backs totaling $17,000.00 in trustee's fees based on the maximum amount of interim fees based on distributions and amount of interim fees allowed by the Court.

* Bird had to forget that he signed an "Operating Report" dated December 26, 1990, that reflected a payment of $38,000.00 in trustee's fees for the period September 30, 1989, through September 30, 1990.

* Bird had to forget that he signed an "Operating Report" dated August 6, 1991, that reflected a payment of $88,000.00 in trustee's fees for the period through June 1991.

Bird's preparation of his June 25, 1992, motion is also indicative that he knew that

either he or the Rose Law Firm had been paid $88,000.00 in interim trustee's fees at the time of the motion, and that he intentionally failed to disclose the payment in the motion. In the motion, Bird was very detailed, meticulous, and exact in preparing his disclosure of fees owed to him by state regulators, listing each state and the specific amount of money owed. He paid attention to this detail and had to check the Stipulations and Orders between the various state regulators and himself to make the calculations and verify the amounts owing to him as fees. Yet, Bird wants the Court to believe that he failed to check any prior orders, or other source documents, that reflect interim payments of trustee's fees. All Bird had to do before, or at the time of, preparing his June 25, 1992, motion was to pull up the Quicken records, category "Trustee's Fees," to see the following entries:

Date: 2/2/89 Acct: NWF Num: 1589 Description: Allen W. Bird II
Category: Trustee's Fee Amount: $38,000.00

Date 1/29/90 Acct: NWF Num: 2004 Description: Allen Bird II
Category: Trustee's Fee Amount: $50,000.00.

Or, Bird could have simply checked the orders filed prior to the time he was preparing his June 25, 1992, motion, which would have clearly reflected that he had been paid $88,000.00 in interim trustee's fees. His preparation of the June 25, 1992, motion is also inconsistent with his preparation of his "Application for Second Interim Allowance of Trustee's Fees." In that application, Bird set forth specifically that he had received an interim trustee's fee of $38,000.00 previously. The June 25, 1992, motion is silent as to the two prior interim trustee's fees having been approved and paid.

In the June 25, 1992, motion, Bird also requested specifically the payment of $40,000.00 in attorneys' fees that was previously awarded the Rose Law Firm as counsel for the Trustee, but held back. To obtain that figure, Bird would have had to go back and review Court orders relating to the hold backs of fees previously awarded by the Court. In fact, Bird must have looked at an order filed January 30, 1990, that stated specifically that $40,000.00 is an ample cushion for attorney fees held back. This is the same day that an order was filed by the Court approving the Trustee's "Application For Second Interim Allowance of Trustee's Fee," allowing an additional disbursement for trustee's fees in the amount of $50,000.00. It is unlikely that Bird would not have noticed on the same day, January 30, 1990, an order was entered authorizing payment and disbursement of $50,000.00 in interim trustee's fees.

While Bird seemed to be focused on the hold back of attorney fees owed the Rose Law Firm in his June 25, 1992, motion, there were also trustee fee hold backs owed to Bird as Trustee. After his December 26, 1989, application for trustee's fees, the trustee fee hold back totaled $17.000.00.[72] There was no testimony at the hearing concerning the $17,000.00 in trustee fee hold back as of the June 25, 1992, motion and July 27, 1992, order.

---

72. The first application sought approval of a maximum trustee's fee of $48,000.00, with a $10,000.00 hold back. The second application stated that the maximum trustee's fee allowable was $105,000.00; however, $38,000.00 had been disbursed previously, and the Trustee was seeking an additional disbursement of $50,000.00, in effect leaving a hold back of $17,000.00.

However, Bird, just before and after the July 27, 1992, order authorizing trustee's fees in the amount of $226,880.00, wrote three checks totaling $17,000.00, the exact amount of the hold backs in trustee's fees as of the date of the July 27, 1992, order.[73] While it can be argued that the three checks signed by, and payable to, Bird totaling $17,000.00, and the $17,000.00 in hold back trustee's fees pursuant to the January 30, 1990, order are merely coincidental, the argument is refuted by the fact that Bird had already established a pattern of fraudulent intent by signing the following checks without Court orders: check number 02424 dated May 3, 1991, drawn on the operating account of NWFX, Inc. and payable to Allen W. Bird in the amount of $1500.00; and check number 02569 dated December 8, 1991, drawn on the operating account of NWFX, Inc. and payable to Allen W. Bird II in the amount of $2000.00.[74] Further, by writing checks totaling $17,000.00, Bird must have known that he had paid himself or the Rose Law Firm $88,000.00. When the $17,000.00 is added to the $88,000.00, the total equals $105,000.00, the maximum fee set forth in Bird's § 326 calculation found in his December 26, 1989, "Application For Second Interim Allowance of Trustee's Fees."

Finally, the magnitude of the interim trustee fees that Bird testified he forgot to deduct at the time he prepared the June 25, 1992, motion is enough alone to find Bird's testimony not creditable. The sum of $88,000.00 was over one-third of the total amount of compensation for which Bird sought Court approval in his June 25, 1992, motion seeking approval of $226,800.00 in trustee's fees. If you add the $41,600.00 in state bond fees that Bird also testified that he forgot (discussed in the next section), Bird would have forgotten he paid himself or the Rose Law Firm a total of $122,600.00 in trustee fees from both sources.

b. *The $41,600.00 payment in state bond proceeds and the $41,527.00 payment in state bond proceeds (Overpayment of $41,600.00 of estate money)*

██ Bird testified at the hearing that check number 02707 dated June 15, 1992, drawn on the operating account of NWFX, Inc. and payable to the Rose Law Firm in the amount of $41,600.00 was in payment of state bond fees owed to him individually pursuant to agreements he had entered into with the various state regulators to process and distribute their state surety bond proceeds. Bird testified that these fees were not to be paid by the Debtor Corporations, and were not subject to a § 326 trustee fee or Court order authorizing the same. Bird also testified that on October 29, 1992, a check was written for $141,527.00, and that $41,527.00 of that amount was in payment of state bond fees owed to him individually pursuant to

---

73. These checks appear on Shaffer's exhibit 97: check number 02726 dated July 9, 1992, payable to Allen W. Bird II in the amount of $10,000.00; check number 02732 dated July 20, 1992, payable to Allen W. Bird II in the amount of $ 2000.00; and check number 02733 dated July 28, 1992, payable to Allen W. Bird II in the amount of $5000.00.

74. At the hearing, Bird admitted that check number 02707 dated June 15, 1992, drawn on the Operating Account of NWFX, Inc. and payable to the Rose Law Firm in the amount of $41,600.00 was for his fee, individually, for services rendered in processing and distributing state surety bond proceeds pursuant to his agreement with the various states, and not subject to a § 326 fee by the Debtor Corporations' estates. Prior to the above two checks being written, Bird had obtained Court orders for the payments of the two prior interim trustee's fees of $38,000.00 and $50,000.00, and had signed and cashed checks in these amounts.

agreements that he had entered into with the various state regulators to process and distribute their state surety bond proceeds. Bird testified that he did not remember that the $41,600.00 had already been paid.[75]

According to Bird, the June 15, 1992, check in the amount of $41,600.00 had been recorded in error under the category of "Legal Fees." However, it was payment to him for services rendered in connection with his processing and distributing state bond proceeds to be paid by the various state regulators. Bird also testified that the October 29, 1992, check in the amount of $141,527.00 was coded into the Quicken Records: $100,000.00 was coded under the category "Trustee's Fees," and $41,527.00 was recorded, in error, under the category "Trustee Bond." In summary, Bird testified that he did not make the allocation as to the $41,600.00 entry into Quicken under "Legal Fees," or the allocation as to the $41,527.00 entry into Quicken under "Trustee Bond." These entries were mistakes and not intentional. Bird also stated that the mistakes were very hard to find.

Again, the Court does not believe, or find creditable, Bird's testimony that he forgot at the time he signed the October 29, 1992, check for $141,527.00, of which $41,527.00 was for payment to fees to him individually by various state regulators, that he had paid the same fee to himself for services to state regulators by check in the amount of $41,600.00 on June 15, 1992. While Bird seeks to blame the coding errors as the reason for the second payment to him of state bond fees by various state regulators, the issue is akin to the $88,000.00 in overpayments of the § 326 trustee's fees: whether Bird forgot, or knowingly and intentionally paid himself twice for fees in connection with the state

bond proceeds to be paid by the state regulators.

The facts are undisputed that on June 15, 1992, Bird signed a check payable to the Rose Law Firm in the amount of $41,600.00 Bird admitted this check was in payment of fees owed to him individually by state regulators, and not owed to him by the Debtor Corporations' estates. On June 25, 1992, Bird filed his "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back." The June 25, 1992, motion sets forth in detail the fees owed to Bird by the state regulators, totaling $41,527.00. The motion specifically stated that the following amounts had already been paid to claimants in the following states:

| | | |
|---|---|---|
| Alabama | 10,807.00 | |
| Arkansas | 253,444.00 | |
| Kansas | 23,694.00 | |
| Louisiana | 58,710.00 | |
| Michigan | 125,000.00 | (to be distributed with estate proceeds) |
| Mississippi | 3648.00 | |
| Ohio | 28,452.00 | |
| Oklahoma | 245,482.00 | |
| Tennessee | 256,576.00 | |
| Texas | 223,157.00 | |
| Puerto Rico | 120,000.00 | |

This amounts to a total distribution of $1,223,970.00. The motion then lists the "fee allowed by the court or agreed to by the appropriate state regulator" as follows:

| | |
|---|---|
| Alabama | 325.00 |
| Arkansas | 7500.00 |
| Kansas | 710.00 |
| Louisiana | 1761.00 |
| Michigan | 3760.00 |
| Mississippi | 109.00 |
| Ohio | 854.00 |
| Oklahoma | 8508.00 |
| Tennessee | 7500.00 |
| Texas | 7500.00 |
| Puerto Rico | 3000.00 |

According to this chart, the total fees owed to Bird amounted to $41,527.00.[76]

There are five reasons why the Court does not credit Bird's testimony that he forgot the payment of the $41,600.00

---

**75.** Tr. 1925.

**76.** Shaffer's Ex. 90.

check. First, the amount of the check was substantial—$41,600.00. Second, this entire payment was owed by the various state regulators. Third, the $41,6000 check was written *just ten days prior* to Bird's filing his June 25, 1992, motion. Fourth, this was the last check Bird wrote pertaining to either trustee's fees or state regulator fees before filing his June 25, 1992, motion. And fifth, the October 29, 1992, check for $141,527.00, of which $41,527.00 was allegedly for payment of state regulator fees to Bird, was written approximately four and a half months after the June 15, 1992, check paying Bird $41,600.00 in fees owed by state regulators.

The Court finds that Bird, as trustee, in relation to the June 25, 1992, "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back," knowingly and intentionally committed fraud upon the Debtor Corporations' estate and the Court in his fiduciary capacity as Trustee of the Debtor Corporations' estates. Bird formulated his fraudulent intent when he failed to disclose in his June 25, 1992, motion that *just ten days before,* on June 15, 1992, he had signed a check and paid himself, through the Rose Law Firm, $41,600.00 in fees for distributing the state bond proceeds for the various state regulators. He executed his fraudulent intent when he obtained the October 29, 1992, check for $141,527.00, of which $41,527.00 was allegedly for pay-

ment of state regulator fees, and which were paid from the Debtor Corporations' funds.

c. *Overpayment of trustee's fees without Court orders*

■ When Bird testified as to the overpayment of trustee's fees, he said, "I don't recall ever having any intent to write any check that I didn't believe was authorized and proper under the bankruptcy code." [77] Bird later testified that he did not believe that he wrote any checks to the Rose Law Firm or himself when he knew there was not a Court order authorizing payment.[78] Bird testified that he did not have a system in place matching checks he had written with Court orders, and that it was not his practice regarding trustee's fees to write a check immediately for the full amount of any trustee's fee after an order had been entered.

The Court will review all of the Court orders authorizing disbursement of trustee's fees, the checks issued by Bird in payment of trustee's fees, and the checks issued by Bird in payment of state regulators fees owing Bird for his services in handling their state bond proceeds. The purpose of this review is to determine whether any of the checks were written, and payments made, without Court orders authorizing the same, and to determine Bird's intent in writing the checks.

| | |
|---|---|
| January 27, 1989 | Court order authorizing disbursement of $38,000.00 in interim trustee's fees. |
| February 2, 1989 | Check for $38,000.00 payable to Allen W. Bird, Trustee. This check was recorded in Quicken under "Trustee's Fee." |
| January 29, 1990 | Check for $50,000.00 payable to Allen W. Bird. This check was recorded in Quicken under "Trustee's Fee." |
| January 30, 1990 | Court order authorizing disbursement of $50,000.00 in interim trustee's fees |

---

**77.** Tr. 493–94. **78.** Tr. 1909.

Note: Bird filed a complaint for turnover against state regulators seeking to have state surety bond proceeds be declared property of the Debtor Corporations' estates by the Court. The Court held that the state surety bond proceeds were not property of the Debtor Corporations' estates. After that, and with Court approval, Bird entered into contracts with the various state regulators to process and distribute their state bond proceeds through the Debtor Corporations' bankruptcy cases. Under the contracts between Bird and the state regulators, the Debtor Corporations' estates would benefit by receiving any excess state bond proceeds to be paid to all money order claimants who claims may not have been covered by surety bonds in their state. Also, the contracts avoided the duplication of claims being filed by money order claimants in the bankruptcy court and with the state regulators. For his services rendered to the state regulators for processing their claims, Bird was to be paid a three percent commission by the state regulators. His fee regarding the state surety bond proceeds was not to be paid by the Debtor Corporations' estates, and was not subject to a § 326 calculation. Bird testified that Court orders were not applicable to any fees paid by state regulators because the monies were derived from state surety bond proceeds, which the Court held were not property of the Debtor Corporations' estates. Bird is correct in his argument that Court orders were not applicable or required for the payment of fees owed to him by state regulators for administering their claims and monies.

May 5, 1991 Check for $1500.00 payable to Allen W. Bird II. There is no notation on the face of the check as to the purpose of payment. This check was entered in Quicken under "Trustee's Fee." There is no Court order authorizing the payment of this check. While Bird may have argued that this check was written for payment of his fees for administering state surety bond proceeds and, therefore, owed by state regulators and paid from their segregated state surety bond proceeds, Bird admitted at the hearing that on June 15, 1992, he signed a check payable to the Rose Law Firm in the amount of $41,600.00, which was in payment of all state regulators' fees owed to him or the Rose Law firm.

The Court finds that Bird knowingly and intentionally signed and paid this check without Court order. However, when Bird signed and paid this check, there would have been $17,000.00 in hold backs in interim trustee's fees pursuant to the orders filed on January 27, 1989, and January 30, 1990.

December 8, 1991 Check for $2000.00 payable to Allen W. Bird II. There is no notation on the face of the check as to the purpose of payment. This check was recorded in Quicken under "Trustee's Fee." The Court finds that Bird knowingly and intentionally signed and paid this check without Court order. However, when Bird signed and paid this check, there would have been $15,500.00 in hold backs in interim trustee's fees pursuant to the orders filed on January 27, 1989, and January 30, 1990.

June 15, 1992 Check for $41,600.00 payable to the Rose Law Firm. This check was recorded in Quicken under "Legal Fees." Bird testified the check should not have been coded as "Legal Fees," and was coded in error. Bird testified that this check was in full payment of fees owed by state regulators to him, and no Court order was required. The Court credits his testimony in this instance.

June 25, 1992 Bird filed his "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back ." The motion sought a payment of $226,880.00 in trustee's fees. Bird testified at trial that he failed to deduct $88,000.00 from the $226,880.00, which he had previously received as interim trustee's fees. Bird would have been entitled to only $138,880.00 in payment of trustee's fees by the Debtor Corporations' estates if the motion had been correct. Also, Bird failed to disclose in his motion that on June 15, 1992, he had paid himself or the Rose Law Firm $41,600.00 in fees owed by state regulators. However, these fees were not subject to a Court order.

July 7, 1992 Check for $10,000.00 payable to Allen W. Bird II. The notation on the check states "Trustee's Fees" and the check was recorded in Quicken under "Trustee's Fees." The Court finds that Bird knowingly and intentionally signed and paid this check without Court order. However, when Bird signed and paid this check, there would have been $13,500.00 in hold backs in interim trustee's fees pursuant to the orders filed January 27, 1989, and January 30, 1990. Furthermore, Bird had just filed a motion on June 25, 1992, seeking $226,880.00 in trustee's fees.

July 20, 1992 Check for $2000.00 payable to Allen W. Bird II. The notation on the check states, "Trustee's Fees" and the check was recorded in Quicken under "Trustee's Fees." Again, the Court finds that Bird knowingly and intentionally signed and paid this check without Court order. However, when Bird signed and paid this check, there would have been $3500.00 in hold backs in interim trustee's fees pursuant to the orders filed January 27, 1989, and January 30, 1990. Furthermore, Bird had just filed a motion on June 25, 1992, seeking $226,880.00 in trustee's fees.

July 27, 1992 Order authorizing payment of trustee's fees in the amount of $226,800.00. This order did not reflect that Bird had been paid $88,000.00 in trustee's fees by the two previous interim orders of January 27, 1989, and January 30, 1990.

 Note: The Court is making the following findings viewed in the light most favorable to Bird for the purpose of determining Bird's intent receiving trustee's fees without Court orders; specifically that he forgot he had been paid $88,000.00 in interim trustee's fees at the time he obtained the July 27, 1992, order.

202

July 28, 1992 — Check for $5000.00 payable to Allen W. Bird II. The notation on the check states, "Trustee's Fees," and the check was recorded in Quicken under "Trustee's Fees." This check was paid pursuant to Court order dated July 27, 1992.

August 20, 1992 — Check for $5000.00 payable to Allen W. Bird II. The notation on the check states, "Trustee's Fees," and the check was recorded in Quicken under "Trustee's Fees." This check was paid pursuant to Court order dated July 27, 1992.

October 28, 1992 — Check for $5000.00 payable to Allen W. Bird II. The notation on the check states, "Trustee's Fees," and the check was recorded in Quicken under "Trustee's Fees." This check was paid pursuant to Court order dated July 27, 1992.

October 29, 1992 — Check for $141,527.00 payable to the Rose Law Firm. There is no notation on the face of the check as to the purpose of the payment. This check was entered in Quicken in split entries: $100,000.00 under "Trustee's Fees," and $41,527.00 under "Trustee's Bond." Bird testified that entering the $41,527.00 under "Trustee's Bond" was in error. This check was paid pursuant to Court order dated July 27, 1992.

Note: Payments for trustee's fees made from May 5, 1991, through October 29, 1992, totaled $172,027.00.

January 27, 1993 — Check for $100,000.00 payable to Rose Law Firm. There is no notation on this check as to the purpose of the payment. This check was recorded in Quicken under "Trustee's Fees." This check exceeded the $226,880.00 amount authorized in the July 27, 1992, Court order, and was, therefore, not authorized by Court order.

Note: Payments for trustee's fees from May 5, 1991, through January 27, 1993, totaled $272,027.00, resulting in an overpayment of $45,147.00 as of January 27, 1993.

May 24, 1993 — Court order authorizing payment to Trustee in the amount of $20,000.00.

May 24, 1993 — Check for $5000.00 payable to Allen W. Bird II. The notation on the check states, "Trustee's Fees," and the check was recorded in Quicken under "Trustee's Fees." This check exceeded all Court orders authorizing payments of trustee's fees, and was in violation of Court orders.

May 24, 1993 — Check for $5000.00 payable to the Rose Law Firm. The notation on the check states, "Trustee's Fees," and the check was recorded in Quicken under "Trustee's Fees." This check exceeded all Court orders authorizing payments of trustee's fees, and was in violation of Court orders.

June 29, 1993 — Check for $2500.00 payable to Allen W. Bird II. The notation on the check states, "Trustee's Fees," and the check was recorded in Quicken under "Trustee's Fees." This check exceeded all Court orders authorizing payments of trustee's fees, and was in violation of Court orders.

July 30, 1993 — Check for $2500.00 payable to Allen W. Bird II. The notation on the check states, "Trustee's Fees," and the check was recorded in Quicken under "Trustee's Fees." This check exceeded all Court orders authorizing payments of trustee's fees, and was in violation of Court orders.

September 22, 1993 Check for $5000.00 payable to Allen W. Bird II. The notation on the check states, "Trustee's Fees," and the check was recorded in Quicken under "Trustee's Fees." This check exceeded all Court orders authorizing payments of trustee's fees, and was in violation of Court orders.

The above Court orders authorized payments of trustee's fees in the amount of $246,880.00. Assuming Bird did forget that he had received $88,000.00 in interim trustee's fees on June 25, 1992, and July 27, 1992, and recognizing that the $41,600.00 check on June 15, 1992, was Bird's payment of fees owed by state regulators, Bird still wrote checks from May 5, 1991, through September 22, 1993, totaling $292.027.00, which were paid from money that was property of the Debtor Corporations' estates. Again, this Court cannot, and does not, credit Bird's testimony that he did not have any intent to write any check that he did not believe was authorized under the bankruptcy code. The facts clearly contradict Bird's testimony. When Bird was asked about why he had written eleven small checks for trustee's fees instead of one check for the full amount awarded by the Court at the time of the order, Bird testified that it was not his practice as trustee to write a check immediately for the full amount of any trustee's fee when an order had been entered. However, his conduct refutes his testimony and credibility because the first two checks he wrote for interim trustees fees in the amounts of $38,000.00 and $50,000.00 were for the full amount of the trustee's fee authorized to be disbursed at the time by the orders. The Court finds that Bird knowingly and intentionally paid trustee's fees to himself or the Rose Law Firm without Court orders authorizing the payments at the time the payments were made.

The Court is further convinced that Bird attempted to avoid a clear method of accounting for the payments of trustee's fees. Bird stopped filing operating reports that would have reflected the current amounts of trustee's fees he had been paid during 1991, 1992, and 1993. The last operating report was filed on August 6, 1991, and reflected payments of $88,000.00 in trustee's fees. This was a correct statement and accounting of trustee's fees paid and authorized by Court order as of that date. Additionally, Bird did not have a system in place for matching the checks written for trustee's fees with Court orders authorizing payments of trustee's fees. All Bird had to do was to write a check for $226,880.00 on July 27, 1992, matching the sum the Court had authorized to be paid. This would have been recorded in Quicken on July 27, 1992, and the discovery of the $88,000.00 in overpayment of trustee's fees would have been obvious. Had Bird maintained his practice of filing operating reports and writing checks for the total amount of authorized distributions, the overpayment may not have occurred.

d. *November 9, 1998, final report and account; July 20, 1999, final report and account; and October 1, 1999, § 326 calculation*

(1) *November 9, 1998, final report and account*

 Shaffer contends that Bird, as trustee, filed a false, misleading, and inac-

curate "Chapter 11 Final Report and Account and Application For Final Decree" on November 9, 1998. Shaffer filed an objection to the final report on December 18, 1998, alleging that it did not contain sufficient information to close the bankruptcy case. As an example, Shaffer stated the final report and account did not contain a record of all receipts and disbursements in the case, or a disclosure of the remaining assets in the case, including information on the judgment liens held by the bankruptcy estate. Additionally, the Final Report and Account stated that the Trustee anticipated approximately $40,000.00 in administrative expenses to close the estate, but no accounting was given for the $40,000.00. On December 29, 1998, Bird filed a response to Shaffer's objection, stating that the objection was well taken in that it related to the finality of the case, and withdrew the final report and account.

The November 9, 1998, final report and account stated that the distribution to both creditors and holders of money orders equaled $10,527,178.38. The report also stated the professional fees and expenses approved and paid to date relating to trustee compensation amounted to $338,500.00. At the hearing, Shaffer contended that Bird intentionally overstated the distribution figure of $10,527,178.38 in order to enhance his trustee's fees. Bird testified that a mistake was made as to the $10,527,178.38 total distribution figure; specifically, that Bird incorrectly copied the distribution figure for Northwest Financial Express, Inc. in reaching the total distribution figure.

The Court credits Bird's testimony in this instance, and finds that Bird did not intentionally overstate the total distribution figure of $10,527,178.38 in his November 9, 1998, final report and account. However, the Court finds that Bird made a false statement in his November 9, 1998, final report and account by stating that trustee's compensation of $338,500.00 had been approved and paid to date. Bird testified that he received this figure from Scharmberg and inserted it into the final report. $338,500.00 is the amount reflected on the September 28, 1999, Quicken report under "Trustee's Fees." [79] But, Bird knowingly and intentionally omitted the $88,000.00 in overpayments of trustee's fees he received when he failed to deduct these overpayments in his June 25, 1992, "Motion of Trustee For Allowance of Trustee's Fees and Authorization For Payment of Legal Fees Held Back," which was granted on July 27, 1992. Bird likewise knowingly and intentionally omitted the $88,000.00 when he prepared and filed his November 9, 1998, final report and account and failed to deduct the amount from the $338,500.00 listed in the report as approved and paid to date. Bird also knowingly and intentionally failed to disclose in the November 9, 1998, final report and account that he had received two payments for fees from state regulators, the first payment on June 15, 1992, in the amount of $41,600.00, and the second payment on October 29, 1992, in the amount of $41,527.00, which was paid from the Debtor Corporations' estates and resulted in an overpayment of $41,600.00.[80] The total of

---

79. Shaffer's Ex. 94.

80. The total amount of the overpayment is $41,600.00 because Bird's total allowed fees from state regulators was $41,527.00, and Bird's first check in the amount of $41,600.00 was, in effect, a $73.00 overpayment at that time.

$41,600.00 should also have been deducted from the $338,500.00 in the November 9, 1998, final report and account.

(2) *July 29, 1999, final report and account*

Likewise, Shaffer contends that Bird, as trustee, filed a "Final Report and Account and Application For Final Decree" on July 29, 1999, that was false, misleading, and contained inaccurate information. The report reflected $9,104,717.62 as the amount distributed to all creditors of the three Debtor Corporations' estates. The July 29, 1999, final report and account has the following entry: "The professional fees and expenses approved and paid to date for all three debtors on a consolidated basis are as follows: Trustee compensation—$296,973.00 ...." Further, in paragraph 5 of the report, Bird states that under § 326, the trustee is eligible for an additional $42,313.49 as fees for his services as trustee.

On September 10, 1999, Shaffer filed his "Objection to Chapter 11 Final Report and Account and Application For Final Decree." In summary, the objection raises three concerns. First, Shaffer alleges that the Trustee overstated the amount of money he distributed to creditors of the estate. In his report, the Trustee claims to have distributed $9,104,717.62 to creditors. Based on a review of the Trustee's record, Shaffer believes the Trustee distributed approximately $7,000.000.00. Second, Shaffer alleges that the Trustee has miscalculated and substantially overpaid trustee fees in this case. Shaffer believes Bird would be entitled to a maximum of approximately $213,000.00 in trustee fees, not the $338,500.00 that, according to Bird's records, Bird has already paid to himself or the Rose Law Firm. Finally, Shaffer objects to the additional trustee fee that Bird requests. Shaffer points out that Bird is requesting the additional fee but has refused to provide either the method used to calculate his requested fees, or any detail to support the calculation of the figure, which Shaffer believes to be incorrect.

The Court finds that the statement contained in the July 29, 1999, "Final Report and Account and Application For Final Decree" that trustee compensation in the amount of $296,973.00 was approved and paid is a false statement. The Court also finds that the Trustee knowingly and intentionally failed to disclosed that he had received $88,000.00 in interim trustee's fees previously received. The Court is convinced that the Trustee, in preparing the July 29, 1999, final report and account, looked at the Quicken Records under "Trustee's Fees" to verify the amount he had received at that point in time. The Trustee testified that the $338,500.00 figure was taken from Quicken. The Quicken records clearly reflected total payments in trustee's fees of $338,500.00, and the first two entries reflected the February 2, 1989, interim payment of $38,000.00, and the January 30, 1990, interim payment of $50,000.00.

The Court also does not believe or find credible Bird's testimony that at the time he was preparing the July 29, 1999, final report, he reduced the $338,500.00 number by the amount of $41,527.00 because that was the amount he believed was paid to him out the state bond fees by the various states. While checking Quicken under the category "Trustee's Fees" when Bird was preparing the July 29, 1999, final report, Bird would have seen that there was no entry for $41,527.00 listed under "Trustee's Fees" at the time. Bird would have

the Court believe that he looked at the $338,500.00 figure that Scharmberg gave him in her report to him and decided that he had already been paid a total fee of $41,527.00 by the various state regulators out of a segregated account for state bond proceeds, even though he had never set up a separate category in Quicken to record the fees owed to him personally or to the Rose Law Firm, and against which he could verify any amount owed to him or the Rose Law Firm. The same amount that Bird thought was paid out of trustee fees, was allegedly coded in error under "Legal Fees" ($41,600.00) and "Trustee's Bond" ($41,527.00). Bird testified that he later realized that the $41,527.00 was, in fact, never recorded in Quicken under the category "Trustee's Fees," and should not have been deducted from the $338,500.00 total trustee's fees figure in Quicken. This explanation is not believable.

Bird is correct that the $41,527.00 in state regulators' fees were not subject to the § 326 calculations because the Debtor Corporations were not to pay for Bird's services for distributing the state surety bond proceeds. However, the Court finds that his testimony that he had forgotten that he had already been paid $41,600.00 in state surety bond fees is not believable, or creditable. Further, he failed to disclose in the July 29, 1999, final report that he had already been paid his personal fee by state regulators. As to Bird's request for an additional $42,313,49 in trustee's fees pursuant to § 326, Bird testified at the hearing that this request was probably incorrect.

(3) *Bird's October 1, 1999, letter to attorney Soulé, with attachments*

Shaffer alleges that Bird knowingly overstated stated his § 326 calculation of trustee's fees by using the 1994 amendments to the bankruptcy code, which were not retroactive to the Debtor Corporations' pending cases filed in 1986. Shaffer also alleges that Bird inappropriately calculated the trustee's fee by using a pro rata allocation of administrative expenses for each Debtor Corporation. Bird admits that he made a mistake by using the 1994 amendments in calculating the trustee's fee, but testified that it was not knowingly or intentionally. Bird said he failed to check the amendments to see whether they were retroactive. Also, according to Bird, the pro-rata allocation of administrative expenses is appropriate in calculating the trustee's fee under § 326.

The Court, in this instance, finds that Bird did not knowingly or intentionally miscalculate his trustee fees as set forth in the attachments to his October 1, 1999, letter to attorney Soulé. The attachment to his letter clearly sets out his § 326 calculation, and the five percent figure is specifically set forth in the calculation. In this instance, the calculation can be verified from the document without any uncertainty. The Court also finds that Bird did not make a false representation or statement by seeking to make a pro-rata allocation of administrative expenses to each of the Debtor Corporations for the purpose of a § 326 calculation.

e. *Failure to provide information*

■■■ The Court finds and concludes that Bird, as trustee, did not directly conceal the Debtor Corporations' records from Shaffer or Shaffer's legal counsel. Further, neither Bird, or any of his employees, altered or destroyed any records of the Debtor Corporations. However, the Court is convinced that Bird, as trustee, set upon a course of conduct to indirectly conceal by specifically avoiding providing Shaffer and his legal counsel a § 326 calculation of his trustee's fees, the source documents upon which a § 326 calculation

would be based, and an accounting of all trustee fees paid to him from the time he filed his November 9, 1998, final report and account, until he provided a § 326 calculation on October 1, 1999, and filed a response to Shaffer's objections on November 15, 1999, in which he provided an accounting of all trustee's fees paid to him, including the disclosure of overpayments in the amount of $133,220.00.

Bird, as trustee, breached his fiduciary duty to Shaffer, as a party in interest, by failing to disclose and provide a § 326 calculation in his July 29, 1999, final report and account; to provide an accounting of all the trustee fees Bird had been paid as of the date of the July 29, 1999, final report and account; and to disclose the $41,600.00 second payment of state regulators' fees, which was paid from money belonging to the Debtor Corporations' estates. Only after Shaffer's objections to Bird's July 29, 1999, final report did Bird actually investigate the alleged overpayment of trustee's fees.

In addition to Bird's failure to provide information in a timely manner, the Court is further convinced that Bird attempted to avoid a clear method of accounting for the payments of his trustee's fees. This is illustrated in four instances. First, Bird stopped filing operating reports after he started signing and cashing checks for trustee fees that at the time were not authorized by Court order to be disbursed. The last operating report was filed on August 6, 1991. Over the next year, the following checks were written: May 5, 1991, in the amount of $1500.00; December 8, 1991, in the amount of $2000; July 9, 1992, in the amount of $10,000.00; and July 20, 1992, in the amount of $2000.00.

Second, Bird signed the first two checks for trustee's fees in the amounts of $38,000.00 and $50,000.00, and notations were made on the face of these checks indicating they were for payment of trustee's fees. Beginning with the May 5, 1991, check for $2000.00, Bird began a pattern of signing some checks payable to either Bird or the Rose Law Firm that did not have a notation on the face of the checks indicating the purpose of the check. For example, the June 15, 1991, check payable to the Rose Law Firm for $41,600.00 had no notation on its face as to the purpose for which the check was written; the October 29, 1992, check payable to the Rose Law Firm for $141,527.00 likewise had no notation on its face as to the purpose for which the check was written. Had Bird instructed whoever prepared the check to designate the purpose of the check on its face, there would have been no coding problem to begin with.

Third, Bird failed to designate a category in the Quicken records and on his operating reports to reflect the state regulator fees that were payable to him personally, or the Rose Law Firm. The $41,600.00 check dated June 15, 1992, did not have a notation on the face of the check, but was recorded under "Legal Fees" in Quicken. Bird would have been the only person who would have known how to record this check for the purpose of reporting the transaction. He also would have had to observe at the time he signed the check on June 15, 1992, that there was no notation on the check indicating what the payment was for. It was clearly not for legal fees. At that time, Bird knew the payment was for payment of his state bond fees, but he failed to create a category in Quicken to reflect this payment. Had he created a category for state bond fees, the coding errors likely would never have occurred.

Fourth, Bird did not have a system in place for matching the checks he signed for trustee's fees with Court orders. The first two checks Bird wrote for payment of interim trustee's fees in the amount of

$38,000.00 and $50,000.00 were written for the entire amount authorized. After that, Bird begin to write numerous small check and some large checks, rather than writing one check in the amount of $226,800.00, the amount authorized by the July 27, 1992, order. The above four examples all indicate that Bird was intentionally avoiding a clear method of accountability for the trustee's fees that he was receiving at various times.

When questioned by Shaffer's counsel during trial, Bird stated, "I think Gary Garrrett and I uncovered every single mistake that was made in all of these calculations, and nothing from you or anyone else assisted in that process." Tr. 1716. While Bird contends that he and Garrett found every overpayment of trustee's fees, Shaffer raised substantial red flags before Garrett became involved in the case. First, on May 11, 1999, by letter from attorney Soulé to Bird, as trustee, Shaffer requested an invoice and supporting detail for check number 2813 in the amount of $41,527.00. This would have been the second payment of state bond fees to Bird or the Rose Law Firm. The supporting detail would have revealed that check number 2813 was in the total amount of $141,527.00, of which only $100,000.00 was posted as a trustee's fee. The remaining $41,527.00 should have been easily recognized by Bird because that is the amount that was owed to him by the state regulators for processing their money order claims paid out of the surety bond proceeds.

Second, in their September 10, 1999, objection, Shaffer's legal counsel specifically pointed out the three orders allowing payments of interim trustee's fees: January 27, 1989, for $38,000.00; January 30, 1990, for $50,000.00; and July 27, 1992, for $226,880.00, which included the previous two allowed fees. This objection would have brought to light the duplication contained in the July 27, 1992, order regarding the $88,000.00 in previous allowed and paid interim trustee's fees.

Third, in the Court's "Stipulated Scheduling Order Regarding Motion For Final Approval of Professional Fees and Objection Thereto," filed on October 15, 1999, the Court ordered the Trustee to research check number 2707, dated June 15, 1992, in the amount of $41,600.00. According to the Trustee's records, the check was in payment of legal fees or expenses to the Rose Law Firm. After researching the check, the Trustee was to provide to Shaffer a copy of the check, a description of the purpose of the check, a copy of the invoice(s) paid by the check, and a copy of the Court order authorizing the payment. The Trustee's research would have disclosed that the legal fees and expenses billed during the time period for which the check was written amounted to $6889.81,[81] thereby precluding check number 2707 having been written for legal fees. The fact is there were no invoices or billing records by the Rose Law Firm reflecting $41,600.00 in legal services rendered during this period. Further, the Rose Law Firm hold back of $40,000.00 in legal fees was paid by check number 2737, dated July 31, 1992. The only explanation left to Bird for the $41,600.00 payment made on June 15, 1992, was that it was for state surety bond fees. The October 15, 1999, "Stipulated Scheduling Order Regarding Motion For Final Approval of Professional Fees and Objection Thereto" gave Bird no option but to disclose the $41,600.00 as an original payment of state surety bond fees.

Bird's actions in these cases are indicative of his pattern of avoidance of making a full and timely disclosure of the trustee

81. Shaffer's Ex. 132.

fees paid to him or the Rose Law Firm. On May 24, 1999, Soulé wrote Bird a letter, in which he stated, "As discussed· at your deposition, and as set forth in your May 13 letter, it is clear that the calculations in your previous reports concerning monies disbursed were not correct. Please provide your new calculations on the amounts disbursed and the backup for your calculations on the trustee's fees you have paid yourself. If, as it appears to us, the trustee's fees have been overpaid, we need to discuss the process and timing of the reimbursement of the amount overpaid." As of June 7, 1999, Bird had not provided Shaffer or his attorneys the § 326 calculation upon which he determined his trustee fees. On June 7, 1999, Bird wrote Soulé a letter in which he stated, "I disagree with you regarding the trustees fees and I am reviewing my calculations." Further, Bird had not provided an accounting of all the trustee fees that had been paid, or the checks evidencing the payments of trustee fees to either himself or the Rose Law Firm. Bird testified that he did not review his calculations regarding trustee's fees until after he filed his July 29, 1999, final report and account.

Shaffer, through his attorneys, requested backup information regarding Bird's trustee's fees on three occasions. First, on February 26, 1999, Shaffer requested in writing to Bird the backup information and documents as to his trustee's fees. Second, on April 2, 1999, Shaffer requested that Bird, as trustee, provide the basis for the numbers used in computing his trustee's fees. And third, on May 24, 1999, Shaffer requested that Bird, as trustee, provide Shaffer with Bird's calculations regarding the trustee's fees that he had paid himself during his administration of the bankruptcy cases. There is no dispute that this information concerns the estate and administration of the estate. Likewise, Shaffer is a party in interest in this case. Bird had a statutory duty to provide Shaffer with certain information that Shaffer requested concerning the Debtor Corporations' estate and administration of the estate. Under § 1106, a trustee shall "perform the duties of a trustee specified in sections 704(2), 704(5), 704(7), 704(8), and 704(9) of this title." 11 U.S.C. § 1106(a)(1). Under § 704(7), a trustee shall, "unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest." 11 U.S.C. § 704(7). Section 704(7) requires the turn over of information if two conditions are met: the information must concern the estate or the administration of the estate; and the request must be made by a party in interest. If these conditions are met, the trustee has a fiduciary duty to provide that information. The language in this code section makes a request for information difficult for a trustee ·to avoid absent a court order to the contrary.

Bird, as trustee, had a clear duty to provide in a timely fashion the information requested by Shaffer by at least July 29, 1999, the date he filed his second final report and account. However, Bird knowingly and intentionally failed to do so, and breached the fiduciary duty owed to Shaffer as a party in interest. Bird, as trustee, failed to make a timely investigation into the payments of trustee's fees to himself or the Rose Law Firm by reviewing the source documents for the payments of his trustee's fees. His attitude was one of indifference. He merely stated that he thought his figures were right as to the trustee fees paid him, and he had offered Shaffer all of the Debtor Corporations' books and records so Shaffer had access to the same records held by Bird. Bird had an affirmative duty to provide a § 326 calculation in a timely manner, including all the backup information as to his trust-

ee's fee, and simply refused to do so until October 1, 1999, when he provided a § 326 calculation, and November 15, 1999, when he disclosed $133,220.00 in overpayments of trustee's fees and all the checks he had signed paying himself or the Rose Law Firm trustee fees. Bird, as trustee, had access to this information and yet, withheld this knowledge until the above dates, thereby concealing it from Shaffer. *See United States v. Turner,* 725 F.2d 1154, 1157 (8th Cir.1984)(finding that withholding knowledge or preventing disclosure or recognition is included in the definition of concealment). This concealment by avoiding a full and timely disclosure of all trustee fees that had been paid and not providing a timely § 326 calculation was a breach of Bird's fiduciary duty as trustee for the Debtor Corporations' estates.

### D. *11 U.S.C. § 326(a) issues raised by the parties*

#### 1. *Is the Trustee entitled to a fee for claims that were compromised or set off*

When the Trustee was appointed in 1986, the section of the code limiting the compensation of a trustee stated:

Limitation on compensation of trustee.

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1000 or less, six percent on any amount in excess of $1000 but not in excess of $3000, and three percent on any amount in excess of $3000, upon all moneys disbursed or turned over in the

case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326(a)(as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984)).[82]

a. *December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final Decree," and § 326(a) fee request by the Trustee*

Included in the Trustee's amended final report is his request and calculation for trustee's fees in the amount of $16,104.31, arising from the offset of prepetition claims. These claims are referenced as "X" and "P" claims of agents against judgments entered against those agents for unreturned money order forms and accounts receivables. The accuracy of the amount of the fee is not in issue.

The December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final Decree" describes the X and P claims as follows:

(a) "X" claims were paid where an agent filed a proof of claim for a specific amount and the Trustee, with no agreement to compromise, disallowed the claim because he held a judgment in excess of the amount shown on the proof of claim. While checks were not exchanged, the Trustee paid to these claimants, $260,090.98.

(b) "P" claims were paid where an agent filed a proof of claim for a specific amount and the Trustee through negotiation established a right to offset the

---

**82.** This section of the code was amended by the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106 (1994). The amendment allowed for an increased compensation paid to a trustee. However, section 702(b) of the Reform Act provided that amendments made by the act shall not apply to cases commenced before the date of enactment of the act, which was October 22, 1994.

claims of the Debtors against the agents. Some of these offsets made by the Trustee were debts reduced to judgments and others were unliquidated claims. While checks were not exchanged, the Trustee paid to these claimants $276,719.48.

Shaffer's Ex. 52, ¶ 12.

b. *Arguments of the Trustee and Shaffer*

The Trustee argues in his post-trial brief that he recognizes that awarding a trustee's fee on the basis of setoffs of pre-petition claims against pre-petition amounts owed is not customary under § 326(a). However, the setoff of the X and P claims here does not follow the typical pattern. In certain situations, non-cash transactions are properly treated as the functional equivalent of cash payments for purposes of calculating fees. 1998 Collier Handbook for Trustees and Debtors in Possession, at ¶ 9.02 (Matthew Bender 1998); *see also In re Greenley Energy Holdings of Pennsylvania, Inc.,* 102 B.R. 400, 404 (E.D.Pa.1989)("[t]o deprive the trustee of fees generated on the basis of the present value of the guaranteed contracts would be unjust and could create incentives for other trustees to structure reorganizations in a way that provides maximum cash payouts to creditors and shareholders but sacrifices advantageous long term contracts.")

The Trustee believes the inclusion of the setoffs in the disbursement amount is justified. The setoffs at issue are not the typical setoffs in which a prepetition claim is setoff against a prepetition liquidated sum the claimant owes the debtor. In this case, the Trustee obtained the judgments for the expressed purpose of preserving the equality of the distribution through the trustee's rights of setoff.

The Trustee spent a substantial amount of time and effort in obtaining the judgments for the benefit of the estate and its creditors. These judgments had value and were used to offset claims. The estate and its creditors benefitted greatly. The Trustee could have required the creditors to pay their claim to the estate, and later paid the creditor a 100% distribution. The dollars to and from the creditor would have been the same, but the costs of administration would have increased. Thus, Mr. Shaffer's objection elevates form over substance.

In *Pritchard v. United States Trustee,* 207 B.R. 138 (N.D.Tex.1997), the trustee distributed unliquidated real property to some unsecured creditors, rather than a money distribution. The court recognized the problem with elevating form over substance:

> "[T]o exclude from the calculation of a trustee's commission the value of an asset disbursed in satisfaction of a debt would create an antithetical incentive for trustees to mechanically jump through procedural hoops to insure their fair and reasonable compensation, regardless of the detrimental effects on the estate in prolonging the bankruptcy proceedings for the process of a sale and ultimate distribution to creditors."

*Id.* at 140 (quoting *Ebert v. Abramson,* 3:94–CV–0556 (J.Solis)). The court further found a hypertechnical interpretation of § 326 inappropriate, stating, " 'a hypertechnical reading of … § 326(a) is only appropriate in cases where a Chapter 7 Trustee attempts to sell fully encumbered property or property in which there is a slight equity. In all other cases, a strict reading … must be balanced by the policy considerations providing just and reasonable fees.' " *Id.* (quoting *In re Stanley,* 120 B.R. 409, 413 (Bankr.E.D.Tex.1990)). The *Pritchard* court concluded by stating,

"[b]ecause this Court agrees with Judge Solis that it would be a perverse incentive to penalize the Trustee for taking the most efficient route to compensating unsecured creditors, it REVERSES the bankruptcy court's order awarding Trustee's fees, computed on only moneys disbursed." *Pritchard,* 207 B.R. at 141.

Here, the Trustee argues that he took the most efficient route. Instead of swapping checks (which, without question, would have resulted in a trustee's fee being earned), the Trustee negotiated or applied setoffs. The Trustee says he should not be penalized for his efficiency, and the setoff amounts should be considered disbursements for the purpose of calculating the fee allowed under 11 U.S.C. § 326.

Shaffer argues in his post-trial brief that the bankruptcy code limits the compensation of a trustee in that the fee must be based upon "moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor . . . ." 11 U.S.C. § 326(a). This language has been interpreted as meaning actual money that passed through the trustee's hands to creditors. *In re Landing,* 142 B.R. 169, 171 (Bankr.N.D.Ohio 1992); *accord In re Barnett,* 133 B.R. 487, 489 (Bankr. N.D.Iowa 1991); *In re Indoor–Outdoor Dining, Inc.* 77 B.R. 952, 953–54 (Bankr. S.D.Fla.1987); *In re New England Fish Co.,* 34 B.R. 899, 902 (Bankr.W.D.Wash. 1983). The trustee may collect a fee only upon money that was disbursed or turned over to creditors or other parties in interest. *See Kandel v. Alexander Leasing Corp.,* 107 B.R. 548, 551 (N.D.Ohio 1988)(holding that the trustee himself must disburse the funds in order to collect a fee).

Shaffer argues that courts have taken a narrow approach to their interpretation of § 326(a) and, as such, have found that the compromising or setting off of a claim does not constitute moneys disbursed or turned over in the case by the trustee. *See, e.g., New England Fish Co.,* 34 B.R. at 902; *In re Music Merchandisers, Inc.,* 131 B.R. 377, 380 (Bankr.M.D.Tenn.1991)(trustee not entitled to trustee fee on funds "deemed" disbursed in settlement with claim holder). Courts have reached this result in part by relying on the definition of "money." " 'Money' means currency or negotiable paper, not other forms of property." *Music Merchandisers, Inc.,* 131 B.R. at 380. This definition would not include the settlement of a claim or debt where no money was disbursed. *Id.* at 381.

According to Shaffer, the Trustee did not "pay" or "disburse" anything to the holders of setoff claims in these cases. The Trustee did what he was obliged to do—he refused to pay claims to creditors who owed money to the estate.[83] Even the Trustee's expert witness, Robertson (also a chapter 7 trustee), reluctantly agreed that the Trustee is not entitled to a trustee's fee on compromised claims.

c. *Conclusions of law*

■ The Trustee relies upon *Pritchard v. United States Trustee,* 207 B.R. 138 (N.D.Tex.1997), for his position that the setoff or compromised amounts of the prepetition claims constitute a constructive distribution of money from the Debtor Corporations' estate. That case was reversed the following year by *Pritchard v. U.S. Trustee (In re England ),* 153 F.3d 232 (5th Cir.1998). The Fifth Circuit Court of Appeals looked at the plain mean-

---

**83.** *See* 11 U.S.C. § 502(b)(1). Refusing to pay is not a disbursement qualifying for a § 326 trustee's fee.

ing of the statutory language found in 11 U.S.C. § 326(a) and concluded that Congress intended for the maximum compensation of a trustee to be based only upon moneys distributed by the trustee, not money and property. *Id.* at 237. That position is consistent with the cases cited by Shaffer. *See, e.g., In re Barnett,* 133 B.R. 487, 490 (Bankr.N.D.Iowa 1991)(concluding that § 326 does not permit considering the value of liens that remain attached to the property interest transferred by the estate); *In re New England Fish Co.,* 34 B.R. 899, 902 (Bankr.W.D.Wash.1983)(concluding that trustee's compensation cannot be based on assets or settlements that can be construed as constructive disbursements). In drafting § 326, Congress could have included property turned over to a creditor, claims assumed by a creditor, the value of liens that remain attached to a property interest transferred by the trustee, or the value of compromised claims as a basis for determining a trustee's commission. However, it did not do so.

The Court agrees with the legal authorities cited by Shaffer, which take a narrow approach in interpreting § 326. The compromising or settling of a claim is not money distributed or turned over in a case by the trustee. Therefore, the Trustee is not entitled to a fee of $16,104.31 for claims arising from the compromised or setoff prepetition claims.

**2. Is the Trustee entitled to a fee for state bond proceeds that were distributed through the Debtor Corporations' estates**

a. *Positions of the parties*

The Trustee's position is that the state bond proceeds were moneys disbursed or turned over through the Debtor Corporations' estates. Because of this, the Trustee is seeking compensation pursuant to 11 U.S.C. § 326(a).

Shaffer contends that even though the state bond proceeds were distributed through the Debtor Corporations' estates, the Trustee should be estopped from charging a fee on the state bond proceeds. The Trustee collected a three percent fee from the states for handling their money order claims pursuant to an agreement that was approved by the Court. Prior to entering into the agreements with the states, the Trustee represented that he would not charge the bankruptcy estates a fee for distributing the moneys through the estates. Now, according to Shaffer, the Trustee is seeking to "double dip" or obtain two fees for the same work. The three percent fee paid by the states was paid to Bird individually, not as trustee of the Debtor Corporations' estates. However, Bird, as trustee, had the benefit and use of the Debtor Corporations' facilities, equipment, supplies, and employees, and used the experience he obtained in processing money order claims as trustee in these cases. The Court ruled that the state bond proceeds were not property of the estate. In exchange for using the Debtor Corporations' estates to process the state bond proceeds, Bird agreed not to charge the Debtor Corporations' estates a trustee fee on the state bond fees.

b. *Findings of fact*

The facts are undisputed that money paid or distributed by the Trustee to money order claimants in each state, through the Debtor Corporations' estates, total $1,244,400.77. Bird's December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final Decree" sets forth in the Trustee's § 326(a) calculation a fee of $37,332.00 on the state surety bond proceeds distributed through the Debtor Corporations' estates. Bird, as

trustee, testified at length as to the circumstances surrounding the money order proceeds and payments of money order claimants in the Debtor Corporations' cases. Before the Debtor Corporations were allowed to do business in each state, they were required to post a bond or certificate of deposit pledged to the appropriate regulator. In the event one of the Debtor Corporations' money orders was not paid, the bond proceeds would be used to pay the money order purchaser.

When the Trustee learned of the existence of the state bond funds, he contacted the state regulators, explained the situation to them, and made demand that the property be turned over to the estate. The regulators refused and the Trustee brought an adversary proceeding against the regulators contending that the bonds were property of the Debtor Corporations' estates. This Court ruled that the state bond proceeds were not property of the Debtor Corporations' estates, and the regulators would not be required to turn over the state bond proceeds to the Trustee. The Trustee did not appeal the decision by the Court.

The Trustee then entered into negotiations with the regulators and explained that it would be difficult for them to distribute those funds effectively. The Trustee had compiled the name, address, and money order number of each of the money order holders in each state. The state regulators did not have that information. Many of the regulators intended to put the funds into their state's unclaimed property fund, and require claimants to file claims against the fund; they did not intent to make any effort to search for the money order purchasers. Moreover, duplicate payments could have resulted when a money order purchaser was paid out of a state bond fund and also filed a claim against the Debtor Corporations' estates. The Trustee would not know that the money order holder had already been paid. The only solutions to this dilemma appeared to be for the Trustee to wait until the states completed their distribution, or to assume that the money order claimants from each particular state would be paid in full by the regulators. This would have caused either unacceptable time delays or inequitable distribution to the money order claimants.

Instead of waiting for each state to disburse the funds, the Trustee proposed that each regulator turn over the state bond funds to the Trustee and the Trustee hold the funds in accordance with the regulator's directions. The Trustee agreed to segregate the funds and distribute them to the money order holders who purchased money orders in each particular state, with the understanding that after each state's money order purchasers were paid, the excess funds would be paid to the estates. The Trustee would then be able to use the excess funds to pay other claims. Without this agreement, the unclaimed funds in each state would stay in the state's unclaimed property fund.

Generally, the agreement entered into between the Trustee and a state provided that (1) the state would liquidate the security pledged by the Debtor Corporation and turn the proceeds over to the Trustee; (2) the Trustee would set up a separate segregated trust account in the name of the state; (3) the Trustee would assemble claims on the trust fund, calculate the amount of payment to be made to each claimant who was a residence of that state, and pay the claim as funds became available; (4) the Trustee would retain three percent of the trust fund; (5) the provisions of the agreement would be incorporated into the Debtor Corporations' plan of reorganization; and (6) by entering into the agreement, the state neither admitted

or agreed that the pledged securities currently held in trust by the state constituted property that the Trustee may use, sell, or lease pursuant to 11 U.S.C. § 363.

The June 15, 1988, Debtor Corporations' "Plan of Reorganization Submitted by the Trustee" incorporated the agreements reached between the Trustee and each state. Segregated accounts were set up for each state, with the money from each state to be used to pay claims of money order purchasers in that state. The plan of reorganization specifically provided that all funds in Segregated Funds Accounts would be transferred to the Distribution Account for the purpose of actual disbursement to the claimant. Bird testified that he implemented the plan and amended plan by making distributions to the money order claimants in each state with the state bond proceeds that had been turned over to him as trustee.

Bird also testified as to his fee arrangement with the states. He stated,

Well, in discussing with them, in trying to convince them that this made more sense than their trying to reach and make available to their citizens the same information, I pointed out to them that there would be some amount of effort involved in the State Regulator's Office or whoever the proper person was to hold the funds, that there would be effort and that effort would be saved if their office would not have to compile names or give notices or publications or do anything. And that for saving them that trouble I wanted to be compensated in an amount equal to three percent of the face amount of the bond.

Tr. 135–36.

He testified that all of the states agreed to his compensation either as a fixed amount or precisely three percent, and the amount was put in the Stipulations and Orders.

Bird stated in his May 1999 deposition, which was read into the record at trial, that he would not be entitled to a trustee's fee from the Debtor Corporations' estates for distributing state bond fund monies. According to Bird, the state bond fee was not to be retained by the bankruptcy estate. The bankruptcy estate would benefit to the extent it did not have to incur any portion of the three percent fee or expense, and excess funds, if any, would be used for other claimants.

c. *Conclusions of law*

■ Section 326(a) states, in relevant part, "the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, ... upon all moneys disbursed or turned over in the case by the trustee to parties in interest ...." 11 U.S.C. § 326(a). This language clearly applies to money disbursed by the Trustee to the money order claimants as provided in the plan of reorganization and amended plan of reorganization. The state bond proceeds were subjected to the plan and amended plan to be disbursed in accordance with the plan and amended plan. The facts are undisputed that the Trustee disbursed the state bond proceeds to the holders of money order claims in each state in which the Debtors Corporations put up security as a condition of doing business. Under § 326(a), the Court may allow reasonable compensation to the Trustee on state bond proceeds disbursed in the Debtor Corporations' cases.

The issue before the Court is whether Bird, as trustee, agreed to waive, or is estopped from requesting his entitlement to a § 326(a) fee relating to the state bond proceeds. The answer is yes. The Trustee filed complaints against the defendant states and Puerto Rico seeking a turn over of bond proceeds. The issue was tried and

this Court held that the state bond proceeds were not property of the Debtor Corporations' estates under 11 U.S.C. § 541.

Bird, as trustee, then began to negotiate with Puerto Rico and the various states that did business with the Debtor Corporations. He reached agreements in which the states and Puerto Rico agreed to turned over to Bird, as trustee, their state bond proceeds and Bird, as trustee, would process and distribute the state bond proceeds through the Debtor Corporations' plan of reorganization to the money order claimants in each state. Then Bird, as trustee, presented the Court with the written agreements he had reached with each state. Bird represented to the Court that the states had agreed to permit Bird, as trustee, to process their claims and pay their claimants. In exchange, the states agreed to turn the state bonds proceeds over to Bird, as trustee. Up to ninety-seven percent of the funds would be paid to the money order claimants, and three percent would be paid to Bird for his services in handing and distributing the states' money order claims. Bird also represented to the Court that the bankruptcy estates would benefit by not having to pay the trustee fee. Additionally, all excess money collected from the state bond fees that was not paid to state money order claimants would be used to pay unsecured creditors and other money order claimants in the Debtor Corporations' cases.

The Court, after considering all of the circumstances including Bird's representation that the fee he would receive for processing and distributing the state bond proceeds would be paid to him individually by the states and not by the Debtor Corporations' estates, determined that the Stipulations and Orders were in the best interest of the Debtor Corporations' estates and approved the Stipulations and Orders.

■■■■ Bird, as trustee, waived his entitlement to a § 326(a) fee as to the state bond proceeds. The doctrine of waiver is clear. Under Arkansas law, "[w]aiver is the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits." *Bharodia v. Pledger*, 340 Ark. 547, 555, 11 S.W.3d 540, 545 (2000). Waiver consists of three elements: "(1) the existence at the time of a waiver, of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit." *South Motor Chrysler–Plymouth, Inc. v. Chrysler Motor Corp. (In re South Motor Co. of Dade County )*, 161 B.R. 532, 544 (Bankr.S.D.Fla.1993); *see also Bharodia*, 11 S.W.3d at 545 (stating that waiver may occur "when one, with full knowledge of material facts, does something which is inconsistent with the right or his intention to rely upon that right. The relinquishment of the right must be intentional.").

The elements of waiver have been met in this instance. First, by having the proceeds of the state bond money pass through the Debtor Corporations' estates, the court "may allow reasonable compensation under section 330 of this title [11 U.S.C.] of the trustee for the trustee's services ...." 11 U.S.C. § 326(a). In other words, Bird, as trustee, may have been entitled to a § 326(a) fee. Second, when Bird, as trustee, made the agreement with the states to process and distribute state bond proceeds through the Debtor Corporations' plans of reorganization, he had either actual or constructive knowledge that he may be entitled to seek a § 326(a) fee relating to the proceeds that passed through the estates. Third, when

Bird, as trustee, represented to the Court that he would receive a three percent fee from the states for his services, and that the estates would benefit by not having to pay his fee, he, in effect, expressed his intention to relinquish his right to recover a fee under § 326(a). Bird, as trustee, waived his right to recover a § 326(a) fee related to the processing and distribution of the state bond proceeds. Further, for Bird to be paid an additional fee by the Debtor Corporations for the same work he performed and was paid for in processing and distributing state bond proceeds would be unconscionable in these cases.

### 3. Is the Trustee entitled to a fee for money distributed to Shaffer as the equity security claimant of the Debtor Corporations' cases

#### a. Findings of fact

The Debtor Corporations' plan and amended plan each list a Class IX, Equity Security Claims. On August 13, 1997, Shaffer filed a "Proof of Interest," which was received into evidence as Bird's exhibit 68. In the Proof of Interest, Shaffer stated that he is the sole stockholder of each of the Debtor Corporations. On October 28, 1997, the Court entered its "Order Determining Equity Security Holder" and found that Shaffer was the sole shareholder of each of the Debtor Corporations.

On May 17, 1999, Shaffer filed a "Motion for Interim Distribution" as a Class IX Equity Security Claimant under the plan and amended plan. The Court approved Shaffer's motion, and entered its "Agreed Order Granting Interim Distribution" on June 21, 1999. The agreed order was signed by Bird and Stephen Soulé, counsel for Shaffer, and authorized the Trustee to distribute $250,000.00 to Shaffer as the Class IX Equity Security Claimant.

#### b. Arguments of the parties

In his post-trial brief, the Trustee argues that the statutory language of § 326(a) is clear and unambiguous, and that the controlling definitions as to this issue are found in 11 U.S.C. § 101:

(13) "debtor" means person or municipality concerning which a case under this title has commenced;

(16) "equity security" means—

(A) share in a corporation, whether or not transferable or denominated "stock," or similar security;

(17) "equity security holder" means holder of an equity security of the debtor.

The facts are not disputed that Shaffer is the equity security holder of the three Debtor Corporations, and the Court has so found. Shaffer has petitioned the Court, and received an interim distribution, as an equity security holder. According to the Trustee, these definitions unequivocally refute Shaffer's contention that the terms "debtor" and "Shaffer" in these cases is one without a difference for the purposes of a § 326(a) calculation. Simply stated, § 326(a) provides that the trustee is entitled to a fee for moneys distributed or turned over to a equity security holder. The terms "debtor" and "equity security holder" are not inter-changeable and are specifically given different treatment in § 326(a). Shafer is an equity security holder, not a debtor, in these cases.

Shafer argues in his post-trial brief that § 326(a) provides that the Trustee may not collect a trustee fee on funds disbursed to the "debtor." Shaffer contends that there is no distinction between Shaffer and the "debtor" for purposes of the instant trustee fee calculation. According to Shaffer, equity dictates that a final distribution to the sole shareholder of a closely held cor-

poration should not be charged a trustee fee.

### c. *Conclusions of law*

■ Section 326(a) clearly provides that the court may allow reasonable compensation for the trustee's services based upon "all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor . . . ." 11 U.S.C. § 326(a). The phrase "parties in interest" is not defined in the code; however, § 1121 sheds some light on who would be included in the definition. It states, in relevant part, "[a]ny party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee . . . ." 11 U.S.C. 1121(c). Shaffer is the equity security holder in the Debtor Corporations' estates, not the debtor, as he argues to the Court. As the equity security holder, he is entitled to a distribution from the estate. The Court finds, as a matter of law, that the Court may allow reasonable compensation to the Trustee for money turned over in this case by the Trustee to Shaffer, the equity security holder.

### E. *Conclusions of law as to the appropriate § 330 and § 326(a) compensation to be paid to the Trustee in the Debtor Corporations' cases*

The Court, in this opinion, has discussed all of the objections and issues relating to the appropriate calculation of a trustee fee pursuant to 11 U.S.C. § 326(a). Before calculating the limitation on trustee compensation pursuant to § 326(a), the Court will review the positions of the parties. The Trustee's positions, as they relate to his amended chapter 11 final report, are

that (1) the claims paid figure of $6,368,290.09 accurately includes the payments from state bond fees, less the amounts returned to Texas and Oklahoma; (2) the tax refunds obtained from the Internal Revenue Service on taxes paid prepetition should be included in the amount available for distribution; and (3) the Trustee is entitled to a fee based on the offset "X" and "P" claims. This results in a total distribution to parties in interest in the amount of $9,043,093.20. By including the state bond fees with the claims paid figure of $6,368,290.09, the trustee is seeking an additional $41,527.00 in trustee's fee pursuant to § 326 for the state surety bond proceeds distributed by the trustee.

In addition to the contrary positions to the above Trustee's claims, Shaffer also argues that (1) the Trustee is not entitled to a fee on distributions made to Shaffer as equity security holder because the distributions are the same as a distribution to the debtor; and (2) the Trustee is not entitled to the $20,000.00 fee enhancement previously awarded by the Court because it exceeds the statutory cap of 11 U.S.C. § 326(a). Following Shaffer's positions results in a total distribution to parties in interest in the amount of $8,412,249.95.

As reflected in the following § 326 calculation, and discussed earlier in this opinion, the Court finds that the claims paid figure should not include the payments from the state bond fees, and Bird is not entitled to a trustee's fee based on bond proceeds received from the states.[84] Nor is the Trustee entitled to a trustee's fee based on the offset of the "X" and "P" claims because these claims were not money distributed by the Trustee.[85] The tax refunds that the Trustee obtained from the Internal Revenue Service on taxes paid pre-

---

**84.** See section III.D.2.

**85.** See section III.D.1.

petition do constitute property of the estate and are included in the calculation of a trustee's fee. Finally, the distributions made to Shaffer as equity security holder are moneys disbursed by the Trustee to a party in interest and are also included in the calculation of a trustee's fee.[86] The Trustee's entitlement to the $20,000.00 enhancement will be discussed below.

Because neither party objected to the amount of claims paid by the Trustee as set forth in the amended chapter 11 final report, except as discussed above, that is the starting point of the Court's calculation of an appropriate compensation for the Trustee that follows. That amount is $6,368,290.09. To that figure, the Court has subtracted the bond proceeds received from the states after making an adjustment for the bond proceeds returned to Texas and Oklahoma. Next, the Court adjusted the administrative claims paid as set forth in the amended final report by removing the disallowed fees of the Rose Law Firm.[87] That adjustment resulted in

an overpayment of fees to the Rose Law Firm that is reflected in the calculation. Finally, the Court added in the cash on hand, which includes the previous reimbursement from the Rose Law Firm, the Internal Revenue Service refunds, and interest on the reimbursement at the rate of five percent per annum.[88] The resulting figure, $7,587,905.70, is the figure from which the Court determined the maximum allowed compensation of the Trustee pursuant to § 326(a)—$228,177.17.

The Court then subtracted from the payments previously made to the Trustee or the Rose Law Firm, Bird's fee from the state bond fees, to which he is entitled pursuant to his agreement with the states and which is not property of the estate; and the amount the Rose Law Firm paid back to the estate. The result is the amount of compensation that has already been paid to either the Trustee or the Rose Law Firm. When this amount is subtracted from the maximum allowed compensation, a balance of $28,197.91 remains.

COURT'S 11 U.S.C. § 326(a) CALCULATION

| $6,368,290.09 | Claims paid according to Bird's amended chapter 11 final report filed 12–15–99 |
|---|---|

COURT ADJUSTMENTS TO CLAIMS PAID

| | 1,934,295.72 | Bond proceeds received from the states |
|---|---|---|
| | (45,842.09) | Bond proceeds returned to Oklahoma |
| | (83,643.23) | Bond proceeds returned to Texas |
| (1,804,810.40) | 1,804,810.40 | Remaining bond fees received from the states, out of which Bird's fee of 41,527.00 was paid |

| 4,563,479.69 | **SUBTOTAL** | Allowed claims paid |
|---|---|---|

COURT ADJUSTMENTS TO ADMINISTRATIVE CLAIMS PAID

| | 684,868.50 | Total Rose Law Firm billing accrued through 9/1/00 |
|---|---|---|
| | (125,456.00) | Disallowed fees (see section III.F.2.) |

---

**86.** See section III.D.3.

**87.** See section III.F.2.

**88.** The parties disagree as to the appropriate rate of interest that should be paid on the amount of reimbursement. The Court credits Bird's testimony that five percent is the average rate of interest of a conservative investment. As a fiduciary, the trustee has a duty to invest funds safely, not to get top dollar. The Court will not speculate as to what interest rate could have been earned and finds that five percent is an appropriate rate.

| | | |
|---|---|---|
| | 559,412.50 | Total allowed Rose Law Firm fees |
| | 662,772.00 | Attorney fees paid to Rose Law Firm according to Bird's amended chapter 11 final report filed 12–15–99 |
| | (559,412.50) | Total allowed Rose Law Firm fees |
| | 103,359.50 | Overpayment to Rose Law Firm |
| | 2,734,049.84 | Administrative claims paid according to Bird's amended chapter 11 final report filed 12–15–99 |
| | (103,359.50) | Overpayment to Rose Law Firm |
| 2,630,690.34 | 2,630,690.34 | Administrative claims paid |
| 7,194,170.03 | **SUBTOTAL** | Allowed claims paid and administrative claims paid |
| 393,735.67 | | Cash on hand as of 3/30/01 (includes 180,120.74—Rose Law Firm reimbursement; 43,579.60—IRS refunds; and interest on reimbursements) |
| $7,587,905.70 | **TOTAL** | Money disbursed or turned over by the Trustee to parties in interest for purposes of 11 U.S.C. § 326(a) calculation |
| $7,587,905.70 | | Money disbursed or turned over by the Trustee to parties in interest for purposes of 11 U.S.C. § 326(a) calculation |

11 U.S.C. § 326(a) CALCULATION

| | |
|---|---|
| 450.00 | 15% of 1000.00 = 150.00 X 3 cases |
| 360.00 | 6% of 2000.00 = 120.00 X 3 cases |
| 227,367.17 | 3% of 7,578,905.70 (7,587,905.70 minus 9000.00) |
| $228,177.17 | Maximum allowed compensation of trustee pursuant to 11 U.S.C. § 326(a) |

PAYMENTS MADE AND ADJUSTMENTS

| | | |
|---|---|---|
| | 421,627.00 | Interim fee awards made to the Trustee or Rose Law Firm |
| | (41,527) | Bird's fee from state bond proceeds |
| | (180,120.74) | Amount paid back to the estate from Rose Law Firm (91,620.00 for Trustee's fee; 41,600.00 for alleged miscoded state bond fee payment; 46,900.74 for interest) |
| (199,979.26) | 199,979.26 | Adjusted interim fee awards made to the Trustee or Rose Law Firm |
| $28,197.91 | | Remaining fees to be paid for maximum allowed compensation of trustee pursuant to 11 U.S.C. § 326(a) |

According to this calculation, Bird would be entitled to an additional trustee's fee of $28,197.91 if he were to receive the maximum compensation allowed under § 326(a). However, in the light of Bird's breach of fiduciary duty in his performance of the duties as Trustee by committing fraud on the Debtor Corporations and the Court in the overpayments in trustee fees to himself and the Rose Law Firm, the Court finds that the Trustee is not entitled to any compensation for his performance as trustee in this case. Trustees are held to high fiduciary standards of conduct. When a trustee misrepresents facts to the Court with knowledge

of their falsity, denial of compensation is appropriate. *Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Charles N. Wooten, Ltd. (In re Evangeline Refining Co.)*, 890 F.2d 1312, 1323 (5th Cir.1989); *see also Lincorp v. Herzog (In re Endeco, Inc.)*, 675 F.2d 166, 167 (8th Cir.1982). The Court will disgorge the trustee fees in their entirety except for the $41,527.00 that the Trustee received from the state regulators, which is not property of the estate. Because of this Court's finding of fraud committed by the Trustee on the Debtor Corporations and the Court, the Court also sets aside its order dated May 5, 1993, awarding the Trustee a $20,000.00 enhancement.[89] The Trustee is ordered to return to the estate the sum of $199,979.26 for interim trustee fees previously paid.

This is a particularly hard result for this Court to reach. Bird's performance as trustee was, in part, rare, visionary, and practical, and substantially benefitted the estate. As a result of the Trustee's success in entering into contracts with the various state regulators, the state surety bond proceeds (which the Court held were not property of the Debtor Corporations' estates) became available to the Debtor Corporations' estates. This enabled all money order claimants to be paid in full; the unsecured creditors to be either paid in full or settled; and Shaffer, as equity security holder, to receive a substantial distribution. However, the fraud that was committed on the Debtor Corporations and the Court by Bird in the performance of his fiduciary duties as trustee in the administration of the Debtor Corporations' estates cannot be overlooked. Fraud on the Debtor Corporations and the Court is "misconduct of the highest order," and de-

spite benefits to the estate, compensation must be denied. *Evangeline Refining Co.*, 890 F.2d at 1323–24; *see also Endeco, Inc.*, 675 F.2d at 167 (recognizing benefit to estate is one factor, but not controlling); *In re Columbia Plastics, Inc.*, 251 B.R. 580 (Bankr.W.D.Wash.2000).

F. **Appropriate compensation pursuant to 11 U.S.C § 330 for professionals employed by the Trustee in the Debtor Corporations' cases**

1. *What is the appropriate compensation for accountant Victoria Mason*

a. *Position of the parties*

Shaffer's position is that accountant Victoria Mason's fees in the amount of $41,060.00 for preparing the Debtor Corporations' federal and state tax returns for the years 1990 through 1998 are unreasonable and excessive. Shaffer also believes the Trustee breached his fiduciary duty when he failed to obtain Court orders in all instances for the payment of Mason's fees.

The Trustee's position is that the fees charged by Mason in preparing six tax returns each year for all three of the Debtor Corporations were reasonable and benefitted the estates. Mason's work was good, economical, and accepted by the IRS without issue. The Trustee admits he did not obtain Court orders for all payments of Mason's fee and he should have. However, Mason performed the work required to prepare the returns and her work was of benefit to the Debtors Corporations. The Trustee believes it is only fair to compensate her fully for her work, and her requests for fees are reasonable.

---

**89.** Even without a finding of fraud, the Court would still set aside the enhancement for three reasons: (1) the enhancement was granted by *ex parte* order, (2) an enhancement, if allowed, should only be made after the trustee's final report and accounting, and (3) the enhancement exceeded the maximum allowed compensation of a trustee pursuant to 11 U.S.C. § 326(a).

b. *Findings of fact*

The following checks were received into evidence reflecting the fees paid to Mason for preparing the Debtor Corporations' tax returns:

- Check number 2666 in the amount of $3960.00, dated April 15, 1992, for the preparation of the 1990 tax returns.
- Check number 2712 in the amount of $4200.00, dated April 21, 1992, for the preparation of the 1991 tax returns.
- Check number 2976 in the amount of $4500.00, dated May 10, 1992, for the preparation of the 1992 tax returns.
- Check number 3263 in the amount of $4700.00, dated August 1, 1994, for the preparation of the 1993 tax returns.
- Check number 3403 in the amount of $4700.00, dated June 28, 1995, for the preparation of the 1994 tax returns.
- Check number 3607 in the amount of $4400.00, dated September 17, 1996, for the preparation of the 1995 tax returns.
- Check number 3769 in the amount of $4800.00, dated September 16, 1997, for the preparation of the 1996 tax returns.
- Check number 3836 in the amount of $2000.00, dated March 11, 1998, for the preparation of the 1997 tax returns.
- Check number 3909 in the amount of $2800.00, dated September 16, 1998, for the preparation of the 1997 tax returns.
- Check number 3938 in the amount of $5000.00, dated December 14, 1998, for the preparation of the 1998 tax returns.

Of the ten checks, the Trustee issued checks numbered 2666 and 2712 pursuant to Court orders. The Trustee issued the remaining eight checks without Court orders.

Bird testified as to Mason's entitlement to fees. Originally, Bird hired the accounting firm of Arthur Young & Co. as the CPA for the Debtor Corporations' estates. It was employed to perform three primary functions: (1) prepare tax returns for the Debtor Corporations, (2) give advice as to accounting matters, and (3) investigate the Debtor Corporations' books and records to determine if there was any criminal activity or fraud in the inception of the case. He retained Arthur Young & Co. until 1991, at which time he decided to employ another CPA in order to reduce costs. At that time, Arthur Young & Co. had concluded its investigation of the Debtor Corporations' books and records and determined that there was no evidence of any criminal conduct.

Bird first employed John D. Toney, a tax accountant and former partner with Thomas and Thomas in Little Rock, to prepare the tax returns and give accounting advice. Toney was appointed by order of the Court filed February 27, 1990, but did not perform any services. On March 26, 1991, Bird filed an application to employ Victoria Mason, a Little Rock CPA who had done some work for Toney, to prepare tax returns and give accounting advice. The purpose of the application was to obtain authorization to fill Toney's vacancy. The motion stated that Mason's area of responsibility would be primarily income tax returns, and the Trustee believed she could prepare the returns at less cost than other accountants for the estate. It further stated that there would be no duplication of services. Mason's compensation, like Toney's, would be on a general retainer basis.

Mason lived in Little Rock, Arkansas, and was the Assistant Financial Officer for Crews and Associates [Crews]. Mason also engaged in part time work as a CPA while working at Crews. Bird told Mason

that given his experience with Arthur Young & Co., he was concerned about an accountant charging an hourly rate, and he wanted to employ her on a fixed rate to prepare the tax returns of the Debtor Corporations' and give tax advice regarding accounting matters. The Court's order appointing Mason as an additional accountant was filed on April 3, 1991.

In Bird's opinion, Mason's fees for the preparation of the tax returns over the course of her employment were reasonable. He formed that opinion based on conferences with other accountants in the Little Rock area and his experience in the employment of accountants. Bird determined that Mason's proposed fee in each instance was reasonable. Bird admitted he did not obtain a Court order authorizing payments to Mason in all instances. Although he could not recall specifics of any of the payments made without Court order, he was under the impression at the time the payments were made that he had the authority to make those payments.

Victoria Mason testified as to her background and the work she performed as the accountant for the Debtor Corporations' estates from 1991 through 1998. Mason received her CPA certificate in 1982. She performs forty hours of continuing legal education every year, primarily in the tax area. At the time of her employment in 1991, she was employed by Crews as Vice President of Operations. She had been employed at Crews for thirteen years, and her employment consisted of working with auditors, tax accountants who prepare tax returns for Crews, and regulatory agencies that Crews had to file reports with. She testified she did not actually do the work, but it was her responsibility to review and oversee the work. She also operated a small tax and accounting practice.

Mason's job experience includes working for Arthur Anderson in their tax and audit departments preparing corporate tax returns, controller for Petroleum Investments Limited, and working for Crews. Her tax and accounting practice consisted of approximately twenty clients for whom she primarily prepared tax returns. At the time she was employed by Bird, she prepared corporate returns for NWFX and one other corporate client.

Mason testified that prior to being hired by Bird, she was preparing the Debtor Corporations' returns for Toney. When Toney stopped doing tax work, Mason approached Bird and asked him for the work. Mason testified that because Bird knew she had done the work the year before, he gave her the job. Until Mason prepared the Debtor Corporations' tax returns, she had not performed any bankruptcy accounting work. Because she has lower overhead than the big accounting firms and works part time, she can charge a reduced fee to prepare the six tax returns she prepares each year for the Debtor Corporations. She testified that the Debtor Corporations' books are kept on a "cash basis." In performing her work, she obtained the Debtor Corporations' investment portfolio, bank statements, cancelled checks, payroll records, and an incomplete trial balance. She would then prepare the tax returns.

Mason testified that her employment compensation by the Trustee as an accountant was on a fixed fee basis. She based the fixed fee each year on the amount of time she spent preparing the tax returns the previous year. She kept a compilation of the time she worked on the Debtor Corporations' tax returns so she could determine how much time she was spending preparing tax returns. She never submitted her time compilations to the Trustee, and the Trustee never asked for her compilation of hours. At the time she started preparing the Debtor Corporations tax re-

turns, her regular hourly rate was $75.00 per hour. When she was engaged to prepare the 1990 return for the Trustee, she calculated that she had spent about 53 hours doing the returns the previous year, and told the Trustee her fixed fee would be $3960.00. Although her fees were based on an hourly rate, she never issued any kind of hourly time statements to her clients.

According to Mason, the tax returns were not as complex as they were time consuming. This was so because she took the cash basis information, converted it to an accrual basis, and then to a tax basis. The numbers had to be right. There were certain items such as the payroll that would have to be adjusted from year to year to go from a cash to an accrual tax basis. She went through every cancelled check that was written for the prior year and made sure that it was booked to a proper expense account in Quicken. Because the Debtor Corporations' records were kept on a cash basis, she had to convert its cash entries to an accrual entry. Generally, it took Mason forty to fifty hours to perform the adjustments required, and three to six hours to write out the tax returns. She allocated the income between the three estates according to an allocation determined by Ernest and Young when it was preparing the returns: ninety percent to one, seven percent to another, and three percent to the other.[90]

Michael D. Robinson was qualified and called as an expert witness by the Trustee. Robinson is a licensed CPA in the states of Arkansas, Tennessee, and North Carolina. He spent four years working as a CPA for Arthur Anderson in its Memphis, Tennessee, office, and then went to work for Cook Industries for three years. He is present-ly employed as a CPA by the firm of Moore, Stephens, and Frost. Moore, Stephens, and Frost is largely a corporate practice, and is the largest single office CPA firm in Little Rock, Arkansas. Moore, Stephens, and Frost has been involved in some large bankruptcy cases in Arkansas, and Robinson has testified as an expert witness four or five times in bankruptcy court in Arkansas, although his primary practice area is not bankruptcy.

Robinson testified that he has known quite a number of CPAs who have regular employment and do outside or additional work as well. Generally, the additional work consists of preparing tax returns. Robinson was hired by the Trustee to review Mason's work from the standpoint of determining whether the fees she charged were reasonable in connection with the work that was required in order to do the tax returns. He testified that he met with Mason once for about two hours. He did not do an exhaustive search of every year Mason filed a return for the Debtor Corporations, but did review a couple of years.

Robinson testified that Mason's files reflected her invoices to the Trustee, which indicated billing on a fixed fee basis. From the description Mason gave to Robinson and listening to her testimony at trial, Robinson believed she was arriving at the fixed fee charged based on the time she believed it would require to perform the work in preparing the tax returns. Robinson testified that looking at the amount of time spent on the prior returns was an appropriate basis in arriving at the fixed fee. He also testified that Mason's use of Ernst and Young's allocations in preparing the tax returns was unusual, but he was not sure it would have mattered

90. Apparently, Ernest and Young and Arthur Young & Co. are the same company that was originally hired by the Trustee.

particularly. Because the corporations were companies that were not audited, Mason was given basically raw financial data that appeared to be for the most part on the cash method of accounting. It was necessary for her to determine the extent of any adjustments in order to convert from cash to accrual basis. The papers in her files reflected this work was done. This work took a substantial amount of time, and was the bulk of her time.

In Robinson's opinion, it would have taken Moore, Stephens, and Frost about the same amount of time to generate the tax returns, and the staff budget would have been about 40 hours plus another 15 to 20 hours to review the returns. Robinson's opinion was that Mason spent a reasonable amount of time in preparing the six tax returns each year, and that her hourly rate at the beginning of $75.00 and later at $100.00 was also reasonable compensation. Robinson testified that the flat fees charged by Mason were very reasonable and that if Moore, Stephens, and Frost had prepared the tax returns, the charge would have been two to three times more. He also testified that his firm would have presented more detailed time records to the attorney for whom it was working.

The Trustee also called James F. Dowden as an expert witness on this issue. Dowden has practiced primarily in bankruptcy since 1985, and is on the trustee panel in Arkansas. Dowden testified that, based on his experience in retaining accountants in his bankruptcy practice, the detail contained in Mason's invoices were similar to invoices he had submitted. In Dowden's opinion, the accounting fees charged by Mason in the Debtor Corporations' cases were very reasonable.

The Trustee also called Thomas E. Robertson as an expert witness on this issue. Approximately one half of Robertson's practice is in bankruptcy. He is on the

trustee panel in Arkansas and has served as a chapter 7 trustee since 1979. In Robertson's experience over the course of years, in a simple chapter 7 bankruptcy requiring a simple tax return, the accountant would merely submit a fee statement. In a more involved chapter 7 case, the accountant would submit a detailed billing statement reflecting the work that he or she had performed. As trustee, he had to satisfy himself as to the work the accountant performed and that the hourly rate he or she used was appropriate. He would file a motion with the Court seeking approval of the accounting fee and include the supporting billing statement submitted by the accountant.

Robertson testified that in the Farmer's Coop of Arkansas and Oklahoma, Inc. case, in which he is the chapter 11 trustee, the accounting fees ranged from $12,000.00 to $18,000.00 a year to prepare financial statements and tax returns, to $600.00 to $1200.00 a year presently to prepare tax returns. In a large bankruptcy case, there are times when more accounting work would be needed than at other times. The Farmer's Coop case was filed in 1985, and now the income is mainly interest income only and real estate.

Shaffer called David R. Payne as an expert witness on this issue. Payne testified that he was present in the courtroom during all the testimony regarding the accounting fees charged by Mason to prepare the Debtor Corporations' tax returns and he had formed an opinion as to the reasonableness of her fees. Payne testified in his opinion her fees were excessive. He believed that a CPA or accountant could have prepared the six returns, and the returns could have been run off one set of numbers. Payne estimated that based on his experience with similar type cases, his firm could have prepared the returns

in issue on an average annualized basis of $750.00 a year.

Payne did not review Mason's work files as to her preparation of the tax returns in issue. He stated he thought it would take no more than a maximum of two hours to convert the data Mason received from a cash to accrual basis so it could be placed on the tax returns. His opinion was based on his reviewing the Quicken data and looking at the nature of what a cash transaction would be in this case versus an accrual transaction.

### c. *Conclusions of law*

The bankruptcy code, as applicable to these cases, allows the court to award to a professional person: "(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and (B) reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A), (B). Section 328(a) provides that "[t]he trustee ... with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis." 11 U.S.C. § 328(a).

The burden of proof is upon the professional person seeking compensation. *In re Land*, 138 B.R. 66, 70 (D.Neb. 1992). In calculating the appropriate compensation, the Eighth Circuit Court of Appeals announced in *Apex Oil Co.* that "the lodestar approach, including the possibility of adjustments in rare and exceptional circumstances, is an appropriate method to use in calculating reasonable compensation under § 330." *P.A. Novelly v. Palans (In re Apex Oil Co.)*, 960 F.2d 728, 732 (8th Cir.1992). The lodestar method is calculat-

ed as the number of hours reasonably expended multiplied by a reasonable hourly rate. *Id.* at 731.

The Court finds that the accounting fees sought by Mason in the amount of $41,060.00 are reasonable compensation for actual and necessary services she performed for the Debtor Corporations' estates. In resolving the creditably issue as to whether Mason's fees for preparing tax returns were reasonable in the light of the work she performed, the Court is more persuaded by Bird's, Mason's, and Robinson's testimony than Payne's. The Court is convinced that it took Mason approximately 53 hours the first year (and a comparable length of time each year thereafter) to prepare the six tax returns for the three Debtor Corporations, and that her hourly rate of compensation was $75.00 per hour, and later $100.00 per hour. Bird testified, and his testimony is credited in this instance, that he changed from Arthur Young & Co., a large accounting firm, to Mason in order to reduce accounting fees for the Debtor Corporations' estates. Mason testified that she could perform the services at a reduced rate because of her lower overhead.

Robinson actually reviewed Mason's files and work product in preparing the tax returns in issue; Payne failed to review any of Mason's files or work product. Robinson also testified that he was convinced that the time Mason spent preparing the six tax returns each year was necessary, and an accurate estimation of the time required. He estimated that it would take Moore, Stephens, and Frost's staff about 40 hours to prepare the returns, and an additional 15 to 20 hours to review the returns at a substantially higher cost than charged by Mason. While the Court is convinced that the preparation of the tax returns was not complicated, it was not as simple as Payne portrayed. The

Court specifically credits Mason's testimony as to the tasks she performed and the time it took to perform these tasks in preparing the Debtor Corporations' tax returns. Her services as an accountant for the Debtor Corporations' estates in preparing the tax returns were of a benefit to the Debtor Corporations' estates and the returns were accepted by the Internal Revenue Service without issue. Mason should be compensated for her services fully even though the Trustee breached his fiduciary duty to the Debtor Corporations' estates by failing to obtain authorization and orders from the Court for eight of the payments made by him as trustee to Mason.

**2. *What is the appropriate compensation for the Rose Law Firm as counsel for the Trustee in the Debtor Corporations' cases***

a. *Specific time billed*

(1) *General statement of law*

 Section 327(a) provides that "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). Compensation for the professional person is addressed in § 330:

> After notice to the parties in interest and the United States trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—
>
> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any para-
> professional person employed by any such person; and
>
> (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a). Section 330 requires that the services provided were reasonable and necessary. Federal Rule of Bankruptcy Procedure 2016 requires a detailed statement of the services rendered, time expended, and expenses incurred. "[A] fee application which sets forth with specificity the exact nature of the services rendered, the time expended, and the expenses incurred is a prerequisite to this Court making a determination that the services were reasonable and necessary." *In re Meyer*, 185 B.R. 571, 574 (Bankr. W.D.Mo.1995); *see also In re Holthoff*, 55 B.R. 36, 42 (Bankr.E.D.Ark.1985)("fee application submitted must comply with Bankruptcy Rule of Procedure 2016 ...."). The trustee must submit an application that sufficiently details "the services for which compensation is sought, containing sufficient detailed information to allow the court to find the services reasonable, actual and necessary as required under § 330 and Rule 2016." *In re Rauch*, 110 B.R. 467, 474 (Bankr.E.D.Cal.1990).

 The Fifth Circuit has held that although Rule 2016 requires detailed statement, applications failing to reach an "ideal level of completeness" may suffice. *Continental Illinois Nat'l Bank & Trust Co. v. Charles N. Wooten, Ltd. (In the Matter of Evangeline Refining Co.)*, 890 F.2d 1312, 1326 (5th Cir.1989)(citing *Matter of Lawler*, 807 F.2d 1207, 1212 (5th Cir.1987)). However, the application must be sufficiently detailed and accurate so the court, in conjunction with any proceeding and record in that proceeding, can make an independent evaluation as to what level of fees are actual, necessary, and reasonable. *Id.* Additionally, when the trustee also serves as attorney for the trustee,

time records should "distinguish with reasonable specificity" the legal services from the administrative tasks of the trustee. *Id.* This is because of two reasons in particular: (1) because of the statutory maximums under § 326, trustees may attempt to evade the limits imposed by allocating trustee work to attorney work in a fee application, and (2) inherent dangers of duplicative billing by trustee and attorney.

According to the Eighth Circuit Bankruptcy Appellate Panel, before a bankruptcy court makes a professional fee award, the court "must either make an express lodestar calculation or make a finding that the lodestar method is inappropriate under the circumstances." *Chamberlain v. Kula (In re Kula)*, 213 B.R. 729, 736 (8th Cir. BAP 1997)(discussing *In re Apex Oil Co.*, 960 F.2d 728, (8th Cir.1992), and recognizing that although the Eighth Circuit does not require an express lodestar calculation, it is clearly the preferred method for calculating fees). To do this, the court must first determine if the number of hours billed were reasonable in the light of the complexity of the case, then multiply that by a reasonable hourly rate for those services. *Id.* at 737. According to the court, "[t]he party seeking an award of fees should submit evidence supporting the hours worked and the rates claimed." *Id.*

■■■ The lodestar calculation reflects (1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, and (4) the results obtained. *See Apex Oil Co.*, 960 F.2d at 731–32; *Kula*, 213 B.R. at 738. The first step in calculating the fee award using a lodestar calculation, is to determine the number of hours billed. The applicant bears the burden of proof as to the reasonableness of a fee application. *Evangeline Refining Co.*, 890 F.2d at 1326; *Holthoff*, 55 B.R. at 39. "The reviewing court should not venture

guesses nor undertake extensive investigation to justify a fee for an attorney or trustee who has not done so himself. It is not an overly burdensome task to enlighten the court as to the work undertaken." *Evangeline Refining Co.*, 890 F.2d at 1326; *see also In re Kusler*, 224 B.R. 180, 184 (Bankr.N.D.Okla.1998)("'It is not the duty of the court to speculate or theorize as to the work performed.)'" (quoting *In re Reconversion Technologies, Inc.*, 216 B.R. 46 (Bankr.N.D.Okla.1997)).

■■■ Most objections to attorney billing relate to the reasonableness of the work or the number of hours performed. Although Shaffer did not object to either reasonableness or number of hours, the law is clear that "the court has an independent duty to investigate the reasonableness of compensation." *In re Curtis*, 70 B.R. 712, 713 (Bankr.E.D.Ark.1987); *see also In re Westside Creek Limited Partnership*, 93 B.R. 177, 179 (Bankr.E.D.Ark.1988)(recognizing that the court has an independent duty to examine attorneys' fee applications).

■■■ Shaffer did object to certain time entries as being work performed and billed as attorney time that should have been trustee time. It is often difficult for a court to articulate the difference between attorney and trustee duties. *In re Columbia Plastics, Inc.*, 251 B.R. 580, 586 (Bankr.W.D.Wash.2000). The burden is on the trustee to show that the services for which compensation is sought involved some "necessary and actual legal service beyond the scope of the trustee's statutory duty." *In re Bosselman*, 125 B.R. 569, 570 (Bankr.D.Neb.1991).

■■■ Some examples of compensable attorney time include:

1. Representing the trustee in contested matters, adversarial proceedings, and specialized matters involving le-

gal analysis or court attendance. *Columbia Plastics, Inc.*, 251 B.R. at 586.

2. Preparation of most pleadings. *Id.*

3. Attendance at court hearings in the capacity of attorney when the trustee has an interest. *Kusler*, 224 B.R. at 186.

4. Preparation of professional related applications. *Id.*

5. Performance of specialized services that cannot be performed practically or lawfully by the trustee without engaging the services of a professional. *Id.*

■ Some examples of time that properly relates to the administrative duties of the trustee include:

1. Payroll and tax matters; reviewing bankruptcy schedules; preparing for and attending 341(a) mtgs. *Columbia Plastics, Inc.*, 251 B.R. at 586.

2. Reviewing claims register and drafting simple objections to claims. *Id.*

3. Collecting outstanding accounts receivables. *Id.*

4. Answering questions from creditors and employees, including routine calls related to the administration of the estate. *Id.*

5. Interim distributions to professionals and creditors. *Id.*

6. Ministerial chores, such as telephone calls, correspondence with creditors and information seekers; preparation of notices and advertisements for the sale of debtor's assets; payment of routine bills and examination of debtor's records. *Bosselman*, 125 B.R. at 570.

7. Letters, conferences, agreements, and phone calls regarding retainers and fee applications. *Holthoff*, 55 B.R. at 42.

8. File organization. *Id.*

■ "Courts have consistently held that 'demarcation between the trustee's services and the attorney's services be clear and distinct in the attorney's application.'" *In re Gary Fairbanks, Inc.*, 111 B.R. 809, 811 (Bankr.N.D.Iowa 1990)(quoting *In re King*, 88 B.R. 768, 770 (Bankr. E.D.Va.1988)). The entries should be specific enough for the court to identify the legal services provided by the applicant, and should at least identify generally the nature and purpose of the service provided. *See Holthoff*, 55 B.R. at 41; *see also Curtis*, 70 B.R. at 716 (citing *In re Werth*, 32 B.R. 442 (Bankr.D.Colo.1983))(disallowing charges when itemization not specific enough to identify properly services rendered).

■ In a related matter, a trustee who is also an attorney for the trustee should keep separate detailed time records for work performed as trustee as well as work performed as an attorney. Section 330(a) allows "reasonable compensation for actual, necessary services" rendered by the trustee, and requires measurement of that compensation by looking at a variety of factors. The first factor to consider is the time spent on such services. Without detailed time records for the work performed as trustee, there is no way for the court to measure accurately the amount of time reasonably, necessarily, and productively expended. *See In re Churchfield Management & Inv. Corp.*, 98 B.R. 838, 890–91, (Bankr.N.D.Ill.1989) The Court recognizes the split among district courts regarding the requirement of time records from a trustee, and is aware that the requirement of time records has been rarely imposed in this district. Further, the requirement to keep detailed time records in a small estate may be burdensome and unnecessary to evaluate a trustee's performance. However, the burden remains on the trustee

who also acts as attorney for the trustee to separate trustee work from attorney work and to demonstrate under § 330 "the time spent on such services." 11 U.S.C. § 330(a)(3)(A). With computer billing, keeping track of the trustee's time is no longer difficult. In this particular case, the Trustee testified that it would have been "very simple to keep trustee time. I could have kept it the same way I kept attorney time and just charged it to a different matter number under this client name." Tr. 449.

 Keeping separate time records is in the best interest of the trustee who is also employed as the attorney for the trustee. Although it is not practicable or economically feasible for a trustee to keep detailed records in a no asset or small asset case, there is a point where the benefit to the estate outweighs the detriment to the trustee. *See In re Moon*, 258 B.R. 828 (Bankr.N.D.Fla.2001)(demarcating an estate valued at $50,000 as the point when detailed time records are necessary). In cases that have significant assets, such as this one, the Court believes that detailed time records are the best way to meet the trustee's burden under § 330. This opinion serves as a caveat that this Court, in the future, will expect and require detailed time records for the trustee in substantial asset cases. What constitutes a substantial asset case shall be determined on a case by case basis.

 Shaffer also objected to the use of lump sum billing in the fee application. Lump sum billing is not permitted. The tasks performed in one day should not be grouped into a single billing. *See Westside Creek Limited Partnership*, 93 B.R. at 180; *Holthoff*, 55 B.R. at 42. When the services are grouped together into one en-

try, the Court is not able to determine whether the time spent on a specific task was reasonable. *Id.* The Court cannot be placed.in a position to speculate as to the length of time spent on a particular matter when that particular matter is grouped with other services performed throughout the day. "Each type of service should be listed with the corresponding specific time allotment so that the reasonableness of the service and value of the service to the estate may be determined." *Curtis*, 70 B.R. at 716.

(2) *Exhibits and professional time spent*

On July 29, 1999, Bird filed his "Motion for Final Approval of All Professional Fees and Expenses." In that motion, Bird stated that the Rose Law Firm spent 7406.2 hours ·and had been paid $589,633.41. On December 15, 1999, Bird filed his "Amended Chapter 11 Final Report and Account and Application for Final Decree." In that report, Bird stated that the Rose Law Firm had been paid $662,772.00. Bird prepared a document that was used during the trial, and introduced as Bird exhibit 171, that presented all of the hours and fees billed by attorneys, paralegals, and law clerks up to November 9, 1998. According to exhibit 171, the total hours spent were 7452 and the fees paid were $612,687.00. The fees paid included $18,462.50 that was paid to the Rose Law Firm without Court order, but did not include an enhancement of $50,000.00 that was allowed pursuant to this Court's order of December 8, 1998, but set aside by this Court's order approving a joint stipulation filed January 14, 1999.[91]

When the $50,000.00 is included with the $612,687.00 that is reflected on exhibit 171, the resulting figure—$662,687.00—sub-

**91.** See section III.F.2.d. for a discussion of the payments of $18,462.50, and section III.

F.2.b. for a discussion of the $50,000.00 enhancement.

stantially matches Bird's December 15, 1999, amended chapter 11 final report figure of $662,772.00. As of December 15, 1999, the following hours and fees had accrued:

| | hours | fees | average |
|---|---|---|---|
| attorney | 4504 | 518,156.00 | 115.04/hr |
| paralegal | 714 | 27,527.00 | 38.55/hr |
| clerk | 2234 | 67,004 | 29.99/hr |
| | | | |
| total fees | | 612,687.00 | |

On June 29, 2000, Bird filed his "Motion for Approval of Professional Fees and Expenses." In that motion, Bird stated that from January 26, 1999, to February 25, 2000, the Rose Law Firm spent an additional 454.4 hours for a total charge of $72,181.50. Of the total hours, 30.35 were for a paralegal at the rate of $60.00/hour. The total paralegal fees were $1821.00. The remaining 424.05 hours were billed as attorney time at the rate of $210.00/hour, for a total of $89,050.50. According to these figures, the total paralegal and attorney fees requested should have been $90,871.50, not the $72,181.50 as stated on the motion. This amounts to a difference of $18,690.00.

Wright, Lindsey & Jennings LLP [the Wright firm] attempted to correct this error in its "Clarification of Fee Application of Wright, Lindsey & Jennings LLP (WL & J) and Motion of the Trustee for Approval of Professional Fees and Expenses of the Rose Law Firm (RLF)," which was filed on December 8, 2000. In that document, the Wright firm stated that 89 attorney hours that were billed on Bird's June 29, 2000, "Motion for Approval of Professional Fees and Expenses" should not have been billed, and that the fees requested in the motion should be reduced by $18,690.00. In fact, and evidently unknown to the Wright firm, the June 29, 2000, motion requested an amount that was already reduced $18,690.00.

On September 6, 2000, the Court ordered the parties to file any supplemental applications for fees and/or expenses through September 1, 2000. In its "Supplement to Fee Application by Allen W. Bird II (Trustee)," the Wright firm stated that the Rose Law Firm would not seek fees for the period between February 25, 2000, and August 31, 2000.

As of September 1, 2000, the following hours and fees for the Rose Law Firm had accrued:

| | hours | fees | average |
|---|---|---|---|
| attorney | 4504 | 518,156.00 | |
| | 424.05 | 89,050.50 | |
| | (89) | (18,690.00) | |
| | 4839.05 | 588,516.50 | 121.62/hr |
| | | | |
| paralegal | 714 | 27,527.00 | |
| | 30.35 | | |
| | | 1821.00 | |
| | 744.35 | 29,348.00 | 39.43/hr |
| | | | |
| clerk | 2234 | 67,004.00 | 29.99/hr |
| | | | |
| total fees | | 684,868.50 | |

(3) *Testimony of the parties*

Because this case has been pending 14 years, and Shaffer did not file objections to the fee until the final fee application was filed with the Court, the Court permitted the Trustee to testify as to any entries or services performed. The burden is on the trustee to establish clearly that an entry is either trustee time or attorney time, and this Court believes Bird should be given the opportunity to reconstruct the time entry in view of the lapse of time.

Bird testified that, as a member of the Rose Law Firm, he was responsible for billing the legal services rendered to the estate. Each timekeeper recorded their services contemporaneously with the performance of the service on forms provided by the firm. Each billing was in tenths of an hour. As the billing attorney, Bird read all time records and the entries to determine whether the services were prop-

erly performed, of benefit to the estate, and related to legal services. When he received the pre-bill or billing memo from the accounting department, he would make appropriate adjustments as needed, including deleting entries that did not appear to be appropriately characterized as attorney time. After editing the bills, it was his opinion that all of the services billed were for legal and professional time. There were 34 separate timekeepers at the Rose Law Firm who recorded time in this case, including lawyers, paralegals, and law clerks.

Bird testified that it was his experience that most trustees in Arkansas are lawyers who hire their own law firm as counsel for the estate. To properly determine whether it was appropriate to bill for professional time, Bird related a prior experience of his. At one time, Bird represented Dennis Daniel, the appointed trustee in a chapter 11 case. Daniel was not an attorney so Bird handled the required legal work. Bird testified that he used Daniel as a guideline in making the determination of whether a task was performed in his capacity as trustee or attorney for the trustee. If he believed it was advisable to have an attorney perform a particular activity, and it was beneficial to the estate, he determined it was properly classified as professional time billed to the estate.

Bird testified that when he consulted with an attorney or paraprofessional in the firm for the purpose of explaining factual matters, he would generally not record his time as attorney time. Similarly, when he appeared in court as a witness, or had conversations that he deemed a lay person could just as easily have had, he would consider that to be trustee time. With regard to money order claims, Bird testified that the debtor corporations' employees generally reviewed the claims. He would become involved only if there was a legal question regarding a particular claim, which he considered legal time. Bird admitted that he had not reviewed all of the entries that were objected to by Shaffer; however, he did state that at the time he initially reviewed the time entries, he believed they all represented professional time that was properly billed to the estate. The Court has reviewed all of the entries, and notes in its discussion of each entry when Bird testified to the content of the entry.

Kennon testified that in August 1986 she was employed as a law clerk with the Rose Law Firm while attending law school. She worked almost exclusively on this case from the time Bird was appointed trustee until she graduated from law school and terminated her employment with the Rose Law Firm. Kennon recorded her time and turned in her timesheets on a daily basis. Bird assigned Kennon to the NWFX case at the outset and told her that he needed assistance and legal research because the case was novel. Kennon testified that she knew the difference between trustee work and attorney work. She also testified that most of the work she performed at the Rose Law Firm was fact finding, even though she labeled a lot of her time as "administrative matters." She testified that all of her time was considered professional time. The Court has reviewed all of Kennon's time entries, and notes in its discussion of each entry when Kennon or Bird testified to the content of the entry.

(4) *Specific entries*

*Because of the volume of specific time entries (approximately 180 pages), they appear in a separate Appendix II.*

(5) *Conclusions and lodestar calculation*

■ Before doing its lodestar calculation, the Court needs to determine the

adjusted number of hours billed, taking into account the above findings. *See Kula,* 213 B.R. at 742 ("A court should exclude from the initial lodestar calculation hours that were not 'reasonably expended' in the representation.") Each of the professional persons listed in the time entries can be divided into three groups: attorneys, paralegals, and law clerks. Baker, Bird, Clark, Goff, Johns, Rosenthal, Smith, Thomas, and Garrett are all attorneys who worked for the Rose Law Firm. Their time was billed between $75.00 per hour and $210.00 per hour. According to the Wright firm's "Motion for Approval of Professional Fees and Expenses," Whitby was a paralegal and her time was billed at the rate of $60.00 per hour. The record does not reflect the occupations of Alkek, Bryant, Durand, Kissell, Mazeika, Peoples, Pryor, or Stocks. Their time was billed between $40.00 per hour and $80.00 per hour, and, for the purpose of the Court's lodestar calculation, their occupation will be listed as paralegal. Finally, Kennon testified that she was hired by the Rose Law Firm in 1984 as an in-house runner, and that in 1985 she was elevated to the position of law clerk. All of her time was billed at the rate of $30.00 per hour. Cunningham was also billed at the rate of $30.00 per hour, and, for the purpose of the Court's lodestar calculation, Cunningham will be listed as a law clerk.

Based on the Court's review of all time entries, and for the reasons stated above under section (4) *Specific entries,* the following adjustments shall be made. The attorney time shall be reduced by 632.90 hours. Taking into account the various rates charged by the individual attorneys, this amounts to a fee reduction of $97,609.00. The paralegal time shall be reduced by 70.35 hours. Taking into account the various rates charged by the individual paralegals, this amounts to a fee reduction of $3457.00. The law clerk time

shall be reduced by 813.00 hours. This amounts to a fee reduction of $24,390.00.

As of September 1, 2000, after reducing the hours and fees for the reasons stated above, the Rose Law Firm had accrued the following hours and fees:

| | hours | fees | average |
|---|---|---|---|
| attorney | 4839.05 | 588,516.50 | |
| | (632.90) | (97,609.00) | |
| | 4206.15 | 490,907.50 | 116.71/hr |
| paralegal | 744.35 | 29,348.00 | |
| | (70.35) | (3457.00) | |
| | 674.00 | 25,891.00 | 38.41/hr |
| clerk | 2234.00 | 67,004.00 | |
| | (813.00) | (24,390.00) | |
| | 1421.00 | 42,614.00 | 29.99/hr |
| total fees | | 559,412.50 | |

The Court will utilize the lodestar calculation in the Debtor Corporations' cases to determine the Rose Law Firm's § 330 attorney fee. The lodestar calculation looks at the number of hours reasonably expended multiplied by a reasonable hourly rate. *Kula,* 213 B.R. at 737. In arriving at the amount of the fee, the Court will consider: (1) the special skill and experience of counsel; (2) the quality of representation; (3) the novelty and complexity of the issues; and (4) the results obtained. *Apex Oil Co.,* 960 F.2d at 731–32.

First, it should be noted that Shaffer has not filed an objection to the Rose Law Firms's hourly rate charged, or the total number of hours for services performed by the Rose Law Firm as counsel for the Trustee. Shaffer did file an objection under § 330 to the nature of the services performed by the Rose Law Firm as to attorney time versus trustee time and lump sum billing, which this Court has addressed in section III.F.2.a. of this opinion.

The Court will now review the evidence as to the following factors:

(1) The special skill and experience of counsel.

Bird testified that he is a partner in the Rose Law Firm, where he has been employed for the past twenty-five years. He practices in the areas of commercial law, commercial litigation, banking, and bankruptcy. He has practiced in the area of bankruptcy for the past twenty-seven years. Through the years he has appeared on numerous bankruptcy seminar panels and at meetings of the Arkansas Bar Association. He has been involved in several significant bankruptcy cases both within and outside the State of Arkansas. He is a member of the American College of Bankruptcy Lawyers, an organization that recognizes members of the bankruptcy bar who have bankruptcy experience and expertise, and who contribute by writing and appearing at educational seminars.

(2) The quality of representation.

The Rose Law Firm has appeared before this judge on numerous occasions over the past seventeen years. Generally, this judge has observed that its legal representation of its clients in court has been outstanding. The firm is well prepared for trial and very competent as to legal issues. Bird, as an attorney, has likewise appeared before this judge on numerous occasions and has demonstrated a thorough knowledge of the bankruptcy code and case law. Generally, Bird is well prepared and does an outstanding job of representing his clients in court.

(3) Novelty and complexity of the issues.

To put this factor into proper perspective, the Court must consider Bird's capacity as a trustee in the Debtor Corporations' cases and as lead counsel for the Debtor Corporations. Bird testified that he employed the Rose Law Firm as counsel for the Trustee in the Debtor Corporations' cases, and that he was lead counsel for the Rose Law Firm. He delegated legal work to the attorneys, paralegals, and law clerks in the Rose Law Firm, and reviewed the services performed on the various legal fee applications. The itemized statements reflect the services performed, the time spent performing the services, and the hourly rates charged for the services rendered. To some extent, Bird serving in both roles required decisions and work that related to his role as trustee and lead counsel. These areas often overlapped and are not easily distinguishable. For example, Bird, as trustee, would examine a proof of claim and object to it if it was a duplicate claim. Bird, as counsel for the Trustee, would examine a proof of claim to determine if the Debtor Corporations had any legal liability as to the claim and whether the damages were provable.

Bird testified as to the complexity and novelty of the Debtor Corporations' bankruptcy cases both administratively and as to the legal issues presented. When Bird was appointed trustee in August 1986, the Debtors Corporations' business affairs were in disarray. Money orders were not being honored because there were insufficient funds in the Debtor Corporations' bank accounts. The State of Arkansas Securities Commissioner had issued cease and desist orders, which had the effect of closing the Debtor Corporations' business operations. The money order purchasers and agents who sold the Debtor Corporations' money orders were hostile and difficult to deal with.

The Debtor Corporations filed a chapter 11 reorganization petition and were, at the time, a debtor-in-possession. On August 1, 1986, the day the Debtor Corporations filed bankruptcy, they also filed a complaint for turnover naming as defendants over 800 agents who sold their money or-

ders to the public. The complaint sought the turnover of blank money orders, money order imprint machines, records of sales of money orders, and the proceeds from the sale of money orders.[92] It was essential that the blank money orders be turned over because of the potential for fraud by entities or individuals in possession of the blank money orders.

The Debtor Corporations' bankruptcy cases were novel in that the Debtor Corporations had no records to identify who the money order purchasers were. Therefore, obtaining the sales records from the agents was also essential in order to administer the bankruptcy cases. Bird, as trustee, had to devise a simple proof of claim form in the Debtor Corporations' cases because most the money order purchasers had no checking accounts and little formal education, and would likely have difficulty in processing the standard bankruptcy proof of claim form. The Court approved the simplified form designed by Bird in his role as an attorney for the Debtor Corporations' estates.

The Debtor Corporations' cases were complex in that over 60,000 proofs of claims were filed relating to over 120,000 money orders. It was important that the trustee capture enough information to be able to identify and check on the validity of each money order.

After the Rose Law Firm was hired, it amended the complaint for turnover and pursued to litigation complex and novel legal issues, including whether the money orders were property of the Debtor Corporations' estates. In fact, the Eighth Circuit Court of Appeals was required to determine the novelty and complexity of the legal issues raised in the Debtor Corporations' cases on numerous occasions.[93] Bird testified that the Rose Law Firm was successful in two of the matters before the Eighth Circuit, and ultimately prevailed on the issue of whether the Debtor Corporations had a interest under § 541(a) in the money order proceeds in the Crown Convenience litigation.

Another area of complex and difficult litigation was the Rose Law Firm pursuing default judgments against over two hundred agents who refused to turn over the blank money orders, sales records, money order imprint machines, and proceeds from the sales of money orders. These agents had refused to file an answer, or appear at the Court's Order To Show Cause hearings. The default judgments were inflated because the agents had not accounted for the blank money orders in their possession. The maximum amount for which a blank money order could be written was $300.00. To protect the estate, the Trustee, in his complaint, sued for the number of money orders outstanding times $300.00 for each money order. The complaint did not take into account the money order sales because until the agent turned over its records, the completed sales were not known. This litigation had to be pursued in order to obtain the blank money orders, sales records, and proceeds. Default judgments were obtained in the approximate amount of $5,500,000.00.

---

92. Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C. was legal counsel for the Debtor Corporations and prepared and filed the Debtor Corporations' bankruptcy petitions and schedules. The Mitchell firm also prepared and filed the complaint for turnover.

93. *See Bird v. Crown Convenience (In re NWFX, Inc.),* 864 F.2d 588 (8th Cir.1988); *Bird v. Carl's Grocery Co., Inc. (In re NWFX, Inc.),* 864 F.2d 593 (8th Cir.1989); *Bird v. Crown Convenience (In re NWFX, Inc.),* 881 F.2d 530 (8th Cir.1989), *en banc,* judgment affirmed by an equally divided court, 904 F.2d 469 (8th Cir.1990); and *Northwest Fin. Express, Inc. v. JWD, Inc.,* 950 F.2d 561 (8th Cir.1991).

However, a review of information obtained later revealed that only approximately $400,000.00 was potentially collectable. Further, because the judgments averaged $4000.00 or less, the Trustee determined it was not economically sound to pursue collection of these judgments further.

In other litigation, the Rose Law Firm filed a complaint for turnover and named all the states and Puerto Rico as defendants. As a condition of doing business with them, the states and Puerto Rico required the Debtor Corporations to obtain a bond as security for the purchasers of money orders in their states and Puerto Rico. The Trustee contended that the state bond proceeds were property of the Debtor Corporations' estates and subject to a turnover order by this Court. The complaint was tried and the Court held that the bond proceeds were not property of the Debtor Corporations' estates. The Trustee did not appeal this decision.

The Trustee and the Rose Law Firm prepared and filed a sophisticated and detailed plan of reorganization. The plan benefitted the purchasers of money orders by giving them a priority over the other unsecured creditors. It was their money that was used in purchasing the money orders, and they could least afford the financial loss. The plan, and subsequent amended plan, was approved by the Court, and the Rose Law Firm resolved all objections to the plan and amended plan successfully.

The Rose Law Firm also handled the complex proof of claim filed by City National Bank of Fort Smith, Arkansas, which involved a claim of $1,500,000.00 and required extensive discovery. The claim took almost two years to resolve successfully in favor of the Debtor Corporations' estate.

Dowden, an expert witness for the Trustee, testified as to the complexity and novelty of the Debtor Corporations' cases. Dowden sat through the entire hearing, less three hours, and reviewed the docket sheet in the Debtor Corporations' cases. Dowden stated that it was his opinion that the Debtor Corporations' bankruptcy cases were extremely complex, particularity when compared to other bankruptcy cases filed in the State of Arkansas. The legal issues were novel in that they involved a money order business. Further, he had never been involved in a case as a trustee where over 65,000 claims had been filed.

Robertson also testified as an expert witness for the Trustee about the complexity of the Debtor Corporations' bankruptcy cases. Robertson testified that based on his review of the pleadings and docket sheet and a three hour conference with Bird, he had formed the opinion the cases were very complex. The Debtor Corporations' cases involved novel issues just in the numbers themselves. The Debtor Corporations did not even know who had purchased the money orders, and the administration of the cases was very complex.

Payne, an expert witness for Shaffer, testified on the issue of complexity of the Debtor Corporations' cases. He stated that it was his opinion that the Debtor Corporations presented complex legal and administrative issues. The following exchange took place between Payne and the Trustee's legal counsel:

Question: Okay. From your review of the records would you say that the complexities related more to legal issues or administrative issues?

Answer: Well, certainly there were legal—I mean you can review the record and know there are legal issues as you have in any case. There were I'm sure legal issues and maybe some issues that were unique to a money

order company. But I think in terms of the overall nature of the case, the complexity really from my review goes to the administration of the case. You've got, you know, thousands of claimants, you're dependent upon a system and employees and data coming out of that system to at least assist in proper administration of the case; and just the sheer volume creates some complexity from an administrative standpoint.

Tr. 2177.

(4) The results obtained.

Bird testified as to the results obtained by the Rose Law Firm in the Debtor Corporations' cases. First, the Rose Law Firm was successful in obtaining a decision at the Eighth Circuit Court of Appeals level that the proceeds from the sale of money orders were property of the Debtor Corporations' estates. Second, the Rose Law Firm was successful in recovering a preference action against the Bank of Northwest Arkansas for $130,000.00. Third, the Trustee and the Rose Law Firm were successful in handling over 60,000 claims against the Debtor Corporations's estates. Fourth, the Trustee and the Rose Law Firm were successful in obtaining a confirmed plan of reorganization and an amended plan of reorganization. Fifth, the Trustee and the Rose Law Firm were successful in pursuing causes of actions against agents who refused to turn over proceeds from the sale of money orders. The Trustee received $5,259,000.00 from agents who held money from the sale of money orders issued by the Debtor Corporation. Sixth, the Rose Law Firm was successful in reducing and settling a $1,500,000.00 claim filed by City National Bank of Fort Smith for $500,000.00. And seventh, the Trustee and the Rose Law Firm were successful in paying every money order claimant that could be found in full, all the unsecured creditors' claims, and an interim distribution to Shaffer as the equity security holder in the amount of $250,000.00. There is remaining in the Debtor Corporations' estates approximately $400,000.00 for further distribution.

Dowden testified as to the results obtained in the Debtor Corporations' cases. In his opinion, when $9,000,000.00 is distributed to money order purchasers and unsecured creditors, $250,000.00 is distributed to the equity security holder, and another $390,000.00 to $400,000.00 remains to be distributed, the results would be considered extraordinary.

Robertson also testified as to the results obtained in the Debtor Corporations' cases. In his opinion, whenever the claimants get all their money and there is money going to the equity security holder, the results are excellent.

Both Dowden and Robertson testified as to the reasonableness of the Rose Law Firm's legal fees charged in the Debtor Corporations' cases. Dowden testified that $115.00 per hour was a reasonable hourly rate for the entire period of time during which the Rose Law Firm billed in the Debtor Corporations' estate. The hourly rate charged is very conservative, and may be on the lower end. Dowden also stated that an hourly rate of $120.00 to $125.00 would be very conservative and reasonable in these cases.

Robertson testified that if legal fees of $518,156.00 were charged by the Rose Law Firm, based upon 4,054 hours of billable time at the average rate of $115.00 per hour, in his opinion the hourly rate of $115.00 would be a very reasonable hourly charge in the Debtor Corporations' cases. Further, the rates charged by the Rose Law Firm would be consistent with the rates charged by other bankruptcy lawyers in the Little Rock, Arkansas, area,

which are somewhat higher than the hourly rates charged elsewhere in the State of Arkansas.

After a review of all of the billing records from the Rose Law Firm in this case, beginning on August 13, 1986, and continuing through September 1, 2000, and based upon the testimony received, the Court finds that the adjusted number of hours billed for the attorneys, paralegals, and law clerks were reasonable in the light of the complexity of the case, the experience and skill of the Rose Law Firm, the quality of representation, and the results obtained. The Court further finds that the average attorney fee rate of $116.71 per hour, the average paralegal rate of $38.41 per hour, and the average clerk rate of $29.99 per hour are reasonable hourly rates for the services provided. In summary, the Court finds that $559,236.50 is reasonable compensation under 11 U.S.C. § 330 for the professional services provided by the Rose Law Firm for the period of time discussed above. According to Bird's amended chapter 11 final report, the Rose Law Firm was paid $662,772.00, resulting in an overpayment of $103,359.50. The Court orders the Rose Law Firm to pay back to the Debtor Corporations' estates $103,359.50.

b. *Whether the Rose Law Firm is entitled to an enhancement of $50,000 in attorney fees*

(1) *General statement of the law of fee enhancement*

■ As stated earlier, 11 U.S.C. § 330(a) allows the court to award reasonable compensation to a professional person for actual, necessary services rendered, based on a consideration of the nature, extent, and value of the services. The court shall take into account all relevant factors, including:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). The burden is on the party seeking an award of fees to prove it is entitled to compensation. *Chamberlain v. Kula, (In re Kula)*, 213 B.R. 729, 736 (8th Cir. BAP 1997); *In re Land*, 138 B.R. 66, 70 (D.Neb.1992); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)(stating that the party seeking an award of fees should submit evidence supporting the hours worked and the rates claimed). In its discussion of appropriate compensation, the Eighth Circuit stated that "the lodestar approach, including the possibility of adjustments in rare and exceptional circumstances, is an appropriate method to use in calculating reasonable compensation under § 330." *P.A. Novelly v. Palans (In re Apex Oil Co.)*, 960 F.2d 728, 731 (8th Cir.1992). After a thorough review of the Rose Law Firm's billing records, this Court determined that, using the lodestar approach, $559,412.50 is reasonable compensation under § 330 for the professional services provided by the Rose Law Firm. The Court must now determine whether a fee enhancement is appropriate.

Calculation of the lodestar amount takes into account (1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, and (4) the results obtained. Because of this, "these factors normally cannot serve as independent bases for increasing the fee award above the lodestar amount." *Apex Oil Co.*, 960 F.2d at 731–32. However, upward adjustments are permissible " 'in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts.' " *Id.* at 732 (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)). The quality of service rendered and the results obtained must be "superior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended." *Id.*

The Eighth Circuit did not state comprehensively what an applicant must show to establish the "rare" and "exceptional" circumstances needed to justify a fee enhancement. However, the Eighth Circuit Bankruptcy Appellate Panel recognized that the factors set forth in *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714 (5th Cir.1974), can be used to determine reasonable compensation under specific circumstances. *Kula*, 213 B.R. at 738. The *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attor-

ney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* Several of these factors have already been taken into account under the lodestar calculation and should not form the basis for a fee enhancement. Additionally, the court must remain mindful that "the lodestar amount is presumed to be reasonable, and that adjustments should be made only in rare and exceptional circumstances ...." *Id.*

### (2) *Position of the parties*

On November 9, 1998, the Rose Law Firm, as counsel to the Trustee in the Debtor Corporations' cases, filed an "Application For Allowance of Final Compensation and Expenses For Counsel For the Trustee." The application requested an attorney's fee enhancement of $50,000.00, and stated,

> The Applicant further believes an enhanced fee is justified in this case. The Applicant has represented the Trustee through this proceeding. The actions in this case have resulted in every single creditor who could be found being paid in full, and a substantial amount being returned to the Debtor. Applicant believes that under all the circumstances an enhanced fee of an additional $50,000.00 is justified.

Shaffer filed an objection to the requested fee enhancement. Simply stated, the Rose Law Firm asserts that the evidence justifies a $50,000.00 attorney's fee enhancement under the guidelines set forth in *Apex Oil Co.* and *Kula*. Shaffer asserts that there is insufficient evidence to award an attorney fee enhancement to the Rose Law Firm as counsel for the Trustee.

### (3) *Findings of fact and conclusions of law*

In order to decide whether the Rose Law Firm, as counsel for the Trustee, is

entitled to an upward adjustment of its fees for the services provided, the Court will apply the *Johnson* factors, as set forth in *Kula*, 213 B.R. at 738.

(1) Time and labor required.

The Rose Law Firm attorneys performed 4206.15 hours in legal services for the Debtor Corporations through September 1, 2000. The Rose Law Firm paralegals performed. 674.00 hours through September 1, 2000. The Rose Law Firm law clerks performed 1421.00 hours through September 1, 2000. The Debtor Corporations' cases were extremely time consuming and have lasted approximately 15 years. From the inception of the Debtor Corporations' cases in August 1986 until 1990, heavy time requirements were placed on the legal staff of the Rose Law Firm in pursuing the eight hundred agents who held proceeds from the sale of money orders, and litigating the estates' legal issues.

(2) The novelty and difficulty of the questions.

The Court adopts and incorporates its previous findings as to this factor in its entirety.

(3) The skill requisite to perform the legal services properly.

The Court adopts and incorporates its previous findings as to this factor in its entirety.

(4) The preclusion of other employment by the attorney due to the acceptance of the case.

Bird testified that from the inception of the Debtor Corporations' cases, his time as trustee and attorney was virtually consumed by these cases. Bird had to ask other attorneys in the Rose Law Firm to take over other legal matters for which he was responsible. For the first few years, the tremendous time requirements involved in the Debtor Corporations' cases caused Bird to decline representation of potential clients and refer legal work to other lawyers.

(5) The customary fee.

Attorneys Dowden and Robertson testified that in their experience, the hourly rate charged by the Rose Law Firm in the Debtor Corporations' cases, which averaged approximately $115.00 per hour, was very reasonable. The Debtor Corporations' cases were extremely complex and presented novel money order legal issues. Dowden testified that a charge of $125.00 per hour in the Debtor Corporations' cases would have been very conservative and reasonable.

(6) Whether the fee is fixed or contingent.

This factor is not applicable to the present cases. The Rose Law Firm billed an hourly rate.

(7) Time limitations imposed by the client or the circumstances.

Bird testified that the circumstances and flurry of activity at the inception of the Debtor Corporations' cases, and thereafter for several years, virtually consumed all his time, and he had to refer his other legal business to other attorneys in the Rose Law Firm.

(8) The amounts involved and the results obtained.

First, as to the amounts involved, the Debtor Corporations' cases were substantial. Over $7,500,000.00 will have been distributed under the Debtor Corporations' plan of reorganization and amended plan. As to the results obtained, the

Court adopts and incorporates its previous findings as to this factor in its entirety.

(9) The experience, reputation, and ability of the attorney.

The Court adopts and incorporates its previous findings as to this factor in its entirety.

(10) The undesirability of the case.

This was an extremely difficult situation to deal with as trustee and as counsel for the trustee from the time the bankruptcy was filed in 1986, through the first major distribution in 1991 and early January 1992, and including the handling of the City National Bank claim of $1,500,000.00. The Debtor Corporations had insufficient funds in its bank accounts shortly before the filing of the bankruptcies, and money orders were bouncing everywhere. The money order purchasers and the agents were furious. The agents were caught in the middle. On one hand, they needed to refund the money orders in order to keep their businesses viable; on the other hand, they had a contract with the Debtor Corporations to turn the proceeds from the sale of money orders over to the Debtor Corporations or be in breach of contract.

Their was no guarantee that the Trustee would be successful in his litigation that money order proceeds were property of the Debtor Corporations' estates. Until the mid 1990s, the Trustee did not think there would be sufficient money available to pay the money order claimants in full. In short, the odds were against a successful result in the Debtor Corporations' cases at its inception and in the foreseeable future.

(11) The nature and length of the professional relationship with the client.

The Rose Law Firm had no previous relationship with the Debtor Corporations.

(12) Awards in similar cases.

This factor is not applicable to the present cases.

The Court also makes additional findings and observations as to the Debtor Corporations' cases regarding the results obtained. The Rose Law Firm legal services were outstanding in the Debtor Corporations' cases (with the exception of failing to obtain Court orders in four instances). However, the Court does not conclude that the legal services performed, based on the above specific findings, meet the standard set forth in *Apex Oil Co.* Specifically, the Court does not conclude that the quality of representation and the results obtained in the Debtor Corporations' cases by the Rose Law Firm were superior to what one reasonably should expect in the light of the hourly rates charged and the number of hours expended. While the legal issues were indeed complex and novel in a number of instances, the Rose Law Firm had skilled and experienced bankruptcy attorneys to handle these issues, and Bird had over twenty seven years of bankruptcy expertise. The true complexity of the Debtor Corporations' cases lies with the administration of the Debtor Corporations' cases, not with the legal issues or legal performance of the Rose Law Firm.

The superior result in the Debtor Corporations' cases is the performance of Bird, in his capacity as trustee, not the Rose Law Firm for normal services rendered in even complex bankruptcy cases such as these. From August 1986 through 1991 and the amendment of the Debtor Corporations' plan, Bird's performance as trustee was truly extraordinary and rare; in fact, ingenious. The Debtor Corporations' business affairs were in a state of disaster: there was no money to operate

the businesses; money orders were bouncing; the State of Arkansas Securities Commission had, in effect, shut down the Debtor Corporations' operations and damaged its reputation as a money order company. Bird, as trustee, quickly grasped the Debtor Corporations' business, kept key personnel, vigorously developed a computer system to identify money order claimants, put the necessary information into the computer system, processed claims, kept an accounting of the money orders paid and not paid, and prepared a sophisticated and workable plan of reorganization. Bird, as trustee, located and identified approximately $843,00.00 in cash in various banks, and recovered approximately $100,000.00 from fidelities.

The most superior result Bird accomplished for the Debtor Corporations' estates was his negotiations with the various states and Puerto Rico to have them turn over to him, *as trustee,* money from the state bond proceeds, with those funds to be administered through the Debtor Corporations' plan and amended plan of reorganization and distributed to money order claimants in each state and Puerto Rico. This Court had held that the state bond funds were not property of the Debtor Corporations' estates. However, Bird's vision, skill, and perseverance enabled the Debtor Corporations' estates to realize over $1,200,000.00, which otherwise would not have been available for distribution in the Debtor Corporations' cases. This amount enabled the money order purchasers to be paid, the unsecured creditors' claims to be paid, and the equity security holder, Shaffer, to receive a distribution.

Obtaining the state bond proceeds was not the work of the Rose Law Firm. It was the work of Bird, individually and in his capacity as trustee. Clearly, Bird could not have made or enabled these agreements with the states and Puerto Rico if he had not been in the position of trustee of the Debtor Corporations' estates. Bird, in fact, acknowledged his performance as trustee to the Court in a letter dated May 13, 1993.[94] Attached to that letter is an excerpt from Bird's "Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back," which was filed on June 25, 1992. In the excerpt, Bird provides the Court with information about his performance as trustee, specifically detailing the results discussed above in discussing the "magnitude of the trusteeship."

As rare and extraordinary as Bird's performance as trustee was from August 1986 until 1992, the opposite is unfortunately true of his performance as trustee from 1992 through December 1999, as previously discussed in this opinion at length. For the reasons stated above, the Court will disallow the Rose Law Firm $50,000.00 fee enhancement, which was approved by a previous order filed on December 8, 1998.

#### c. *Unpaid billing of $17,375.58*

Bird testified at the February 2000 hearing that he had discovered the Rose Law Firm had been underpaid the sum of $21,436.00, which had been previously authorized by Court orders, but had not been paid. Bird requested that the Court approve the payment of this amount, and enter an order authorizing the disbursement of this amount to the Rose Law Firm as back payment due and owing pursuant to previous Court orders.

Bird testified that Bird's exhibit 215 tracks each application for attorney's fees and expenses with each order authorizing the payment of attorney's fees and expenses from November 24, 1986, through

---

94. Shaffer's Ex. 92.

December 8, 1998. During the earlier years of this case, certain percentage hold backs were used. As each fee application was approved, a percentage was withheld from the fees paid until the Trustee successfully applied to have the hold back reduced to a total of $40,000.00. In Bird's "Application of Rose Law Firm, a Professional Association, For Allowance of Interim Compensation and Expenses as Counsel for the Trustee," filed December 27, 1989, Bird advised the Court that the hold back was $61,402.89, and requested that the Court release $21,402.89. The Court granted the Trustee's request. However, the entry dated July 3, 1989, on Bird's exhibit 215 indicates the hold back as of the date of Bird's December 27, 1989, application should have been $82,838.89, not $61,402.00. Therefore, after the hold back of $40,000.00, there was still a hold back balance of $21,436.00 that had been authorized to be paid, but was never remitted to the Rose Law Firm.

Bird also testified that Bird exhibit 215 reflects an overpayment of expenses in the amount of $4060.42. Bird explained that when he prepared the June 3, 1988, order allowing payment of fees and expenses, he added $4060.42 to both the fee and expense side, which resulted in an overpayment of expenses in the amount of $4060.42. Offsetting the overpayment of $4060.42 from the underpaid legal fees results in the Rose Law Firm having been underpaid for legal fees in the amount of $17,375.58.

Bird's testimony was not refuted at the hearing on this matter. The Court credits Bird's testimony in this instance, and finds that the Rose Law Firm had been underpaid the sum of $21,436.00 based on the hold back as of the date of Bird's December 27, 1989, application. The Court also credits Bird's testimony that the Rose Law Firm was overpaid expenses in the amount of $4060.42. Accordingly, the Rose Law Firm is entitled to receive compensation for its unpaid billing in the amount of $17,375.58, subject to the adjustments made in section III.F.2. of this opinion.

d. *Payments to the Rose Law Firm in the total amount of $23,388.87 in legal fees and expenses without Court orders*

■ The facts are undisputed that the following billing statements by the Rose Law Firm were paid without Court orders:

| | |
|---|---|
| October 6, 1992 | $4850.25 in legal fees, $2039.56 in expenses; |
| April 28, 1993 | $2810.00 in legal fees, $1454.95 in expenses; |
| March 8, 1995 | $307.50 in legal fees, $708.13 in expenses; and |
| January 17, 1997 | $10,494.75 in legal fees, $723.73 in expenses. |

Bird testified that all of the work set forth in the billings statements was actually performed. The itemization of services rendered by each attorney is complete. The difference in the format of these four billings statements and the billing statements that were filed on behalf of the Rose Law Firm in the late 1980s is that there are more single line item entries and more detail in the description of each service on the later billing statements. All timekeepers were experienced bankruptcy practitioners and were aware of the increased

requirements of specificity in recording the time entries. *See In re Westside Creek Ltd. Partnership*, 93 B.R. 177, 180 (Bankr.E.D.Ark.1988)("A fee application should be specific enough to identify the legal services rendered so that the Court can determine the difficulty of the case and what results were achieved for the estate.)" (citing *In re Holthoff*, 55 B.R. 36 (Bankr.E.D.Ark.1985)). Bird further testified that the services included in the four billing statements were necessary in the firm's representation of him as trustee, and that the fees were reasonable in his opinion. Bird requested the Court to do what he should have asked a long time ago—authorize payment of the above legal fees.

Bird further testified that the Rose Law Firm, upon finding out that the four billing statements did not have Court orders, reimbursed the Debtor Corporations' estates the total amount of the billing statements—$23,388.87—with interest at the rate of five percent, the average rate of interest the estates were earning on their funds held at Union National Bank. The interest was calculated from the first date of overpayment on the total refunded and totaled $5610.34.

Payne testified as a witness for Shaffer regarding the proper interest rate to be paid on the money received by the Rose Law Firm. In his opinion, the appropriate rate of interest paid should have been ten percent. He testified that ten percent is a minimum fair rate that a professional or professional firm could secure for a period of years on an unsecured basis.

As to these issues, the Court credits Bird's testimony that the legal services and expenses as reflected in the four billing statements in issue were actually performed, and were necessary and reasonable. The Rose Law Firm should be entitled to receive the legal fees and expenses billed in the four statements totaling $23,388.87 as requested by the Trustee at the hearing on the Trustee's motion to approve all professional fees. Recognizing the bankruptcy courts' equitable powers, the Eighth Circuit Court of Appeals stated that, "in limited circumstances, the bankruptcy court as a matter of fundamental fairness may exercise its discretion and enter a *nunc pro tunc* order authorizing compensation." *Lavender v. Wood Law Firm*, 785 F.2d 247, 248–49 (8th Cir.1986). In this case, the Court finds that the Rose Law Firm should be compensated for its services. Further, the Court finds Bird's testimony more persuasive than Payne's as to the appropriate interest rate to be applied to the refund. The estate received a fair rate of return from investing its funds at Union National Bank. The trustee is not required to invest any excess funds at the highest possible interest rate obtainable; rather, he is to safeguard the funds and have access to the funds in the event it is necessary to pay expenses incurred by the estates.

The Court finds that the Rose Law Firm is entitled to a payment of $23,388.87 for its expenses and legal services performed as reflected in the above four billing statements, subject to the adjustments made in section III.F.2. of this opinion. Further, the Court finds that the five percent interest rate paid by the Rose Law Firm is an appropriate interest rate in these circumstances, and the repayment of $5610.34 is approved.

e. *Shaffer's request for disgorgement of the Rose Law Firm's legal fees and costs*

The Court, considering all of the evidence in the Debtor Corporations' cases, finds that the disgorgement of all or part of the Rose Law Firm's legal fees and

expenses is not warranted, except in instances where the Court has made a reduction in fees such as attorney time versus trustee's time, lump sum billing, and duplicate legal services rendered at the date Wright, Lindsey & Jennings LLP was employed as special legal counsel for the Trustee. The legal services performed at the time were necessary and reasonable, and covered a period in excess of thirteen years. The Court will address the issue as to whether the Rose Law Firm is vicariously liable for the acts of the Trustee in the Debtor Corporations' cases later in this opinion.

3. *Is Wright, Lindsey & Jennings LLP entitled to compensation as special counsel for the Trustee in the Debtor Corporations' cases? If so, can, and should, the Trustee be surcharged for the legal fees and costs incurred by Wright, Lindsey & Jennings LLP*

Bird was appointed trustee for the Debtor Corporations' cases on August 12, 1986. On August 28, 1986, Bird filed his motion to appoint the Rose Law Firm as attorneys for the Trustee. On September 4, 1986, the Court entered its order approving the appointment of the Rose Law Firm. On December 1, 1999, Bird filed his motion to appoint the law firm of Wright, Lindsey & Jennings LLP [the Wright firm] as special counsel to "prosecute his Chapter 11 final report and application for a final decree and to defend Larry Shaffers' objections to the final report and to the motion for final approval of all professional fees and expenses" pursuant to 11 U.S.C. § 327(e). In Bird's "Trustee's Application for Approval of Employment of Special Counsel Pursuant to 11 U.S.C. § 327(e)," Bird stated that the professional services requested of the Wright firm would include,

(a) give the Trustee legal advice with respect to his duties and powers in the case; (b) represent and assist the Trustee in carrying out his duties under Title 11, including the filing and approval of a Chapter 11 final report and account and application for a final decree, as well as the Trustee's motion for final approval of all fees and expenses incurred by the professionals retained by the Trustee; and (c) perform such other legal services as may be required by the Trustee and which may be necessary as part of completing administration of the Debtor's Chapter 11 bankruptcy estate.

Over Shaffer's objection, on December 10, 1999, the Court entered its order granting *nunc pro tunc* to December 6, 1999, Bird's application to employ the Wright firm. In its order, the Court preserved and continued Shaffer's objections regarding the employment of the Wright firm prior to December 6, 1999, and whether the Wright firm's fees and expenses in connection with this case should be borne by the bankruptcy estate or the Trustee.

The Wright firm filed its "First Application for Allowance of Fees and Expenses by Wright, Lindsey & Jennings LLP, Counsel for Trustee," on June 29, 2000, requesting professional fees in the amount of $194,574.00 and expenses in the amount of $22,896.30. It filed its "Second Application for Allowance of Fees and Expenses by Wright, Lindsey & Jennings LLP, Counsel for Trustee," on September 20, 2000, requesting professional fees in the amount of $105,671.00 and expenses in the amount of $16,228.14. Shaffer objected to the first application in his "Combined Objection to First Application for Allowance of Fees and Expenses by Wright, Lindsey & Jennings LLP, Counsel for Trustee and Motion For Approval of Professional Fees and Expenses and Brief in Support," filed on September 1, 2000. Shaffer filed his "Objection to Second Application for Al-

lowance of Fees and Expenses by Wright, Lindsey & Jennings LLP, Counsel for Trustee" on September 20, 2000. Finally, the Wright firm filed its "Clarification of Fee Application of Wright, Lindsey & Jennings LLP (WL & J) and Motion of the Trustee for Approval of Professional Fees and Expenses of the Rose Law Firm (RLF)" on December 8, 2000.

■■■ Section 327(e) provides the authority for the trustee to employ special counsel. This section states:

The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. 327(e). According to § 327(e), the trustee and special counsel need to meet three conditions: (1) the attorney previously represented the debtor, (2) hiring the attorney is in the best interest of the estate, and (3) the attorney does not hold an interest adverse to the debtor or estate with respect to the matter on which such attorney is to be employed. *In re Cockings*, 195 B.R. 735, 736–37 (Bankr. E.D.Ark.1996); *accord In re Abrass*, 250 B.R. 432, 435 (Bankr.M.D.Fla.2000). Section 327(e) expressly requires that to serve as special counsel, the attorney must have previously represented the debtor. *Abrass*, 250 B.R. at 435; *see also Cockings*, 195 B.R. at 736; *In re Black & White Cab. Co.*, 175 B.R. 24, 26 (Bankr.E.D.Ark. 1994). The legislative history of § 327(e) sheds light on this requirement by recognizing that § 327(e) " 'will most likely be used when the debtor is involved in complex litigation, and changing attorneys in the middle of the case after the bankrupt-

cy case has commenced would be detrimental to the progress of that other litigation.' " *Abrass*, 250 B.R. at 436 (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 328 (1977), U.S.Code Cong. & Admin. News 1977, p. 5963). A trustee can employ multiple general counsels for general representation or for limited purposes, as long as each counsel meets the requirements under § 327(a). However, "only attorneys who formerly represented the debtor qualify for special treatment under Section 327(e)." *Id.* In this case, there is no evidence that the Wright firm has previously represented the debtor. Because of this, the Wright firm does not meet the first requirement, and cannot qualify as special counsel under § 327(e).

■■ Further, the Trustee's application seeks to employ the Wright firm to represent the Trustee in administrative matters typically required of a trustee or their general counsel. Section 327(e) does not allow the trustee to employ special counsel for that purpose; in fact, it provides authority for the trustee to employ special counsel "for a specified special purpose, *other than to represent the trustee in conducting the case* . . . ."

■■ Clearly, the Trustee was seeking to employ the Wright firm to represent the Trustee in this administrative litigation relating to his chapter 11 final report, and to defend against Shaffer's objections to that final report. Also, given Shaffer's objections to the Trustee's motion for final approval of all professional fees, the Rose Law Firm was, at this time, a party in interest. Even though the Wright firm does not meet the requirements of § 327(e), in the present litigation the Court concludes that the Wright firm meets § 327(a) at this stage in the administration of the Debtor Corporations' cases. For the above reasons, the Court will treat the Trustee's application to employ the

Wright firm pursuant to § 327(e) as a motion to substitute the Wright firm for the Rose Law Firm in the pending administrative litigation. In treating the Trustee's motion as a motion to substitute counsel, the Court must follow the dictates of § 327(a) to determine whether, and from when, the Wright firm is entitled to compensation.

The general statement of the law is clear: "[a]n attorney is not entitled to compensation from the estate in a case under chapter 11 unless prior thereto an order is entered approving the employment of the attorney pursuant to 11 U.S.C. § 327(a) and Bankruptcy Rule 2014(a)." *In re Westside Creek Ltd. Partnership*, 93 B.R. 177, 179 (Bankr.E.D.Ark.1988)(citing 13 cases and Collier on Bankruptcy). Some courts have taken an inflexible approach to the general rule and held that when there has been no compliance with the rule, the attorney has no right to compensation. This approach would exclude any *nunc pro tunc* approval of employment. *In re Glinz*, 36 B.R. 17, 18 (Bankr. D.N.D.1983). According to these courts, the purpose of a *nunc pro tunc* order is to correct a prior unrecorded act of the court. Under this reasoning, a *nunc pro tunc* order cannot be used to correct or supply a prior omission when prior approval of employment was not received. *Id.*

The Eighth Circuit has taken a different approach to the entry of a nunc pro tunc order. Recognizing the bankruptcy courts' equitable powers, the court stated that, "in limited circumstances, the bankruptcy court as a matter of fundamental fairness may exercise its discretion and enter a *nunc pro tunc* order authorizing compensation." *Lavender v. Wood Law Firm*, 785 F.2d 247, 248–49 (8th Cir.1986). In this case, the Court preserved Shaffer's objections regarding the employment of the Wright firm prior to December 6, 1999.

The Court finds that the Trustee was entitled to representation in the prosecution of his chapter 11 final report and application for a final decree, and to defend him against Shaffer's objections. The Wright firm began its representation on November 9, 1999, and filed its affidavit of disinterestedness with the trustee's application for approval of employment on December 1, 1999. Because all parties were on notice as of December 1, 1999, that the Wright firm was representing the Trustee, the Court denies Bird's motion to employ the Wright firm prior to December 1, 1999, and grants Bird's motion *nunc pro tunc* from December 1, 1999, and thereafter. The Court sustains Shaffer's objection regarding the employment of the Wright firm prior to December 1, 1999, and overrules Shaffer's objection regarding the employment of the Wright firm from December 1, 1999, and thereafter.

In approving the employment of the Wright firm, the Court recognizes that (1) the Trustee has chosen the Wright firm as lead counsel to represent him for purposes of the final report and Shaffer's objections, and (2) the Rose Law Firm is a party in interest because of the pending applications for compensation to which Shaffer has objected. Since December 1, 1999, the time entries of both the Rose Law Firm and the Wright firm all relate to the Trustee and pending litigation. It would be unjust and unduly burdensome for the estate to be forced to pay both firms for the Trustee's representation in the litigation. Because of this, the Court will disallow the time entries of the Rose Law Firm from December 1, 1999. The Court does note that the Rose Law Firm withdrew its application for attorney fees for the time period of February 25, 2000, through August 31, 2000, in its "Clarification of Fee Application of Wright, Lindsey & Jennings LLP (WL & J) and Motion of

the Trustee for Approval of Professional Fees and Expenses of the Rose Law Firm (RLF)." Shaffer's concerns of whether the Wright firm should be paid by the estate or the trustee related to the double billing of the Rose Law Firm and the Wright firm, and are mooted by the Court's disallowance of the Rose Law Firm's time entries from December 1, 1999.

The Court now considers whether the Wright firm should be compensated by the estate, or whether Bird individually should be surcharged for the legal fees and costs incurred by the Wright firm in this litigation based upon this Court's finding that Bird committed fraud on the Debtor Corporations and the Court.

The trustee is a fiduciary of the estate. *Moulded Products, Inc. v. Barry*, 474 F.2d 220, 224 (8th Cir.1973); *see also Commodity Futures Trading Comm. v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). According to the Supreme Court, "a trusteeship is serious business and is not to be undertaken lightly . . . ." *Mosser v. Darrow*, 341 U.S. 267, 274, 71 S.Ct. 680, 95 L.Ed. 927 (1951). In *Mosser*, the Court recognized that a trustee may derive some qualified immunity from the "difficult business judgments" he is called upon to make. However, that immunity will not protect the trustee from personal liability for negligent or wilful acts. *Id.* at 273–74, 71 S.Ct. 680. In interpreting *Mosser*, the circuit courts are split regarding the imposition of personal liability for acts of negligence. *See Carter v. Schott (In re Carter Paper Co.)*, 220 B.R. 276, 293–94 (Bankr.M.D.La.1998)(discussing in detail the split in circuits); *see also* Norton Bankruptcy Law and Practice 2d § 79:21 p. 79–45 n.44. However, in this case the Trustee committed fraud on the Debtor Corporations and the Court. Under *Mos-*

*ser*, and the cases that discuss *Mosser*, regardless of the debate occurring in circuit courts regarding personal liability for negligent acts, a bankruptcy trustee is personally liable for wilful or intentional breaches of duty, and the trustee will be surcharged, personally, to return the profits to the estate. *Carter Paper Co.*, 220 B.R. at 293–94.

The Court finds that the Trustee should be surcharged for his acts of fraud. According to Black's Law Dictionary, surcharge means "[t]he imposition of personal liability on a fiduciary for wilful or negligent misconduct in the administration of his fiduciary duties." Black's Law Dictionary 1005 (abridged 6th ed.1991). Most often, the surcharged amount is the diminution in value of the estate property. *See, e.g., Mosser*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951)(trustee surcharged to return profits to the estate); *In re Moon*, 258 B.R. 828 (Bankr.N.D.Fla.2001)(trustee surcharged for the difference of what was earned and what reasonably should have been earned by the estate); *In re Charlestown Home Furnishing*, 150 B.R. 226 (Bankr.E.D.Mo.1993)(trustee surcharged for the yield that could have been earned when assets were deposited in a non-interest bearing account). On the surface, a surcharge is not appropriate in this instance because the Trustee has paid back to the estate the money that was overpaid, with interest. As recognized by the Second Circuit, the purpose of a surcharge is to benefit either the creditors or the estate, not punish the trustee. *In re Gorski*, 766 F.2d 723, 727 (2d Cir.1985)(rejecting the use of a civil fine as form of trustee surcharge). However, but for the actions of the Trustee, the Wright firm would not have been employed to "prosecute his Chapter 11 final report and application for a final decree and to defend Larry Shaf-

fers' objections to the final report and to the motion for final approval of all professional fees and expenses."

■■■■ Although the Wright firm was effective in its defense of many of the objections raised by Shaffer, it is unjust for a trustee to obtain reimbursement for the defense of an action in which the trustee, in his fiduciary capacity and in the performance of his job as trustee of the estate, committed fraud. A trustee generally is entitled to defend himself from allegations of malfeasance by a party in interest. However, if the malfeasance is established, the estate should not bear the cost of that defense. *In re Yellow Cab Co.,* 212 B.R. 154, 159 (Bankr.S.D.Cal. 1997); *accord Behrman v. Egan,* 31 N.J.Super. 95, 106 A.2d 36, 39 (Ch. Div.1953)(holding that trustees who have been found to have violated the trust are precluded from reimbursement of costs incident to their defense of the action). Likewise, and even more certain, when acts of fraud have been committed on the court and estate, the trustee is not entitled to reimbursement for the cost of his defense from the estate.

After the Wright firm was substituted for the Rose Law Firm, the Wright firm petitioned for an award of reasonable compensation pursuant to § 330 for representing the Trustee in these administrative matters. It is apparent to the Court that Bird employed the Wright firm for his individual benefit relating to Bird's chapter 11 final report and fee application and Shaffer's objections to the report and application. Bird made the choice to retain the Wright firm to defend him, individually, in the performance of his fiduciary duty as trustee. If the Debtor Corporations' estate paid the Wright firm its fees and expenses, the injury would be to Shaffer, as equity security holder. Any money remaining in the Debtor Corporations' estate

after the payment of administrative expenses would go to Shaffer, as equity security holder. To allow the estate to use that money to pay the Wright firm's fees and expenses would have Shaffer, in effect, paying for Bird's defense of Shaffer's own objections.

■■■ The Court agrees with a leading treatise regarding this subject which states, "[w]here the trustee employs an attorney for his individual benefit and not for that of the estate, he must pay the attorney out of his own pocket and is not entitled to reimbursement from the trust estate." III Scott on Trusts § 188.4, at 67–68 (4th ed.1988). This result is also supported by the Court's finding that Bird committed fraud on the Court. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)(holding that a court can impose attorney fees against a party if it finds that fraud has been practiced upon the court). Accordingly, the Court surcharges Bird for the entire defense provided by Wright, Lindsey & Jennings LLP, and orders Bird to pay all of Wright, Lindsey & Jennings LLP's fees and expenses out of his own pocket, not from the Debtor Corporations' estate.

4. *Can, and should, the trustee be surcharged for the legal fees and costs incurred by Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C. in this litigation, including the fees and expenses of Shaffer's expert witness and financial consultant, D.R. Payne & Associates, or should Shaffer be required to pay for his own legal fees and costs incurred*

Shaffer has asked the Court to order the Trustee and the Rose Law Firm to pay Shaffer's reasonable attorney's fees and costs, including expert witnesses, in object-

ing to the Trustee's reports. However, Shaffer has cited no statutory authority for this request. Instead, Shaffer requests reimbursement through a "court-ordered surcharge" in an amount "determined by the loss suffered by the estate and Shaffer ...." This Court has already determined that the actions and performance of the Trustee in his administrative position did not result in any injury to the estates or the creditors of the estates. Bird was negligent in not obtaining Court orders before making certain disbursements of estate money, but was not negligent in closing the estate, pursuing judgments, or employing and paying Penny Scharmberg. Further, all money that was overpaid was returned to the estate, with interest.

Shaffer filed his "Application for Allowance and Surcharge of Attorneys Fees and Expenses" on June 30, 2000, requesting professional fees in the amount of $289,065.50 and expenses in the amount of $18,629.69. He filed his "First Interim Application of D.R. Payne & Associates as Financial Experts and Accountants For Larry Shaffer ('Shareholder') For Allowance of Compensation For Actual Necessary Services Rendered and For Reimbursement of All Actual, Necessary Expenses Incurred For the Period October 21, 1999 Through February 26, 2000" on July 10, 2000, requesting professional fees in the amount of $42,280.00 and expenses in the amount of $1827.11. Shaffer filed a "Supplement to Application For Allowance and Surcharge of Attorneys Fees and Expenses" on September 20, 2000, requesting professional fees in the amount of $50,518.75 and expenses in the amount of $11,449.50. Bird, through his counsel Wright, Lindsey & Jennings LLP, filed his "Objection by Trustee and Rose Law Firm to Application and Supplement to Application For Allowance of Attorney's Fees and Expenses Filed by Larry Shaffer (Mr. Shaffer)" on October 16, 2000.

The only statutory provision that may have given rise to a claim for attorney fees and expenses under the code would be a claim for administrative expenses under 11 U.S.C. § 503. Section 503(b) states:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
>
> (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;
>
> (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. § 503(b)(3), (4). The phrase, "after notice and hearing," means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1). The Court is empowered to act without a hearing in certain instances, but only if proper notice is given. Because Shaffer did not make a claim under § 503(b), parties in interest were not afforded the opportunity to object and have the matter heard. As a result, the Court will not consider Shaf-

fer's request for payment of his attorney's fees and costs under this section of the code.

Second, even if it was appropriate for the Court to consider a claim under § 503(b), the burden of proof would be on Shaffer to establish his entitlement to an award "by demonstrating by a preponderance of the evidence that a 'substantial contribution' was made." *In re 9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. 246, 249 (Bankr.D.Colo.1990); *accord In re Glickman, Berkowitz, Levinson & Weiner, P.C.*, 196 B.R. 291 (Bankr.E.D.Pa. 1996). Substantial contribution means that "'the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.'" *9085 E. Mineral Office Bldg., Ltd.*, 119 B.R. at 250 (quoting *In re Lister*, 846 F.2d 55 (10th Cir.1988)). The only objection raised by Shaffer that resulted in a benefit to the debtors' estate in this instance related to the fee application of the Trustee and the Rose Law Firm. However, the Court is required to perform its own independent evaluation of any fee request, and has made its findings earlier in this opinion. Additionally, the only entity that would benefit from the disallowance of the Rose Law Firm's fees is Shaffer, as equity security holder; all of the other creditors have been paid in full. Even if Shaffer had filed an application for administrative expenses pursuant to 11 U.S.C. § 503, this Court has discretion whether or not to allow those fees. *Glickman, Berkowitz, Levinson & Weiner, P.C.*, 196 B.R. at 294. In this instance, Shaffer's actions did not result in a substantial contribution to the estate resulting in a benefit to the estate and creditors of the estate.

Shaffer may be afforded some relief under an exception to the American Rule. Typically, under the American Rule, a prevailing party may not recover attor-

ney fees as costs from the opposing party. *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). However, the Supreme Court has recognized three categories of exceptions to the American Rule. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). First, a court may award attorney fees to a party whose litigation efforts directly benefitted others under the common fund exception. *Id.* Second, "a court may assess attorney fees as a sanction for the 'wilful disobedience of a court order.'" *Id.* And third, a court may assess attorney fees when a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 45–46, 111 S.Ct. 2123 (quoting *Alyeska*, 421 U.S. at 258–59, 95 S.Ct. 1612). Under the third exception, if a court finds "'that fraud has been practiced upon it,'" it may assess sanctions against the bad actor under the court's inherent power to police itself. *Id.* at 46, 111 S.Ct. 2123. In each instance, discretion lies with the court to find an exception to the American Rule. *See Chambers*, 501 U.S. at 55, 111 S.Ct. 2123 (stating that the imposition of sanctions is reviewed for abuse of discretion).

The law in Arkansas follows the American Rule—each litigant must pay his own attorney fees. *Hardy v. Hardy*, 217 Ark. 305, 230 S.W.2d 11, 16 (1950). Likewise though, Arkansas recognizes an equitable exemption to the common rule. In matters of a trustee's misconduct, neglect, or breach of trust, the award of an attorney fee to the prevailing party is appropriate. *Id.; see also Liles v. Liles*, 289 Ark. 159, 711 S.W.2d 447, 457 (1986). Again, this sanction is discretionary with the court. *See Hosey v. Burgess*, 319 Ark. 183, 890 S.W.2d 262, 267 (1995)("attorney's fees *may* be awarded for a trustee's breach of trust")(emphasis added).

■ In the case before the Court, Shaffer raised 13 objections to the Trustee's final report and application for final decree. Shaffer abandoned five of those 13 objections prior to trial. At trial, the parties focused on the Trustee's time entries and the calculation of the trustee fees. Of the eight matters heard at trial, and discussed in detail in this opinion, Bird prevailed on six of the issues. Clearly, Shaffer raised numerous issues that required extensive discovery. The Court finds that Shaffer overreached by expanding the issues and electing to pursue these issues through discovery and trial. In so doing, he caused considerable expense to the estate in defending these actions.

Given the numerous objections made by Shaffer, it would be unjust to require the estate, or Bird, to pay the related litigation expense Shaffer incurred in prosecuting this action. Prior to trial, Bird disclosed the overpayments that were made, and repaid that amount to the estate, with interest. Further, the record and time entries do not reflect any allocation as to the time spent on specific issues. The issues are intertwined, and it would be impracticable, if not impossible, for the Court to attempt to allocate specific time to specific issues. After considering the equities, it is this Court's decision that the exceptions to the American Rule are not warranted in this case, and each side should be required to pay their own attorney fees. This requirement, as it relates to Bird, was discussed in the preceding section. The Court orders Shaffer to pay his own attorney fees, including the fees and costs relating to his expert witness and financial consultant, D.R. Payne & Associates.

### 5. Is the Rose Law Firm vicariously liable for the acts of the Trustee in the Debtor Corporations' cases

■ Shaffer's position is that because Bird is an employee of the Rose Law Firm, the Rose Law Firm is vicariously liable for Bird's wrongful acts under the doctrine of respondent superior. Shaffer argues that under the doctrine of respondent superior, an employer may be held liable for the wrongful acts of its employee, if the employee was acting within the scope of his employment. *Lawson v. United States*, 103 F.3d 59, 60 (8th Cir. 1996). This rule applies in the context of attorneys and law firms. *See Baker v. Ploetz*, 597 N.W.2d 347, 352 (Minn.Ct.App. 1999).

Further, according to Shaffer, the Rose Law Firm has acted as legal counsel for Bird as Trustee, since the inception of the Debtor Corporations' bankruptcy cases, and has effectively ratified the Trustee's conduct in these cases. The Rose Law Firm has a substantial amount of overpaid fees and has failed to repudiate the Trustee's continuing concealment of the facts, or breaches of fiduciary duties. The Rose Law Firm has benefitted greatly from the Trustee's role as trustee and the firm's role as attorney to the Trustee in these cases. The Rose Law Firm has retained the benefit of not only hundreds of thousands of dollars in legal and trustee fees, but has also been paid a significant amount of rent by the estates and has obtained the use of direct computer services on a "shared basis." Shaffer argues that the Rose Law Firm should be held equally liable for any damages that are awarded against Bird as trustee.

The Trustee's position is that the Rose Law Firm is not vicariously liable for any alleged wrongful act by the Trustee in the Debtor Corporations' bankruptcy cases. First, the doctrine of respondent superior is not applicable in these bankruptcy cases. Second, the Rose Law Firm has not been made a party to these proceedings in

which Shaffer is seeking to hold the firm liable for damages. Shaffer has not filed a civil action or adversary proceeding naming the Rose Law Firm as a defendant thereby denying due process to the Rose Law Firm. Third, the Rose Law Firm did not obtain any trustee's fees or legal fees with knowledge that the fees were unlawfully incurred by the Trustee in the administration of the Debtor Corporations cases.

A review of the record shows that on August 12, 1986, this Court entered its order appointing Bird as trustee in the Debtor Corporations' cases pursuant to 11. U.S.C. § 1104. On August 28, 1986, Bird, as trustee, filed a motion to appoint the Rose Law Firm as counsel for the Trustee in the Debtor Corporations' cases pursuant to 11 U.S.C. § 327. Section 327 provides that the trustee, with the Court's approval, may employ one or more attorneys to represent or assist the trustee in carrying out the trustee's duties under this title. The statutory language is clear that the Trustee is the employer in the Debtor Corporations' cases and the Rose Law Firm is the employee hired by the Trustee to represent and assist the Trustee in carrying out his duties under the code. Therefore, the respondent superior doctrine is not applicable in the pending motions before the Court.

While the Rose Law Firm is involved in the pending motion before the Court as to the Trustee's July 29, 1999, "Motion For Final Approval of All Professional Fees and Expenses," it has not been sued by Shaffer for damages under the doctrine of respondent superior or any other legal cause of action. For this Court to rule on any liability or damage issue without Shaffer formally bringing a civil action against the Rose Law Firm for liability and damages, and without giving the Rose Law Firm an opportunity to respond to and defend against any claim for damages asserted against it would be a denial of due process.

The Court finds that the doctrine of respondent superior does not apply to the facts relating to the pending motions before the Court that were filed by the Trustee; specifically, the December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final Decree," and the July 29, 1999, "Motion For Final Approval of All Professional Fees and Expenses." In these Debtor Corporations' cases, the pleadings and orders entered reflect that Bird, as trustee, employed the Rose Law Firm (in which he is a partner) as legal counsel for the Trustee in the administration of the Debtor Corporations' estates. In other words, Bird, as trustee, is the employer, and the Rose Law Firm is the employee or agent of the Trustee. The Court further finds that the Rose Law Firm is not properly before the Court on the issue raised by Shaffer regarding the vicarious liability of the Rose Law Firm for any unlawful acts or conduct by Bird as trustee for the Debtor Corporations' estates.

## IV. CONCLUSIONS AS TO THE PENDING APPLICATION, MOTIONS, AND ISSUES BEFORE THE COURT.

The following are conclusions reached by the Court as to the issues addressed in this Memorandum Opinion.

(1) Shaffer's objections to the Trustee's December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final Decree" are timely, and not barred by law.

(2) Bird, as trustee of the Debtor Corporations' estates, did not breach his fiduciary duty to close the Debtor Corporations' estates in a timely manner.

(3) Bird, as trustee, did not breach his fiduciary duty by failing to collect judgments on behalf of the Debtor Corporations' estates.

(4) Bird, as trustee, breached his fiduciary duty to the Debtor Corporations' estates, by failing to obtain orders by the Court to sell property of the Debtor Corporations' estates; however, Bird, as trustee, exercised reasonable business judgment in selling the property of the Debtor Corporations' estates and the Debtor Corporations' estates were not damaged.

(5) Bird, as trustee, did not breach his fiduciary duty, by sharing employees of the Debtor Corporations' estates with the Rose Law Firm. Bird, as trustee, exercised reasonable business judgment.

(6) Bird, as trustee, breached his fiduciary duty to the Debtor Corporations' estates, by paying Penny Scharmberg a $10,000.00 bonus without obtaining an order from the Court; however, paying the bonus was reasonable business judgment by Bird, as trustee, in order to retain Scharmberg's services. Further, Bird, as trustee, did not breach his fiduciary duty, by retaining Scharmberg as a full time employee for the Debtor Corporations.

(7) Bird, as trustee, breached his fiduciary duty to the Debtor Corporations' estates, by making payments to Victoria Mason as accountant for the Debtor Corporations' estates in preparing tax returns without first obtaining orders from the Court; however, Mason's accounting services benefited the Debtor Corporations' estates, and the estates were not damaged as a result of her services.

(8) Bird, as trustee, breached his fiduciary duty to the Debtor Corporations' estates, by paying the Rose Law Firm for legal services rendered to the Trustee without obtaining Court orders; however, the Rose Law Firm legal services benefited the Debtor Corporations' estates and the estates were not damaged by the payments made by the Trustee without orders from the Court.

(9) Bird, as trustee, breached his fiduciary duty to the Debtor Corporations' estates, and committed fraud upon the Debtor Corporations' estates and the Court, by making application on June 25, 1992, obtaining an order on July 27, 1992, and receiving $88,000.00 in duplicate trustee's fees pursuant to 11 U.S.C. § 326. Further, Bird, as trustee, breached his fiduciary duty to the Debtor Corporations' estates, and committed fraud on the Debtor Corporations' estates and the Court, by paying himself or the Rose Law Firm $41,527.00 on October 29, 1992, when he obtained a second payment of state regulators' fees from funds of the Debtor Corporations' estates.[95]

(10) Bird, as trustee, knowingly and intentionally made overpayments of trustee's fees to himself or the Rose Law Firm without Court orders, and, in doing so, breached his fiduciary duty to the Debtor Corporations' estates.

(11) The November 9, 1998, "Chapter 11 Final Report and Account and Application For Final Decree," filed

---

**95.** Bird signed a check in the amount of $41,600.00 on June 15, 1992, which was the first payment of state regulators' fees, and which was paid from state bond proceeds.

by Bird, as trustee, contained a false representation in that the report failed to disclose that Bird or the Rose Law Firm had been overpaid trustee's fees.

(12) The July 29, 1999, final report and account, filed by Bird, as trustee, contained a false statement in that the report failed to disclose that Bird or the Rose Law Firm had been overpaid in trustee's fees.

(13) Bird, as trustee, breached his fiduciary duty by avoiding disclosing in a timely manner to Shaffer, as an equity security holder and party in interest, an accounting and supporting documents as to all of his or the Rose Law Firm's trustee's fees, and a § 326 calculation upon which entitlement of trustee's fee was determined.

(14) The Court will disgorge Bird's trustee's fee in the Debtor Corporations' cases pursuant to 11 U.S.C. § 326 in its entirety because of his performance in committing fraud upon the Debtor Corporations' estates and the Court. Bird is ordered to pay back to the Debtor Corporations' estate the sum of $199,979.26 for interim trustee fees paid. However, the Court will not disgorge Bird's fee of $41,527.00 paid to him by various state regulators for services rendered by him in handling and distributing the state regulators' money order claims pursuant to agreements made between Bird and the various state regulators. Bird's fee was paid from surety bond proceeds owned by the various states, and not from proceeds of the Debtor Corporations' estates.

(15) The Court will set aside its May 24, 1993, order awarding the Trustee a $20,000.00 fee enhancement.

(16) The five percent interest paid by the Rose Law Firm for the use of the overpayment of trustee's fees is an appropriate interest investment rate of return for the Debtor Corporations' estates.

(17) Bird, as trustee, is not entitled to a fee under 11 U.S.C. § 326 for claims that were either compromised or set off.

(18) Bird, as trustee, is not entitled to a fee under 11 U.S.C. § 326 for funds distributed from proceeds that were derived from state surety bond proceeds because the Trustee waived his fee under § 326 by agreeing to receive his fees from the various state regulators. Bird agreed that his fees on these proceeds would not be an expense the Debtor Corporations' estates would have to pay. Also, to require the Debtor Corporations' estates to pay a duplicate fee for the same services in connection with handling the distribution of state surety bond proceeds, for which Bird had already been paid $41,527.00, would be unconscionable.

(19) Victoria Mason is entitled to fees in the amount of $41,060.00 for accounting services rendered to the Debtor Corporations' estates.

(20) The Rose Law Firm, as legal counsel for the Trustee in the Debtor Corporations' estates, is entitled to legal fees and expenses in the amount of $559,236.50. The Rose Law Firm has been paid a total of $662,772.00. Thus, the Rose Law Firm has been overpaid in the amount of $103,359.50, and is ordered to pay that amount to the

successor trustee, who shall be appointed by the United States trustee, and who shall deposit the money in the Debtor Corporations' account.

(21) The Rose Law Firm is not entitled to a $50,000.00 enhancement of fees in the Debtor Corporations cases.

(22) Because of the Trustee's breach of his fiduciary duty in the performance of the administration of the Debtor Corporations' estates by committing fraud on the Debtor Corporations' estates and the Court, and because the Trustee elected to employ Wright, Lindsey & Jennings LLP as special counsel for the Trustee in the subject litigation, the Court will surcharge Bird for all of the attorneys' fees and expenses incurred by Wright, Lindsey & Jennings LLP as of the date of this opinion, and Bird shall be personally responsible for the payment of Wright, Lindsey & Jennings LLP's legal fees and expenses. The legal fees and expenses of Wright, Lindsey & Jennings LLP shall not be paid from the Debtor Corporations' estates.

(23) Because Shaffer raised numerous issues as to the final report and account, dropped some of the issues shortly before trial, and lost a number of substantial issues, such as delay in closing the Debtor Corporations' estates and failure of the Trustee to collect judgments, the Court concludes that Shaffer should paid all of the attorneys' fees and expenses owed to Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., which Shaffer employed to represent him in this litigation, including the fees and expenses of

D.R. Payne & Associates as financial advisors and expert witnesses.

(24) The Rose Law Firm is not vicariously liable for the wrongful acts of Bird, as trustee.

A separate order will be entered regarding each of the issues addressed in this memorandum opinion.

## ORDER GRANTING IN PART AND DENYING IN PART SHAFFER'S OBJECTIONS TO THE TRUSTEE'S JULY 29, 1999, FINAL REPORT AND ACCOUNT AND APPLICATION FOR FINAL DECREE, AND DECEMBER 15, 1999, AMENDED CHAPTER 11 FINAL REPORT AND ACCOUNT AND APPLICATION FOR FINAL DECREE, AND DISGORGING TRUSTEE'S FEES

This Court, on even date, has filed a Memorandum Opinion addressing numerous objections and issues raised by Larry Shaffer, as the equity security holder and a party in interest in the above Debtor Corporations' cases, to the Trustee's July 29, 1999, "Final Report and Account and Application For Final Decree," and December 15, 1999, "Amended Chapter 11 Final Report and Account and Applications For Final Decree." [referred to collectively as "Final Report"] Because of the number of issues raised and the length of the Memorandum Opinion, this Order will address the issues raised by Shaffer in the succeeding numbered paragraphs, and include a footnote indicating where the findings of facts and conclusions of law are located in the Memorandum Opinion.

1. The Court holds that Shaffer's objections to the Trustee's Final Report are timely and not barred.[1]

---

**1.** See section III.A. of the Memorandum Opinion, beginning at page 6.

2. The Court holds that the Trustee did not breach his fiduciary duty, and was not negligent, in closing the Debtor Corporations' cases.[2]

3. The Court holds that the Trustee did not breach his fiduciary duty, and was not negligent, in pursuing the collection of judgments for the Debtor Corporations' estates.[3]

4. The Court holds that the Trustee breached his fiduciary duty by failing to obtain orders before selling property of the Debtor Corporations' estates; however, the Debtor Corporations were not damaged because the Trustee exercised reasonable business judgment in the sale of these properties.[4]

5. The Court holds that the Trustee did not breach his fiduciary duty by employing certain individuals to work part time for the Debtor Corporations' estates and part time for the Rose Law Firm. The Trustee exercised reasonable business judgment in these instances.[5]

6. The Court holds that the Trustee breached his fiduciary duty by not obtaining an order authorizing the payment of a $10,000.00 bonus to retain the services of employee Penny Scharmberg; however, the Debtor Corporations' estates were not damaged because the Trustee exercised reasonable business judgment in continuing her employment. She was a vital employee and her continued employment was necessary. Further, the Trustee was not negligent, and did not breach his fiduciary duty, by continuing to employee Scharmberg on a full time basis until she left the employment of the Debtor Corporations in July of 1999.[6]

7. The Court holds that the Trustee breached his fiduciary duty by making payments to accountant Victoria Mason without orders from the Court authorizing such payments; however, the Court further holds that the Debtor Corporations' estates were not damaged in that Mason's accounting services were necessary, and the Trustee paid reasonable compensation.[7]

8. The Court holds that the Trustee breached his fiduciary duty by making four payments to the Rose Law Firm without Court orders for legal services rendered; however, the Court holds that the legal services were performed and necessary, and the Debtor Corporations' estates were benefited and not damaged.[8]

9. The Court holds that Bird, as trustee, breached his fiduciary duty in the performance of his position as trustee of the Debtor Corporations' estates and committed fraud upon the Debtor Corporations' estates and the Court by making application on June 25, 1992, obtaining an order on July 27, 1992, and receiving $88,000.00 in duplicate trustee's fees pursuant to 11 U.S.C. § 326. The Court holds that Bird, as trustee, breached his fiduciary duty in the performance of his position as trustee of the Debtor Corporations' estates and committed fraud upon the Debtor Corpo-

2. See section III.B.1. of the Memorandum Opinion, beginning at page 13.

3. See section III.B.2. of the Memorandum Opinion, beginning at page 50.

4. See section III.B.3. of the Memorandum Opinion, beginning at page 57.

5. See section III.B.4. of the Memorandum Opinion, beginning at page 64.

6. See section III.B.5. of the Memorandum Opinion, beginning at page 69.

7. See sections III.B.6. of the Memorandum Opinion, beginning at page 74, and III.F.1.,beginning at page 169.

8. See section III.B.7. of the Memorandum Opinion, beginning at page 76.

rations' estates and the Court by paying himself or the Rose Law Firm $41,527.00 on October 29, 1992, a second payment of state surety bond fees from money belonging to the Debtor Corporations' estates. Bird, as trustee, knowingly and intentionally made overpayments of trustee's fees to himself or the Rose Law Firm without Court orders and breached his fiduciary duty to the Debtor Corporations' estates.[9]

10. The Court holds that Bird, as trustee, made false representations in his November 9, 1998, "Chapter 11 Final Report and Account and Application For final Decree," and July 29, 1999, Final Report and Account and Application For Final Decree, by failing to disclose overpayments of trustee's fees to himself or the Rose Law Firm.[10] The Court further holds that the Trustee breached his fiduciary duty by avoiding to timely disclose to Shaffer, as a equity security holder and a party in interest, an accounting and supporting documents as to all of his or the Rose Law Firm's trustee's fees and an 11 U.S.C. § 326 calculation upon which entitlement of trustee's fees are determined.[11]

11. The Court holds that the Trustee is not entitled to include in his 11 U.S.C. § 326 calculation the dollar amount of the claims that were compromised or set off.[12]

12. The Court holds that the Trustee is not entitled to included in his 11 U.S.C. § 326 calculation the bond proceeds disbursed through the Debtor Corporations' estates. The Trustee waived his § 326 fee by reaching agreements with various state regulators to pay fees personally to him or the Rose Law Firm for handling and distributing state surety bond proceeds.[13]

13. The Court holds that the Trustee is entitled to include money disbursed to equity security holders claimants in his 11 U.S.C. § 326 calculation.[14]

14. The Court holds that 5% interest paid by the Rose Law Firm to reimburse the Debtor Corporations' estates for overpayment of trustee fees is appropriate in the Debtor Corporations' estates.[15]

15. The Court holds the appropriate calculation of a fee pursuant to 11 U.S.C. § 326 for the December 15, 1999, Final Report is $228,177.17.[16]

16. Because of the fraud committed by Bird, as trustee, in the performance of his administration of the Debtor Corporations' estates by intentionally overpaying himself or the Rose Law Firm the $88,000.00 in duplicate § 326 trustee fees and $41,527.00 as a second payment of state regulator fees, which were paid out of the money of the Debtor Corporations' estates, the Court finds that Bird's § 326 trustee fee in the amount of $228,177.17 should be disgorged in its entirety.

Bird is entitled to retain the $41,527.00 in state regulator fees paid to him from

---

9. See sections III.C.4.a. of the Memorandum Opinion, beginning at page 115, III.C.4.b., beginning at page 125, and III.C.4.c., beginning at page 129.

10. See sections III.C.4.d.(1) of the Memorandum Opinion, beginning at page 135, and III.C.4.d.(2), beginning at page 137.

11. See section III.C.4.e. of the Memorandum Opinion, beginning at page 140.

12. See section III.D.1. of the Memorandum Opinion, beginning at page 147.

13. See section III.D.2. of the Memorandum Opinion, beginning at page 153.

14. See section III.D.3. of the Memorandum Opinion, beginning at page 160.

15. See section III.E. of the Memorandum Opinion, beginning at page 162, n.88.

16. See section III.E. of the Memorandum Opinion, beginning at page 162.

state surety bond proceeds. These are fees Bird negotiated with various state regulators to handle and process their money order claims, and were paid out of state surety bond proceeds, which were not property of the Debtor Corporations' estates.[17]

IT IS ORDERED that Allen W. Bird, II trustee's fee in the amount of $228,177.17 be disgorged in its entirety. Bird is entitled to retain $41,527.00 in fees derived from services he performed for various state regulators and paid out of state surety bond proceeds. Bird has earned 11 U.S.C. § 326 trustee fees in the amount of $228,177.17, and has been paid adjusted interim trustee fees in the amount of $199,979.26. Bird shall reimburse the Debtor Corporations' estates the sum of $199,979.26, and a judgment is hereby entered in favor of the Debtor Corporations' estates against Allen W. Bird, II in the amount of $199,979.26.

IT IS SO ORDERED.

## ORDER SETTING ASIDE ORDER OF MAY 24, 1993, AWARDING TRUSTEE A $20,000.00 ENHANCEMENT FEE

Based on a Memorandum Opinion of even date, this Court's May 24, 1993, Order awarding the Trustee in the above styled cases an enhancement fee of $20,000.00 is set aside for the reasons set forth in the Memorandum Opinion.[1]

IT IS SO ORDERED.

17. The Court will issue separate Orders for pending applications for professional fees and expenses filed by the Trustee and Shaffer in the above Debtor Corporations' cases, which are addressed the Memorandum Opinion, as well as separate Orders relieving the Trustee of his duties in the above Debtor Corporations' cases and setting aside a previous Order filed on May 24, 1993, awarding a fee enhancement to the Trustee in the amount of $20,000.00.

## ORDER RELIEVING ALLEN W. BIRD, II AS TRUSTEE OF THE DEBTOR CORPORATIONS' ESTATES

Based on a Memorandum Opinion of even date, Allen W. Bird, II is relieved as Trustee in the above Debtor Corporations' cases effective on the date of this Order. The United States Trustee is ordered to appoint a successor trustee to administer and close the Debtor Corporations' cases as soon as practical.

IT IS SO ORDERED.

## ORDER APPROVING ACCOUNTING FEES DUE VICTORIA MASON

Based on a Memorandum Opinion of even date, the Trustee's motion for final approval of accounting fees due to Victoria Mason in the amount of $41.060.00 is approved.[1]

IT IS SO ORDERED.

## ORDER APPROVING ATTORNEY FEES TO THE ROSE LAW FIRM AS LEGAL COUNSEL TO THE TRUSTEE, AND DENYING SHAFFER'S REQUEST TO DISGORGE THE ROSE LAW FIRM'S FEES AND EXPENSES

Based on a Memorandum Opinion of even date, the applications of the Rose Law Firm as legal counsel for the Trustee in the above Debtor Corporations' cases are approved in the amount of $559,412.50.[1] The Rose Law Firm has been

1. See section III.E. of the Memorandum Opinion, beginning at page 162, n.89.

1. See section III.F.2.c. of the Memorandum Opinion, beginning at page 178.

1. The Rose Law Firm's applications for legal fees and expenses considered are through September 1, 2000.

paid a total of $684,868.50 in legal fees and expenses as of the date of this Order. The Rose Law Firm has been overpaid in the amount of $125,456.00 and shall make a remittance of that amount to Charles W. Tucker, Ass't United States Trustee, Department of Justice, Suite 201, 500 S. Broadway, Little Rock, Arkansas 72201, to be deposited into the Debtor Corporations' bank account.

Further, the evidence received at the hearing failed to establish that the Rose Law Firm's legal fees and expenses should be disgorged. Shaffer's request to disgorge the Rose Law Firm's legal fees and expenses is denied.

IT IS SO ORDERED.

## ORDER SURCHARGING TRUSTEE ALLEN W. BIRD, II, INDIVIDUALLY, FOR THE LEGAL FEES AND EXPENSES OF THE LAW FIRM OF WRIGHT, LINDSEY & JENNINGS, LLP, AND DENYING WRIGHT, LINDSEY & JENNINGS LLP'S APPLICATION FOR FEES AND EXPENSES TO BE PAID FROM THE DEBTOR CORPORATIONS' ESTATES

Based on a Memorandum Opinion of even date, because Allen W. Bird, II breached his fiduciary duty in the performance of the administration of the Debtor Corporations' estates by committing fraud upon the Debtor Corporations' estates and the Court, and because Bird elected to employ Wright, Lindsey & Jennings LLP as counsel to defend him as trustee as to the objections filed by Shaffer to the December 15, 1999, "Amended Chapter 11 Final Report and Account and Application For Final Decree" and the issues raised therein, including the fraud issues litigated before this Court, and Shaffer's objections to Bird's "Motion For Final Approval of All Professional Fees and Expenses," for the reasons set forth in the Memorandum Opinion Allen W. Bird, II will be surcharged with the entire legal fees and expenses of Wright, Lindsey & Jennings LLP through and including its last filed itemized statement for legal services on September 20, 2000, and its clarification of fee application on December 8, 2000, in the total amount of $300,245.00 in fees and $29,948.84 in expenses. The Debtor Corporations' estates should not bear the cost of these legal fees and expenses, which were primarily for the personal benefit of Bird, when the Court finds by more than a preponderance of the evidence that Bird committed fraud upon the Debtor Corporations' estates and the Court.[1]

Further, the Court denies the "First Application For Allowance of Fees and Expenses by Wright, Lindsey & Jennings LLP, Counsel for Trustee," filed on June 29, 2000, and the "Second Application For Allowance of Fees and Expenses by Wright, Lindsey & Jennings LLP, Counsel for Trustee," filed on September 20, 2000, because Bird individually is being surcharged the legal fees and expenses of Wright, Lindsey & Jennings LLP for the reasons set forth in the Memorandum Opinion.[2]

IT IS SO ORDERED.

---

1. See sections III.C.4. of the Memorandum Opinion, beginning at page 115, and III.F.3., beginning at page 214.

2. See section III.F.3. of the Memorandum Opinion, beginning at page 214.

ORDER DENYING LARRY SHAFFER'S APPLICATIONS FOR ALLOWANCE AND SURCHARGE OF ATTORNEYS' FEES AND EXPENSES OF THE LAW FIRM OF HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C. AND MOTION FOR ALLOWANCE OF APPLICATION BY ACCOUNTANT D.R. PAYNE & ASSOCIATES FOR FEES AND EXPENSES AS FINANCIAL ADVISORS TO LARRY SHAFFER AND AS EXPERT WITNESSES

Based on the Memorandum Opinion of even date, because of the numerous issues raised by Larry Shaffer to the Trustee's final report and account, and the fact that Shaffer lost at trial a number of substantial issues such as delay in closing the Debtor Corporations' estates by the Trustee, and failure to pursue collection of judgments on behalf of the Debtor Corporations' estates by the Trustee, the Court concludes that Shaffer should pay all of the attorneys fees and expenses owed to the law firm of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., which he employed to represent him in this litigation, as well as pay the fees and expenses of his financial advisors and legal expert witnesses, D.R. Payne & Associates, which he hired in this litigation, and hereby denies Shaffer's "Application for Allowance and Surcharge of Attorneys Fees and Expenses [Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.]," filed on June 30, 2000, requesting $289,065.50 in legal fees and $18,629.69 in expenses; "First Interim Application of D.R. Payne & Associates as Financial Experts and Accountants For Larry Shaffer ('Shareholder') For Allowance of Compensation For Actual, Necessary Services Rendered and For Reimbursement of All Actual,

Necessary Expenses Incurred For the Period October 21, 1999 through February 26, 2000," filed on July 10, 2000, requesting $42,280.00 in professional fees and $1827.11 in expenses; and "Supplement To Application For Allowance and Surcharge of Attorneys Fees and Expenses [Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.]," filed on September 20, 2000, requesting $50,518.75 in legal fees and $11,449.50 in expenses.[1]

IT IS SO ORDERED.

ORDER APPROVING TRUSTEE'S JULY 29, 1999, MOTION FOR FINAL APPROVAL OF ALL PROFESSIONAL FEES AND EXPENSES RELATING TO OTHER LAW FIRMS EMPLOYED BY THE TRUSTEE

On July 29, 1999, the Trustee filed a motion that sought Court approval of legal services rendered by numerous law firms employed by the Trustee to assist the Trustee in legal matters in the administration of the Debtor Corporations' cases. The total amount sought for approval in the motion is $86,871.94. The Trustee testified that these services were reasonable and necessary in the administration of the Debtor Corporations' cases. The Court, who presided over these legal matters, credits the Trustee's testimony and approves the Trustee's motion to pay all other legal counsel for the Trustee in the total amount of $86,871.94.

Shaffer, in his "Objection to Motion For Final Approval of All Professional Fees and Expenses," filed on September 10, 1999, and "Supplement to Objection to Motion For Final Approval of All Professional Fees and Expenses," filed on October 21, 1999, objected only to the legal fees and expenses of the Rose Law Firm and did not object to the payment of any other

---

1. See sections III.B.1., 2., 3., 4., 5., 6., and 7. of the Memorandum Opinion, beginning at page 13, and III.F.1., and 2., beginning at page 169.

professional legal fees and expenses by the Trustee. Shaffer, in his September 10, 1999, "Objection to Chapter 11 Final Report and Account and Application for Final Decree," asserted that the Trustee had a cause of action for pre-petition attorney fees against the law firm of Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C. and attorney Gary Corum. At the hearing, Shaffer offered no evidence to rebut the Trustee's testimony that these legal services were necessary and reasonable, nor did Shaffer offer any evidence to support by a preponderance of the evidence that a pre-petition cause of action existed against Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C. or Gary Corum.

IT IS SO ORDERED.

## ORDER SETTING ASIDE ORDER OF DECEMBER 8, 1998, AWARDING THE ROSE LAW FIRM AN ENHANCEMENT OF $50,000

Based on a Memorandum Opinion of even date, the Court hereby sets aside its "Order Approving Application of Rose Law Firm, A Professional Association, For Allowance of Interim Compensation and Expenses as Counsel For The Trustee," filed on December 8, 1998. The Rose Law Firm filed its "Application For Allowance of Final Compensation and Expenses For Counsel For The Trustee" on November 9, 1998, and included a request for an enhancement of $50,000.00. The Court entered its order approving the application on December 8, 1998. Shaffer objected to the entry of the Court's order in his "Motion For New Trial or Alternatively to Alter or Amend Order Filed December 8, 1998," filed on December 18, 1998. The parties subsequently filed a joint stipulation in which the parties agreed to reserve Shaffer's objections. For the reasons stated in the Memorandum Opinion, the Court sets aside its order of December 8, 1998.[1]

IT IS SO ORDERED.

## APPENDIX I

Section III.C.3.

a. *Exhibits/chronology based on documents received into evidence, including court docket sheet*

August 1, 1986 — Chapter 11 petitions; "Motion For Joint Administration" of Debtor Corporations' estates; and complaints for turnover against agents, filed by Debtor Corporations. (Docket Entry No. 1.)

August 5, 1986 — "Motion For Appointment of Trustee," filed by Debtor Corporations. (Docket Entry No. 5.)

August 12, 1986 — "Order Appointing Trustee," appointing Allen Bird. (Docket Entry No. 11.)

August 28, 1986 — "Motion to Appoint Attorneys For Trustee," by Bird to appoint the Rose Law Firm. (Docket Entry No. 31.)

September 4, 1986 — "Order Appointing Attorneys For Trustee," appointing the Rose Law Firm. (Docket Entry No. 34.)

September 5, 1986 — "Order" granting Debtor Corporations' "Motion For Joint Administration." (Docket Entry No. 38.)

---

1. See section III.F.2.b. of the Memorandum Opinion, beginning at page 204.

September 26, 1986 — "Monthly Report," filed by the Trustee (through 9/22/86). (Docket Entry No. 47a.) This and subsequent monthly operating reports include the categories "Trustees Fees," "Trustee Bond," and "Legal–Professional Fees," among others.

October 15, 1986 — "Application For Allowance of Interim Fees and Expenses to Counsel For Debtors." (Docket Entry No. 58.)

November 17, 1986 — "Monthly Report," filed by the Trustee (through 10/22/86). (Docket Entry No. 70.)

December 30, 1986 — "Application for Allowance of Attorneys Fees and Expenses," in the amount of $82,641.64 filed for the Rose Law Firm by the Trustee. (Docket Entry No. 74(c).)

January 8, 1987 — Complaint against State of Alabama Security Commissioner for turnover of bond proceeds, filed by the Trustee. The Court issued an oral opinion that the state surety bond proceeds in issue were not property of the Debtor Corporations' estates and denied the Trustee's complaint.

January 22, 1987 — "Monthly Report," filed by the Trustee (through 11/22/86). (Docket Entry No. 84.)

January 22, 1987 — "Monthly Report," filed by the Trustee (through 12/22/86). (Docket Entry No. 85.)

January 27, 1987 — "Monthly Report," filed by the Trustee (through 1/22/87). (Docket Entry No. 86.)

January 28, 1987 — "Order Allowing Payment of Fees and Expenses," authorizing $41,130.92 in attorney fees to the Rose Law Firm. (Docket Entry No. 89.) The application was for $82,641.64. The order contained the following language explaining the reduction: "The Court is concerned about the availability of funds to pay all costs of administration, and therefore at this time is authorizing the payment of only one-half of the professional expenses incurred . . . ."

March 4, 1987 — "Monthly Report," filed by the Trustee (through 2/22/87). (Docket Entry No. 95.)

April 23, 1987 — "Monthly Report," filed by the Trustee (through 3/22/87). (Docket Entry No. 102.)

May 4, 1987 — After the Court denied the Trustee's complaint for turnover of bond proceeds, the Trustee entered into agreements with various states and Puerto Rico to handle, process, and distribute to money order claimants the proceeds from surety bonds that the states and Puerto Rico had required the Debtor Corporations to post as a condition of doing business in their venues. Generally, under the agreements, the states and Puerto Rico turned over their state surety bond proceeds to the Trustee. The Trustee distributed the proceeds from each state and Puerto Rico to money order claimants from the respective states and Puerto Rico. If, after satisfying the claims from a particular state, there were any excess funds, the monies would escheat to the Debtor Corporations' estates to pay claimants from other states. Bird, as trustee and individually, negotiated a fee of approximately three percent to be paid to him individually or

the Rose Law Firm by the various state regulators for processing and distributing their proceeds from surety bonds to their respective claimants. This expense was not to be borne by the Debtor Corporations' estates and was not to have been subject to 11 U.S.C. § 326 fee payments by the Debtor Corporations' estates. Based on the negotiations between the various states and Puerto Rico and the Trustee, Stipulations and Orders were entered into and submitted to the Court for approval. The Court approved the various Stipulations and Orders over a time period starting on May 4, 1987, and ending on November 21, 1990. (Shaffer Exs. 137–145.)

June 2, 1987 — "Monthly Report," filed by the Trustee (through 4/22/87). (Docket Entry No. 105.)

June 24, 1987 — "Monthly Report of Income and Expenses Through May 22, 1987; and Liquid Assets on Hand to May 31, 1987," filed by the Trustee. (Docket Entry No. 111.)

July 8, 1987 — "Application For Allowance of Fees and Expenses For Trustee and Counsel for the Trustee." (Docket Entry No. 115.) The application states in relevant part:

> 3. On January 26, 1987, this Court authorized one-half of the Trustee's application for fees and expenses. The application was for $82,641.64, of which $3,897.39 was for expenses, and $78,744.25 was for attorneys' fees for services. The Trustee prays the Court will allow the balance of all the expenses and 80% of the fees for that period, pending final application.
>
> 4. In addition, the Trustee hereby prays the Court will allow all expenses incurred by the attorneys for the Trustee and 80% of the fees pending final application. All expenses total $7,294.28 for the period from December 12, 1986 to June 15, 1987. All attorneys' fees total $70,785.50 and 80% of that figure equals $56,628.40. [The total request being $89,494.66.]

July 31, 1987 — "Order Allowing Payment of Fees and Expenses" of $89,494.66 to the Trustee and counsel for the Trustee. (Docket Entry No. 120; Shaffer's Ex. 109.)

August 28, 1987 — "Monthly Report of Income and Expenses Through June 22, 1987; and Liquid Assets on Hand to June 30, 1987," filed by the Trustee. (Docket Entry No. 125.)

August 28, 1987 — "Monthly Report of Income and Expenses Through July 22, 1987; and Liquid Assets on Hand to July 31, 1987," filed by the Trustee. (Docket Entry No. 126.)

October 26, 1987 — "Monthly Report of Income and Expenses Through August 22, 1987; and Liquid Assets on Hand to August 31, 1987," filed by the Trustee. (Docket Entry No. 133.)

October 29, 1987 — "Monthly Report of Income and Expenses Through September 22, 1987; and Liquid Assets on Hand to September 30, 1987," filed by the Trustee. (Docket Entry No. 134.)

November 25, 1987 — "Monthly Report of Income and Expenses September 23 to October 31, 1987; and Liquid Assets on Hand to October 31, 1987," filed by the Trustee. (Docket Entry No. 141.)

January 25, 1988 — "Report of Income, Expenses and Liquid Assets to December 31, 1987," filed by the Trustee. (Docket Entry No. 156a.)

March 18, 1988 — "Report of Income, Expenses and Liquid Assets to January 31, 1988," filed by the Trustee. (Docket Entry No. 181.)

March 18, 1988 — "Report of Income, Expenses and Liquid Assets to February 29, 1988," filed by the Trustee. (Docket Entry No. 182.)

April 25, 1988 — "Report of Income, Expenses and Liquid Assets to March 31, 1988," filed by the Trustee. (Docket Entry No. 206.)

June 16, 1988 — "Report of Income, Expenses and Liquid Assets to April 30, 1988," filed by the Trustee. (Docket Entry No. 217.)

June 16, 1988 — "Report of Income, Expenses and Liquid Assets to May 31, 1988," filed by the Trustee. (Docket Entry No. 218.)

July 21, 1988 — "Report of Income, Expenses and Liquid Assets to June 30, 1988," filed by the Trustee. (Docket Entry No. 225.)

September 12, 1988 — "Report of Income, Expenses and Liquid Assets to July 31, 1988," filed by the Trustee. (Docket Entry No. 245.)

October 18, 1988 — "Report of Income, Expenses and Liquid Assets to August 31, 1988," filed by the Trustee. (Docket Entry No. 264.)

October 18, 1988 — "Report of Income, Expenses and Liquid Assets to September 30, 1988," filed by the Trustee. (Docket Entry No. 265.)

January 3, 1989 — Trustee's first "Application For Interim Allowance of Trustee's Fees." (Shaffer's Ex. 86.)

266

FILED
U.S. BANKRUPTCY COURT
EST. & WST. DISTS. OF ARK.

JAN 0 3 1989

PEGGY CARROLL, CLERK

By ————— E.R.CLERK

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: NORTHWEST FINANCIAL EXPRESS, CASE NO. FA 86-148F
 INC., NWFX, INC., AND GOLD
 FINANCIAL EXPRESS, INC.

APPLICATION FOR INTERIM ALLOWANCE OF TRUSTEE'S FEES

Comes now Allen W. Bird II, the duly appointed and acting Trustee of the estates referenced above, and for his Application of Interim Trustee's Fees, states:

1. This Application is filed pursuant to Title 11, United States Code, Section 330, and Bankruptcy Rule 2016.

2. Allen W. Bird II is the duly qualified and acting Trustee for the estates mentioned above, acting pursuant to Court Order.

3. Through September 30, 1988, the Trustee has disbursed or turned over to parties-in-interest, excluding the Debtor, the total sum of $859,924.00 as operating expenses and through the date of this petition has disbursed or turned over to parties-in-interest, including claimants, sums in excess of $750,000.00 for total monies disbursed or turned over of $1,609,000.00.

4. Pursuant to Section 326 of the Bankruptcy Code, including 1984 amendments, the Trustee would be entitled to a maximum of $48,500.00. The Trustee has received no interim Trustee payments to date.

SHAFFER

EXHIBIT
86

PRE-ADM

5. The Trustee has performed the function as Trustee without compensation since his appointment in August of 1986 and makes this Application for interim Trustee's fees pending a full and final report and subject to revision by this Court at a later date.

6. The Trustee believes that an interim Trustee's fee of 80% of the maximum amount he would otherwise be entitled to at this time is reasonable and justified under the circumstances involved in this case.

WHEREFORE, the Trustee prays the Court will authorize an interim Trustee's fee in the sum of $38,000.00 at this time, which represents 80% of the maximum amount based on the funds actually disbursed to date by the Trustee, subject to final review by this Court and a final accounting of all Trustee's fees and for all other proper relief.

Allen W. Bird II, Trustee for
Northwest Financial Express,
Inc., NWFX, Inc., and Gold
Financial Express, Inc.
120 East Fourth Street
Little Rock, Arkansas 72201

–2–

2207I
122788

January 3, 1989 "Application of Rose Law Firm, A Professional Association, For Allowance of Interim Compensation and Expenses as Counsel For the Trustee." (Shaffer's Ex. 116.)

268

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAN 9 2 1989
BY CARROLL, CLERK
By _____

IN RE: NORTHWEST FINANCIAL EXPRESS, CASE NO. FA 86-148F
 INC., NWFX, INC., AND GOLD
 FINANCIAL EXPRESS, INC.

APPLICATION OF ROSE LAW FIRM, A PROFESSIONAL
ASSOCIATION, FOR ALLOWANCE OF INTERIM COMPENSATION
 AND EXPENSES AS COUNSEL FOR THE TRUSTEE

Comes now, Rose Law Firm, a Professional Association (the "Applicant"), the duly appointed and acting counsel to the Trustee, Allen W. Bird II (the "Trustee"), and for their Application states as follows:

1. This Application is filed pursuant to Title 11, United States Code, Section 327 and Bankruptcy Rule 2016.

2. The Applicant is the duly appointed and acting counsel to the Trustee, acting pursuant to Court Order.

3. The Applicant has previously unbilled fees in the amount of $46,073.75 incurred from July 26, 1988 to November 30, 1988. In addition, the current unbilled expenses for applicant total $1,761.64.

4. The applicant asks the Court to approve the payment of 80% of the fees pending final application, and the total of out-of-pocket expenses. The expenses were incurred in the ordinary course of business and are reasonable under the circumstances and should be paid. In summary, this Application asks for:

SHAFFER
**EXHIBIT**
116

PRE-AD

Attorneys' fees from July 26, 1988 $46,073.75
to November 30, 1988 (See
Exhibit "A")

Expenses from July 26, 1988 to $ 1,761.64
November 30, 1988

Total Application $38,620.64
(80% of fees and all expenses)

5. The Trustee has on hand in excess of $300,000.00 in funds which were not obtained from agents for the sale of money orders; therefore there are ample funds with which to pay these expenses and fees.

WHEREFORE, the Applicant prays that the Court will set a time and date for a hearing on this Application, and upon proper notice to all interested parties, the Court will enter an order approving said application and order the Trustee to reimburse the Applicant and for all other proper relief.

ROSE LAW FIRM
A Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
(501) 376-6300

By: _____
 Allen W. Bird II

-2- 1017K
 122788

January 27, 1989 "Order Allowing Payment of Fees and Expenses," in the amount of $38,620.64. (Docket Entry No. 287; Shaffer's Ex. 117.)

270

U.S. BANKRUPTCY COURT
EST. & WST. DISTS. OF ARK.

JAN 27 1989

PEGGY CARROLL, CLERK

By: _____
 DEP. CLERK

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: NORTHWEST FINANCIAL EXPRESS, CASE NO. FA 86-148F
 INC., NWFX, INC., AND GOLD
 FINANCIAL EXPRESS, INC.

### ORDER ALLOWING PAYMENT OF FEES AND EXPENSES

Comes on for hearing this 24th day of January, 1989, the Trustee's Application for Allowance of Attorney's Fees and Expenses for Trustee and Counsel for the Trustee filed January 3, 1989.

THE COURT HEREBY FINDS THAT:

1. The attorneys for the Trustee mailed copies of the Notice of Application for Reimbursement of Expenses and Payment of Interim Attorney's Fees to parties-in-interest on the 3rd day of January, 1989, as evidenced by the Affidavit of Mailing, which was filed with this Court on January 3, 1989. The Trustee has complied in all respects with Rule 2002 of the rules of bankruptcy procedure.

2. There was no objection filed to the Trustee's Notice of Application for Reimbursement of Expenses and Payment of Interim Attorney's Fees.

3. The out-of-pocket expenses incurred from July 26, 1988 to November 30, 1988 in the amount of $1,761.64 are reasonable and should be paid at this time. The Court further finds that the fees incurred from July 26, 1988 to November 30, 1988 in the

SHAFFER
EXHIBIT
117

PRE-AD

Entered on docket on _____ by _____
Compliance with FRBP 8004(a), 9021 and/or FRCP 58, 79(A)

amount of $46,073.75 are reasonable and were incurred in the ordinary course of business. Eighty percent of the fees incurred should be paid at this time, with the balance to be subject to further orders of this Court.

4. The Trustee is therefore authorized to pay to his attorneys as follows:

| | |
|---|---|
| Expenses from July 26, 1988 to November 30, 1988 | $ 1,761.64 |
| 80% of fees from July 26, 1988 to November 30, 1988 | $36,859.00 |
| TOTAL ALLOWED | $38,620.64 |

THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:

That Allen W. Bird II, Trustee, be and hereby is, directed to pay Rose Law Firm, P.A. the sum of Thirty-eight Thousand, Six Hundred Twenty 64/100 Dollars ($38,620.64) as allowance for attorney's fees and expenses incurred by the Trustee.

HONORABLE ROBERT F. FUSSELL
U. S. BANKRUPTCY JUDGE

DATED: 1-27-1989

APPROVED:

Allen W. Bird II
Trustee for Northwest Financial
 Express, Inc., NWFX, Inc.
 and Gold Financial Express,
 Inc.
120 E. 4th Street
Little Rock, AR 72201

-2-

22191
012589

January 27, 1989 "Order Allowing Interim Trustee's Fees." (Docket Entry No. 286; Shaffer's Ex. 87.)

FILED

U.S. BANKRUPTCY COURT
EST. & WST. DISTS OF ARK.

JAN 27 1989

PEGGY CARROLL, CLERK

By: ——————————
 DEP. CLERK

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: NORTHWEST FINANCIAL EXPRESS, CASE NO. FA 86-148F
 INC., NWFX, INC., AND GOLD
 FINANCIAL EXPRESS, INC.

### ORDER ALLOWING INTERIM TRUSTEE'S FEES

Comes on for hearing this 24th day of January, 1989, the Trustee's Application for Interim Allowance of Trustee's Fees filed herein on January 3, 1989, and from the application and other matters before the Court, the Court finds:

1. The Trustee mailed copies of the Application for Interim Allowance of Trustee's Fees to parties-in-interest on the 3rd day of January, 1989, as evidenced by the Affidavit of Mailing which was filed with this Court on January 3, 1989. The Trustee has complied in all respects with Rule 2002 of the rules of bankruptcy procedure.

2. There was no objection filed to the Trustee's Application for Interim Allowance of Trustee's Fees.

3. The interim Trustee fee requested in the sum of $38,000.00 is reasonable and should be paid at this time. Such sum represents approximately 80% of the maximum amount based on funds actually disbursed to the date of the application by the Trustee, subject to final review by this Court and a final accounting of all Trustee's fees. It is,

SHAFFER

**EXHIBIT**

**87**

PRE-AP

Entered on docket in
compliance with FRBP 5003(d), 9021, and/or FRCP 58, FRKA.

THEREFORE, ORDERED, ADJUDGED AND DECREED, that Allen W. Bird II, Trustee, be and is hereby authorized to pay to himself the sum of $38,000.00 as an allowance for interim Trustee's fees, which amount shall be subject to final review by this Court and a final accounting of all Trustee's fees.

_____
HONORABLE ROBERT F. FUSSELL
U. S. BANKRUPTCY JUDGE

DATED: 1-29-199

APPROVED:

_____
Allen W. Bird II
Trustee for Northwest Financial
 Express, Inc., NWFX, Inc.
 and Gold Financial Express,
 Inc.
120 E. 4th Street
Little Rock, AR 72201

-2-

22191
012589

274

February 2, 1989 Bird, as trustee, signed check number 001589, drawn on the account of Allen W. Bird II, Trustee For NWFX, Inc. OPERATING AC-COUNT. The check was made payable to the order of Allen W. Bird II, Trustee, in the amount of $38,000.00, and contains the following notation: "Interim Trustee Fees; Reissue of # 001569—Voided." The check was endorsed, "Pay to the Order of the Rose Law Firm," and signed by Allen W. Bird II, Trustee. It was paid on February 8, 1989. (Shaffer's Ex. 97.) The check was recorded in the QuickZoom Report under the category "Trustee's Fee." (Shaffer's Ex. 94.)

February 16, 1989 "Report of Income, Expenses and Liquid Assets for the Months of October, November and December 1988," filed by the Trustee. (Docket Entry No. 289.) The report lists the trustee's fees since last report as $0, and the trustee's fees total for the estate to date as $0.

September 15, 1989 "Report of Income, Expenses and Liquid Assets for the Months of January and February, 1989," filed by the Trustee. (Docket Entry No. 318.) The report lists the trustee's fees since last report as $0, and the trustee's fees total for the estate to date as $0.

September 15, 1989 "Report of Income, Expenses and Liquid Assets for the Months of March and April, 1989," filed by the Trustee. (Docket Entry No. 319.) The report lists the trustee's fees since last report as $0, and the trustee's fees total for the estate to date as $38,000.00.

September 15, 1989 "Report of Income, Expenses and Liquid Assets for the Months of May, June, and July, 1989," filed by the Trustee. (Docket Entry No. 320.) The report lists the trustee's fees since last report as $0, and the trustee's fees total for the estate to date as $38,000.00.

December 26, 1989 "Application For Second Interim Allowance of Trustee's Fees." (Docket Entry No. 356; Shaffer's Ex. 88.)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PEGGY CARROLL, CLERK

IN RE: NORTHWEST FINANCIAL EXPRESS, CASE NO. FA 86-148F
INC., NWFX, INC., AND GOLD
FINANCIAL EXPRESS, INC.

APPLICATION fOR SECOND
INTERIM ALLOWANCE OF TRUSTEE'S FEES

Comes now Allen W. Bird II, the duly appointed and acting Trustee of the estates referenced above, and for his Application of Interim Trustee's Fees, states:

1. This Application is filed pursuant to Title 11, United States Code, Section 330, and Bankruptcy Rule 2016.

2. Allen W. Bird II is the duly qualified and acting Trustee for the estates mentioned above, acting pursuant to Court Order.

3. Through November 30, 1989, the Trustee has disbursed or turned over to parties-in-interest, excluding the Debtor, the total sum of $1,524,521.86 as operating expenses and through the date of this petition has disbursed or turned over to parties-in-interest, including claimants, sums in excess of $2,000,000.00 for total monies disbursed or turned over of over $3,500,000.00.

4. Pursuant to Section 326 of the Bankruptcy Code, including amendments, the Trustee would be entitled to a maximum of $105,000.00. The Trustee has received one interim Trustee payment in the amount of $38,000.00 to date.

SHAFFER
**EXHIBIT**
**88**

PRE-AD

5. The Trustee has performed the function as Trustee with compensation of only $38,000.00 since his appointment in August of 1986 and makes this Application for a second interim Trustee's fees pending a full and final report and subject to revision by this Court at a later date.

6. The Trustee believes that a second interim Trustee's fee of $50,000.00 is reasonable and justified under the circumstances involved in this case.

WHEREFORE, the Trustee prays the Court will authorize a second interim Trustee's fee in the sum of $50,000.00 at this time, subject to final review by this Court and a final accounting of all Trustee's fees and for all other proper relief.

Allen W. Bird II, Trustee for
Northwest Financial Express,
Inc., NWFX, Inc., and Gold
Financial Express, Inc.
120 East Fourth Street
Little Rock, Arkansas 72201

-2-

1498K
121889

December 26, 1989 "Application of Rose Law Firm, A Professional Association, For Allowance of Interim Compensation and Expenses as Counsel for the Trustee." (Docket Entry No. 358; Shaffer's Ex. 118.) The application provides in relevant portion:

3. The applicant has previously unbilled fees in the amount of $52,718.00 incurred from May 1, 1989 through December 5, 1989, and in addition, the current unbilled expenses for applicant total $5,622.72, all as shown on Exhibit "A."

4. From prior billings, the Trustee has retained 20% of each billing. Such holdback now equals $61,402.89. It is understood that such holdback is to give the Court and the Trustee a cushion against which to adjust the final billing of the attorneys. The petitioner herein believes that a cushion of $40,000.00 is ample and moves the Court to authorize release of $21,402.89 of the holdback, leaving unpaid but approved from prior billing, $40,000.00.

| | |
|---|---|
| January 29, 1990 | Bird, as trustee, signed check number 002004, drawn on the account of Allen W. Bird II, Trustee For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to the order of Allen W. Bird II, in the amount of $50,000.00. The following notation appears on the check, "Trustee's Fees/NWFX, Inc." The check was endorsed "Pay to the Order of the Rose Law Firm" for deposit into account 007–123–3 on January 30, 1990, and paid on February 9, 1990. (Shaffer's Ex. 97.) The check was recorded in the QuickZoom Report under the category "Trustees Fee." (Shaffer's Ex. 94.) |
| January 30, 1990 | "Order Allowing Interim Trustee's Fees." (Docket Entry No. 364; Shaffer's Ex. 89.) |

FILED

U.S. BANKRUPTCY COURT
WESTERN DIST. OF ARK.

JAN 30 1990

PEGGY CARROLL CLERK

BY: _____ DEPUTY

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: NORTHWEST FINANCIAL EXPRESS, CASE NO. FA 86-148F
 INC., NWFX, INC., AND GOLD
 FINANCIAL EXPRESS, INC.

### ORDER ALLOWING INTERIM TRUSTEE'S FEES

Comes on for hearing this 23rd day of January, 1990, the Trustee's Application for Second Interim Allowance of Trustee's Fees filed herein on December 26, 1989, and from the application and other matters before the Court, the Court finds:

1. The Trustee mailed copies of the Application for Interim Allowance of Trustee's Fees to parties-in-interest on the 22nd day of December, 1989, as evidenced by the Affidavit of Mailing which was filed with this Court on December 28, 1989. The Trustee has complied in all respects with Rule 2002 of the rules of bankruptcy procedure.

2. There was no objection filed to the Trustee's Application for Interim Allowance of Trustee's Fees.

3. The interim Trustee fee requested in the sum of $50,000.00 is reasonable and should be paid at this time. The sum of $50,000.00 in addition with the $38,000.00 previously paid represents approximately 80% of the maximum amount of the Trustee's fee based on funds actually disbursed to the date of the application by the Trustee, subject to final review by this Court and a final accounting of all Trustee's fees. It is,

SHAFFER

**EXHIBIT**

89

PRE-AD

Entered on docket on 1/30/90 SC
in compliance with FRBP 5003(a), 9022 and/or FRCP 58, 79(a)

THEREFORE, ORDERED, ADJUDGED AND DECREED, that Allen W. Bird II, Trustee, be and is hereby authorized to pay to himself the sum of $50,000.00 as an allowance for interim Trustee's fees, which amount shall be subject to final review by this Court and a final accounting of all Trustee's fees.

HONORABLE ROBERT F. FUSSELL
U. S. BANKRUPTCY JUDGE

DATED: _January 26, 1990_

APPROVED:

Allen W. Bird II
Trustee for Northwest Financial
 Express, Inc., NWFX, Inc.
 and Gold Financial Express,
 Inc.
120 East Fourth Street
Little Rock, Arkansas 72201

-2-

1547K
012390

January 30, 1990 "Order Allowing Payment of Fees and Expenses." (Docket Entry No. 365; Shaffer's Ex. 118.) The order provides in relevant part:

> The Court finds that the fees incurred from May 1, 1989 through December 5, 1989 in the amount of $52,718.00 are reasonable and were incurred in the ordinary course of

280

■■■■■■■■■

■■■■■■■■■

business. The Court further finds the amount of $21,402.89 of the holdback amount of $61,402.89 on previous attorneys fees should be paid, because a cushion in the amount of $40,000.00 is ample.

December 26, 1990 "Report For Income, Expenses and Liquid Assets For September 1989 through September 1990," filed by the Trustee. (Docket Entry No. 396.) The report lists the trustee's fees for month as $0, and the trustee's fees total for estate to date as $38,000.00.

January 28, 1991 "Report For Income, Expenses and Liquid Assets for October through December 1990," filed by the Trustee. (Docket Entry No. 399.) The report lists the trustee's fees since last report as $0, and the trustee fees total for estate to date as $88,000.00.

May 5, 1991 Bird, as trustee, signed check number 02424, drawn on the account of Allen W. Bird II, Trustee For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to the order of Allen W. Bird II in the amount of $1500.00. There is no notation on the face of the check as to the purpose of the check. The check was endorsed by the signature of Allen W. Bird II, and paid on May 7, 1991. (Shaffer's Ex. 97.) The check was recorded in the QuickZoom Report under the category "Trustee's Fee." (Shaffer's Ex. 94.)

May 29, 1991 "Report For Income, Expenses and Liquid Assets For January through March 1991," filed by the Trustee. (Docket Entry No. 411.) The report lists the trustee's fees since last report as $0, and the trustee's fees total for estate to date as $88,000.00.

August 6, 1991 "Report for Income, Expenses and Liquid Assets for April through June 1991," filed by the Trustee. (Docket Entry No. 418.) The report lists the trustee's fees since last report as $0 and the trustee's fees total for estate to date as $88,000.00. This report was the last operating report filed by the Trustee for the Debtor Corporations until the Trustee's November 9, 1998, final report and account.

December 8, 1991 Bird, as trustee, signed check number 02569, drawn on the account of Allen W. Bird II, Trustee For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to the order of Allen W. Bird II, in the amount of $2000.00. There is no notation on the face of the check as to the purpose for the check. The back of the check reflects that it was paid on December 11, 1991. (Shaffer's Ex. 97.) The check was recorded in the QuickZoom Report under the category "Trustee's Fee." (Shaffer's Ex. 94.)

June 15, 1992 Bird, as trustee, signed check number 2707, drawn on the account of Allen W. Bird II, Trustee For NWFX, INC.—OPERATING AC- COUNT.. The check was made payable to the Rose Law Firm in the amount of $41,600.00. This check was recorded in the QuickZoom report under the category "Legal Fees." (Shaffer's Ex. 96). Bird testified at the hearing in this matter that this check was wrongly coded, and that the check was actually payment for the handling, processing, and distribution of the state surety bond proceeds in accordance with his agreement with the various state agencies. (Shaffer Exs. 137–145.) The actual amount of his fee for handling, processing, and distributing the state surety bond pro-

ceeds was $41,527.00. Bird testified that he rounded the figure up to $41,600.00 for purposes of the check and QuickZoom entry.

June 25, 1992 "Motion of Trustee For Allowance of Trustee's Fee and Authoriza-
 tion For Payment of Legal Fees Held Back." (Docket Entry No.
 447; Shaffer's Ex. 90.)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: NORTHWEST FINANCIAL EXPRESS, CASE NO. FA 86-148F
 INC., NWFX, INC., and GOLD (Chapter 11)
 FINANCIAL EXPRESS, INC. (CONSOLIDATED)

 DEBTOR

**MOTION OF TRUSTEE FOR ALLOWANCE OF TRUSTEE'S FEE
AND AUTHORIZATION FOR PAYMENT OF LEGAL FEES HELD BACK**

Comes now Allen W. Bird II, the duly appointed and acting
Trustee of the estates of NWFX, Inc., Northwest Financial Express,
Inc. and Gold Financial Express, Inc., in bankruptcy, and for his
motion states:

1. Allen W. Bird II is the duly appointed and acting Trustee
of the estates of the Debtors named above. Pursuant to 11 U.S.C.
Section 330, as limited by Section 326, this Court may allow the
Trustee a fee for his services in this case. This motion prays for
the allowance of such a fee, and the authority for payment of
previously approved legal fees which were held back from payment.

SERVICES PERFORMED BY THE TRUSTEE

2. The services of the Trustee in this case began with his
appointment in August, 1986.

3. The services performed in this case may be divided into
several broad areas of responsibility: (1) Conceive of and execute
a system for handling claims; (2) Collect all property of the

RCC019A4.AWB

estate; (3) Coordinate with regulators from all states where the Debtors did business, in order to distribute bond proceeds, and (4) Obtain confirmation of a plan of reorganization and distribute funds of the estate to the claimants.

## CLAIMS SYSTEM

4. This project actually started with the designing of the claim form. It was vitally important that we capture enough information to be able to identify and check on the validity of each money order claim. The money orders of these debtors were sold in amounts and to purchasers unknown to the issuer. The amounts were normally ultimately reported, but not the identity of the purchaser. In the chaos of the weeks after the petition, the reports sent in by agents who sold the money orders were either non-existent or also in chaos. In order to collect the relevant necessary data, we designed a claim form which would provide all the information necessary to verify the claims. My staff and I then designed a computer program which recorded all the information on the claim form, and would allow us to verify that the money order claim was valid, and would produce reports necessary to detect duplications, and would categorize the claims for payment purposes, and would print the checks. The system designed has allowed us to respond to questions from claimants, delete duplicate claims, and prepare a program to pay claims in pro-rata amounts and deduct payments from the claims.

## COLLECTING PROPERTY OF THE ESTATE

5. The effort to collect property of the estate was directed to several areas, including funds in the hands of the agents who had sold the money orders, funds in the hands of various banks, debts owed by former agents, referred to as "fidelities", and recovery of preferences. We pursued over two hundred agents who had received blank money orders, but who had not accounted for the blanks. In each case we required that the agent account for the blanks, or we assumed, in the absence of a report, that the money order was sold for $300, the maximum amount for which the money order.could be sold. We then proceeded to either collect those amounts, after resolving the liability, by seeking judgments against the agents for unpaid funds, or deleting, by agreement, claims filed by these agents for repurchased money orders, all of which raised the distribution percentage to the other claimants.

6. We also identified approximately $843,000 in cash located in various banks, and recovered that for the estate. In addition approximately $100,000 was recovered from fidelities.

7. A preference in the amount of $130,000 was recovered from the Northwest National Bank of Fayetteville.

## COORDINATION WITH REGULATORS

8. In each of the states and Puerto Rico, where the Debtors did business, they were required to post a bond to protect the purchasers from loss. The normal bond was either $100,000 or $250,000. I met with all of the regulators and was successful in

3 RCC019A4.AWB

284

convincing them that the only rational way to distribute the proceeds of the bonds was by using the data base of claims we had created. The states had no method by which they could identify the purchasers, and therefore each state entered into a contract with me as Trustee, to distribute the bond funds. In several states, the bonds paid all the claims, thus allowing me to pay a higher percentage to the remaining claimants from property of the estates. In some cases the bonds were in excess of the claims in the state and therefore some of the bond funds were left over for distribution to claimants in other states. In each case, the Trustee negotiated a contract which called for the Trustee to distribute those funds to the claimants, and the expenses of distribution to be paid from the bond funds, including a 3% allowance for Trustee's fees, postage and other administrative expenses. Therefore the estate paid none of the expenses of distributing the bond funds, and the claimants were paid substantial amounts of their claims; again raising the percentage of recovery from the estate, by reducing the claims.

9. As a result of distributing the bond funds, the following amounts **have been already paid** to claimants in the following states:

RCC019A4.AWB

| | | |
|---|---:|---:|
| Alabama | $10,807.00 | 90% |
| Arkansas | 253,444.00 | 100% |
| Kansas | 23,694.00 | 100% |
| Louisiana | 58,710.00 | 68% |
| Michigan | *125,000.00 | |
| Mississippi | 3,648.00 | 100% |
| Ohio | 28,452.00 | 100% |
| Oklahoma | 245,482.00 | ** 100% |
| Tennessee | 256,576.00 | 62% |
| Texas | 223,157.00 | 7% |
| Puerto Rico | 120,000.00 | 13% |
| TOTAL | $1,223,970.00 | |

\* Will be distributed with the estate proceeds.

\*\* All creditors which could be found were paid 100% in a two phase distribution.

10. The Court should be aware that as a result of the negotiations and arrangements with the state regulators, and in three states, as approved by non-bankruptcy courts, the undersigned was allowed a fee equal to approximately 3% of the non-estate funds distributed. The fee allowed by the court or agreed to by the appropriate state regulator is equal to the following:

| | |
|---|---:|
| Alabama | $ 325 |
| Arkansas | 7,500 |
| Kansas | 710 |
| Louisiana | 1,761 |
| Michigan | 3,760 |
| Mississippi | 109 |
| Ohio | 854 |
| Oklahoma | 8,508 |
| Tennessee | 7,500 |

5

RCCO19A4.AWB

| | |
|---|---|
| Texas | 7,500 |
| Puerto Rico | 3,000 |

## PLAN OF REORGANIZATION

11. The Plan of Reorganization proposed was designed to maximize the payment to the people hurt the worst by this bankruptcy: the money order purchasers. The Plan provides that after the costs of administration and priority claims, the balance of the estate will be paid to the purchasers. The purchasers come before the ordinary trade credit, and all other creditors. This has two beneficial effects: one, the purchasers do not have to share with the other creditors, which would reduce the percentage of distribution; and two, there has been no need to object to and litigate with contingent and other trade creditors, thus saving the estate legal costs. In addition, this type of settlement had the side effect of reducing the trustee's fees, in that these funds did not come through the estate for redistribution.

The percentage of recovery by each claimant is difficult to calculate. As the Court will recall, the Plan has been revised to provide that all claimants which do not negotiate checks within 90 days of issuance, will receive nothing from the estate. Therefore, all claimants will be mailed checks in phase one. Only after 90 days will we be able to calculate the funds remaining and the number and amount of claimants remaining. Using estimates that on average 80% of the recipients will negotiate the checks in phase one, the Trustee estimates that in phase two, the claimants who

receive a check will receive in excess of 90% of their total claims.

### RELEASE OF HOLDBACK ATTORNEYS FEES

12. During the pendency of this case, the Trustee has from time to time moved for authority to pay attorneys fees. The Court has allowed such payments, but subject to a withholding of fees until the close of the case. The total withheld is in the sum of $40,000. In view of the fact that all accounting must be done in order to determine what funds may be distributed in accordance with the Plan, the Trustee must make all final payments at this time in order to make final distribution. The Court has previously approved all fees as reasonable and necessary, and the holdback was only for purposes of insuring that funds were available for payment of all administrative claims. Such funds are available and the holdback should be paid at this time.

### ALLOWANCE OF FEE

13. Pursuant to 11 U.S.C. Sect. 326, the compensation of the Trustee is limited to 15% of the first $1,000, 6% of the next $3,000 and 3% in excess of $3,000 of all moneys disbursed or turned over in the case the Trustee to parties in interest, excluding the debtor, but including holders of secured claims.

14. The funds which are property of the estate which were segregated and came solely from sources identified as funds which

RCC019A4.AWB

were generated from the sale of money orders in a particular state, and held by agents at the date of filing are as follows:

| | |
|---|---|
| Northwest Financial Express, Inc. (Puerto Rico only) | $ 800,000 |
| NWFX, Inc. (Texas, Michigan, Oklahoma, Tennessee, Ohio, Arkansas, Kansas) | $4,296,000 |
| Gold Financial Express, Inc. (Louisiana, Mississippi, Alabama) | $ 162,000 |

These funds have been segregated by company, as ordered by this Court during the administration of this estate.

In addition to the sums above, the Trustee has collected funds which were also assets of the estate which were not in the hands of agents at the date of the petition. These include funds in the corporate bank accounts, unsegregated by debtor. These funds have been used to pay all of the expenses of the estate and have been (or will have been) disbursed when the case is closed. The total of these funds is $2,296,000. These funds also are property of the estate and are subject to an allocation of Trustee's fees. The only distinction is that these funds were not segregated by the trustee by debtor during the pendency of the case.

15. The maximum fee allowed by the Bankruptcy Code as applied to these debtors would therefore be:

8 RCC019A4.AWB

Northwest Financial Express, Inc.

```
15% of first $1,000 = $ 150
 6% of next $3,000 = $ 120
 3% of the balance = $ 23,730

 TOTAL $ 24,000
```

NWFX, Inc.

```
15% of first $1,000 = $ 150
 6% of next $3,000 = $ 120
 3% of the balance = $128,610

 TOTAL $128,880
```

Gold Financial Express, Inc.

```
15% of first $1,000 = $ 150
 6% of next $3,000 = $ 120
 3% of the balance = $ 4,590

 TOTAL $ 4,860
```

Property of the estate not otherwise specifically allocated to one of the three debtors:

```
15% of first $1,000 = $ 150
 6% of next $3,000 = $ 120
 3% of the balance = $ 68,870

 TOTAL $ 69,140
```

16. The Trustee believes that the work performed by him was necessary and essential in order to effectively deal with the records of the over 120,000 money orders which were the basis for the claims filed by more than 65,000 claimants, to locate and collect all of the assets of the estates, to deal with the unique and complex legal and administrative issues, and to maximize the return to the claimants in these cases which could easily exceed a 90% distribution. The Trustee believes that he should be awarded the maximum statutory fees in this case in view of the time

290

required to perform the functions of Trustee, which has been over five years, and undoubtedly will cover another year or so, even after all funds have been disbursed.

WHEREFORE, The Trustee prays (1) that he be allowed a Trustee's fee in the amount of $24,000 in the case of Northwest Financial Express, Inc., $128,880 in the case of NWFX, Inc., $4,860 in the case of Gold Financial Express, Inc., $69,140 as to the unallocated funds, and (2) he be authorized to pay to Rose Law Firm, P.A. the attorneys fees previously approved but held back in the sum of $40,000, and for all other proper and further relief.

Respectfully submitted,

Allen W. Bird II, Trustee
120 E. Fourth St.
Little Rock, AR 72201
(501) 377-0307

10 RCC019A4.AWB

July 9, 1992 Bird, as trustee, signed check number 02726, drawn on the account of Allen W. Bird II, Trustee For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to the order of Allen W. Bird II, in the amount of $10,000.00, and contains the notation "Trustee's Fees." The check was endorsed by Allen W. Bird II and paid on July 13, 1992. (Shaffer's Ex. 97.) This check was entered on the QuickZoom Report and under the category "Trustee's Fee." (Shaffer's Ex. 94.)

July 20, 1992 Bird, as trustee, signed check numbered 02732, drawn on the account of Allen W. Bird II, Trustee For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to the order of Allen Bird II, in the amount of $2000.00. There is no notation on the face of the check as to its purpose. The check was paid on July 21, 1992. (Shaffer's Ex. 97.) This check was recorded on the QuickZoom Report in the category "Trustee's Fee." (Shaffer's Ex. 94.)

July 27, 1992 "Order Granting Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back." (Docket Entry No. 451; Shaffer's Ex. 91.)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RECEIVED
JUL 27 1992
U. S. BANKRUPTCY COURT
LITTLE ROCK. ARKANSAS 72203

FILED
U.S. BANKRUPTCY COURT
EST. & WST. DIST. ARKANS.

IN RE: NORTHWEST FINANCIAL EXPRESS, NO. FA 86-148F
 INC., NWFX, INC., and GOLD (Chapter 11)
 FINANCIAL EXPRESS, INC. JUL 27 1992 (CONSOLIDATED)

DEBTOR
PEGGY CARROLL, CLERK

By: ——————————
 DEP. CLERK

ORDER GRANTING MOTION OF TRUSTEE
FOR ALLOWANCE OF TRUSTEE'S FEE
AND AUTHORIZATION FOR PAYMENT OF LEGAL FEES HELD BACK

Now before the Court is the MOTION OF TRUSTEE FOR ALLOWANCE OF TRUSTEE'S FEE AND AUTHORIZATION FOR PAYMENT OF LEGAL FEES HELD BACK, and the Court is advised that on June 26, 1992 the Trustee herein, Allen W. Bird II, caused a copy of such motion to be mailed to such parties as directed by the Court, with notice that any objections to the Motion should be filed on or before July 19, 1992, or the movant would ask the Court to enter an Order allowing the relief prayed for in the Motion. The Court is advised that no objection to the motion was filed by any party in interest.

The Court finds that the request for trustee's fees constitutes reasonable compensation for actual, necessary services rendered by such trustee, based upon the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title.

1 RCC019A4.AWB

SHAFFER
EXHIBIT
91
2.22.00

Entered on docket 7/27/92 by
compliance with FRBP 5003(a) and/or FRCP 79, 79(a)

The Court further finds that the hold back of legal fees should be paid at this time, in view of the fact that distribution of substantial all of the funds of the estate are about to be distributed, and all costs of administration on par with the legal fees and expenses have been or will also be paid in full.

It is therefore ORDERED, ADJUDGED AND DECREED as follows: (1) The Trustee is hereby allowed a Trustee's fee in the amount of $24,000 in the case of Northwest Financial Express, Inc., $128,880 in the case of NWFX, Inc., $4,860 in the case of Gold Financial Express, Inc., $69,140 as to the unallocated funds, and such fees may be paid at this time, and (2) the Trustee is hereby authorized to pay to Rose Law Firm, P.A. the attorneys fees previously approved but held back in the sum $40,000.00.

Done at Little Rock, Arkansas, this ___27ᵗʰ day of July, 1992.

_____
Honorable Robert F. Fussell
U.S. Bankruptcy Judge

ROSE LAW FIRM
A Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
(501) 375-9131

By: _____
Allen W. Bird II
ABA No. 68-006

Certificate of Mailing

I hereby certify that this document has been mailed to the parties which are reflected thereon and/or by attachment ...
___ day of _____, 19___.
_____, Deputy Clerk

RCC019A4.AWB

2

---

July 28, 1992 Bird as trustee, signed check number 02733, drawn on the account of Allen W. Bird II, Trustee for NWFX, INC.—OPERATING ACCOUNT. The check was made payable to the order of Allen W. Bird II, in the amount of $5000.00, and contains the notation "Trustee's Fees." The check was paid on July 30, 1992. (Shaffer's Ex. 97). This check was recorded on the QuickZoom Report in the category "Trustee's Fee." (Shaffer's Ex. 94.)

| | |
|---|---|
| July 31, 1992 | Bird, as trustee, signed check number 2737, drawn on the account of Allen W. Bird II, Trustee for NWFX, INC.—OPERATING AC-COUNT. The check was made payable to the Rose Law Firm in the amount of $40,000.00. This check was in payment of a "hold back in legal fees" prayed for in the Trustee's June 25, 1992, "Motion of Trustee for Allowance of Trustee's Fee and Authorization for Payment of Legal Fees Held Back," and the July 27, 1992, order authorizing the payment of the sums requested in the motion, including the $40,000.00 in legal fees owed the Rose Law firm, but previously held back. This check is recorded on the QuickZoom Report under the category "Legal Fees." (Shaffer's Ex. 96.) |
| August 20, 1992 | Bird, as trustee, signed check number 02755, drawn on the account of Allen W. Bird II, Trustee, For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to the order of Allen W. Bird II, in the amount of $5000.00 and contains the notation, "Trustee's Fees." The check was paid on August 24, 1992. (Shaffer's Ex. 97.) This check was recorded on the QuickZoom Report under the category "Trustee's Fee." (Shaffer's Ex. 94.) |
| September 15, 1992 | "Order Reducing Bond." (Docket Entry No. 455.) The order provides that "[t]he Court finds that the Bond for the Trustee, Allen W. Bird II, . . . should be decreased from $4,5000,000.00 to $100,000.00. The Trustee is hereby directed to obtain a $100,000.00 corporate surety bond within the next ten (10) days and to file the same with this Court for its approval." |
| October 28, 1992 | Bird, as trustee, signed check number 02806, drawn on the account of Allen W. Bird II, Trustee, For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to Allen W. Bird II in the amount of $5000.00, and contained the notation, "Trustees Fees." The check was paid on October 29, 1992. (Shaffer's Ex. 97). This check was recorded in the QuickZoom Report in the category "Trustee's Fee." (Shaffer's Ex. 94). |
| October 29, 1992 | Bird, as trustee, signed check number 02813, drawn on the account of Allen W. Bird II, Trustee For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to the order of Rose Law Firm, in the amount of $141,527.00. There is no notation on the face of the check as to the purpose for which it was written. The check was deposited into the account of the Rose Law Firm, account number 007–123–3, on October 30, 1992, and paid on November 2, 1992. (Shaffer's Ex. 97.) |

The QuickZoom Reports reflect the following entries related to check number 02813:

Date—10/29/92; Acct—NWF; Check Number—2813; Description—Rose Law Firm; Category—Trustee's Fee; Amount—$100,000.00. (Shaffer's Ex. 94.)

Date—10/29/92; Acct—NWF; Check Number—2813; Description—Rose Law Firm; Memo—State Bond Fees; Category—Trustee's Bond; Amount—$41,527.00. (Shaffer's Ex. 95.)

At the trial, Bird testified that placing the $41,527.00 in the "Trustee's Bond" category was an "coding" error. He did not do the coding; rather, one of three employees would code the entry or entries of the checks. Bird testified that the $41,527.00 was in payment of state surety bond fees owed to him pursuant to agreements he had with the various states. Bird testified that at the time he signed this check, he had forgotten that he had previously paid himself, with a check payable to the Rose Law Firm, a $41,600.00 fee owed to him by various state regulators for processing and distributing surety bond proceeds to their respective money order claimants.

January 27, 1993 Bird, as trustee, signed check number 02891, drawn on the account of Allen W. Bird II, Trustee For NWFX, INC.—OPERATING ACCOUNT. The check was made payable to Rose Law Firm, in the amount of $100,000.00. There is no notation on the face of the check as to its purpose. (Shaffer's Ex. 97.) This Check is recorded in QuickZoom Report under the category "Trustee's Fee." (Shaffer's Ex. 94.)

May 11, 1993 Letter from the Trustee to Court. (Shaffer's Ex. 92.)

# ROSE LAW FIRM

PHILLIP CARROLL
W. DANE CLAY
GEORGE E. CAMPBELL
HERBERT C. RULE III
W. WILSON JONES
ALLEN W. BIRD II
WILLIAM R. BISHOP
C. BRANTLY BUCK
TIM BOE
M. JANE DICKEY
KENNETH R. SHEMIN
RONALD M. CLARK
GARLAND J. GARRETT
JERRY C. JONES
THOMAS P. THRASH
CHARLES W. BAKER
DAVID L. WILLIAMS
JACKSON FARROW JR.
LES R. BALEDGE
JIM HUNTER BIRCH
KEVIN A. BURNS
RICHARD T. DONOVAN
RICHARD N. MASSEY
GARY H. SPEED
JOHN T. HARDIN
STEPHEN N. JOINER
JAMES M. GARY
JAMES H. DRUFF

A PROFESSIONAL ASSOCIATION

ATTORNEYS

120 EAST FOURTH STREET

LITTLE ROCK, ARKANSAS 72201-2893

TELEPHONE (501) 375-9131

TELECOPIER (501) 375-1309

U. M. ROSE
1834-1913

GORDON S. WILBOURN
LEE ADKEW, III
AMY LEE STEWART
DAVID A. SMITH
GALAN ROSENTHAL
SARAH TODD TEED
T. CRAIG JONES
J. SCOTT SCHALLHORN
STEVEN O. DUMANO
JEFFREY J. GEARHART
JAMES L. HARRIS
MARK ALAN PEOPLES
PATRICIA J. HERITAGE
SAMMIE P STRANGE, JR.
CLAY M. DAVID
JOHN A. BRYANT
FRANKLIN M. FAUST
ROBERT CRAIG HANNAH
BRYANT R. CRAWFORD
LISA C. FERRELL
STEPHEN E. SNIDER
VADA BERGER
GRANT C. FORTSON
DAVID P. MARTIN
KATHRYN BENNETT PERKINS

J. GASTON WILLIAMSON
JOHN A. DAVIS, III
OF COUNSEL

May 13, 1993

WRITER'S DIRECT DIAL NO.

(501) 377-0307

Honorable Robert F. Fussell, Chief Judge
United States Bankruptcy Court
Eastern District of Arkansas
Western Division
Post Office Drawer 2381
Little Rock, Arkansas 72203

 Re: NWFX, Inc., Debtor
 U. S. Bankruptcy Case No. FA86148F

Dear Judge Fussell:

 Some time ago you asked me to give you certain information about my performance as Trustee in the above-referenced matter. I enclose information which I believe will assist you in understanding the magnitude of the trusteeship. If there is any further information you desire, please do not hesitate to contact me.

 Sincerely yours,

 Allen W. Bird II

AWBII:dh
Encl:

SHAFFER

EXHIBIT
92

2.22.00

## SERVICES PERFORMED BY THE TRUSTEE

A. The services of the Trustee in this case began with his appointment in August, 1986.

B. The services performed in this case may be divided into several broad areas of responsibility: (1) Conceive of and execute a system for handling claims; (2) Collect all property of the estate; (3) Coordinate with regulators from all states where the Debtors did business, in order to distribute bond proceeds, and (4) Obtain confirmation of a plan of reorganization and distribute funds of the estate to the claimants.

## CLAIMS SYSTEM

C. This project actually started with the designing of the claim form. It was vitally important that we capture enough information to be able to identify and check on the validity of each money order claim. The money orders of these debtors were sold in amounts and to purchasers unknown to the issuer. The amounts were normally ultimately reported, but not the identity of the purchaser. In the chaos of the weeks after the petition, the reports sent in by agents who sold the money orders were either non-existent or also in chaos. In order to collect the relevant necessary data, we designed a claim form which would provide all the information necessary to verify the claims. My staff and I then designed a computer program which recorded all the information on the claim form, and would allow us to verify that the money order claim was valid, and would produce reports necessary to detect duplications, and would categorize the claims for payment

purposes, and would print the checks. The system designed has allowed us to respond to questions from claimants, delete duplicate claims, and prepare a program to pay claims in pro-rata amounts and deduct payments from the claims. Computers were used extensively in connection with the recording of claims. Approximately 120,000 money orders were the basis for claims, and over 65,000 total claims were ultimately filed, claiming a total of over $5,200,000. The computer system was required to not only allow us to identify each of the claimants, but also the address of the claimant, the numbers of the money orders, any attorneys representing the claimants, and the type of the claim, i.e. priority or otherwise. The system also was used to make payment of the claims, and therefore had to have the ability to determine which claims to pay by state, determine the amount of the check to be written to the claimant, deduct that amount from the claim for future payments, and print all of this information on a check form, which was then run through a check writing machine for signature.

### COLLECTING PROPERTY OF THE ESTATE

D. The effort to collect property of the estate was directed to several areas, including funds in the hands of the agents who had sold the money orders, funds in the hands of various banks, debts owed by former agents, referred to as "fidelities", and recovery of preferences. We pursued over two hundred agents who had received blank money orders, but who had not accounted for the blanks. In each case we required that the agent account for the

2

blanks, or we assumed, in the absence of a report, that the money order was sold for $300, the maximum amount for which the money order could be sold. We then proceeded to either collect those amounts, after resolving the liability, by seeking judgments against the agents for unpaid funds, or deleting, by agreement, claims filed by these agents for repurchased money orders, all of which raised the distribution percentage to the other claimants. Judgments were obtained totalling approximately $2,200,000. After judgments, we either collected the judgments, or we allowed those agents who were also claimants to set off their judgments against claims. We allowed the claimant/agent to use 50% of his claim as a set off on the theory that the claims would only be paid 50 cents on the dollar. That turned out to be a very good deal for the estate since it now appears that every claimant who can be found will receive more than 90 cents on the dollar, and in most states 100 per cent of the claim.

E. We also identified approximately $843,000 in cash located in various banks, and recovered that for the estate. In addition approximately $100,000 was recovered from fidelities.

F. A preference in the amount of $130,000 was recovered from the Northwest National Bank of Fayetteville.

### COORDINATION WITH REGULATORS

G. In each of the states and Puerto Rico, where the Debtors did business, they were required to post a bond to protect the purchasers from loss. The normal bond was either $100,000 or

3

$250,000. I met with all of the regulators and was successful in convincing them that the only rational way to distribute the proceeds of the bonds was by using the data base of claims we had created. The states had no method by which they could identify the purchasers, and therefore each state entered into a contract with me as Trustee, to distribute the bond funds. In several states, the bonds paid all the claims, thus allowing me to pay a higher percentage to the remaining claimants from property of the estates. In some cases the bonds were in excess of the claims in the state and therefore some of the bond funds were left over for distribution to claimants in other states. In each case, the Trustee negotiated a contract which called for the Trustee to distribute those funds to the claimants, and the expenses of distribution to be paid from the bond funds, including a 3% allowance for Trustee's fees, postage and other administrative expenses. Therefore the estate paid none of the expenses of distributing the bond funds, and the claimants were paid substantial amounts of their claims; again raising the percentage of recovery from the estate, by reducing the claims.

As of May, 1993, every claimant who could be found had been paid 100% of their claim, with the exception of claimants in Texas, Michigan, and Tennessee who have been paid 87% to date, with the anticipation that the final distribution will equal approximately 97%.

4

**301**

### PLAN OF REORGANIZATION

H. The Plan of Reorganization proposed was designed to maximize the payment to the people hurt the worst by this bankruptcy: the money order purchasers. The Plan provides that after the costs of administration and priority claims, the balance of the estate will be paid to the purchasers. The purchasers come before the ordinary trade credit, and all other creditors. This has two beneficial effects: one, the purchasers do not have to share with the other creditors, which would reduce the percentage of distribution; and two, there has been no need to object to and litigate with contingent and other trade creditors, thus saving the estate legal costs. In addition, this type of settlement had the side effect of reducing the trustee's fees, in that these funds did not come through the estate for redistribution.

May 24, 1993 *Sua sponte* order for additional compensation. (Docket Entry No. 462.) This order gave Bird a fee enhancement of $20,000.00 based on his performance as trustee in the Debtor Corporations' cases. The enhancement was based on the extraordinary result he had obtained in the case to date.[1]

1. 11 U.S.C. § 326(a) sets a maximum as to the limitation of trustee's fees. This Court

| | |
|---|---|
| May 24, 1993 | Bird, as trustee, signed check number 2985, drawn on the account of Allen W. Bird, II, Trustee For NWFX, INC.—OPERATING AC-COUNT. The check was made payable to the order of Rose Law Firm in the amount of $5000.00 and contains the notation, "Trustee's Fee's." (Shaffer's Ex. 97.) This check was recorded in the QuickZoom Report under the category "Trustee's Fee." (Shaffer's Ex. 94.) |
| May 24, 1993 | Bird, as trustee, signed check number 2986, drawn on the account of Allen W. Bird, II, Trustee For NWFX, INC.—OPERATING AC-COUNT. The check was made payable to the order of Allen W. Bird, II, in the amount of $5000.00 and contains the notation "Trustee's Fee's." The Check was paid on May 25, 1993. (Shaffer's Ex. 97.) This check was recorded in the QuickZoom Report under the category "Trustee's Fee." (Shaffer's Ex. 94.) |
| June 29, 1993 | Bird, as trustee, signed check number 3011, drawn on the account of Allen W. Bird, II, Trustee For NWFX, INC.,—OPERATING AC-COUNT. The check was made payable to the order of Allen W. Bird, in the amount of $2,500.00, and contains the notation "Trustees Fees." The check was paid on June 29, 1993. (Shaffer's Ex. 97.) This check was recorded in the QuickZoom Report under the category "Trustee's Fee." (Shaffer's Ex. 94.) |
| July 30, 1993 | Bird, as trustee, signed check number 3036, drawn on the account of Allen W. Bird, II, Trustee For NWFX, INC.,—OPERATING AC-COUNT. The check was made payable to the order of Allen W. Bird II, in the amount of $2500.00, and contains the notation, "Trustees Fees." The check was deposited on August 2, 1993. The back of this check is not legible enough to determine the date it was paid. (Shaffer's Ex. 97.) This check was recorded in the QuickZoom Report in the category "Trustee's Fee." (Shaffer's Ex. 94.) |
| September 22, 1993 | Bird, as trustee, signed check number 3064, drawn on the account of Allen W. Bird, II, Trustee For NWFX, INC.—OPERATING AC-COUNT. The check was made payable to the order of Allen W. Bird, in the amount of $5000.00, and contains the notation, "Trustee's Fees." The check was paid on September 27, 1993. (Shaffer's Ex. 97.) This check was recorded in the QuickZoom Report in the category "Trustee's Fee." [2] |
| December 10, 1997 | "Request for Accounting," filed by Larry Shaffer. (Docket Entry No. 639.) The request provides, in part, "[h]aving never seen an up to date accounting of NWFX et al., SHAFFER in accordance with 11 USC Sec 704 SHAFFER does hereby REQUEST AN AC-COUNTING by the TRUSTEE." |

was in error in awarding the $20,000.00 fee enhancement to the Trustee because it had all ready approved the maximum fee requested by the Trustee in its "Order Granting Motion of Trustee For Allowance of Trustee's Fee and Authorization For Payment of Legal Fees Held Back," filed on July 27, 1992.

2. According to the QuickZoom Report, from the period of August 1, 1986, through September 22, 1993, checks totaling $338,500.00 were written and recorded in the QuickZoom Report under the category "Trustee's Fee."

December 17, 1997 Order denying Shaffer's request for an accounting by the Trustee without prejudice as pre-mature at this time. (Docket Entry No. 644.) Citing pending claims litigation between the Trustee and City National Bank, the order provided that until the Court determined the outcome of that litigation, Shaffer's request for an accounting was pre-mature.

December 30, 1997 Letter from Trustee to Shaffer. (Shaffer's Ex. 70.)

---

**ROSE LAW FIRM**
A PROFESSIONAL ASSOCIATION
ATTORNEYS
120 EAST FOURTH STREET
LITTLE ROCK, ARKANSAS 72201-2893

TELEPHONE (501) 375-9131
FACSIMILE (501) 375-1309

December 30, 1997

WRITER'S DIRECT DIAL NO.

501-377-0007
abird@roselawfirm.com

Mr. Larry Shaffer
2704 American St.
Ste. 3
Springdale, AR 72764

Re: Northwest Financial Express, Inc., et al

Dear Mr. Shaffer:

You recently filed a request for an accounting of the estate of Northwest Financial Express, Inc. Although Judge Fussell has denied your motion for the time being, I want you to know that the books and records of the estate are always open to your or your representatives. I only ask that you give me a few days notice if you or someone on your behalf desires to review the financial records of the estate.

In the mean time, an unaudited review of the current records reveals the following amounts to date:

| | |
|---|---|
| Paid to claimants: | $5,493,047.51 |
| Cost of administration: | $1,644,322.31 |
| Professional fees paid: | $782,856.83 |
| Cash on hand: | $1,233,183.47 |

If you have any questions, please call me or Penny Scharmberg.

Sincerely yours,

Allen W. Bird II

SHAFFER
EXHIBIT
70

2.15.00

November 9, 1998 "Application for Allowance of Final Compensation and Expenses For Counsel For the Trustee. (Docket Entry No. 668.)

November 9, 1998 "Chapter 11 Final Report and Account and Application For Final Decree." (Docket Entry No. 668; Shaffer's Ex. 27.)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PEGGY CARROLL. CLERK
BY_____

IN RE: NWFX, INC. CASE NO. FA86-8143M
 NORTHWEST FINANCIAL EXPRESS, INC. (Chapter 11)
 GOLD FINANCIAL EXPRESS, INC. (CONSOLIDATED)

CHAPTER 11 FINAL REPORT AND
ACCOUNT AND APPLICATION FOR FINAL DECREE

Comes now Allen W. Bird II, Trustee for the estates of the debtors herein and respectfully reports:

1. In 1988 this Court duly entered its order confirming the plan proposed by the Trustee for the Debtor, and directing the execution and consummation of said plan.

2. The confirmed plan has been implemented and consummated. During the course of such implementation, the Trustee has distributed the following amount to those creditors who purchased money orders which were outstanding at the time this bankruptcy proceeding was instituted:

 a. Gold Financial Express, Inc. $83,287.89

 b. NWFX, Inc. $4,441,718.76

 c. Northwest Financial Express, Inc. $5,423,033.51

3. This amounted to a 100% distribution to all those holders who could be found after claims were filed.

4. During the course of such implementation, the Trustee has distributed to $579,138.22 the other creditors which amounted to a 100% distribution to all other creditors.

SHAFFER
EXHIBIT
27

2/15/2000

5. The distribution to both creditors and to the holders of money orders equals $10,527,178.38

6. The professional fees and expenses approved and paid to date for all three debtors on a consolidated basis are as follows:

 a. Trustee compensation: $338,500.00

 b. Attorneys for the Trustee $647,555.95

 c. Accountants for the Trustee $82,407.00

7. The Trustee has on hand the sum of $573,750.00 as of October 21, 1998. There are un-cleared checks outstanding in the sum of $55,764.00. The trustee anticipates approximately $40,000 in administrative expenses to close the estate.

8. The attorneys for the Trustee have applied for final fees and expenses in the sum of $71,462.31.

9. Following payment of the remaining expenses of the estate, the Trustee should be relieved of any further duties in this matter and discharged. Such action would have the effect of returning control of the debtor entities to the stockholders and directors thereof.

WHEREFORE having reported and accounted, the debtor prays that this Court will enter a final decree discharging the Trustee from any further duties in this matter and closing this case.

_____
Allen W. Bird II, Trustee
120 E. Fourth St.
Little Rock, AR 72201
501-375-9131

December 18, 1998 "Objection to Chapter 11 Final Report and Account and Application For Final Decree," filed by Larry Shaffer. (Docket Entry No. 673; Shaffer's Ex. 28.)

306

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: NWFX, INC. )
 NORTHWEST FINANCIAL EXPRESS, INC. ) Case No. FA86-148F
 GOLD FINANCIAL EXPRESS, INC. ) (Chapter 11)
 ) (Consolidated) **RECEIVED**
 )
 ) DEC 2 2 1998

 OBJECTION TO CHAPTER 11 FINAL REPORT AND ACCOUNT Hall, Estill
 AND APPLICATION FOR FINAL DECREE

 Larry Shaffer ("Shaffer"), an interested party, hereby files his Objection to the Chapter 11

Final Report and Account and Application for Final Decree filed November 9, 1998 ("Final

Report"). In support, Shaffer states as follows;

 1. Shaffer did not receive a copy of the Final Report until the December 3, 1998, when

it was received by Federal Express from the Trustee, Allen W. Bird II ("Trustee"). Therefore, notice

of the Final Report was insufficient.

 2. The Final Report does not contain sufficient information to close this bankruptcy

case. For example, the Final Report does not contain a record of all receipts and disbursements in

the case or a disclosure of all of the remaining assets in the case, including information on the

judgment liens held by the bankruptcy estate.

 3. The Final Report states that the Trustee anticipates approximately $40,000.00 in

administrative expenses to close the estate. No accounting was given for the $40,000.00. The

Trustee should be required to give details as to how the $40,000.00 is proposed to be spent.

 4. Shaffer is the sole remaining beneficiary of the remainder of the bankruptcy estate.

There is no U.S. Trustee or other interested party monitoring this case. Therefore, careful scrutiny

SHAFFER
**EXHIBIT**
**28**

2/15/2000

should be allowed upon proper notice.

WHEREFORE, Larry Shaffer respectfully requests that the Court deny approval of the Final Report or, alternatively, order the Trustee to supplement the Final Report to address the issues raised herein, and for such other relief as the Court deems just.

Respectfully submitted,

HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.

By: _____

Thomas A. Creekmore OBA#2011
Steven W. Soulé OBA#13781
320 South Boston, Suite 400
Tulsa, Oklahoma 74103
(918) 594-0466
(918) 594-0505 (Facsimile)

and

HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.
William E. Bishop, ABA #____
James L. Harris, ABA #90011
One East Center Street, Suite 315
Fayetteville, Arkansas 72701-5387
(501) 973-5200
(501) 973-0520

### CERTIFICATE OF MAILING

I hereby certify that I caused to be mailed a true and correct copy of the above and foregoing instrument by depositing the same in the U.S. Mail, Tulsa Oklahoma, with proper postage being fully prepaid and affixes thereto, this 18th day of December, 1998, and addressed to:

Allen W. Bird, II, Trustee
120 E. Fourth Street
Little Rock, Arkansas 72201

_____

1w2-9050

December 29, 1998 "Response to Objection to Chapter 11 Final Report and Account and Application For Final Decree," filed by the Trustee. (Docket Entry No. 676; Shaffer's Ex. 28.) The response provides, in relevant part, that "[t]he objection is well taken as it relates to the finality of the case (but not the lack of knowledge), and the previously filed final report and application for final decree is hereby withdrawn."

308

January 29, 1999 Letter from attorney Creekmore to the Trustee. (Shaffer's Ex. 212.) The letter states that its purpose is to,

> follow up on our conversation at the end of December concerning the Final Report. It was my understanding that you were going to prepare a revised Final Report (to include . . . a detailed statement of receipts and disbursements from the bankruptcy estates and a breakdown of the remaining administrative costs) and provide us an opportunity to review it prior to filing.

February 19, 1999 Letter from the Trustee to attorney Creekmore with draft copy of "Chapter 11 Final Report and Account and Application for Final Decree. (Shaffer's Ex. 212.)

# ROSE LAW FIRM
A PROFESSIONAL ASSOCIATION

### ATTORNEYS

WRITER'S TELEPHONE

501-377-0307

120 East Fourth Street
Little Rock, Arkansas
72201-2893

501-375-9131
501-375-1309 FAX

WRITER'S ELECTRONIC MAIL

abird@roselawfirm.com

February 19, 1999

RECEIVED
FEB 2 ˮ 1999
Hall. Estill

Thomas A. Creekmore
320 South Boston, Suite 400
Tulsa, OK 74103

Re: NWFX, Inc.

Dear Tom:

Enclosed please find a draft motion to close the case and for final approval of fees and expenses for professionals.

Please review them and let me know if you want further information before these are filed.

Sincerely yours,

Allen W. Bird II

310

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: NWFX, INC. CASE NO. FA86-148F
 NORTHWEST FINANCIAL EXPRESS, INC. (Chapter 11)
 GOLD FINANCIAL EXPRESS, INC. (CONSOLIDATED)

CHAPTER 11 FINAL REPORT AND
ACCOUNT AND APPLICATION FOR FINAL DECREE

Comes now Allen W. Bird II, Trustee for the estates of the debtors herein and respectfully reports:

1. In 1988 this Court duly entered its order confirming the plan proposed by the Trustee for the Debtor, and directing the execution and consummation of said plan.

2. The confirmed plan has been implemented and consummated. During the course of such implementation, the Trustee has distributed the following amount to those creditors who purchased money orders which were outstanding at the time this bankruptcy proceeding was instituted:

 a. Gold Financial Express, Inc. $83,287.89

 b. NWFX, Inc. $4,441,718.76

 c. Northwest Financial Express, Inc. $5,423,033.51

3. This amounted to a 100% distribution to all those holders who could be found after claims were filed.

4. During the course of such implementation, the Trustee has distributed to $579,138.22 the other creditors which amounted to a 100% distribution to all other creditors.

5. The distribution to both creditors and to the holders of money orders equals $10,527,178.38

6. The professional fees and expenses approved and paid to date for all three debtors on a consolidated basis are as follows:

 a. Trustee compensation: $338,500.00

 b. Attorneys for the Trustee $676,505.35

 c. Accountants for the Trustee $99,407.00

7. The Trustee has on hand the sum of $443,556.29 as of February 19, 1999. There are un-cleared checks outstanding in the sum of approximately $12,000. The trustee anticipates approximately $5,000-$7,000 in administrative expenses to close the estate consisting of paying an accountant to file the 1999 tax returns and salary and benefits for Penny Scharmberg until the matter is closed.

8. Attached hereto as Exhibit "__" is the cash flow report of the estate from inception to _____ showing all receipts and disbursements of funds. Attached hereto as Exhibit "__" is the balance sheet of the estate as of _____.

9. Following payment of the remaining expenses of the estate, the Trustee should be relieved of any further duties in this matter and discharged. Such action would have the effect of returning control of the debtor entities to the stockholders and directors thereof.

WHEREFORE having reported and accounted, the debtor prays that this Court will enter a final decree discharging the Trustee from any further duties in this matter and closing this case.

Allen W..Bird II, Trustee
120 E. Fourth St.
Little Rock, AR 72201
501-375-9131

Attached to the February 19, 1999, draft is a "Cash Flow Report" reflecting all inflows of income, which totals $14,757,314.10, and all outflows of income, which totals $14,319,983.75, leaving a balance of $437,330.35. The "Trustee's Fee" is listed as $338,500.00; the "Legal Fees" are listed as $676,505.35, the "Trustee's Bond" is listed as $59,593.00.[3]

3. Each of the three above categories are reflected in the QuickZoom Reports. Shaffer

February 26, 1999 Letter from attorney Soulé to the Trustee. (Shaffer's Ex. 212.) The letter provides, in relevant part:

> we received your draft Chapter 11 Final Report and Motion For Final Approval of Fees and Expenses of Professionals. Prior to your filing the Final Report, our client would like to review the backup information and documents for several of the entries on the cash flow report. I am attaching a list of the entries for which our clients would like to review the back-up documents. It is my understanding from our telephone conversation that you can print certain information relating to these accounts, such as check payee and amount, from your Quicken accounting program. Please forward that information to me at your earliest convenience.

Included on the list of entries were "Trustee's Bond," and "Trustee's Fee."

April 2, 1999 Letter from attorney Soulé to the Trustee. (Shaffer's Ex. 212.) The letter states, in relevant part, that its purpose "is to request further information, in addition to the back-up documentation you printed off your Quick Books program.... My client requests answers and/or documentation in response to the following: ... 13. Please provide the basis for the numbers used in computing the Trustee's fee."

April 5, 1999 Letter from the Trustee to attorney Soulé. (Shaffer's Ex. 212.) The letter states, in relevant part:

> I am willing to provide additional copies of documents and computer files. I am of the opinion that answering your questions regarding policies, and "why?" questions in writing will simply lead to more questions and is counter-productive.

> I am willing to sit for a deposition, if you deem it necessary, so that you can ask any questions you like until your client is satisfied that you that he has all the information available.

> . . .

> Soon I will provide you with the written information requested in your paragraphs numbered 1, 8, 9, 10, 12.

> The following is also responsive to several other questions: Para 13.—The Trustee's fee was calculated in accordance with 11 U.S.C. § 326.

exhibit 94 lists the trustee's fees, Shaffer exhibit 96 lists the legal fees, and Shaffer exhibit 95 lists the trustee's bond. Shaffer exhibit 95, "Trustee's Bond," reflects an entry on October 29, 1992, that check number 2813 was made payable to the Rose Law Firm; the memo with the entry states, "State Bond Fees"; category "Trustee's Bond," in the amount of $41,527.00. The other thirteen entries in the state bond fees category are checks payable to Marsh & McLennan or Meadors & Adams for bond premiums. All are in the amount of less than $7000.00 each.

May 11, 1999 Letter from attorney Soulé to the Trustee. (Shaffer's Ex. 212.) The letter states, in relevant part:

> After the hearing [on May 17, 1999], we will conduct you deposition by agreement in the conference room in our Fayetteville office.... Please forward the following information to us by overnight mail as soon as possible:
> A. Invoices for these payments with supporting detail:
>> 17. The Rose Law Firm 2813 41,527.00
>
> . . .
>
> H. A reconciliation of claims paid per your Chapter 11 Report and Account and Application for Final Decree which shows $10,527.178 in claims paid, while the payments reflected on records furnished Mr. Shafer are approximately $6,000,000.
>
> . . .
>
> J. A copy of each written agreement and other relevant documents evidencing your agreements with different states relating to the bond proceeds which were distributed by the states and an accounting for any fees you received relating to those distributions.

May 13, 1999 Letter from the Trustee to attorney Soulé. (Shaffer's Ex. 212.) The letter provides, in relevant part:

> In response to your letter of May 11, 1999, I am enclosing those items described below:
>
> A. The supporting detail of those items listed in your letter is enclosed.
>
> . . .
>
> H. The reconciliation is enclosed. My previous reports showing a total in excess of $10,000,000 was incorrect. I added two subtotal numbers and one total number to reach this amount. The correct amount of total claims paid is shown on the enclosed.
>
> . . .
>
> J. We will have all this information available on Monday.

May 24, 1999 Letter from attorney Soulé to the Trustee. (Shaffer's Ex. 212.) The letter states, in relevant part:

> As discussed at your deposition, and as set forth in your May 13 letter, it is clear that the calculations in your previous reports concerning monies disbursed were not correct. Please provide your new calculation on the amounts disbursed and the backup for your calculations on the trustee's fees you have paid yourself. If, as it appears to us, the trustee's fees have been overpaid, we need to discuss the process and timing of the reimbursement of the amount overpaid.

June 7, 1999 Letter from the Trustee to attorney Soulé. (Shaffer's Ex. 212.) The letter states, in relevant part: "I disagree with you regarding the trustees fees and I am reviewing my calculations."

June 11, 1999

Letter from attorney Soulé to the Trustee. (Shaffer's Ex. 212.) The letter states, in relevant part:

> I do not pretend to know how computers or software work. I am told we need the software you paid to develop to run with the Paradox software in order to use the data. In an effort to solve the licensing problem, Larry Shaffer has now purchased a copy of the Paradox software. Therefore, he is an authorized user in accordance with the license statement. I will forward a copy of the receipt for your review. We now request that you copy the entire computer file, including the data and software, for our use and review.

July 29, 1999

"Final Report and Account and Application For Final Decree." (Docket Entry No. 686; Shaffer's Ex. 33.) The report provides:

> 1. In 1988 this Court duly entered its order confirming the plan proposed by the Trustee for the Debtor, and directing the execution and consummation of said plan.
>
> 2. The confirmed plan has been implemented and consummated. During the course of such implementation, the Trustee has distributed $9,104,717.62 to all creditors and holds $176,805.00 in cash for payment of final allowable trustee's fees, expenses and distribution to Larry Shaffer, the sole remaining creditor. The distribution to creditors amounted to a 100% distribution to all those holders who could be found after claims were filed, except for Mr. Shaffer.
>
> 3. The professional fees and expenses approved and paid to date for all three debtors on a consolidated basis are as follows:
>
> a. Trustee compensation $296,973.00
>
> b. Attorneys for the Trustee $676,503.35
>
> c. Accountants for the Trustee (including payment for 1999 tax returns) $104,407.00
>
> 4. The trustee anticipates approximately $6,000 in administrative expenses to close the estate, $5,000.00 of which will go to Victoria Mason for preparation of the 1999 tax returns for all the debtors. The Trustee holds books and records of the original debtors which he intends to return to Mr. Shaffer.
>
> 5. The Trustee is eligible for an additional $42,313.49 as fees for his services as trustee pursuant to 12[sic] U.S.C § 326.
>
> 6. Following payment of the remaining expenses of the estate, the Trustee should be relieved of any further duties in this matter and discharged. Such action would have the effect of returning control of the debtor entities to the stockholders and directors thereof.

**316**

WHEREFORE having reported and accounted, the debtor prays that this Court will award him an additional $40,000.00 as trustee's fees, and enter a final decree discharging the Trustee from any further duties in this matter and closing the case.

September 10, 1999 "Objection to Chapter 11 Final Report and Account and Application For Final Decree," filed by Shaffer. (Docket Entry No. 689; Shaffer's Ex. 35.) The objection states, in relevant part:

6. Based on the information provided by the Trustee to Shaffer to date and based on the information (or lack thereof) provided in the Final Report, Shaffer has the following objections to the Final Report:

A. *Distribution Amount.* The Trustee appears to have overstated the amount of money he has distributed to creditors of the estate. The Trustee claims to have distributed $9,104,717.62 to creditors. The Trustee included no backup information for this calculation. Based on a review of the Trustee's own records, it appears that the Trustee actually distributed approximately $7 million. This amount is critical to the closing of the case and the Trustee should be required to provide the Court with evidence to support the actual distribution amount. Among other things, the Trustee's fee is calculated based on this number and as set forth below appears to have been calculated incorrectly and overpaid.

B. *Trustee Fee.* The Trustee's fee request is based on 11 U.S.C. § 326. The Trustee has apparently miscalculated and substantially overpaid the Trustee's fees in this case. Further, the Trustee seeks an additional trustee fee without providing any detail to support the additional fee (or the original fee request). Despite numerous requests by Shaffer, the Trustee has refused to provide *either* the method used to calculate his requested fees, or any detail to support such calculation.

In the Final Report, the Trustee claims to have been paid $296,973.00 in Trustee compensation and he seeks an additional $42,313.49. There are no supporting calculations for these figures, which Shaffer believes to be incorrect. Based on the Trustee's own business records, the trustee's fee should be a maximum of $213,000. [Footnote 1: This number is an approximation based on on [sic] the Trustee's Quickbooks records, and it does not include deductions which must be made if certain payments made by the Trustee set forth herein, as well as the Objection to the requested professional fees of Victoria Mason and the Rose Law Firm filed contemporaneously herewith, are ordered disgorged.] [Footnote 2: The Trustee seeks allowance of his fees pursuant to 11 U.S.C. § 326. That section establishes a statutory maximum, not a guaranteed minimum, trustee's fee.] This Court has previously entered three Orders allowing the payment of interim trustees fees, which were specifically made subject to a final review and accounting as follows: Orders entered January 27, 1989, in the amount of $38,000.00, January 30, 1990, in the amount of $50,000.00, and on July 27, 1992, for a total amount allowed of $226,880.00, which amount includes the previous two allowed fees.

However, the Trustee's records reflect that he has actually paid himself the amount of $338,500 in trustee's fees. [Footnote 3: This number comes from the Trustee's records and includes the · $20,000 fee enhancement awarded by Court Order filed May 24, 1993, which appeared to be an attorney fee enhancement, but which the Trustee recorded as a Trustee fee.] Additionally, the Trustee paid himself $41,527 as a fee which appears to relate to the state surety bond proceeds which were determined to not be property of the estate. [Footnote 4: On information and believe, the Trustee paid to himself a separate fee based on his distribution of such surety bond proceeds, based on agreements reached with the various states with whom such bonds were posted.] This $41,527 payment does not appear to have been approved by the Bankruptcy Court. The Trustee must be required to provide evidence to support his trustee fee request, including the specific calculations of the fees requested. If the Trustee has been overpaid, he should be ordered to repay the estate the overpaid amount immediately.

September 27, 1999 Letter from the Trustee to Judge Fussell, with copy to attorney Soulé. (Shaffer's Ex. 212.) The letter provides, in relevant part:

After our telephone conference call on Friday, September 24, 1999, I reviewed again the objection to my final reports filed by Mr. Shaffer. In that review, I realized there were several items discussed by Mr. Shaffer which, if produced at this time, would shorten any hearing this matter.

Those items are as follows. The paragraph reference is to paragraph six of Mr. Shaffer's Objection to Chapter 11 Final Report and Account and Application for Final Decree:

. . .

6.B. How was the figure of $213,000 calculated and what records are relied upon to reach that calculation?

6.B. How was the figure of $338,500 calculated and what records are relied upon to reach that calculation?

6.B. How was the figure of $41,527 calculated and what records are relied upon to reach that calculation?

. . .

If you would rather me to use traditional discovery methods to find this information, I will be .happy to do so; however, it seems that this matter would be facilitated if Mr. Shaffer is directed to provide this information on October 11, 1999 in Fayetteville, at the same time I provide the documents as you directed.

September 30, 1999

Letter from attorney Soulé to Judge Fussell, with copy to the Trustee. (Shaffer's Ex. 212.) The letter provides, in relevant part:

> This letter is in response to Allen Bird's letter to you dated September 27, 1999. . . . The following should address the items raised by the Trustee (the Trustee's numbering system was followed):
>
> . . .
>
> 6.B. The $213,000.00 fee calculation is based on a $3% trustee fee on the figure used in Exhibit A. This number is an approximation based on possible differences in the state bond fund proceeds distributed by the Trustee, the details of which have not been provided to Mr. Shaffer.
>
> 6.B. The $338,500.00 amount of Trustee's fees that has been paid comes directly from the Trustee's Quicken records.[4]
>
> 6.B. The $41,527.00 figure for the fee the Trustee paid himself for the state bond fees comes from the Trustee's Quicken records. *See* Exhibit C.

4. *See* Shaffer' Ex. 94.

Quick Zoom Report

Qdata 93

GENERAL-All Accounts

| Date | Acct | Num | Description | Memo | Category | Clr | Amount |
|------|------|-----|-------------|------|----------|-----|--------|
| 9/9/86 | NWF... | 115 | Marsh & McLenn... | | Trustee's Bond | | -50.00 |
| 10/24/89 | NWF... | 1872 | Marsh & McLennan | | Trustee's Bond | x | -200.00 |
| 12/11/89 | NWF... | 1935 | Marsh & McLennan | Increase of ... | Trustee's Bond | x | -3,744.00 |
| 1/20/90 | NWF... | 2191 | Marsh & McLennan | Trustee's Bo... | Trustee's Bond | x | -4,975.00 |
| 2/15/91 | NWF... | 2368 | Marsh & McLennan | Invoice #125150 | Trustee's Bond | x | -723.00 |
| 6/19/91 | NWF... | 2454 | Marsh & McLennan | Renewal | Trustee's Bond | x | -6,275.00 |
| 10/29/92 | NWF... | 2813 | Rose Law Firm | State Bond Fees | Trustee's Bond | x | -41,527.00 |
| 12/30/92 | NWF... | 2869 | Marsh & McLennan | 400HJ0197 | Trustee's Bond | x | -299.00 |
| 6/28/93 | NWF... | 3006 | Marsh & McLennan | | Trustee's Bond | x | -300.00 |
| 7/7/94 | NWF... | 3252 | Marsh & McLennan | Invoice #145... | Trustee's Bond | x | -300.00 |
| 6/28/95 | NWF... | 3404 | Marsh & McLenn... | Policy #400H... | Trustee's Bond | x | -300.00 |
| 7/12/96 | NWF... | 3584 | Meadors & Adams | Renewal Poli... | Trustee's Bond | x | -300.00 |
| 6/9/97 | NWF... | 3722 | Meadors & Adams | Renewal Poli... | Trustee's Bond | x | -300.00 |
| 7/29/98 | NWF... | 3891 | Meadors & Adams | Renewal Poli... | Trustee's Bond | x | -300.00 |

TOTAL 8/1/86 - 9/28/99 -59,593.00

TOTAL INFLOWS 0.00
TOTAL OUTFLOWS -59,593.00

NET TOTAL -59,593.00

EXHIBIT
" C "

7

October 1, 1999 Letter from the Trustee to attorney Soulé, and attachments. (Shaffer's Ex. 54.)

ALLEN W. BIRD II, TRUSTEE
120 EAST FOURTH ST.
LITTLE ROCK, AR 72201
501-377-0307
501-375-1309 (FAX)

OCTOBER 1, 1999

VIA FACSIMILE

Mr. Steven W. Soule
Hall, Estill, Hardwick, Gable, Golden & Nelson
320 South Boston Ave.; Ste. 400
Tulsa, OK 74103-3709

Re: NWFX, Inc.
No. FA86-148F

Dear Steven:

This is in response to your letter of September 30, 1999.

I have told Mr. Shaffer, and have told all of his lawyers, that I will be glad to make available ALL of my records to him or his representatives at any reasonable time, with reasonable notice.

On several occasions, Greg Moldenhauer has come to Little Rock and given me a list of documents he wanted to review, and I made those documents available to him. You have now waited until Ms. Scharmberg is gone and asked for new documents and information and I have employed temporary help to fulfill your demands.

Pursuant to Bankruptcy Rule 7034, and Federal Rule of Civil Procedure 34, I will, *again*, make all the documents available to you for review. I will no longer (without a court order) allow Mr. Moldenhauer to inspect the records without you or an attorney present, inasmuch as he seems to be unable to ask for the documents needed by you.

In response to some of your specific requests, I respond as follows:

* Rose Law Firm Fees—I am compiling those records and will bring them to Fayetteville on October 11 as directed by Judge Fussell.

* Other Lawyers Fees—After almost a year of fulfilling Mr. Shaffer's requests for information, this is the first I have heard of this. I will

SHAFFER

EXHIBIT

54

2.15.00

compile these records, and attempt to have them October 11; however, as I have told you for months, I will be out of the office next week, and I may not have them that day. ·

- Trustees Fees—I will compile these records, and attempt to have them October 11; however, as I have told you for months, I will be out of the office next week, and I may not have them that day. I have not kept a record of hours in performing services as trustee.

- Funds distributed "to all creditors"—These records would fill a medium size Mayflower moving van. Early this summer, I gave Mr. Moldenhauer a print out listing EVERY check written by me from the operation account, itemizing the payee, date, check number and purpose. In addition I delivered a CD containing information on every check written to pay a claimant. As I mentioned, if you want to see the backup for each check, those records are here for you to review.

- Trustee Fee Calculation—As directed by Judge Fussell, those calculations are attached. The documents to support these figures include all the records of the case. There are here for your review.

We can discuss the other documents you want at my deposition on October 15th.

It is now apparent to me that Mr. Shaffer is not interested in narrowing any issues, as requested by Judge Fussell, and is simply attempting to make this entire process as difficult as possible; however, as I have consistently said, EVERY document in my possession in this matter is available for review by you or Mr. Creekmore, along with whomever you chose to bring with you.

Sincerely yours,

Allen W. Bird II

cc: Judge Fussell
Gary Garrett

## NWFX Trustee's Fee Calculation

| | Gold | Northwest | NWFX |
|---|---|---|---|
| Total Allocated Disbursements | $1,215,803.16 | $2,024,695.71 | $5,744,050.76 |
| 25% of $5,000 | $1,250.00 | $1,250.00 | $1,250.00 |
| 10% of $5,000 to $50,000 | $4,500.00 | $4,500.00 | $4,500.00 |
| 5% 50,000 to 1,000,000 | $47,500.00 | $47,500.00 | $47,500.00 |
| 3% of over 1,000,000 | $6,474.09 | $30,740.87 | $142,321.52 |
| TOTAL FEES | $59,724.09 | $83,990.87 | $195,571.52 |
| COMBINED TOTAL FEES | $339,286.49 | | |

Trustee's Fee Calculation- Detail

**Gold Financial**

| | |
|---|---|
| Claims Paid | $94,509.21 |
| One-Third of CNB Claim | $166,666.67 |
| One-Third of Shaffer | $83,333.33 |
| One-Third of Cash | $58,935.00 |
| One-Third of Administration | $911,349.95 |
| One-Third of Trustee's Fee | ($98,991.00) |
| **TOTAL Gold** | **$1,215,803.16** |

**Northwest Financial Exp.**

| | |
|---|---|
| Claims Paid | $903,401.76 |
| One-Third of CNB Claim | $166,666.67 |
| One-Third of Shaffer | $83,333.33 |
| One-Third of Cash | $58,935.00 |
| One-Third of Administration | $911,349.95 |
| One-Third of Trustee's Fee | ($98,991.00) |
| **TOTAL Northwest** | **$2,024,695.71** |

**NWFX**

| | |
|---|---|
| Claims Paid | $4,622,755.81 |
| One-Third of CNB Claim | $166,666.67 |
| One-Third of Shaffer | $83,333.33 |
| One-Third of Cash | $58,935.00 |
| One-Third of Administration | $911,349.95 |
| One-Third of Trustee's Fee | ($98,991.00) |
| **TOTAL NWFX** | **$5,744,050.76** |

| | |
|---|---|
| **TOTAL of ALL** | **$8,984,549.63** |

Prepared by Allen W. Bird II 10/01/99 Page 1

October 15, 1999 "Stipulated Scheduling Order Regarding Final Report and Account and Objection Thereto." (Docket Entry No. 692; Shaffer's Ex. 36.) The scheduling order provides, in relevant part:

324

2. On or before October 28, 1999, the Trustee shall identify and produce to Shaffer any Court Orders authorizing payment of Trustee's fees herein *other than* those identified in Shaffer's Objection.

3. On or before October 28, 1999, the Trustee shall identify any ledgers, software, systems, etc. which would reflect receipts and/or disbursements transactions of the estate which are not recorded in (i) the Quicken database/program as of April 30, 1999, previously provided to Shaffer, and (ii) the check database previously provided to Shaffer. If no such items exist, the Trustee will stipulate that all such receipt and disbursement transactions are reflected in the Quicken database/program and check database previously provided to Shaffer.

 . . .

5. On or before October 28, 1999, Bird shall provide to Shaffer copies of canceled checks written as payment for all trustee's fees paid by the estate to the Trustee.

October 15, 1999 "Stipulated Scheduling Order Regarding Motion for Final Approval of Professional Fees and Objection Thereto." (Docket Entry No. 693; Shaffer's Ex. 37.) The scheduling order provides, in relevant part:

5. Shaffer contends that the Trustee's records reflect payment of legal fees and/or expenses to the Rose Law Firm in the amount of $41,600, by check dated June 15, 1992, check no. 2707, for which no statement or court order has been provided. The Trustee shall research such check and provide to Shaffer on or before October 21, 1999(a) a copy of canceled check no. 2707; (b) a description of the purpose of such check (*e.g.,* legal fees and expenses) and the invoice(s) paid by check no. 2707; and (c) a copy of any order of this Court authorizing such payment, or a stipulation that no such order exists.

October 15, 1999 "Request for Information and Documents Pursuant to Stipulated Scheduling Orders Filed October 14, 1999." (Shaffer's Ex. 38.) The request provides, in relevant part:

7. Provide copies of the following checks written to pay Trustee's fees, No. 2813 dated October 29, 1992, in the amount of $141,527 and No. 2891 dated January 27, 1993, in the amount of $100,000. Please provide copies of the endorsements for said checks, any supporting invoices and records to reflect where these checks were deposited.

November 15, 1999 "Response to Larry Shafer's Objections to Trustee's Final Report and Account." (Docket Entry No. 703; Shaffer's Ex. 43.) The response provides, in relevant part:

TRUSTEE FEES

28. Shaffer alleges the Trustee miscalculated and substantially overpaid the Trustee's fees in this case. Objection, par. 1B. After reviewing the relevant records, the Trustee admits that the Trustee's fees were overpaid. The Trustee erroneously received $133,220.00, computed as set forth below. This amount has been returned to the estates, with interest from October 28, 1992 at the estates's average earning rate of 5.00%, as evidence by the check attached hereto as Exhibit D.

29. The total of all checks in payment of Trustee fees is $338,500.00.

30. As set forth in Exhibit E hereto, there are four orders approving fees for the Trustee: (a) an order dated January 27, 1989 approving $38,000.00, (b) an order dated January 30, 1990 approving $50,000.00, (c) an order dated July 27, 1992 approving $226,880.00, and (d) an order dated May 24, 1993 approving $20,000.00.

31. The order dated July 27, 1992 approving $226,880.00 subsumes the two prior orders. So, with the approval of an additional $20,000 .00, the total of all approved fees is $246,880.00. However, in paying the two subsequent orders the Trustee failed to deduct the $38,000.00 and the $50,000.00 sums approved by the two earlier orders.

32. In addition, the Trustee made a duplicate payment unrelated to Trustee fees. The amount of $41,527.00 received by the Trustee from the proceeds of state regulatory bonds by agreement with the various states was mistakenly paid twice. As set forth on Exhibit F, one payment was recorded in Quick Books as a legal fee, and another duplicate payment was recorded in Quick Books as a payment on a Trustee's bond.

33. Accordingly, an accounting of the mistakes made by the Trustee and the resulting reimbursement already made to the estate is as follows:

| | |
|---|---|
| 338,500.00 | Trustee Fees Paid |
| − 246.880.00 | Trustee Fees Approved |
| 91,620.00 | Mistaken overpayment |
| + 41,600.00 | Mistaken Duplicate Payment |
| $133,220.00 | Total Mistaken Payments |
| 46,900.74 | Interest |
| $180,120.74 | Total Reimbursed to Estates |

December 15, 1999 "Amended Chapter 11 Final Report and Account and Application For Final Decree," filed by the Trustee. (Docket Entry No. 718; Shaffer's Ex. 52.)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: NWFX, INC. CASE NO. FA86-148F
 NORTHWEST FINANCIAL EXPRESS, INC. CHAPTER 11
 GOLD FINANCIAL EXPRESS, INC. (CONSOLIDATED)

AMENDED CHAPTER 11 FINAL REPORT AND ACCOUNT
AND APPLICATION FOR FINAL DECREE

Comes now Allen W. Bird, II, Trustee for the estates of the Debtors herein, and respectfully reports:

1. In 1988 this Court duly entered its order confirming the plan proposed by the Trustee for the Debtors, and directing the execution and consummation of said plan. In 1992, this Court entered its Order Granting the Trustee's Motion to Amend Plan, which provided for a different distribution method.

2. The confirmed plan with Amendment has been implemented and consummated.

3. During the course of implementation, the Trustee has made distribution to creditors as are documented in the Quicken program and the Claims Data Base which have been furnished previously to the objecting party, Larry Shaffer (Shaffer). A copy of a disk containing the information on the Quicken program and the Claims Data Base is submitted with this report. The payments follow:

 $5,799,509.39 Allowed claims paid to holders of money orders,

 including payments from state bond proceeds, which

143936

SHAFFER
EXHIBIT
52
2·14 00

are separately set forth in Exhibit I, and allowed claims paid to unsecured creditors.

$513,516.72 Allowed claims paid as the result of four (4) settlements being:

| | |
|---|---|
| Handy Andy Supermarkets | $6,806.94 |
| MBank Dallas, N.A. | $201,154.66 |
| MBank Dallas, N.A. | $55,555.12 |
| Shaffer | $250,000.00 |

$55,263.98 Priority claims paid by the Trustee.

$6,368,290.09 SUBTOTAL This subtotal does not include the $83,643.23 returned to the State of Texas under court order. This subtotal does not include $45,842.09 returned to the State of Oklahoma under court order. Texas and Oklahoma are the only states to which any bond funds were returned.

The Quicken program reflects total claims paid of $6,368,290.09, as set forth above. The Claims Data Base reflects a slightly different number for total claims paid of $6,370,667.78. There is a de minimis difference of $2,377.69. For purposes of computing Trustee fees, the Trustee has used the smaller number.

143938 2

328

4. During the course of implementation, the Trustee has paid administrative claims as follows:

$2,734,049.84 Administrative claims paid are itemized in two (2) different formats on Exhibits 2 and 3 as reflected in the Quicken program.

5. During the course of implementation, the Trustee has made distribution to creditors and paid administrative expenses as follows:

$9,102,339.93 TOTAL

6. During the course of implementation, the Trustee made the following payments which are subtracted from distributions:

- $41,527.00 Fees paid to Trustee from state bond funds as set forth in Exhibit 4.

- $338,500.00 Fees paid to Trustee per Quicken program.

-$41,600.00 Inadvertent duplicate payment of fees on state bond funds paid to trustee.

$8,680,712.93 SUBTOTAL

7. During the course of implementation the Trustee accumulated sums which are to be added to the distribution as follows:

+ $176,649.19 Cash on Hand as reflected in the Quicken program.

143936 3

+$180,120.74 Rose Firm reimbursement being the sum of

$91,620.00 for Trustee's fee, $41,600.00 for

inadvertent duplicate payment from state bond funds

and $46,900.74 of interest.

+$5,610.34 Interest on reimbursement paid by Rose Firm.

8. During the course of implementation, the Trustee has or will distribute or turnover to parties in interest excluding the Debtor as follows:

**$9,043,093.20** TOTAL

9. In arriving at the total set forth in Paragraph 8, the Trustee used numbers in the Quicken program as of July, 1999. These numbers were used because they are the numbers provided to Shaffer and both parties need to use the same reference point. Some numbers have changed since July, 1999, like the "cash on hand" number which has been increased by the amount of the deposits of the Rose Firm checks and interest. After final payment of administrative claims, all remaining funds will be distributed to Shaffer. Consequently, the changes make no difference to this final report.

10. The funds from which disbursements or turnovers in the case were made to parties in interest, excluding the Debtor, includes sums which were tax refunds obtained by the Trustee from the Internal Revenue Service on taxes paid by the Debtor prior to the commencement of this case. Shaffer has alleged that tax refunds totaling

143936 4

$43,579.60 should be excluded, but the trustee believes all tax refunds should be included.

11. The Trustee has disbursed or turned over in the three (3) cases to parties in interest including the Debtor, an amount equal to not less than $9,043,093.20. The Trustee is entitled to the following in fees:

| | | |
|---|---|---|
| 15 percent of $1,000.00 = $150.00 x 3 cases = | | $450.00 |
| 6 percent of $2,000.00 = $120.00 x 3 cases = | | $360.00 |
| | TOTAL: | $810.00 |
| 3 percent of $9,034,093.00 ($9,043,093.20 minus $9,000.00) = | | $271,002.27 |
| TOTAL FEES EARNED | | $271,812.27 |

12. The Trustee is also entitled to fees for offset of claims calculated in two (2) categories as follows:

a) "X" claims were paid where an agent filed a proof of claim for a specific amount and the Trustee, with no agreement to compromise, disallowed the claim because he held a judgment in excess of the amount shown on the proof of claim. While checks were not exchanged, the Trustee paid to these claimants, $260,090.98.

b) "P" claims were paid where an agent filed a proof of claim for a specific amount and the Trustee through negotiation established a right to offset the claims of the Debtors against the agents. Some of these offsets made by the Trustee were debts reduced to judgments and others were unliquidated claims. While checks were not exchanged, the Trustee paid to these claimants $276,719.48.

143936 5

c) The calculation of Trustee's fees follow:

| | |
|---|---|
| $260,090.98 | X Claim |
| + $ 276,719.48 | P Claim |
| $536,810.46 | **TOTAL** |
| 3% | Trustee fees |
| $16,104.31 | TOTAL Trustee fees |

13. The calculation of the fees to which the Trustee is entitled follows:

| | |
|---|---|
| $271,812.27 | See Paragraph 11 |
| $16,104.31 | See Paragraph 12 |
| $287,916.58 | TOTAL due Trustee |
| $246,880.00 | Fees paid to Trustee to date |
| $41,036.58 | TOTAL owed to Trustee and unpaid |

14. An accounting of professional fees are set forth in this paragraph:

a) · Professional fees included in the Quicken program and the Claims Data Base follow:

| | |
|---|---|
| $676,505.00 | Net Legal fee payments and deposits per Quicken program. |
| + $45,325.00 | Mitchell Firm retainer refund shown on the Quicken program and the Claims Data Base as an increase in professional fees paid. |

332

$721,830.00 TOTAL payments and deposits per Quicken program and Claims Data Base.

b) Distributions which are not professional fees are subtracted as follows:

- $41,600.00 Duplicate payment of fees on state bond funds

-$1,728.00 Payment to R. Steinkamp who is an attorney, but was paid as an expert witness.

- $6,280.00 Costs and expenses included with payment of attorneys' fees.

c) Payments to attorneys:

$349.00 Total payments to Green & Green

$3,350.00 Total payments to Collins Kilgore

$3,000.00 Total payments to Dickinson

$2,751.00 Total payments to Winstead, McGuire

$662,772.00 Total payments to Rose Law Firm. This number includes the fees totaling $18,462.50 mistakenly paid without court order. These fees have been refunded, but are included in anticipation of court approval.

$721,830.00 **TOTAL** payments of fees to attorneys

c. Payment to accountants:

$104,407.51 Fees paid to accountants by Trustee per Quicken program plus payments to Victoria Mason for 1999 tax returns.

143936 7

15. A distribution of one hundred percent (100%) of the allowed claims has been made to all holders of money order claims who could be found, the unsecured creditors, and the priority creditors.

16. The Trustee is eligible for an additional $41,036.58 as Trustee fees for his services as Trustee pursuant to 12 USC § 326.

17. Following payment of the remaining expenses of the Trustee, including attorneys' fees, and the payment of the balance to Shaffer, the Trustee should be relieved of any further duties in this matter and discharged.

WHEREFORE, having reported and accounted the Trustee prays that a) this court award the Trustee an additional $41,036.58 as Trustee's fees; b) after application and in accordance with the bankruptcy code, the Trustee's attorneys be awarded reasonable fees and reimbursement of expenses; c) the Trustee be directed to pay all outstanding administrative expenses; d) the Trustee be directed to pay the balance on hand to Shaffer; e) upon completion of the distributions, the court enter a final decree discharging the Trustee from any further duties in this matter in closing the case; and f) for all other proper relief.

Allen W. Bird II, Trustee
120 E. Fourth Street
Little Rock, AR 72201
501/375-9131

143936 8

334

## CERTIFICATE OF SERVICE

On December ___14___, 1999, a copy of the foregoing was sent via facsimile at number 918/594-0505 and served by U.S. mail on Mr. Thomas Creekmore, HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, 320 South Boston, Suite 400, Tulsa, OK 74103.

_____
Isaac A. Scott, Jr. (60032)

143936 9

Total Bond Proceeds and Payments Therefrom

| STATE | BOND PROCEEDS * | BOND PAYMENTS ** | BALANCE |
|---|---|---|---|
| AL | $ 11,367.00 | $ 10,789.22 | $ 577.78 |
| AR | 272,433.15 | 238,377.31 | 34,055.84 |
| KS | 214,330.71 | 23,263.53 | 191,067.18 |
| LA | 74,864.09 | 51,401.49 | 23,462.60 |
| MI | 129,939.37 | 128,303.00 | 1,636.37 |
| MS | 27,099.15 | 3,500.85 | 23,598.30 |
| OH | 149,464.65 | 25,894.72 | 123,569.93 |
| OK | 292,523.00 | 225,883.32 | 66,639.68 *** |
| PR | 210,377.84 | 126,000.00 | 84,377.84 |
| TX | 280,447.24 | 177,678.61 | 19,142.90 **** |
| TN | 271,449.52 | 233,308.72 | 38,140.80 |
| | | | |
| TOTAL | $1,934,295.72 | $1,244,400.77 | $ 606,251.72 |

\* This figure includes the bond or cash deposit received from the state, plus interest, less bank charges. It represents the amount moved from the specific state account to the distribution or operating account, except in Texas where no state specific account was created.

\*\* This is the amount designated as bond payments in reports to the state regulators.

\*\*\* This is the net of the sum of $45,842.09 which the trustee was required to return to the State of Oklahoma pursuant to court order of the federal district court in Oklahoma.

\*\*\*\* This includes the sum of $83,643.23 which the Trustee was required to return to the Treasurer of the State of Texas pursuant to court order of the federal district court in Austin, Texas. The totals are out of balance by $17.50.

EXHIBIT
1

144325

| MONEY | COMMENTS |
|---|---|
| $14,587,233.04 | Gross Dollars Out |
| -5,799,509.39 | Allowed claims paid per Quicken |
| 8,787,723.65 | SUBTOTAL |
| -513,516.72 | Allowed claims paid as a result of four settlements. |
| 8,274,206.93 | SUBTOTAL |
| -55,263.98 | Allowed priority claims paid per Quicken |
| 8,218,942.95 | SUBTOTAL |
| -5,484,893.11 | In and Out transactions per Quicken |
| 2,734,049.84 | **TOTAL paid to satisfy administrative costs** |

142036

EXHIBIT
2

| EXPENSE DESCRIPTION | EXPENSE AMOUNT |
|---|---|
| Water, Gas, Electric | $9,138.99 |
| Accounting Expense | 99,407.51 |
| Bank Charge | 10,842.94 |
| BPs Property Tax | 20.78 |
| Company FUTA contribution | 49.23 |
| Contract Labor | 25,852.70 |
| Corp Income Tax | 45,326.24 |
| Equipment Maintenance | 44,181.56 |
| Equipment Purchase | 32,962.72 |
| Equipment Rental | 56,682.66 |
| Fed Cash Management | 130,585.45 |
| Franchise Tax | 1,237.71 |
| Freight | 1,825.34 |
| Legal Costs | 128,102.39 |
| Legal Fees | 676,505.35 |
| Meals | 678.55 |
| Medical Insurance | 19,892.43 |
| Miscellaneous Taxes | 903.74 |
| Miscellaneous Salaries | 4,180.86 |
| Miscellaneous | 3,622.50 |
| Office Supplies | 23,588.98 |
| Parking | 6,803.50 |

Payroll Transactions:

| | |
|---|---|
| Comp FICA | 56,784.10 |
| Comp FUTA | 3,119.92 |
| Comp MCARE | 2,733.52 |
| Comp SUI | 15,803.50 |

Compensation to Employee:

| | |
|---|---|
| Bonus | 12,000.00 |
| Comp. to emp. | 5,147.69 |
| Comp. to emp. | 300.00 |
| Christmas Bonus | 15,582.43 |
| Comp. to emp. (other) | 709,188.59 |

| | |
|---|---|
| Total Comp. to Emp. | 742,218.71 |
| Payroll Advance | 1,050.19 |

| | |
|---|---|
| Total Payroll Transaction | 821,709.94 |
| Payroll-Garnish | -0.02 |
| Postage | 46,513.78 |
| Records Storage | 3,856.45 |
| Rent | 85,861.25 |
| Sales Tax | 922.90 |
| Telephone Expense | 30,124.60 |
| Tracing Refund | 37.00 |
| Travel Expenses | 19,898.05 |
| Trustee's Bond | 59,593.00 |
| Trustee's Fee | 338,500.00 |
| Workers' Compensation Insurance | 4,640.76 |
| **TOTAL EXPENSES** | **$2,734,049.84** |

EXHIBIT
3

143701-v1

338

| STATE | FEES |
|-------|------|
| ALABAMA | $325 |
| ARKANSAS | 7,500 |
| KANSAS | 710 |
| LOUISIANA | 1,761 |
| MICHIGAN | 3,760 |
| MISSISSIPPI | 109 |
| OHIO | 854 |
| OKLAHOMA | 8,508 |
| TENNESSEE | 7,500 |
| TEXAS | 7,500 |
| PUERTO RICO | 3,000 |

143987

EXHIBIT

4

## APPENDIX II

### (Section III.F.2.)

a. *Specific time billed*

(4) *Specific entries*

In its discussion of the following time entries, the Court refers to each separate time entry in the singular, regardless of the number of individual statements of activity that are contained in that time entry. In the event more than one time entry is recorded for a given date, the Court refers to those entries in the plural. For example, Bird's time entries for August 13 and August 14, 1986 are considered in the plural because more than one specific time record is recorded. On the other hand, Bird's time entries for August 15 and August 21, 1986 are considered in the singular because only one time record is made for each day. The Court's findings are based on the general statement of law contained in section III.F.2.a.(1) of the memorandum opinion.

### (a) *Time entries of Bird*

The Court has reviewed the fee application of the Rose Law Firm, as presented by the Trustee, in detail. Based upon its review, the Court makes the following findings relating to the time entries of Bird:

*August 13, 1986*

3.50 Travel to Fayetteville to meet with officials of company

0.80 Conference with L. Kennon regarding order of appointment, bond locksmith, form of claim form

1.50 Conference with C. Huber regarding office space, personnel, telephones

Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The initial meeting with clients does not identify who the clients were, or the subject matter of the meeting. Changing locks and dealing with telephones are administrative in nature and should not be billed as attorney time. Further, Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Bird's testimony that the meeting with officials of the company was to begin to understand the problems involved in the case is vague and not sufficiently descriptive of the service performed. Bird admitted that changing locks was a trustee function. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow these entries in their entirety.

*August 14, 1986*

9.00 Initial meeting with officers of the companies

3.50 Return to Little Rock from Fayetteville

Again, the description "initial meeting with officers of the companies" is vague

and non-descriptive, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Further, the Court does not credit Bird's testimony in this instance that all of the nine hours at the meeting dealt solely with legal matters. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow these entries in their entirety.

*August 15, 1986*

6.50 Telephone conference with J. Smith regarding office security; conference with L. Kennon regarding telephone at Fayetteville; review order employing Rose Firm; review and change claim form; telephone conference with P. Carroll regarding bond and claim form; telephone conference with John Brown regarding office security; conference with P. Carroll and Judge Fussell regarding claim form and hearing

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose

to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 21, 1986*

8.40 Telephone conference with J. Daniels, S. Gunter regarding M Bank; telephone conference with J. Vines regarding Arthur Young; telephone conference with C. Taylor of Memphis Housing Authority; telephone conference with W. Bankston regarding computer transfer of information to Fayetteville; telephone conference with J. Smith and J. Proctor regarding hearing in Fayetteville; visit Tower Building office space; visit Union National Bank and review record; telephone conference with American Express reps.

In this instance, the Court does not credit Bird's testimony that he only visited the Tower Building to observe space for 10 or 15 minutes, and the rest of the time was attorney time. Entries such as telephone conferences regarding computer transfer of information to Fayetteville, visiting office space, and visiting Union National Bank to review records are vague and give the appearance of trustee tasks. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 22, 1986*

11.30 Travel to Fayetteville for hearing; attend hearing on property of estate; meeting with officers of NWFX and others.

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is

on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. "Meeting with officers of NWFX and others" is too vague as to subject matter. The Court will disallow this entry in its entirety.

*August 25, 1986*

10.20 Conference with I. Rector regarding office; conference with Judge Fussell, P. Carroll, etc. regarding hearings and trial dates; dictate pretrial order and order to show cause and review; conference with J. Fussell regarding signature of orders; meet with printers to arrange copies; conference with L. Kennon regarding mailout; supervise mailout of summons, pretrial order, etc.

Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all work performed related to professional time; meeting with printer to arrange copies and supervising mail out of summons are routine tasks to be performed by the trustee. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the

trustee's statutory duty. The Court will disallow this entry in its entirety.

*August 26, 1986*

6.50 Telephone conference with various attorneys; visit Tower Building office; review pleadings; telephone conference with Carl Stuecken regarding moving; telephone conference with R. Richards, atty.; telephone conference with S. Moll of MTECH; telephone conference with American Express; start mailout; review motion and order for administrative expenses.

The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court does credit his testimony that at the time he reviewed the entries he struck entries that appeared to be trustee time or administrative in nature. A telephone conference regarding moving appears to be administrative. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 27, 1986*

6.50 Telephone conference with J. Brown and Carl Stuecken regarding records; telephone conference with R. Moll regarding M–Tech; review incoming mail; prepare claim form for non-purchasers; telephone conference with M–Tech regarding price; telephone confer-

ence with E. Davis regarding rent; draft letter to E. Davis and O. Undum

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 28, 1986*

6.40 Telephone conference with Carl Stuecken and J. Brown regarding microfilm, offices, reporting copies, etc.; telephone conference with M. O'Brien–UNB; telephone conference with Texas Attorney General; telephone conference with J. Brown regarding telephone equipment and diskette; telephone conference with M. Guard, OK bank dept.; telephone conference with C. Huber regarding payroll; draft letter to regulators; review incoming claims.

These entries appear to be administrative and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*September 2, 1986*

4.80 At Union National Bank to open account; at Mitchell Firm to pick up checks; telephone conference with Ms. Rector regarding claims; miscellaneous telephone conferences.

The Court does not credit Bird's testimony that all tasks performed were legal in nature. Clearly, opening an account at Union Bank and picking up checks are ministerial duties of a trustee. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 3, 1986*

11.20 Travel to Fayetteville to work in office; meet with employees; meet with G. Bolt regarding computer maintenance, etc.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters. of the trustee, ministerial tasks, or legal work, particularly meeting with G. Bolt regarding computer maintenance. While Bird's testimony is definitive, it does not overcome the description given in the entries at the time the entries were made, and the Court does not credit Bird's testimony that the time involved was professional time. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks de-

scribed. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 4, 1986*

6.90 Telephone conference with Ohio attorney; prepared payroll; telephone conference with M. Johns regarding interpleader; telephone conference with L. Kennon regarding federal suit; telephone conference with I. Rector regarding more personnel; meeting with state regulators.

Preparing payroll is clearly an administrative function. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 5, 1986*

7.20 Attend O.S.C. hearing and status conference on pending AP's; conference with J. Brown on list of agents and claim form program.

The entry appears to be legal in nature. The Court will allow this entry in its entirety.

*September 10, 1986*

3.6 Meeting with L. Kennon and M. Johns regarding pleadings—Travelers, MBank, etc.; review checks and deposits; draft letters to banks; create pleading forms.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 12, 1986*

2.00 Review mail; conference with L. Kennon regarding pleadings; review payroll.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that the time involved was profes-

sional time. The Court will disallow this entry in its entirety.

*September 15, 1986*

2.30 Review mail, pleadings, etc.; respond to mail

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*September 16, 1986*

5.20 Review pleadings, dictate letters; conference with M. Johns regarding travelers cond pleadings; set up list processing of pleadings; conference with B. Cahanin regarding payroll; telephone conference J. Brown regarding agents report and Puerto Rico

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court can-

not be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 17, 1986*

9.00 Travel to Fayetteville; meeting with staff, J. Brown, G. Moldenhauer, D. Horton, C. Stuecken, et al; return to Little Rock.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that the time involved was professional time. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*September 22, 1986*

6.90 Review pleadings and correspondence; conference with L. Kennon and M. Johns; research regarding turnover, research regarding notice by publication; draft motion and order regarding publication; meet with I. Rector regarding claims; meeting with Judge Fussell, D. Powell, J. Smith and J. Proctor regarding hearings.

The entry does not distinguish with reasonable specificity the legal services from

the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court will disallow this entry in its entirety.

*September 29, 1986*

> 4.70 Revise default judgment; review mail; dictate order on bank accounts

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 2, 1986*

> 5.30 Conference with I. Rector regarding claims; telephone conference with P.

Carroll regarding claims and first meeting; telephone conference with R. Stuckey regarding recording telephone; telephone conference with Louisiana attorney general; respond to miscellaneous letters; letter to fidelities.

The Court does not credit Bird's testimony in this instance that the time involved was professional time. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 3, 1986*

> 12.00 Travel to Fayetteville to NWFX offices; conference with J. Brown, G. Moldenhauer, D. Horton, et al; return to Little Rock.

The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the adminis-

trative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*October 6, 1986*

2.60 Review mail; conference with I. Rector regarding claims; conference with L. Kennon regarding briefs.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 7, 1986*

5.30 Review pleadings; meeting with C. Stuecken and J. Anderson at Union National Bank regarding Comex; Conference with I. Rector; Conference with L. Kennon

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 8, 1986*

5.80 Responses to Shop Rite, Hill's, National Bank of Detroit; conference with B. Cahanin regarding accounts' telephone conference with R. Steinkamp; telephone conference with C. Hampton for J.W.D., Inc.; telephone conference with J. Brown; telephone conference with O. Undem; telephone conference with I.T., conference with Kansas Attorney General; conference with C. Stuecken regarding sale to Comex

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable speci-

ficity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 9, 1986*

> 2.80 Review mail; telephone conference with J. Brown; telephone conference with T. Burke

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*October 13, 1986*

> 4.60 Telephone conference with S. Adams regarding Kansas claims; telephone conference regarding Shop Rite; telephone conference with J. Beachboard regarding Detroit; review all bank receipts and CD's; draft letters to banks with money

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 16, 1986*

> 6.30 Review Rice Foods files; conference call with J. Fussell, H. Kollenberg and D. Powell; conference with I. Rector regarding claims; various telephone calls with P. Carroll regarding claims; conference with L. Kennon regarding stipulations

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. When fees for services are sought based on conferences, the applica-

tion should at least state the general nature and purpose of the conference. The Court will disallow this entry in its entirety.

*October 20, 1986*

4.20 Telephone conference with J. Brown regarding I.T.; letter to I. Rector regarding computer; conference with L. Besancon regarding sort list processing

These entries appear to be administrative and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*October 21, 1986*

4.80 Review D. Horton memos; review Mbank proposed order; draft motion to amend Traveler's order and letter to court; conference with Union National Bank regarding bill

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 22, 1986*

12.00 Travel to Fayetteville; conference with all personnel; review A/R report of agents; return to Little Rock

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Bird's testimony that all tasks performed were professional in nature. The Court will disallow this entry in its entirety.

*October 28, 1986*

4.80 Review mail; review brief on jury trial; conference with I. Rector regarding claims; conference with L. Kennon regarding insurance.

Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. "Review mail" is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. While Bird's review of mail certainly would contain legal matters, the Court will not credit Bird's testimony that all mail reviewed was legal. The Court will disallow this entry in its entirety.

**APPENDIX II**—Continued

*November 7, 1986*

11.50 Conference prior to trial; trial with JWD, Inc.; conference with J. Brown regarding accounts receivable.

Description of conference with Brown is too vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. While Bird's testimony is credible in this instance, Bird as trustee and attorney has a duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*November 10, 1986*

0.40 Prepare for hearing; review checks and bills.

The Court credits Bird's testimony in this instance that he was preparing for a hearing and that reviewing the checks and bills was an evidentiary review. The Court will allow this entry in its entirety.

*November 13, 1986*

2.80 Conference with I. Rector regarding claims; conference with M. Johns regarding Quickie Mart; review recent mail and pleadings.

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court will disallow this entry in its entirety.

*November 14, 1986*

2.50 Review recent mail and pleadings; conference with L. Kennon; telephone conference with C. Stueken and J. Brown; telephone conference with D. Powell regarding depositions of O. Undem, et al.

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Review recent mail could be both attorney time and trustee time. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty.

The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*November 17, 1986*

3.00 Meet with Carl Stueken and load claims to go to Fayetteville, AR

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks, and Bird testified that he could not remember loading boxes. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*November 18, 1986*

6.80 Travel to Fayetteville; meeting with D. Powell to review records; conference with J. Brown, et al. regarding treatment of claim forms

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Trustee had a duty to review proof of claim form. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 19, 1986*

11.00 Attend depositions of D. Horton, O. Undem, L. Schaefer and G. Moldenhauer; conference with J. Brown regarding claims program and personnel

The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. "Conference with J. Brown regarding claims program and personnel" appears to be administrative or ministerial in nature. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*November 20, 1986*

1.50 Conference with I. Rector regarding claims and accounting; conference with M. Johns regarding Quickie Mart; telephone conference with S. Gunter regarding first meeting.

Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 20, 1986*

3.50 Attend first meeting of creditors

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will not credit Bird's testimony that all tasks performed were legal in nature in this instance because he had a duty to attend first meeting of creditors as trustee and attorney. Bird failed to separate the amount of time spent performing the tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*December 9, 1986*

11.00 Trip to Fayetteville; conference with J. Brown, et al regarding claims and agents; conference with D. Horton and G. Moldenhauer; return to Little Rock

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court will disallow this entry in its entirety.

*December 19, 1986*

2.30 Review miscellaneous mail; dictate letters

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result,

the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*December 30, 1986*

> 3.30 Conference with J. Brown in Little Rock regarding accounts receivable from agents; computer problems; review accounts receivable printout

The entries, "computer problems; review accounts receivable printout," are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*January 26, 1987*

> 1.40 Conference with L. Goff, L. Kennon, and M. Johns regarding Ohio and other state's bonds

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. While Bird testified all time performed was legal, a party in interest would not be put on sufficient notice as to the subject matter or the nature of the work performed. Bird individually contracted with various states to handle their state bond claims administratively. The Court will disallow this entry in its entirety.

*January 27, 1987*

> 11.40 Trip to Fayetteville, Arkansas; review and revise demand letter on agents; visit J. Brown, et al.

Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry, "visit J. Brown, et al.," is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Brown was the debtor's computer expert and from the entry there is no way of knowing the purpose of the visit. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird's testimony does not cure the deficiency of the entry. The Court will disallow this entry in its entirety.

*February 2, 1987*

> 1.00 Meeting with Judge Fussell regarding status of AP's; conference with L. Kennon regarding updated list of agents

The Court set a status conference as to the status of the adversary proceeding to schedule trials and obtain an updated list of adversary proceedings that had not been settled or default judgments were

being pursued by the trustee. The Court will allow this entry in its entirety.

*February 24, 1987*

2.00 Conference with M. Woods regarding computer access to claimants; review programs on Wang

This entry appears to be a trustee function, not attorney time, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance regarding the conference with Woods. The Court will disallow this entry in its entirety.

3.80 Review week's mail; conference with M. Johns regarding pending matters; conference with L. Goff and L. Kennon regarding Nanjer contempt

The entry, "review week's mail," is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*March 6, 1987*

1.20 Conference with C. Stuecken and J. Brown regarding agent claims

These were conferences with employees of the debtor regarding agent claims.

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Although Bird testified that the conference was in preparation of any litigation, the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*March 9, 1987*

0.60 Review recent mail and pleadings; conference with L. Kennon regarding agents

The entries, "review recent mail" and "conference with Kennon regarding agents," are vague and ambiguous and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that the time involved was professional time preparing for any litigation. The Court will disallow this entry in its entirety.

*March 11, 1987*

9.0 Go to Fayetteville and conference with all personnel

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court will not speculate whether the services provided were administrative matters of the trustee,

ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*April 21, 1987*

1.40 Conference with J. Brown and L. Kennon regarding claims; review miscellaneous mail

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. When fees for services are sought based'on conferences, the application should at least state the general nature and purpose of the conference. The Court does not credit Bird's testimony in this instance that all time reviewing miscellaneous mail was legal in nature without a more detailed description of the matters reviewed. The Court will disallow this entry in its entirety.

*May 11, 1987*

2.00 Travel to Fayetteville to meeting with J. Brown, et al.

The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Further, Bird's testimony that he was closing the Fayetteville office would involve trustee time. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*May 12, 1987*

8.00 Meeting with J. Brown, et al. regarding winding up and claims; return to Little Rock

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*May 20, 1987*

1.40 Conference with D. Thomas regarding collections from agents; conference with L. Goff regarding Fidelity collections; conference with L. Kennon

These entries reflect legal work regarding conferences concerning collections from agents. The Court credits Bird's testimony that the conferences were with attorneys and paralegals employed by Bird as counsel in collection matters with agent defendants. The Court will allow this entry in its entirety.

*May 26, 1987*

1.50 Review expense records; conference with I. Rector regarding payroll and taxes

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*June 15, 1987*

1.40 Conference with J. Brown regarding move to Little Rock of records and computer

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony that all tasks performed were legal in nature. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*June 22, 1987*

1.60 Prepare May monthly report and develop liquid asset report

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that all the time involved was legal time; preparing monthly operating reports is an administrative function of a trustee. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Preparation of monthly operating reports is an administrative duty required of the trustee. The Court will disallow this entry in its entirety.

*June 26, 1987*

8.40 Travel to Fayetteville; meeting with J. Brown regarding closing Fayetteville office, computer move, furnishings move, etc,; return to Little Rock

These entries clearly appear to be functions of a trustee, not an attorney. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*July 1, 1987*

0.80 Conference with L. Kennon and M. Johns regarding consolidation

The Court credits Bird's testimony in this instance that the work performed regarding consolidation of the Debtor Corporations' cases was legal in nature. The Court will allow this entry in its entirety.

*July 17, 1987*

1.20 Conference with J. Brown regarding computers; conference with L. Kennon regarding claims

Conference with Brown regarding computers appears to be administrative work by trustee, not as an attorney. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work.

The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that the time involved was legal time. The Court will disallow this entry in its entirety.

*August 26, 1987*

> 1.60 Prepare monthly reports for June and July, 1987; revise amended complaint against agents

Entry preparing monthly operating reports is a duty of the trustee and is ministerial, not legal. While some legal work may be involved, Bird failed to identify the legal work in his testimony with specificity and the entry does not meet the requirements of Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 10, 1987*

> 0.80 Conference with I. Rector regarding tax returns; telephone conference with Arthur Young company; conference with L. Kennon regarding Fayetteville office and warehouse

Conference with Kennon appears administrative work, not legal. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony that all tasks performed were legal in nature. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 14, 1987*

> 0.80 Conference with J. Brown and L. Kennon regarding update system for keeping up with accounts receivable

Conference with Brown and Kennon appears to be trustee work, not legal. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*September 18, 1987*

> 2.20 Meeting with all attorneys and paralegals involved to plan action on all fronts for resolving the case

This entry identifies legal work performed only. The Court does credit Bird's testimony that all tasks performed were legal in nature. The Court will allow this entry in its entirety.

*October 1, 1987*

1.60 Conference with G. Aaron regarding suspicions of criminal activity

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Bird could not identify G. Aaron when Bird testified, and the entry does not meet the specificity requirements of Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*October 28, 1987*

1.20 Prepare monthly report to court of income and expenses

Preparing monthly operating reports is a duty and function of a trustee. The Court does not credit Bird's testimony in this instance that the time involved was professional time. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*November 3, 1987*

2.10 Set up accounts for report to court

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*November 13, 1987*

2.30 Reformat monthly report; conference with I. Rector regarding expenses

These entries appear to be trustee functions, not legal. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*January 4, 1988*

2.40 Group meeting regarding agent suits, trust funds, etc.

This entry reflects subject matter was legal work. The Court does credit Bird's testimony that all tasks performed were legal in nature. The Court will allow this entry in its entirety.

*January 18, 1988*

2.80 Enter checks for monthly report and show Irma how to report

This entry reflects the ministerial duties of a trustee, not legal work. Bird testified that he could not remember the events

surrounding this entry. The Court will disallow this entry in its entirety.

*January 22, 1988*

2.10 Prepare November and December monthly reports

This entry also reflects the ministerial duties of a trustee, not legal work. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*February 24, 1988*

1.0 Conference with D. Thomas, et al. regarding defaults; travel to courthouse for testimony

These entries reflect that Bird was preparing to testify as trustee at the default judgment hearings, which is his duty as trustee. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will not allow him to bill as legal time in this instance. Bird was not the attorney performing the legal work. The Court will disallow this entry in its entirety.

*March 7, 1988*

2.20 Prepare January 31 and February 29 operation and balance sheet report

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. Preparing operating reports and balance sheet reports are duties of the trustee. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. If both legal work and trustee matters, then

Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*March 15, 1988*

4.50 Research notice of chapter 11 plan; meeting with B. Thompson of Union National Bank regarding check printing and mailing; revise and complete brief on Michigan fees

Meeting with Thompson appears to be ministerial work performed by the trustee in administration of the debtor's estate. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*March 16, 1988*

2.10 Conference with J. Brown regarding Tennessee agents and defaulting agents; review system

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. "Review system" is vague and ambiguous, and the

Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*March 22, 1988*

> 2.10 Review all Tennessee, Oklahoma, Alabama, Ohio and Kansas claims to delete duplicates, etc. for payment

Again, reviewing duplicate claims could be a trustee function or legal function, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. Reviewing claims is a duty of the trustee. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*March 23, 1988*

> 1.30 Conference with Ms. Rector to clean up and review Arkansas claims

The Court will not credit Bird's testimony in this instance that as an attorney he was reviewing claims brought to his attention that needed legal consultation as to those claims. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*April 5, 1988*

> 0.50 Conference with J. Brown and V. Caserta regarding update of agent receivables

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*April 22, 1988*

> 2.30 Review operating reports and prepare March report; conference with L. Goff regarding trials

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. Preparing operating reports are a duty of the trustee. If Bird performed work as both trustee and attorney, he should have identified and billed only for legal time. Bird served in the dual role of trustee and attorney for

the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Further, Bird contracted individually to process state bond claims. The Court will disallow this entry in its entirety.

*May 4, 1988*

4.50 Review with Liz Goff procedures in Ohio, Kansas, Arkansas, etc. regarding payment of bond claims; draft letter to Ohio, Kansas, Arkansas regarding claims list and codes

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to , separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*May 20, 1988*

0.40 Telephone conference with T. Wurz regarding Tennessee report and claims

Reviewing Tennessee reports and claims is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*June 2, 1988*

1.40 Draft Tennessee master's report and motion; draft letter to D. Powell regarding ARG corporation; conference with L. Goff regarding August trials

The Court does credit Bird's testimony that all tasks performed were legal in nature. Powell is an attorney with law firm of Wright, Lindsey & Jennings, LLP. The Court will allow this entry in its entirety.

*June 13, 1988*

5.60 Prepare trustee's reports for April and May; conference with J. Brown regarding disputed agent claims; conference with L. Goff regarding agent litigation; prepare final of financial information for disclosure statement

Preparing operation reports for April and May are duties of trustee and should not be billed as legal time unless specific identification of legal services performed and time spent is detailed. The Court does not credit Bird's testimony in this instance that the time involved was all professional time. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed

statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*June 20, 1988*

> 6.30 Review all regular claims for objection; review 8th Circuit brief on Handy Andy

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Reviewing regular claims would be a duty performed by the trustee. The Court will disallow this entry in its entirety.

*June 22, 1988*

> 3.40 Review Tennessee claims; complete report to Tennessee; review Crook's, ARG's and Compton's files

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*June 23, 1988*

> 2.30 Telephone conference with D. Powell regarding Crook's; review Tennessee claims and revise report to Tennessee court; conference with J. Brown regarding Tennessee and Texas

This entry is vague and ambiguous, particularly the conference with Brown regarding Tennessee and Texas, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 27, 1988*

> 1.80 Conference with R. Clark, K. Cagle and I. Rector regarding 1987 taxes;

calculate percentage of deductions for each company

The Court credits Bird's testimony that work performed was all legal in working on 1987 taxes with tax attorney and employees for each debtor corporation. The Court will allow this entry in its entirety.

*July 13, 1988*

 1.30 Prepare May monthly report

The Court does not credit Bird's testimony in this instance that the time involved was professional time. Preparing operating reports are a duty and function of trustee. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*September 9, 1988*

 1.80 Conference with J. Brown and C. Stuecken regarding address on return mail

This entry is clearly ministerial work, not legal. Further, the Court cannot conceive it would take 1.80 hours to perform this task, and Bird testified he could not imagine what was legal about return addresses on return mail. The Court will disallow this entry in its entirety.

*September 29, 1988*

 2.80 Draft agreement w/Michigan regarding disbursement of Michigan bond; letter to Michigan Department regarding bond

While this work appears to be legal, which is how Bird testified, the Court had held that the state bond proceeds were not property of the debtor's estate. Bird, individually and as trustee, negotiated agreement with Michigan in handling money to be distributed through the estate. Bird is not entitled to a legal fee; he was paid a commission by Michigan. The Court will disallow this entry in its entirety.

*September 30, 1988*

 0.60 Review of Michigan trust fund agreement and revisions

As stated above, while this work appears to be legal, the Court had held that the state bond proceeds were not property of the debtor's estate. Bird, individually and as trustee, negotiated agreement with Michigan in handling money to be distributed through the estate. Bird is not entitled to a legal fee; he was paid a commission by Michigan. The Court will disallow this entry in its entirety.

*October 10, 1988*

 5.60 Review and mark all Texas claims to delete duplication

*October 11, 1988*

 2.60 Finish review of Texas duplicate claims and mark for payment

Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. These entries do not distinguish with reasonable specificity the legal services from the administrative tasks. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. These entries do

not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow these entries in their entirety.

*October 19, 1988*

2.80 Review discovery and checking account summaries of Northwest National Bank

The Court credits Bird's testimony that he was performing legal work deciding whether a preference adversary proceeding should be filed against Northwest National Bank. Bird did file an adversary proceeding and made a substantial recovery for the estate. The Court will allow this entry in its entirety.

*October 24, 1988*

2.30 Prepare computer reports on agents who have settled; review collection efforts

Preparing computer reports is ministerial or administrative task, not legal work. Reviewing collection efforts is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that the time involved was professional time. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

2.30 Research setoff and unreasonable buildup of account; review deposits in account

The Court credits Bird's testimony in this instance. Reviewing deposits in accounts and when they are made is a legal function in preparation of a preference or set off litigation. The Court will allow this entry in its entirety.

*October 26, 1988*

0.80 Conference with C. Stuecken and J. Brown regarding money order accounts at Northwest National Bank

The Court credits Bird's testimony that this was legal work in preparation of preference action against Northwest National Bank. The Court will allow this entry in its entirety.

*November 7, 1988*

2.40 Review Texas claims for validity; review pleadings and orders regarding JWD, Rice, Ballard's, etc.

These tasks appear to be legal in nature, and the Court credits Bird's testimony in this instance. The Court will allow this entry in its entirety.

*November 8, 1988*

2.30 Draft and revise motion to pay Texas bond; calculate reductions of bond payments

Although the Court does credit Bird's testimony that all tasks performed on these dates were legal in nature, the work involved appears to deal with state bond proceeds. The Court has held the state bond proceeds are not property of the estate. The Court will disallow this entry in its entirety.

*November 28, 1988*

1.30 Conference with L. Brown regarding Texas claims; telephone conference with Judge Nowlin's law clerk

Conference with Brown entry is vague and ambiguous. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. When fees for services are sought based

on conferences, the application should at least state the general nature and purpose of the conference. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*May 19, 1989*

> 2.80 Prepare master's report for Oklahoma; conference with K. Kissell regarding miscellaneous agents

The Court does not credit Bird's testimony that all tasks performed were legal in nature. The entry "conference with K. Kissell regarding miscellaneous agents" is vague and ambiguous and does not meet the specificity requirements of Federal Rule of Bankruptcy Procedure 2016. The Court will disallow this entry in its entirety.

*May 24, 1989*

> 2.50 Proofread and modify Oklahoma order, modify claim status codes

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. "Modify claim status codes" is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*May 31, 1989*

> 1.80 Conference with Ms. Rector regarding claims; review Louisiana claims

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Bird's testimony in this instance that there was a specific legal question involved because he failed to identify and explain the specific legal issues requiring the assistance of an attorney in reviewing claims. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*June 29, 1989*

> 1.80 Conference with J. Brown regarding Oklahoma; conference with J. Brown regarding tape drive; telephone

conference with K. Rhodes regarding Oklahoma hearing

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird testified that the conference with Brown regarding the tape drive was probably trustee time. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*July 17, 1989*

0.40 Review Oklahoma file; prepare amended master's report

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to

speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*July 20, 1989*

0.90 Review draft of Oklahoma order; letter to R. Bauman

Bird testified that he was reviewing the orders that would be entered in Oklahoma. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The entry "letter to R. Bauman" is vague and ambiguous and does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. The Court will disallow this entry in its entirety.

*July 31, 1989*

1.30 Conference with I. Rector re accounting; conference with P. Scharmberg re agents

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

366

*August 15—18, 1989*

1.30 Review Oklahoma claim with C. Stuecken

2.30 Review all Oklahoma claims with C. Stuecken

0.80 Telephone conference with R. Bauman

0.80 Review new checks to be issued and memos from Ms. Rector

3.20 Review all deposits and checks for 1989; prepare reports

4.80 Travel to Oklahoma City for hearing

8.30 Attend hearing regarding Oklahoma bond; meeting with Attorney General's office; return to Little Rock

Bird testified that all of the entries dated August 15 to August 18 dealt with his negotiations with the Oklahoma regulator regarding bond funds. The entries do not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. Further, the state bond proceeds were held not to be property of the estate, and work performed by Bird individually relating to the state bond proceeds should not be paid out of the estate. The Court will disallow these entries in their entirety.

*August 25, 1989*

2.80 Review and revise chronology of events of NWFX and Northwest National Bank loans; conference with T. Thrash

The Court does credit Bird's testimony that all tasks performed were legal in nature; Thrash was an attorney with the Rose Law Firm. The Court will allow this entry in its entirety.

*September 15, 1989*

1.70 Revise printout and form regarding agent collections

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*September 18, 1989*

2.80 Revise and reprint agent judgment list; conference with P. Scharmberg regarding agents

The entry, "Revise and reprint agent judgment list," would be legal work. However, the conference with Scharmberg, the Trustee's administrative assistant, would appear to be trustee time. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 22, 1989*

2.90 Conference with K. Kissell regarding Handy Andy's claim; conference with J. Brown regarding Texas payments; conference with T. Thrash

regarding discovery and Northwest National Bank

Conference with Brown regarding Texas payments appears to be administrative matter, not legal, and Bird testified that he could not remember. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 28, 1989*

1.80 Conference with I. Rector and J. Brown regarding coordinate payment of Oklahoma claims

1.20 Draft initial report to Oklahoma state court regarding bond payments

1.80 Revise Texas order and draft letter and orders for Texas court; conference with I. Rector regarding status of accounts

Most of these entries are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The entries do not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entries do not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Further, Bird, individually, entered into separate agreements for work performed in handling state bond proceeds and the states paid him individually a commission for his work. Rose Law Firm is not entitled to a legal fee for state bond proceeds that were held not to be property of the debtor's estate. The Court will disallow these entries in their entirety.

*February 15, 1990*

1.30 Review Oklahoma order, conference with J. Brown regarding checks

Conference with Brown entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*March 9, 1990*

2.20 Prepare and review list of all agents with judgments, draft letter to clerks to register

The Court does credit Bird's testimony that all tasks performed were legal in nature. The Court will allow this entry in its entirety.

*March 15, 1990*

1.30 Conference with P. Scharmberg regarding registration of judgments

The Court does credit Bird's testimony that all tasks performed were legal in nature. The Court will allow this entry in its entirety.

*April 11, 1990*

1.80 Work with P. Scharmberg regarding agents

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird served in the dual role of trustee and attorney for the trustee and has a higher duty to make a detailed statement of the services provided. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*May 16, 1990*

2.30 Prepare and review letter to clerks regarding agent judgments

The Court does credit Bird's testimony that all tasks performed were legal in nature. The Court will allow this entry in its entirety.

*June 4, 1990*

3.40 Conference with P. Scharmberg regarding budget, expenses and monthly reports

Preparing budget expenses and monthly reports are a duty of the trustee. Bird concedes this billing as trustee time. The Court will disallow this entry in its entirety.

*June 5, 1990*

2.60 Conference with P. Schamberg regarding expenses, agents and checks

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*June 14, 1990*

1.40 Conference with J. Toney regarding taxes, etc.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*June 19, 1990*

2.80 Conference with staff regarding objection to claims; conference with P. Scharmberg regarding Puerto Rico; telephone conference with M. Colbert regarding Pyburn

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*June 26, 1990*

1.40 Conference with C. Stuecken, P. Scharmbert and J. Brown regarding reports, agent collections, Puerto Rico

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*July 17, 1990*

3.30 Review with P. Scharmberg status of "B" claims; review garnishment package from Tennessee

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 5, 1990*

1.20 Conference with P. Scharmberg regarding Oklahoma; draft report and order to Oklahoma

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*September 12, 1990*

.80 Conference with C. Stuecken; telephone conference with Puerto Rico regarding duplicates

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry

does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*November 1, 1990*

.60 Conference with S. Durand and P. Scharmberg regarding Mansour bankruptcy in Michigan

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*March 7, 1991*

1.30 Review with Ms. Scharmberg details for objection to claims

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Scharmberg was the administrative assistant to Bird as trustee; she was not a law clerk or paralegal. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*April 3, 1991*

1.40 Review MTS correspondence; telephone conference with SESI regarding Detroit Trading Post; telephone conference with R. Hughes regarding MTS; conference with P. Scharmberg regarding MTS

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. These entries are likewise vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

(b) *Time entries of Kennon*

Based upon its review, the Court makes the following findings relating to specific time entries of Kennon:

*August 13, 1986*

2.75 Telephone conference with Libby Jacobi, manager of the Tower Building regarding renting space in Tower Building; telephone conference with Fayetteville Sheriff's Office regarding possible protection for Trustee; telephone conference with Fayetteville City Police regarding possible protection for Trustee; telephone conference with Buddy Waldron of Buddy's Lockshop regarding changing locks on NWFX; telephone conference with Commercial Mail Service regarding printing of envelopes and mailing, etc.; went to post office and obtained P.O. box for Trustee, also obtained from Peggy Carroll 10 certified copies of order appointing Trustee.

The Court does not credit Kennon's testimony that all tasks performed were legal in nature. Renting space, changing locks, mail service and printing envelopes are clearly administrative tasks, not legal services. Kennon failed to separate the

amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter, and Kennon did not allocate any of the services as to time spent on administrative tasks. The Court will disallow this entry in its entirety.

*August 14, 1986*

> 3.75 Drafting of motion to appoint Rose Law Firm; meeting with Linda Besancon regarding fixing answering machine problems; drafting motion to appoint Arthur Young; drafting order employing Arthur Young; drafting order employing Rose Law Firm as attorneys; fix answering machine again; drafting motion and order to allow rental of temporary office space; telephone conference with Susan Gunter regarding new contempt order, proof of claim, and pleadings to be sent to Rose Law Firm; telephone conference with Libby Jacobi regarding rental of office (more information needed for motion and order); telephone conference with Louis at commercial mail service regarding capabilities of their computer to sort; etc.; telephone conference with bankruptcy clerk's office to get form to defer expenses; telephone conference with AT & T regarding incoming watts line; change tape on answering machine.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Obviously certain tasks performed were trustee's administrative matters such as fixing answering machines, phone call regarding rental of office spaces, and changing tape on answering machine. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Kennon's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*August 15, 1986*

> 1.25 Re-draft order for bond, motion and order for Rose Law Firm; telephone conference with Southwestern Bell Telephone regarding hooking up phone at NWFX; telephone conference with Priscilla at bankruptcy regarding amount of bond for Trustee.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Even though the Court credits Kennon's testimony that the phone call with Southwestern Bell Telephone took about five minutes, the face of entries do not separate time spent performing legal and administrative services. The Court will disallow this entry in its entirety.

*August 20, 1986*

> 3.00 Meeting with Jim Smith and Susan Gunter regarding interpleading claims (T. conference call with Chek Cash attorneys); meeting with Libby Jacobi regarding lease on office at Tower Building; meeting with Carolyn Huber regarding furniture for office at Tower Building; telephone service.

The Court does not credit Kennon's testimony that all tasks performed were legal in nature. Clearly, the meeting regarding furniture, lease, and telephone service is an administrative function. Kennon failed

to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 21, 1986*

3.75 Conference with Libby Jacobi, Tower Building—to get keys for office and deliver lease; set up office; conference with Priscilla Bowen regarding setting dates for hearings; hearing on 8/22 and Bird's meeting with Bowen 8/22.

Kennon admitted some of these entries might not be considered professional time in this instance. The Court finds that the conference with Jacobi and setting up the office appear to be administrative tasks not professional legal task. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 22, 1986*

5.00 Attendance at hearing at Fayetteville; attendance at meeting with employees of Trustee at NWFX.

The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Kennon's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*August 25, 1986*

6.00 Research regarding property of estate (T. what constitutes); meeting with Irma Rector, and to help set up office at Tower Building; telephone conference with John Irving—casualty insurance agent for NWFX; meeting with J. Russell, Peggy Carroll and Jim Smith, et al regarding NWFX.

The entry reflecting meeting with Rector to help set up offices at Tower Building is an administrative task not legal in nature. Also, obtaining casualty insurance for NWFX appears to be administrative task. The Court does not credit Kennon's testimony that all tasks performed were legal in nature. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 26, 1986*

4.00 Research regarding property of the estate; deliver money to Union National Bank; took money orders received to Tower Building.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon's testimony was too vague regarding time spent on research. The Court will disallow this entry in its entirety.

*August 27, 1986*

0.75 Telephone conference with John Druz regarding proof of claim of those other than purchasers Michigan agent's redeeming monies; telephone conference with Judy Proctor regarding Sept. 5 status conference.

The Court does not credit Kennon's testimony in this instance that the time involved was professional time. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 3, 1986*

8.00 Flew to Fayetteville to meet with John Brown and other personnel who have remained to work with Trustee.

The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Kennon's or Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*September 5, 1986*

7.50 Attendance at hearing regarding O.S.C. and status conference on NWFX;

meeting with John Brown and Allen Bird.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*September 10, 1986*

5.30 Meeting with Allen Bird and Michael Johns regarding pleadings and strategy in answering same; meeting with Julie Anderson at Union Bank; setting up computer system for pleadings.

All of this work appears to be in the nature of legal work. The Court will allow this entry in its entirety.

*September 11, 1986*

6.00 Finish NWFX pleading control forms (on docket); meeting with Julie Anderson, Union National Bank; delivered material from Union National Bank to Tower Building office; assisted Irma Rector at her request.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and

actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 16, 1986*

6.00 Travel to Fayetteville; investigation; went through files of agents; conference with John Brown, et al., regarding agent files.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court will disallow this entry in its entirety.

*September 17, 1986*

7.50 Conference with John Brown and Allen Bird regarding computer printout; other administrative matters; travel time back to Little Rock.

Clearly, the entries reflect administrative services, not legal. The Court does not credit Kennon's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*September 25, 1986*

7.00 Attendance at hearing

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Fed-

eral Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*September 30, 1986*

4.25 Abstract arguments in AP pleadings; telephone conference with Don Carver, Centennial Insurance regarding continuance of NWFX insurance policies

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*October 2, 1986*

5.30 Telephone conference with John Blanchard Attorney General's office in Michigan; research regarding constructive trust; drafting motion and order for extension of time and file schedules and statements; telephone conference with I. Rector regarding administrative problems

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*October 3, 1986*

7.25 Telephone conference with Scott Burgess, Kansas Loss Prevention; tele-

phone conference with Larry Muse, Traveler's Insurance; meeting with I. Rector regarding administrative problems; research regarding constructive trust; drafting memorandum to file regarding insurance; draft letter to Lucille Billings; draft turnover complaint and consent order for states

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*October 6, 1986*

6.00 Letter to Larry Muse of Traveler's Insurance; draft complaint and order for turnover; research regarding constructive trust; telephone conference with Don Carver of Centennial Insurance

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal

service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 16, 1986*

3.75 Telephone conference with H. Kollenberg, D. Powell, Judge Fussell, A. Bird and M. Johns regarding trial dates and discovery; meeting with M. Johns and A. Bird regarding response to stipulations submitted by Carl's Inc., and Redi Cash, Inc.; telephone conference with John Brown and Greg Moldenhauer; drafting memo on constructive trust law in Texas

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 20, 1986*

1.25 Telephone conference with Peggy Carroll regarding 1st mortgage/creditors; telephone conference with Carl Stuecken regarding stipulations; telephone conference with Julie Anderson at Union National Bank regarding bill for services

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is

on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*October 21, 1986*

> 7.00 Revision of statements and schedules; meeting with Julie Anderson, Allen Bird and Mike O'Brien at Union National Bank regarding Union's work for NWFX.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Kennon's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*October 22, 1986*

> 4.00 Drafting letter to Lucille Billings, Michigan; telephone conference with Irma Rector regarding administrative problems; review stipulations of Quickie Mart; review final copies of statements and schedules; telephone conference with Peggy Carroll, regarding first meeting of creditors, notice of publication; telephone conference with Phillip Nicholson, attorney for Quickie Mart regarding stipulations; telephone conference with Peggy Carroll regarding notice of publication, extension of time to file claims

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services

involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*October 27, 1986*

> 6.00 Meeting with A. Bird regarding stipulations, administrative matters; meeting with Garland Binns, James Beachboard and M. Johns and A. Bird regarding National Bank of Detroit; meeting with A. Bird and M. Johns regarding upcoming hearing, responses to pleadings.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*October 28, 1986*

> 6.75 Meeting with A. Bird regarding brief in response to jury trial, administrative problems; telephone conference with Priscilla Bowen regarding brief for jury trial; review of files at bankruptcy court; drafting memo on constructive trust-Texas Law; telephone conferences with Greg Moldenhauer regarding sub-

poena for trial Nov. 7–10; telephone conference with Carl Stuecken regarding sale of equipment; telephone conferences with Ranko Oliver regarding translator of Spanish language documents for Puerto Rico.

Some of the entries clearly reflect administrative or ministerial functions, not legal. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*October 29, 1986*

7.75 Meeting with A. Bird regarding stipulations; review SBC files for Nov. 7–10 hearings to substantiate allegations in stipulations at JWD, Inc.; telephone conference I. Rector regarding administration matters; telephone conference with Bruce Waitz regarding stipulations for Carl's Food, Inc.; telephone conference with Phil Nicholson regarding stipulations for Quickie Mart

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*October 30, 1986*

5.25 Telephone conference with Priscilla Bowen regarding MBANK agreed order; telephone conference with Charles Hampton regarding stipulations for JWD, Inc.; revise stipulations; telephone conference with John Brown regarding October statement; telephone conference with Julie Anderson at Union National Bank regarding October statement; telephone conference with Charles Hampton regarding JWD stipulations; review documents for hearing preparation.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Telephone conferences reflecting review and discussion of October bank statement of debtor appears to be administrative or ministerial function rather than legal, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*October 31, 1986*

5.00 Meeting with Irma Rector regarding Michigan claims, reply letters; review pleadings for list of questions for witnesses; telephone conference with Bruce Waitz regarding stipulations for Carl's.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The entry does not

distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*November 3, 1986*

> 6.75 Review pleadings for list of questions to witness; telephone conference with Greg Moldenhauer regarding questions for testimony on 7 and 10th; telephone conference with Irma Rector regarding administrative procedures; review cases on constructive trust.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Conference with Rector regarding administrative procedures reflect administrative time spent, not legal. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*November 4, 1986*

> 10.50 Trial preparation; review cases on court; set-off; review pleadings; read Colliers on set-off and court; telephone conference with Irma Rector regarding administrative matters, telephone conference with Carl Stuecken, Doug Horton, Greg Moldenhauer and Obert Undem.

Again, telephone conference with Rector regarding administrative matters is not allowable as definitive of legal services performed. Also, conference with Stuecken, Horton, Moldenhauer, and Undem con-

tains no subject matter of conference. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court does not credit Bird's testimony that all tasks performed were legal in nature. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*November 5, 1986*

> 6.25 Trial preparation; set up files for trial; telephone conference with Priscilla Bowen regarding Friday hearing; telephone conference with I. Rector regarding administrative matters; telephone conference with Charles Hampton regarding stipulations; telephone conference with Doug Horton, Greg Moldenhauer regarding testimony at hearing

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*November 10, 1986*

> 6.50 Attendance at hearing; preparation for hearing; administrative matters

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. If the service was for preparing for trial, it should be stated in the entry that way, not as administrative matters. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 11, 1986*

2.75 Telephone conference with Pat Jones of Mitchell Firm regarding Handy Andy; telephone conference with Mike Ellison, Ellison's Supermarket regarding first meeting of creditors; reply letters to Jennifer Meadows and Daniel Pace; administrative matters; telephone conference with Carl Stuecken

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter.

The Court will disallow this entry in its entirety.

*November 13, 1986*

5.50 Telephone conference with Irma Rector regarding administrative matters; drafting statement of facts for JWD and Handy Andy; conference with Michael Johns and Allen Bird regarding brief for Handy Andy and JWD; administrative matters

"Administrative matters" is not an acceptable entry for the purpose of billing for legal services. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entries referencing administrative matters cause parties in interest to file needless objections to fee applications. Bird as an attorney has a duty to correct such entries. The Court does not credit Bird's or Kennon's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 14, 1986*

4.50 Telephone conference with Doug Horton regarding stop payment procedure; telephone conference with Carl Stueken regarding records in Lnacaster, Texas; meeting with A. Bird and M. Johns regarding Quickie Mart; telephone conference with Carl Stuecken regarding Lancaster records; drafting letters in response to inquiries

Entries regarding conference with Horton and Stuecken regarding records is too vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 18, 1986*

7.50 Organize pleading files; meeting with Irma Rector regarding administrative matters

This entire entry appears to be administrative. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*November 19, 1986*

4.50 Telephone conference with Irma Rector regarding administrative matters; telephone conference with John Blanchard, Michigan Attorney General's office; telephone conference with John Blanchard, Michigan Attorney General's office and John Dewey, Michigan office

Financial Institutions Bureau; telephone conference with Julie Anderson at Union National Bank; drafting letters to Rickey Smith, LaMesa District Attorney's office and John Blanchard, Michigan Attorney General's office; telephone conference with Philip Nicholsen regarding Quickie Mart; meeting with M. Johns concerning P. Nicholsen's telephone call

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*November 20, 1986*

4.50 Meeting with Allen Bird and Michael Johns regarding depositions, first meeting of creditors; telephone conference with Carl Stuecken to get Doug Caldwell's phone number; telephone conference with Wayne Valentine/LA Financial Institutions Bureau regarding LA securities; telephone conference with Irma Rector regarding Young Hee Chang; telephone conference with Young Hee Chang; attendance at first

meeting of creditors; telephone conference with Carl Stueken.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that the time involved was professional time. Telephone conference with Stuecken to get Caldwell's phone number and conference with Stuecken are ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*November 21, 1986*

2.00 Drafting letters in response to inquires (T. SIC)

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's or Kennon's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*November 24, 1986*

1.75 Telephone conference with Irma Rector regarding administrative matters; drafting administrative replies

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or

legal work. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Bird's or Kennon's testimony that all tasks performed were legal in nature. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*November 25, 1986*

3.25 Research regarding collection proceedings/property of the estate; meeting with Liz Goff regarding research; telephone conference with Irma Rector regarding administrative matters; telephone conference with Carl Stuecken regarding Doug Caldwell; telephone conferences with Gloria Stuecken regarding Kansas claimant.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*December 1, 1986*

2.00 Letters to requests from claimants

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or

legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*December 3, 1986*

6.25 Attendance at telephone conference with A. Bird, Susan Gunter, Judge Fussell, Henry Kollenberg regarding opinion on jury trial for Rice Foods; meeting with A. Bird regarding pleadings, rice hearing; drafting complaint for turnover of state CD's and securities; meeting with A. Bird regarding admin. problems; telephone conference with Doug Horton and Greg Moldenhauer telephone conference with Collins Kilgore regarding minutes

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Meeting with Bird regarding administrative problems should not be billed as attorney time. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*December 8, 1986*

1.50 Telephone conference with John Brown regarding securities commission request for documents; telephone conference with Doug Caldwell regarding Rice Foods hearing; meeting with Irma Rector regarding admin. matters; telephone conference with Susan Gunter regarding Carl's

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*December 9, 1986*

1.75 Telephone conference with Nancy Jones regarding reports; conference with M. Johns regarding Handy Andy and JWD briefs; review Handy Andy brief and response by trustee; telephone conference with Lisa at Associated Press regarding trustee's press release; meeting with Irma Rector regarding Associated Press request

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird testified that portions of this

entry appear to be trustee time, not legal time. The Court will disallow this entry in its entirety.

*December 10, 1986*

1.50 Telephone conference with Collins Kilgore regarding Hong Rue; telephone conference with Troy Thompson and Gunderson regarding Carl's stipulations; telephone conference with Pat Jones and Steve Gunderson regarding Carl's stipulations; telephone conference with Doug Caldwell regarding flight arrangements

The Court credits Bird's testimony in this instance that paralegals often make flight arrangements for hearings. While it is administrative in nature as well as legal, in this instance it appears to be legal preparation for trial. The Court will allow this entry in its entirety.

*December 19, 1986*

2.00 Meeting with Liz Goff regarding motion to dismiss/change venue; research regarding brief in support of motion to dismiss/change venue; telephone conference with Carl Stuecken regarding power lines; telephone conference with John Brown regarding contract for Jones Sugar Service; prepare stipulations for Scott's Market, et al.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Bird testified that portions of this entry appear to be trustee time, not legal time. The Court will disallow this entry in its entirety.

*December 22, 1986*

5.45 Drafting motion to dismiss or change venue, order allowing reimbursement for Rose Law Firm, notice and motion regarding reimbursement to Union National Bank; brief in support of motion to dismiss or change venue; meeting with Liz Goff regarding same; telephone conference with Carl Stuecken, Doug Horton and John Brown

Telephone conference with Stuecken, Horton, and Brown is too vague, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*December 23, 1986*

5.50 Telephone conference with John Brown regarding printout; telephone conference with Michigan collection; drafting brief in support of motion to dismiss; motion to extend time to file response; research regarding parol modification of contract; meeting with M. Johns regarding Carl's, Crook's and ARG's brief.

Telephone conference with Brown appears to be administrative task, not legal. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum

the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. Telephone conference with Michigan collection is too vague, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*December 24, 1986*

1.50 Telephone conference with Carl Stuecken and John Brown regarding files; locating files; call back with information

The Court does not credit Bird's testimony in this instance that the time involved was professional time. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*January 5, 1987*

6.75 Conference with I. Rector regarding administrative matters; meeting with A. Bird regarding model market; telephone conference with John Brown regarding same; telephone conference with John Brown regarding Pitney Bowes bill; telephone conference with John Blanchard, Michigan Attorney General's office; telephone conference with John Brown regarding Michigan claims; telephone conference with Carl Stuecken regarding Pitney Bowes; telephone conference with

Doug Horton regarding FEI Miami money orders; attendance at conference call regarding Rice Food Markets and Quickie Mart; conference with A. Bird and M. Johns regarding same; telephone conference with James Beachboard regarding National Bank of Detroit; telephone conference with Greg Moldenhauer regarding follow-up on conference call; telephone conference with Carl Stuecken regarding Michigan money order imprinters; telephone conference with John Brown regarding Michigan claims.

The telephone conference with Rector regarding administrative matters and telephone conference with Stuecken regarding money order imprinter clearly appear to be administrative matters or ministerial. The subject matter of the telephone conference with Stuecken is too vague to identify the subject matter discussed, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's or Kennon's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*January 6, 1987*

6.25 Meeting with L. Goff regarding proper demo sales; telephone conference with John Brown regarding proper demo sales; drafting form reply letter to money order tracing request; telephone conference with John Blanchard, Michigan Attorney General's office, regarding Michigan claims; telephone conference with Chester Bowles, Fayetteville Pros-

ecuting Attorney's office, regarding check for NWFX; meeting with Irma Rector regarding drafting of form letter; telephone conference with Priscilla Bowen regarding January 21, 1987 hearings; telephone conference with John Brown regarding proper demo, Michigan claims; revise complaint for turnover of state securities; memo to L. Goff regarding proper; memo to A. Bird and M. Johns regarding January 21, 1987 hearings; telephone conference with Bill Bowen, president of First Commercial regarding City National Bank; telephone conference with John Brown and Carl Stuecken regarding power; drafting response to model market

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Telephone conferences, especially conference with Brown regarding proper demo sales, appear to be ministerial or administrative tasks that a trustee should perform. Further, this entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*January 12, 1987*

6.00 Review administrative mail from Irma Rector; telephone conference with Carl Stuecken regarding Michigan claims; meeting with Irma Rector regarding response to tracing request, etc.; review pleadings, correspondence from Irma Rector regarding NWFX; drafting application for removal and research regarding removal application for Ohio 86–3494; telephone conference with John Brown regarding Eastbridge Food Center; research regarding action for contempt; and drafting motion for contempt regarding Nanjer, Inc., d/b/a Eastbridge Food Center

Reviewing administrative mail from Rector and telephone conferences appear to be administrative or ministerial tasks. Further, this entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony that all tasks performed were legal in nature. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*January 15, 1987*

5.20 Revise brief regarding Scott's market, et al; review brief regarding Crooks and ARG; telephone conference with Greg Moldenhauer regarding tax returns; telephone conference with Paul Allen, Arkansas Department of Finance and Administration, regarding tax returns; memo to A. Bird regarding administrative matters, Michigan claims; letters regarding various administrative matters and requests for information; telephone conference with Mrs. Bantram regarding agent's check that was not cashed; telephone conference with Joel Stauffer regarding claim forms; tele-

phone conference with Betty Cahanin regarding workers' comp policy; telephone conference with Mrs. Bantram regarding agent's check; telephone conference with Sylvia at 1st Nat'l bank—New Mexico regarding cd; meeting with A. Bird regarding administrative matters requiring action; telephone conference with Doug Horton regarding New Mexico cd and insurance

Most entries appear to be administrative or ministerial tasks that would be performed by a trustee. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The entry, "letters regarding various administrative matters," would not be legal work. The Court does not credit Bird's testimony, and Kennon's broad testimony, that all tasks performed were legal in nature. While some of the entries such as tax matters and workers compensation claims would be legal matters, Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*January 16, 1987*

4.35 Meeting with A. Bird regarding contempt action and removal action regarding Nanjer, Inc.; redraft contemp action; telephone conference with Carl Stuecken regarding severance and vacation claims; meeting with A. Bird regarding contempt action; drafting letter regarding amendment to turnover complaint vs. states holding cd's and securities; research regarding drafting notice of removal for Nanjer, Inc.; telephone conference with Carl Stuecken regarding Michigan claims; telephone conference with John Brown regarding Michigan claims; drafting notice of appeal regarding Rice Food Markets, Inc.; signing letters to regulators regarding amended turnover complaint; preparation of notice of appeal for filing

While the telephone conferences with Stuecken and Brown regarding Michigan claims and severance and vacation claims could be interpreted as both legal work and trustee work, the trustee has the duty to explain these types of claims in administering the debtor's estate. The Court does credit Bird's testimony that all tasks performed were legal in nature. However, Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Because of that, the Court will disallow this entry in its entirety.

*January 20, 1987*

5.05 Meeting with A. Bird regarding hearing January 21, 1987; telephone conference with Don Monroe regarding worker's comp. insurance; letter to Paul Allen, tax auditor, regarding 1984 & 1985 NWFX returns and Arkansas income tax; research regarding disputed debts under 3542 (T.B.); telephone conference with Priscilla Bowen regarding hearing January 21, 1987; drafting order regarding allowance of legal fees; preparation of application for workers'

comp. insurance; drafting letter to Scott Spencer regarding wiring cd funds from New Mexico; telephone conference with Julie Anderson regarding wiring instruction to Union Bank; conference with M. Johns regarding New Mexico letter; re-draft letter; conference with A. Bird regarding order approving attorney's fees; drafting order approving expenses regarding Union National Bank; preparation of documents for hearing January 21, 1987; research regarding contracts/trusts

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Further, entries concerning drafting letter to Spencer regarding wiring CD funds from New Mexico and telephone conference with Anderson regarding wiring instructions to Union Bank appear to be administrative tasks, not legal. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. New Mexico was not a state that debtor corporations were authorized to do business, or required to obtain bond. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*January 21, 1987*

> 7.25 Preparation for hearing; attendance at hearing; research regarding model contracts and tracing require-

ments for trusts; telephone conference with Julie Anderson regarding fees and wiring of $2,500.00 from New Mexico; telephone conference with John Brown regarding administrative matters; read reports

Entries regarding telephone conferences are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The Court will disallow this entry in its entirety.

*January 27, 1987*

> 4.75 Revise designation of record and notice of appeal; conference with Irma Rector regarding administrative matters; telephone conference with A. Bird regarding attorney list and insurance; telephone conference with Doug Horton regarding insurance and Nanjer, Inc.; review revised brief for ARG and Crooks; drafting list of agents

Entry regarding conference with Rector represents the work to be administrative, not legal. The Court does not credit Bird's testimony that all entries made by Kennon using the description as "administrative matters" were legal in nature. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*January 28, 1987*

2.75 Telephone conference with John Blanchard, Michigan Attorney General's office regarding complaint for turnover, Michigan receivership; telephone conference with Dan Monroe, Block Insurance, regarding insurance for auto, liability; telephone conference with Robert Newsome, NWFX agent, regarding bounced check; telephone conference with John Brown, Carl Stuecken and Margaret Bell in Fayetteville regarding insurance, Michigan claims; review of Nanjer, Inc. documents; drafting motion and brief to conference with Henry Kollenberg regarding Rice Food proof of claim

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*January 29, 1987*

1.25 Telephone conference with John Brown regarding setting up computer program for non-money order claims; telephone conference with Susan Gunter regarding Larry Shaffer's furniture, Mitchell retainer account; drafting memo to A. Bird regarding retainer for Mitchell firm; telephone conference with Carl Stuecken regarding license number for insurance

Telephone conferences regarding setting up computer program for non-money order claims and license number for insurance are vague, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that the services noted were legal services typically performed by a law clerk in this instance. The Court will disallow this entry in its entirety.

*January 30, 1987*

3.00 Telephone conference with Carl Stuecken regarding insurance; telephone conference with John Brown regarding same; meeting with I. Rector regarding insurance; telephone conference with A & M reporters regarding Rice transcript; telephone conference with John Brown regarding claims sent and agent list; telephone conference with Priscilla Bowen regarding agents who have filed stipulations; telephone conference with Margaret Bell at Fayetteville office regarding tracing requests; meeting with I. Rector regarding tracing request from Michigan

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the

specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*February 2, 1987*

5.55 Memo to M. Johns regarding appeal; telephone conference with Priscilla Bowen regarding meeting with Judge Fussell; review insurance files; telephone conference with John Brown regarding insurance; telephone conference with Stuart Reporting regarding transcript; telephone conference with Bill Nalepka, Arthur Young and Co., regarding financial statements for NWFX; meeting with Judge Fussell and A. Bird regarding status of case, default judgment, etc.; telephone conference with John Brown regarding claims; telephone conference with Carl Stuecken regarding claims and W-2 forms; telephone conference with Greg Moldenhauer and Doug Horton regarding taxes; drafting memo to A. Bird regarding telephone conference with Greg Moldenhauer; telephone conference with Bill Nalepka, Arthur Young and Co., regarding taxes for 1986; looking for trial balances sent to us by NWFX for Jan–June, 1985; meeting with A. Bird regarding trial balances and other administrative matters; meeting with Irma Rector regarding taxes for 1986

Again, many entries are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Further, "meeting with Bird regarding trial balances and other administrative matters" and "conference with Stuecken regarding claims and W-2 forms" are administrative tasks, not legal. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*February 3, 1987*

5.75 Telephone conference with Bobby Stevens regarding insurance for NWFX; drafting letter to Stuart Reporting regarding Rice transcript; telephone conference with Dan Monroe regarding insurance for NWFX; meeting with A. Bird; telephone conference with John Brown regarding insurance for NWFX; drafting letter to Scott Spencer, attorney general for New Mexico, regarding NWFX settlement; meeting with A. Bird and Irma Rector regarding checks for Doug Horton and Greg Moldenhauer; telephone conference with Carl Stuecken regarding same; drafting memo to M. Johns, A. Bird and L. Goff regarding contempt action; review of pleading in Nanjer, Inc.; revise same and preparation; telephone conference with John Brown regarding Rice Food claims; look for MBank pleadings; correspondence to determine if we should dispute their claim for funds owed because of stopped checks; research regarding UCC section

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Here, some of the entries appear to be for obtaining insurance for NWFX, which would be an administrative task. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*February 4, 1987*

4.00 Telephone conference with John Brown and Carl Stuecken regarding claims, etc.; research regarding UCC 4–209 and 4–208; bank's security interest in proceeds; telephone conference with John Brown regarding Livernous Express check; drafting stipulations for Penn Foods, Inc.

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. Telephone conference with employees Stuecken and Brown as to "claims" is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of

Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*February 5, 1987*

6.00 Review Fidelity files; call various Secretary of State offices to obtain corporation information; get addresses of individuals; telephone conference with Norman Pentecost regarding stipulations; telephone conference with John Brown regarding Penn Foods, Inc.

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. Reviewing Fidelity files and calling various Secretary of State offices are vague and ambiguous entries, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*February 10, 1987*

6.60 Review administrative documents; conference with Irma Rector regarding same; review pleadings regarding Nanjer, Inc. and revise; telephone conference with Carl Stuecken and John Brown regarding Louisiana and Ohio claims; telephone conference with Bill Greenhaw regarding Cordoba pick-up;

drafting brief in response to Scott's, et al.; telephone conference with John Brown regarding claims; telephone conference with Doug Caldwell regarding vacation and severance claims; research regarding Lexis research on agency/contractor, etc.; reading cases pulled on Lexis; telephone conference with Carl Stuecken and John Brown regarding administrative matters

Again, reviewing administrative documents and a telephone conference regarding picking up a Cordoba appear to be administrative tasks, not legal work. Also, entries reflecting conferences about claims are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony that all tasks performed were legal in nature. The Court will disallow this entry in its entirety.

*February 11, 1987*

5.25 Telephone conference with John Brown regarding package not received; research regarding relationship with oral agreement; telephone conference with Carl Stuecken regarding package not received; telephone conference with John Brown & Carl Stuecken regarding Ohio money order; drafting list of

agents not in default per Judge Fussell's request

The telephone conference with Stuecken and Brown regarding packages not received are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*February 12, 1987*

4.25 Telephone conference with John Brown and Carl Stuecken regarding Ohio money order issued January 26, 1987; preparation of list of agents still to be tried for Judge Fussell; review of pleading files to determine disposition of agents on list for Judge Fussell; telephone conference with Carl Stuecken regarding Ohio money order; telephone conference with Dan Monroe regarding insurance; telephone conference with Ed Cress regarding fraudulent money order; telephone conference with Carl Stuecken regarding Ohio money order; telephone conference with John Brown regarding Penn Foods, Inc. stipulations; telephone conference with Susan Gunter regarding retainer account and employee claims; telephone conference with Carl Stuecken regarding Ohio claims

The entries relating to the Ohio money order issued January 26, 1987, and the insurance are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or

legal work. The Court does not credit Bird's testimony that all tasks performed were legal in nature. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*February 13, 1987*

5.05 Telephone conference with John Brown regarding Penn Foods, Inc.; drafting letter to Judge Fussell regarding lists requested; meeting with M. Johns regarding NWFX status conference; telephone conference with Carl Stuecken regarding file; look up agent file requested and call back with information; telephone conference with Susan Gunter regarding claims; telephone conference with John Brown regarding letters to agents; review various answers to complaint for turnover of securities; telephone conference with John Brown regarding refund/claim policy; meeting with Doug Horton regarding administrative matters and fidelities; review of Missouri Attorney General's complaint; telephone conference with Carl Stuecken regarding Missouri complaint and bill of sale for Larry Shaffer's furniture; telephone conference with Mark Flanegin

Telephone conference with Brown regarding letters to agents, and meeting with Horton regarding administrative matters, appear to be administrative or ministerial, not legal, and are vague and ambiguous. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, ac-

tual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*February 16, 1987*

1.50 Telephone conference with Carl Stuecken regarding FBI investigation of stolen money order in Texas; telephone conference with Susan Gunter regarding lawsuit against Larry Shaffer; telephone conference with John Brown and Carl Stuecken regarding report for M. Johns; telephone conference with Carl Stuecken regarding encoding errors

Telephone conference with Stuecken regarding encoding errors would be an administrative task, not legal work, and is not allowed as billing as a legal service. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*February 17, 1987*

5.30 Review of document received from Competition and Accessories, Inc.; telephone conference with John Brown regarding mail received; telephone conference with David Fuqua regarding model market and Alice Foodcraft; telephone conference with Carl Stuecken regarding mail; telephone conference with John Brown regarding Rice Food proofs of claim; look for proofs of claims filed

regarding employees of NWFX; telephone conference with Carl Stuecken regarding same; obtain Quickie Mart file; telephone conference with Carl Stuecken regarding same; telephone conference with Larry Shaffer regarding furniture, Missouri complaint; telephone conference with Tracye Thompson at Mitchell Firm regarding claim for Don Swafford; telephone conference with Carl Stuecken regarding Larry Shaffer's desk; telephone conference with district clerk regarding Rice appeal; telephone conference with John Brown and Carl Stuecken regarding address of Money Stores, et al; review interrogatories and requests for admissions regarding fidelities; conference with Liz Goff regarding same; review more answers sent in by state regulators regarding complaint for turnover

The following entries are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work: telephone conference with Brown regarding mail received, telephone conference with Shaffer regarding furniture, telephone conference with Stuecken regarding Shaffer's desk, and meeting with Horton regarding administrative matters. The entries do not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony that all tasks performed were legal in nature. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter.

The Court will disallow this entry in its entirety.

*February 18, 1987*

2.40 Telephone conference with Carl Stuecken regarding mail problems; telephone him back with answers to questions; conference with M. Johns regarding appeal, status report; telephone conference with Carolyn Huber regarding insurance for NWFX; telephone conference with Carl Stuecken regarding agent list; return call after telephone conference with Paula Anderson; telephone conference with Paula Haddock Anderson regarding Affiliated Foods; telephone conference with Chris Chance regarding money order purchased by client; conference with Irma Rector regarding administrative matters; telephone conference with Pat Jones of Mitchell Firm regarding Larry Shaffer; telephone conference with Carl Stuecken regarding administrative matters; conference with Irma Rector regarding proof of claims submitted today, etc.; telephone conference with Jennifer Goodnow, New York attorney for money order claimant

The Court does not credit Bird's testimony in this instance that the time involved was professional time. Numerous entries appear to be billed for legal matters which are in the nature of administrative services: telephone conferences regarding mail problems, insurance for NWFX, and administrative matters; conference regarding administrative matters. The entry regarding "proofs of claims submitted today" is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry.

The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*February 19, 1987*

3.75 Review mail received from NWFX; complete interrogatories and requests for admissions regarding NWFX fidelities; conference with Liz Goff regarding same; telephone conference with Carl Stuecken; telephone conference with John Moore, Arkansas Securities Commissions regarding complaint for turnover settlement; conference with Irma Rector regarding various administrative problems; telephone conference with Carl Stuecken regarding Check Case; return call with answer to Carl's questions; telephone conference with Jennifer Goodnow, New York attorney, regarding New York City National Bank claims; telephone conference with Carl Stuecken regarding Chek Cash, Inc.

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. Reviewing mail from NWFX, telephone conference with Stuecken, and conference regarding administrative matters are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The

Court will disallow this entry in its entirety.

*February 20, 1987*

2.75 Deliver post trial briefs of Scott's et al to Judge Fussell; preparation of interrogatories and request for admissions for filing after final revision; drafting memo to A. Bird regarding City National Bank money orders; telephone conference with John Brown regarding Alabama claimants; telephone conference with Carl Stuecken regarding mail; drafting motion for contempt regarding City National Bank; telephone conference with Carl Stuecken regarding City National Bank money orders

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The entry regarding telephone conference with Stuecken regarding mail is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*February 23, 1987*

3.50 Telephone conference with John Brown regarding letters; review mail from Fayetteville; telephone conference with Joyce Bradley regarding Redi–Cash; return call with information requested; telephone conference with Vicki regarding Redi–Cash; telephone conference with Norm Pentecost regard-

ing Penn Foods stipulations; telephone conference with Carl Stuecken regarding agent reports filed as claims; draft letters in response to inquiries regarding claims; meeting with M. Johns regarding contempt hearing

The Court does not credit Bird's testimony in this instance that all the time involved was professional time. The following entries are administrative or ministerial work that a trustee would normally perform: telephone conference with Stuecken regarding mail, and agent reports filed as claims. Further, the entries do not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*February 24, 1987*

4.35 Telephone conference with Carl Stuecken regarding mail received; telephone conference with Joyce Bradley regarding pleadings for Judge Fussell; meeting with A. Bird and L. Goff regarding Nanjer, Inc.; telephone conference with Tim Sims regarding Texas claims, etc.; telephone conference with John Brown regarding 75% claims, average claims per Tim Sims request; search for Redi-cash brief; telephone conference with Joyce Bradley regarding Scott's, et al; telephone conference with Carl Stuecken regarding Northwest National Bank letter from A. Bird; telephone conference with Priscilla Bowen regarding service on Nanjer, Inc. and

Robin in docketing regarding same; telephone conference with David Fuqua regarding money orders from Alice Foodcraft; meeting with Liz Goff regarding Nanjer, Inc. hearing for contempt

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*February 25, 1987*

6.25 Nanjer, Inc., d/b/a Eastbridge; attendance at hearing; preparation for hearing prior; telephone conferences with John Brown and Carl Stuecken regarding administrative matters; drafting letter to David Fuqua regarding Model Market and Alice Foodcraft; meeting with A. Bird and M. Johns regarding administration matters; drafting letter to Robert Cohen regarding City National Bank

"Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The

entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*February 26, 1987*

5.75 Re-draft letter to City National Bank's attorney, Robert Cohen; telephone conference with John Brown regarding 1) demand letters 2) setting up agent claims in separate file per A. Bird; drafting letter to Susan Gunter regarding Larry Shaffer's furniture; telephone conference with Bill Greenhaw regarding Northwest National Bank money orders; telephone conference with Mark Flanegin regarding assurance of voluntary compliance; telephone conference with John Brown and Margaret Bell regarding agent with stopped check; other administrative matters; match letters to enclosures (demand letters to agents); conference with Penny Scharmberg regarding same; telephone conference with John Brown regarding Northwest National Bank money orders; Conference with Irma Rector regarding same.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*February 27, 1987*

6.00 Meeting with A. Bird, M. Johns, David Powell, David Fuqua and Judge Fussell regarding additional information needed by Judge Fussell; telephone conference with Carl Stueken regarding claims; telephone conference with John Brown regarding agent demand letters; telephone conference with Tim Sims, Texas Attorney General's office regarding Texas money orders; telephone conference with John Brown regarding information needed by Texas Attorney General; telephone conference with John Brown regarding Alice Foodcraft; telephone conference with Mark Flanegin regarding assurance of voluntary compliance; telephone conference with Tim Sims regarding Texas claims; telephone conference Paul Haddock Anderson regarding Affiliated Foods; telephone conference with Carl Stuecken regarding Affiliated Foods and Larry Shaffer; review of Ohio agreements.

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent

performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*March 2, 1987*

> 6.25 Telephone conference with Carl Stuecken regarding money order; research regarding contempt proceedings; power of bankruptcy court to enforce; read Collier on Bankruptcy and Collier Bankruptcy Practice Guide; pull cases and read cases on contempt

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*March 3, 1987*

> 6.25 Telephone conference with Carl Stuecken regarding administrative problems; telephone conference with Carl Stuecken regarding compliance report; status conference with M. Johns, L. Goff, and A. Bird; telephone conference with John Brown regarding Penn Foods; telephone conference with Carl Stuecken regarding same; meeting with Irma Rector regarding administrative problems; research regarding contempt powers of judge

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*March 4, 1987*

> .50 Telephone conference with John Brown regarding mail; trip to Little Rock

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*March 5, 1987*

> 7.00 Meeting with John Brown and Carl Stuecken regarding agent files, demand letters, procedures to be followed, other administrative matters.

"Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*March 9, 1987*

> 6.50 Revise memo on contempt; telephone conference with Carl Stuecken regarding admin. problems; draft letter to Norman Pentecost regarding stipulations; telephone conference with Carl Stuecken and John Brown regarding administrative matters, payroll claims, demand letters, etc.; telephone conference with various agents regarding demand letters; telephone conference with Mark Flanegin, Missouri Attorney General re-

garding affidavit of voluntary compliance

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*March 9, 1987*

> 7.25 Research regarding jurisdiction of bankruptcy court under 542(B); Lexis research; Shepardize cases; reading cases; meeting with Mr. Penn and Ricky Richards regarding Alto Foods and Buchoon Grocery; telephone conference with Carl Stuecken and John Brown regarding administrative problems; meeting with Irma Rector regarding administrative problems; telephone conference with Joyce Bradley regarding jurisdiction brief

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*March 10, 1987*

> 7.00 Telephone conference with Carl Stuecken regarding payroll and mail; draft various letters to attorneys, newpapers, etc. regarding request for information; telephone conference with various agents regarding demand letters; review files for agents; telephone conference with John Brown regarding demand letters

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*March 11, 1987*

> 13.00 Travel to Fayetteville to meet with John Brown and A. Bird regarding demand letters

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*March 13, 1987*

> 6.50 Telephone conference with John Brown regarding lost items; telephone conference with Irma Rector regarding administration problems; review agent

letters; looked at files to try to determine items still owed, etc.; telephone conference with various agents, money orders

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety. ·

*March 18, 1987*

6.50 Draft reply letters to agents; telephone conference with various agents regarding demand letters; telephone conference with John Brown and Carl Stuecken regarding administrative problems

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*March 31, 1987*

6.00 Finish list of agents/dollars for Judge Fussell; draft notice of hearing; meeting with Liz Goff regarding same; telephone conference with Priscilla Bowen regarding same; meeting with Penny Scharmberg; telephone conference with Carl Stuecken and John Brown regarding administrative problems

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the

individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*April 2, 1987*

7.50 Research regarding Rice brief; telephone conference with agents regarding demand letters; telephone conference with John Brown regarding administrative problems

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*April 15, 1987*

6.50 Review agent replies to demand letters; various conferences with I. Rector, John Brown, etc. regarding administrative problems

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry.

The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*April 15, 1987*

6.50 Review and reply to agent demand letters; conference with John Brown regarding administrative problems

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*April 17, 1987*

13.50 Fly to Fayetteville; meet with John Brown regarding administrative problems; conference with Greg Moldenhauer regarding same

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*April 20, 1987*

8.50 Conference with A. Bird regarding Friday trip to Fayetteville; review of agent replies to demand letters

This entry is vague and ambiguous, and the Court will not speculate whether the

services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*April 21, 1987*

8.50 Review of agent replies to demand letters; meeting with John Brown and A. Bird regarding administrative problems

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court will disallow this entry in its entirety.

*April 23, 1987*

2.50 Meeting with I. Rector regarding administrative problems; telephone conference with Missouri Attorney General regarding court costs in state suit

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*April 24, 1987*

2.50 Telephone conference with John Brown regarding administrative problems; review of letter from I. Rector; conference with I. Rector regarding same

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*April 27, 1987*

3.00 Telephone conference with Irma Rector, John Brown, and Carl Stuecken regarding administrative problems

*April 28, 1987*

3.00 Telephone conference with Irma Rector, John Brown, and Carl Stuecken regarding administrative problems

*April 29, 1987*

3.00 Telephone conference with Irma Rector, John Brown, and Carl Stuecken regarding administrative problems

*April 30, 1987*

3.00 Telephone conference with Irma Rector, John Brown, and Carl Stuecken regarding administrative problems

*May 1, 1987*

3.00 Telephone conference with Irma Rector, John Brown, and Carl Stuecken regarding administrative problems

The above entries on their face are entered as administrative problems, not legal. The Court does not credit Kennon's testimony in this instance without a specific recital relating to pending or anticipated litigation. The entries do not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Additionally, all of these entries are for the exact time spent each day performing the exact services. The Court will disallow these entries in their entirety.

*May 4, 1987*

7.50 Telephone conference with John Brown and Carl Stuecken regarding administrative problems; meeting with Irma Rector regarding administrative problems; review mail from agents, claimants, etc.; meeting with A. Bird and M. Johns regarding review of Judge Fussell's May 1, 1987 opinion; telephone conference with Doug Horton regarding documents held by Doug Horton; telephone conference with Tim Sims, Texas Attorney General regarding Texas bond

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety.

*May 5, 1987*

3.00 Telephone conference with Irma Rector, John Brown, and Carl Stuecken regarding administrative problems

*May 6, 1987*

3.00 Telephone conference with Irma Rector, John Brown, and Carl Stuecken regarding administrative problems

The above entries on their face are entered as administrative problems, not legal. The Court does not credit Kennon's testimony in this instance without a specific recital relating to pending or anticipated litigation. The entries do not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Additionally, all of these entries are for the exact time spent each day performing the exact services. The Court will disallow these entries in their entirety.

*May 7, 1987*

4.00 Review mail from agents and claimants

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Kennon's testimony in this instance that the time involved was professional time. The Court will disallow this entry in its entirety. At this point in her testimony, Kennon testified that any other highlighted item regarding her time was professional time.

*May 8, 1987*

6.00 Review of MBank and Northwest National Bank situation; telephone conference with Margaret Bell of Fayetteville office regarding same; examination of documents received from Northwest National Bank; telephone conference with John Brown regarding administrative problems; telephone conference with Carl Stuecken regarding administrative problems; meeting with Irma Rector regarding same; meeting with A. Bird regarding same; meeting with A. Bird regarding Northwest National Bank account

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 11, 1987*

7.50 Telephone conference with Jerry Nugent regarding JWD et al.; telephone conference with John Brown regarding computer work to be done for May 9, 1987 hearing; meeting with Irma Rector regarding same; review of agent files for agents in May 1, 1987 opinion

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal

service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 12, 1987*

14.00 Travel to Fayetteville; meeting with John Brown, Carl Stuecken, Margaret Bell and A. Bird regarding administrative problems

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 13, 1987*

7.50 Telephone conference with David Powell, Bruce Waitz, Jerry Nugent, Bert Thompson regarding May 1, 1987 opinion and reports; telephone conference with Rick Taylor; rec regarding Puerto Rico; telephone conference with John Brown and Carl Stuecken regarding administrative problems; prepare requested documents for mailing to John Brown; draft letters to agents involved in May 29, 1987 hearing regarding notice and proofs of claim; meeting with Liz Goff regarding May 18, 1987 meetings with Bert Thompson and Rick Taylor

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 14, 1987*

8.75 Telephone conference with A. Bird regarding Steve Gunderson request; telephone conference with Steve Gunderson regarding conference call; review Rice reply brief and trustee's initial appeal brief; draft letters to City National Bank and Northwest National Bank regarding records; telephone conference with John Brown and Carl Stuecken regarding administrative problems; telephone conference with Margaret Bell at Fayetteville regarding Carl's et al.; telephone conference with Carol Burch regarding JWD accounting problems; review JWD records

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 15, 1987*

> 4.75 Review Rice and trustee appeal brief; outline for reply brief; telephone conference with A. Bird, Steve Gunderson and Bruce Waitz regarding Carl's Foods, Inc.; telephone conference with John Brown regarding administrative problems; draft Rice appeal brief

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that

the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 17, 1987*

> 4.00 Telephone conference with John Brown regarding money order format; draft reply brief for Rice Foods, Inc.; review of Handy Andy file to prepare for meeting with Thompson

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 20, 1987*

> 5.50 Draft notice of hearing and application for approval of stipulation and order in 87–00(?); telephone conference with Pam Smith, Union National Bank, to set up accounts for Kansas–Alabama; meeting with Liz Goff regarding same; telephone conference with John Brown and Carl Stuecken regarding administrative problems; telephone conference

with Joyce Bradley regarding hearings set for April 29, 1987; meeting with Liz Goff regarding same; telephone conference with Rick Taylor regarding Puerto Rico settlement; telephone conference with Trini Flores, irate claimant; draft letter regarding same; meeting with A. Bird regarding Puerto Rico meeting with Rick Taylor and meeting with Bert Thompson of Handy Andy; telephone conference with Carol Birch regarding JWD, et al. accounting; draft letter to same; meeting with D. Thomas regarding default judgment; follow-up same; meeting with A. Bird and D. Thomas regarding default judgments

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 22, 1987*

5.00 Telephone conference with John Brown regarding administrative problems; draft Rice appeal brief; review draft; telephone conference with Gary Page, Page Foods; draft letter to Mississippi regarding wiring instructions; telephone conference with Pam Smith at Union National Bank regarding same

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*May 27, 1987*

6.25 Prepare for Friday hearing; telephone conference with Tim Sims regarding bond; prepare bond for Texas; meeting with Rick Taylor, (?) FE & C regarding Puerto Rico settlement; conference with John Moore, Arkansas Securities Commission; prepare waiver of notice and order per his request; meeting with Liz Goff regarding same; telephone conference with John Brown regarding Friday hearing; telephone conference with John Brown regarding administrative problems

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure

2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 3, 1987*

6.50 Answer correspondence from agents, claimants and attorneys regarding NWFX; telephone conference with John Brown and Carl Stuecken; conference with Irma Rector regarding administrative problems; preparation of and prepare for filing notice and application for Alabama and Kansas; conference with Liz Goff regarding same

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal

services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 8, 1987*

5.75 Meeting with A. Bird and Dave Thomas regarding order setting aside default judgment; research regarding motion to reconsider order setting aside default judgment; telephone conference with John Brown regarding move to Little Rock; telephone conference with Claudia Decker regarding Sav–Mart; conference with Irma Rector regarding May telephone bill; telephone conference with John Brown regarding computer system and warehouse problems

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 15, 1987*

4.50 Review of incoming correspondence; draft letters in reply to same; telephone conference with John Brown regarding upcoming move to Little Rock; meeting with I. Rector regarding correspondence and her correspondence problems

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is

on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 16, 1987*

6.00 Telephone conference with John Brown regarding claims, administrative problems of move; organize files regarding NWFX; draft letter in reply to claimants, attorneys requests

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 17, 1987*

5.25 Telephone conference with John Brown regarding Preston's, MBank,

Wang, final reports, CNB and move; meeting with I. Rector regarding claims, other administrative problems; telephone conference with Susan Perry, Travelers Indemnity Co., regarding claims they have; review Lar–Lin class action; research regarding disposal of money orders; conference with S. Joiner

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 22, 1987*

4.50 Telephone conference with John Brown and C. Stuecken regarding administrative matters; meeting with L. Goff regarding Miss/La orders; telephone conference with Joyce Bradley regarding same; conference with L. Goff regarding status; conference with I. Rector regarding claims, administrative matters; draft replies to correspondence

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or

legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative matters" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 23, 1987*

2.25 Telephone conference with John Brown regarding claims and administrative problems; research regarding disposal of money orders; telephone conference with Carl Stuecken regarding his telephone conference with American Express legal dept.; telephone conference with John Brown regarding move to Little Rock

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 24, 1987*

4.25 Telephone conference with John Moore, ASC, regarding disposal of money orders; telephone conference with John Brown and Carl Stuecken regarding move to Little Rock and administrative problems; meeting with I. Rector regarding claims, move to Little Rock and other administrative matters; review mail; draft answers to same

All of these entries appear to reflect administrative time. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 25, 1987*

3.25 Meeting with I. Rector regarding move to Little Rock of Fayetteville operation, claims, correspondence; telephone conference with Madonna Kukay of Columbia Daily Tribune at I. Rector's request; telephone conference with Claudia Decker regarding claims filed by her clients, default judgment and motions; telephone conference with irate money order purchaser

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 26, 1987*

> 10.00 Travel to Fayetteville; meeting with John Brown and A. Bird to close down Fayetteville office

This entry is vague and ambiguous, and appears to be administrative work, not legal. The Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 29, 1987*

> 3.75 Review mail and claims from Fayetteville; draft letters of reply to correspondence; telephone conference with Margaret Bell regarding bill for copies; memorandum to file regarding computer backup, storage; telephone conference with Betty Patterson and Mary Russell regarding same; telephone conference with Shaw, attorney for money order claimant regarding status of case; telephone conference with Carl Stuecken regarding tracing requests and move; meeting with Irma Rector regarding claims, vacations and other administrative problems

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*June 30, 1987*

> 1.25 Telephone conference with Carl Stuecken regarding move, claims and tracing requests; draft notice of appeal regarding Carl's Grocery; meeting with A. Bird regarding move to Little Rock of Fayetteville

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal

service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 1, 1987*

3.50 Meeting with A. Bird regarding objections to claims, default judgments; telephone conference with central terminal storage regarding computer backup storage, storage of boxes; telephone conference with Mary Russell regarding arranging help for move from Fayetteville; telephone conference with John Brown regarding status of move; meeting with Sharon Watt of Central Records Storage regarding storage of files, computer tapes; meeting with Irma Rector regarding move and problems; revise bond and order for Texas; conference with A. Bird regarding claims, move to Little Rock of Fayetteville operation; telephone conference with Libby Jacobi, Tower Building manager, regarding move from Fayetteville to Little Rock; memo to A. Bird regarding Texas special master order; telephone conference with Bob Ward telephone conference with Bob Ward, attorney for Traveler's Insurance in Denver, Colorado regarding Traveler's claims

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 2, 1987*

6.75 Telephone conference with John Brown regarding move to Little Rock; research regarding joinder of parties; what is an indispensable party (in Federal Rules of Civil Procedure) also Moore's Federal Practice for Lar–Lin v. NWFX answer to motion for relief from stay; assisting in move of documents from Fayetteville office to Little Rock office

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a

position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 6, 1987*

.50 Telephone conference with Carl Stuecken regarding computer problems with George Bolt—Bolt was taking computer parts that A. Bird and Bolt had agreed Bird could keep

This entry appears to be purely administrative in nature. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 7, 1987*

5.50 Meeting with John Brown regarding moved in documents; reply to correspondence from Claudia Decker, attorney for Affilliated Foods regarding Feagin Supermarket and Harris Foods; open mail from claimants (in Irma Rector's absence)

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks

described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 8, 1987*

3.75 Open mail from claimants (in I. Rector's absence); meeting with Sharon Watt, Central Records Storage regarding storage of NWFX documents from Fayetteville warehouse; draft designation of record in NWFX, et al. v. Carl's Grocery Co.,; telephone conference with A/M Reporters regarding transcript of hearing for NWFX v. Carl's grocery; draft letter to same; continue request for record

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 9, 1987*

5.00 Meeting with John Brown regarding problems with move of operations of Fayetteville; telephone conference with Carl Stuecken regarding transfer from

Bank IV, Topeka, Kansas—transfer of records from warehouse; open mail (in Irma Rector's absence) from money order claimants; telephone conference with Jim Malone, attorney for Kathy Newman (money order claimant) regarding how and where to file her proof of claim; preparation of designation of record; review docket obtained from bankruptcy court regarding same

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The move from Fayetteville to Little Rock appears to be administrative work. The Court will disallow this entry in its entirety.

*July 10, 1987*

5.50 Open mail from claimants (and answer correspondence in I. Rector's absence); packing boxes; separation of NWFX records going to the warehouse from NWFX records to be kept at Tower Building

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 14, 1987*

5.50 Telephone conference with Melissa at David Powell's office regarding request for pleadings filed by Rice Foods; obtain same and send to Melissa; meeting with John Brown; meeting with John Brown and A. Bird regarding what to do about duplicate claims, invalid claims, state deadlines for claimant listings; review proposed orders submitted by D. Powell for ARG and Crooks; review settlements with various states regarding traveler's and cash bonds to determine if trustee has deadlines for filing proposed list of claimants; meeting with A. Bird regarding same

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 15, 1987*

5.25 Meeting with John Brown regarding computer problems in Little Rock and also problems with George Bolt in Fayetteville; preparations of letter to A/M Reporters requesting transcript of

December 15th hearing regarding Carl's Grocery' review response and brief to motion to set aside default judgment filed by Alice Foodcraft and Model Market; review trustee's motion and brief regarding same; telephone conference with John Brown regarding cables taken by George Bolt; meeting with A. Bird regarding same; telephone conference with John Brown regarding A. Bird's response to Brown's question regarding procedure to follow to request cables; draft memo to A. Bird regarding John Brown's conversation with George Bolt regarding cables Bolt took; draft letter to Channel 13, Toledo Ohio regarding City National Bank money order endorsement; meeting with M. Johns regarding sending Lar–Lin's accounts receivable to Steven Gunderson, counsel for Lar–Lin; preparation of accounts receivable for mailing and draft cover letter regarding same; review American Bankruptcy Law Journal article on referral for reply to response of Alice Foodcraft, etc. to trustee's motion to reconsider order setting aside default judgment

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony, or Bird's testimony, that the time involved was professional time. The Court will disallow this entry in its entirety.

*July 17, 1987*

4.50 Meeting with John Brown regarding claims; telephone conference with Sharon at Central Records to set up appointment for J. Brown to visit; open mail from money order claimants, attorneys for agent; respond to same

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July, 1987*

3.50 Meeting with John Brown regarding computer problems, claims; conference with Irma Rector regarding same—search for claims

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 29, 1987*

7.00 Open and respond to mail from agents; meeting with J. Brown regarding mail; problems with computers and claims; draft list of problems A. Bird needs to make decisions on; review list of priority claimants; draft list of priority wage claimants and amounts payable to them under the bankruptcy code

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 30, 1987*

4.00 Review and revise list of priority claimants; check employee files on questionable claims; meeting with J. Brown; telephone conference with Carl Stuecken regarding same

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*July 31, 1987*

1.75 Meeting with A. Bird and J. Brown regarding list of priority claimants; telephone conference with Carl

Stuecken to obtain more employee files need to check claims

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 3, 1987*

5.50 Preparation of replies to correspondence from agents and attorneys; telephone conference with Carl Stuecken regarding administration problems; meeting with I. Rector and J. Brown regarding same

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 4, 1987*

4.00 Meeting with J. Brown regarding claims; locate claims that were misplaced; telephone conference with Carl Stuecken regarding claims, administra-

tive problems; meeting with I. Rector regarding same

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 5, 1987*

> 3.75 Review correspondence from agents; draft replies to same; meeting with J. Brown and I. Rector regarding administrative problems; telephone conference with Carl Stuecken

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 6, 1987*

> 5.25 Meeting with M. Johns regarding JWD order; telephone conference with Carol Birch, counsel for JWD and Joyce Bradley, at bankruptcy court regarding missing order for JWD; meeting with M. Johns and A. Bird regarding procedure to follow for missing order; draft motion to extend time for appeal of final order at JWD, et al; meeting with J. Brown and I. Rector regarding adminis-

trative problems; telephone conference with Carl Stuecken

Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 8, 1987*

> 5.50 Review correspondence from agents and draft replies to same; telephone conference with Henry Echols (Stop & Go) and Steve Adams (Mako) regarding claims of agents; meeting with J. Brown and I. Rector regarding administrative problems; telephone conference with Carl Stuecken regarding same; conference with L. Goff regarding status of Mako claims and Kansas trust fund; telephone conference with Rick Taylor regarding Puerto Rican claims status and status of settlement; meeting with A. Bird regarding same

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's gener-

al testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 10, 1987*

> 3.25 Meeting with J. Brown regarding administrative problems; conference with I. Rector regarding same; telephone conference with Carl Stuecken regarding clearing out and closing down; answering correspondence from agents and attorneys

All of these entries appear to be administrative; the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 11, 1987*

> 2.50 Meeting with L. Goff regarding Derby Oil; telephone conference with attorney for Derby regarding setoff of claim against amount due NWFX; administrative meeting with J. Brown and I. Rector; telephone conference with C. Stuecken regarding shutdown of warehouse, material needed by Arkansas ESD

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. "Administrative meeting" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 12, 1987*

> 3.75 Telephone conference with Elliot Shavin, Texas AG regarding documents needed by him for State of Texas in capacity as consumer protection representative; meeting with I. Rector regarding Fayetteville checking account; telephone conference with C. Stuecken regarding same and documents needed by Arkansas ESD

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 14, 1987*

> 4.75 Draft notice of appeal and statement of issues for ARG and Crooks; revise same; telephone conference with Dean Ferguson regarding Quickie Mart account receivables and settlement offer; meeting with I. Rector regarding administration problems; telephone conference with Carl Stuecken regarding Arkansas ESC request

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*August 18, 1987*

3.25 Meeting with A. Bird, I. Rector and J. Brown regarding amended complaint, claims processing and status conference; telephone conference with C. Stuecken regarding moving furniture to Little Rock; draft designation of record regarding Crooks Supermarkets, Inc.; draft designation of record regarding ARG, Inc.

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Kennon failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Kennon's general testimony that all the time involved was professional time; conference regarding moving furniture to Little Rock is not legal time. The Court will disallow this entry in its entirety.

*September 18, 1987*

3.50 Meeting with A. Bird, L. Goff, M. Johns, J. Brown, E. Cunningham, I. Rector and S. Schallhorn regarding NWFX status conference

All of the persons listed except J. Brown are attorneys at the Rose Law Firm, which indicates this meeting was legal. The Court will allow this entry in its entirety.

*October 1, 1987*

1.00 Meeting with A. Bird regarding Texas deadline—list of proposed claimants

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Further, the bond proceeds from Texas were not property of the estate, and it is not clear whether this work relates to the state bond proceeds. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*October 2, 1987*

1.50 Meeting with J. Brown and I. Rector regarding administrative problems

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*October 2, 1987*

.25 Telephone conference with C. Stuecken regarding Pitney–Bowes postage machine pickup from Fayetteville

This entry clearly appears to be administrative in nature. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*October 13, 1987*

1.00 Meeting with I. Rector regarding Tennessee claims and administrative problems

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*October 15, 1987*

1.50 Meeting with J. Brown and I. Rector regarding NWFX administrative/personnel problems

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*October 30, 1987*

3.00 Telephone conference with Greg Moldenhauer regarding "Terry Sloan"; examination of personnel records to determine if T. Sloan worked for NWFX

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 4, 1987*

5.00 Conference with L. Goff regarding various agents attempting to settle trustee's amended complaint; investigation of records substantiating trustee's accounts receivable printouts

This entry appears to be legal work in its entirety. The Court will allow this entry in its entirety.

*November 9, 1987*

2.00 Organization of files

Even though this entry is somewhat vague, the Court credits Bird's testimony that Kennon was organizing files for litigation purposes. The Court will allow this entry in its entirety.

*November 10, 1987*

2.00 Conference with J. Brown regarding various administrative matters

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 13, 1987*

4.00 Investigation of various agents' accounts receivable records; meeting with L. Goff and J. Brown regarding same; meeting with J. Brown regarding administrative problems

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 18, 1987*

2.00 Meeting with J. Brown regarding administrative problems; accounts receivable problems with Lar–Lin

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 20, 1987*

3.00 Organization of files

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*November 23, 1987*

.50 Telephone conference with G. Moldenhauer regarding T. Chandler (possible theft of agent funds from Livernois Express)

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*December 23, 1987*

4.50 Meeting with J. Brown, I. Rector, A. Bird and L. Goff regarding bond settlements with states and computer printouts; telephone conference with D. Mooney regarding information needed by H. Gee; telephone conference with T. Wurz regarding Tennessee bond settlement; telephone conference with C. Decker regarding settlement of her client's claim (Harris Grocery) against NWFX

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*January 4, 1988*

3.00 Status meeting with A. Bird, K. Goff, E. Cunningham, M. Johns and J. Brown

When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*February 5, 1988*

5.75 Organize files; conference with L. Goff, E. Cunningham, J. Brown and I. Rector

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative mat-

ters of the trustee, ministerial tasks, or legal work. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*March 24, 1988*

5.50 Examine the file on Metro Check; meeting with L. Goff and J. Brown regarding that and also Pyburn's; meeting with J. Brown regarding administrative problems; review Mbank files for Dallas trip; research regarding marshalling [sic] of assets

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*April 4, 1988*

2.50 Meeting with I. Rector and J. Brown regarding administrative problems; telephone conference with H. Holliman regarding MBank assignments

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*April 8, 1988*

2.50 Telephone conference with H. Holliman regarding Mbank assignments; draft correspondence to various agents; meeting with I. Rector regarding administrative problems

"Administrative problems" is not an acceptable entry for the purpose of billing for legal services. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

*April 28, 1988*

7.75 Telephone conference with C. Decker regarding withdrawal of proof of claim filed by Pit Stop Grocery; draft letter regarding same; meeting with J. Brown and I. Rector regarding administrative problems; telephone conference

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. "Administrative problems" is not an acceptable entry for the purpose of billing for legal services. The Court does not credit Kennon's general testimony that all the time involved was professional time. The Court will disallow this entry in its entirety.

(c) *Other time entries*

Based upon its review, the Court makes the following findings relating to the following specific time entries:

*September 10, 1986—Cahanin*

1.00 Setting up of general ledger

Clearly this entry reflects an administrative function, not legal services. The Court will disallow this entry in its entirety.

*September 13, 1986—M. Johns*

2.25 Office conference with J. Birch regarding Chek Cash and Travelers

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court will disallow this entry in its entirety.

*September 23, 1986—Cahanin*

2.00 Input checks and prepare general ledger and income statements for month of September, 1986

Clearly this entry reflects an administrative function, not legal services. The Court will disallow this entry in its entirety.

*September 30, 1986—Cahanin*

.75 Prepare payroll for employees

Clearly this entry reflects an administrative function, not legal services. The Court will disallow this entry in its entirety.

*October 14, 1986—Cahanin*

1.00 Prepare payroll

Clearly this entry reflects an administrative function, not legal services. Bird also testified that this was not legal work.

The Court will disallow this entry in its entirety.

*October 27, 1986—Cahanin*

1.00 Prepare payroll

Clearly this entry reflects an administrative function, not legal services. The Court will disallow this entry in its entirety.

*November 18, 1986—M. Goff*

1.00 Reviewed files; organized fidelity sheets for record of payments

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. The Court will disallow this entry in its entirety.

*November 21, 1986—M. Goff*

3.50 Revised list; made telephone calls; drafted letters

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. The Court will disallow this entry in its entirety.

*November 21, 1986—S. Mazeeka*

 0.50 Telephone conference with irate money order purchaser

Generally trustee has a duty to communicate with creditors about their claims. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court does not credit Bird's testimony in this instance that the time involved was legal time. The Court will disallow this entry in its entirety.

*November 24, 1986—M. Goff*

 1.50 Telephone conference with computer support group; telephone conferences with John Brown; drafted demand letter

Telephone conference with computer support group appears on its face to be administrative matter, not legal. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. The Court will disallow this entry in its entirety.

*March 2, 1987—M. Goff*

 3.00 Memo to Allen Bird regarding proper demo and fidelities; telephone conference with John Brown and Collette Gibbons; telephone conference with Ronnie Mansour

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine

whether the services were reasonable, actual, and necessary. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. The Court will disallow this entry in its entirety.

*March 5, 1987—M. Goff*

 2.50 Office conference with Linda Kennon and John Brown; telephone conference with attorney for proper demo; telephone conference with Stop N Go; office conference with K. Stocks

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*April 17, 1987—M. Goff*

 1.80 Telephone conference with John Brown; office conference with Kathy Stocks regarding Westside Checking Fidelity; conference with Arkansas Securities Commission (John Moore); research for Rice brief

Conference with Brown has no subject matter or explanation of what was discussed at the meeting. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Also, the entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*July 6, 1987—M. Goff*

1.50 Telephone conference with Joyce Bradley of Judge Fussell's court regarding Nanjer's contempt and settlement with Louisiana in the ussery [sic] case; memo to Joyce Bradley with copy of Louisiana settlement order; conference with John Brown regarding removal of equipment from Fayetteville office; conference with Fayetteville office and Allen Bird; conference with Kansas representative regarding wiring of funds to separate trust account

Conferences regarding removal of equipment and wiring funds to trust account appears to be administrative. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trust-ee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*September 11, 1987—M. Goff*

2.00 Conference with L. Kennon regarding funds in operating account; Oklahoma Attorney General's office; draft and revise motions for default judgment for fidelities

Conference with Kennon appears to be administrative, not legal. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. The Court will disallow this entry in its entirety.

*September 14, 1987—M. Goff*

2.00 Conference with Irma Rector regarding wire transfer of New Mexico funds; revise and file motions for default judgment; conference with Dave Thomas and Allen Bird regarding bankruptcy action against agents; conference with Linda Kennon

Conference with Rector, an employee of NWFX and not an attorney, law clerk, or paralegal, appears to be administrative, not legal. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. The Court will disallow this entry in its entirety.

*February 2, 1988—S. Alkek*

.20 Telephone conference with C. Dillon of Marsh and McClennan, Inc. regarding insurance for Nissan pickup truck

Conference regarding insurance appears to be administrative and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*February 4, 1988—S. Alkek*

.30 Telephone conference with M. Noor of Marsh and McClennan regarding insurance coverage on Nissan pickup

Conference regarding insurance appears to be administrative and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*February 8, 1988—S. Alkek*

1.50 Travel to and conference with state revenue office clerk regarding title transfer and licensing

Clearly this entry reflects an administrative function, not legal services. The Court will disallow this entry in its entirety.

*February 9, 1988—S. Alkek*

1.00 Conference with J. Brown regarding history of Nissan pickup truck; arranging inspection of Nissan pickup truck; telephone conference with M. Noor of Marsh and McClennan regarding insurance coverage on truck

This entry appears to reflect administrative functions and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*February 24, 1988—S. Alkek*

3.50 Review correspondence from M. Noor regarding insurance coverage on Nissan truck and binder; conference with representative of revenue office and obtain registration and title; correspondence to M. Noor regarding insurance coverage; correspondence to A. Bird

Clearly this entry reflects primarily administrative functions, not legal services. The Court will disallow this entry in its entirety.

*March 10, 1988—S. Alkek*

.50 Receipt and review of AR certificate of title on Nissan truck; review file regarding insurance status; memo to A. Bird

Clearly this entry reflects an administrative function, not legal services. The Court will disallow this entry in its entirety.

*March 16, 1988—K. Pryor*

2.50 Objections; meeting with postal service pertaining to bulk permit

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Pryor failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*March 21, 1988—K. Pryor*

4.00 Objections; meeting with A. Bird and J. Brown

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Pryor failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*April 25, 1988—A. Cunningham*

0.40 Compute prejudgment interest awardable against Pyburn, Inc.; review check received from Super Service, Inc.; conference with Irma Rector concerning check

Reviewing check and conference with Rector are vague and ambiguous entries, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Rector is employee of debtor corporations, not attorney or paralegal. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Cunningham failed to separate the amount of time spent performing the individual tasks described. Rather, he chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court does not credit Bird's testimony in this instance that all the time involved was legal time. The Court will disallow this entry in its entirety.

*May 3, 1988—M. Goff*

2.50 Revise letter brief to Judge Fussell regarding prejudgment interest vs. Pyburn; draft memo to A. Bird; conference with L. Kennon regarding distribution of trust funds; telephone conference with Kansas representative regarding distribution of Kansas trust fund; conference with A. Bird and J. Brown regarding distribution of trust funds

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, min-

isterial tasks, or legal work. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*May 4, 1988—M. Goff*

2.00 Telephone conference with M. Colbert regarding Pyburn Enterprises; conference with A. Bird regarding distribution of trust funds; conference with L. Kennon and E. Cunningham regarding compilation of agents who have settled without claims; review claimant lists for trust funds

Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*May 10, 1988—M. Peoples*

.50 Find and copy cases

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*May 18, 1988—S. Alkek*

.50 Review correspondence and rejection of uninsured motorists forms from M. Noor of Marsh & McLennan and memo to A. Bird regarding same

This entry appears to be administrative in nature. This entry is also vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*June 27, 1988—K. Stocks*

1.00 Review correspondence received; review files to determine if checks can be deposited; conference with L. Goff regarding Berkley's; draft order of dismissal

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Stocks failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*June 27, 1988—R. Clark*

1.50 Conference with Allen Bird and Kathy Cagle regarding tax returns

The Court credits Bird's testimony in this instance that the time involved was legal time. The Court will allow this entry in its entirety.

*June 30, 1988—M. Goff*

.80 Conference with A. Bird regarding trust fund claims; conference with J. Brown regarding trust fund claims; telephone conference with Kansas representative regarding NWFX checking account; review correspondence

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*July 5, 1988—D. Thomas, Jr.*

4.00 Telephone conference with Rick Petronella; review file for Save–A–Stop, Inc.; conference with Liz Goff; conference with John Brown; telephone conference with Rick Petronella

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court does not credit Bird's testimony in this instance that the time involved was legal time. The Court will disallow this entry in its entirety.

*July 18, 1988—M. Goff*

3.50 Review correspondence and pleadings from agent; revise response to motion to dismiss and brief/Richwood; research on change of venue; draft letters to attorneys for agents; telephone conference with attorney for Puerto Rico; conference with I. Rector re deposit of checking account funds; conference with K. Stocks re settlements w/ agents; review trust fund files; telephone conference with attorneys for Alabama re Oklahoma trust fund; telephone conference with attorneys for agents re Mbank and second amended complaint

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*July 19, 1988—K. Stocks*

1.75 Proofed settlement agreement for Delly's; revise settlement agreement for The Trading Post; draft correspondence to D. Gault; recorded information in status report; conference with A. Bird and L. Goff; conference with J. Brown; conference with C. Stuecken; revise affi-

davit; review Metro check file; review Savemart

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Stocks failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court will disallow this entry in its entirety.

*July 20, 1988—K. Stocks*

1.00 Conference with C. Stuecken regarding Save–Mart; telephone conference with R. Prince re: Alabama trust fund; telephone conference with D. Malkoff; telephone conference with T. Smyly regarding Ohio trust fund; conference with A. Bird; telephone conference with T. Smyly; draft correspondence with T. Smyly

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Stocks failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. When fees for services are sought based on conferences, the application should at least state the general nature and purpose of the conference. The Court will disallow this entry in its entirety.

*August 2, 1988—M. Goff*

6.50 Telephone conference with agents' attorneys regarding settlements; review agent files; draft letters to agents' attorneys; draft settlement agreements and affidavits; review claims filed by agents; conference with I. Rector regarding claims; conference with K. Stocks regarding settlements by Agents; conference with A. Bird regarding claims by agents and settlement agreements; conference with A. Bird regarding collection of default judgments; conference with D. Thomas regarding settlements by agents on default list

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, ac-

tual, and necessary. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 3, 1988—M. Goff*

5.00 Draft motion for default judgment and accompanying notices in AP 86–484 and AP 88–193; conference with K. Stocks regarding defaulting defendants; conference with attorney for defendant Pic'N'Pak regarding amount in dispute and possible settlement; conference with K. Stocks regarding agent settlements; conference with C. Stuecken regarding Alec Food Circle's sales, missing reports, etc; telephone conference with agents' attorneys

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 8, 1988—K. Stocks*

3.00 Draft correspondence to T. Nguyen; updated status; review Westside Check Cashing file to determine last payment; calculated principal and interest owing after each payment; confer-

ence with Carl; draft complaint; prepare exhibits

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Stocks failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*August 9, 1988—K. Stocks*

.30 Review Benny's Food Mart file and claims file

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*October 10, 1988—M. Goff*

1.00 Telephone conference with Attorney General's office for State of Kansas regarding distribution of Kansas trust fund; conference with A. Bird regarding same; review correspondence from agents and agent's attorney regarding settlement and default judgments; conference with D. Thomas regarding default judgments v. agents

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty, and did not include time entries for services performed in relation to state bond payments. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*October 17, 1988—M. Goff*

3.00 Telephone conference with law clerk for Judge Waters, U.S. District Judge regarding interest rate for default judgments; conference with P. Terrell and I. Rector regarding claims of agents; attend NWFX staff meeting, discussion of claims payout, computer entries, settlements with agents, etc.; review correspondence from attorneys for various agents regarding settlement agreements and agreed orders withdrawing

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of

time spent on each matter. The Court will disallow this entry in its entirety.

*November 8, 1988—M. Goff*

2.00 Review agent litigation, miscellaneous files and draft summary of files; review correspondence and pleadings from agents; conference with A. Bird regarding response to motion filed by J. Nugent on behalf of Ballard's; conference with I. Rector regarding payments by agents who have settled; update agent summary sheets

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*November 10, 1988—M. Goff*

3.50 Telephone conference with attorneys for agents regarding settlement of default judgments; revise agent summary charts' conference with I. Rector regarding deposits by agents and Fidelity update; revise fidelity summary sheet; review motion by Ballard's to file proof of claim and draft trustee's response to same; draft letter to Judge Fussell and precedent for an order for Ballard's motion; review City National Bank's claim and trustee's objection thereto; draft motion and order to with-

draw trustee's objection without prejudice

The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*November 11, 1988—M. Goff*

3.30 Review and revise trustee's response to Ballard's motion to allow filing of proof of claim and precedent for order; draft letter to Judge Fussell regarding same; draft motion to dismiss trustee's objection to City National Bank's claim and precedent for an order granting the same; revise agent summary sheets' conference with K. Stocks regarding settlements with agents; settlements with agents telephone conference with R. Bauman of Oklahoma Travelers regarding master's order

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. Goff failed to separate the amount of time spent performing the individual tasks described. Rather, she chose to lump sum the services in one entry. The Court cannot be placed in a position to

speculate as to the length of time spent on each matter. The Court will disallow this entry in its entirety.

*November 21, 1989—K. Kissell*

4.50 Review proofs of claim to determine if personal, family or household; regarding JWD, Money Store and J. Knight

This entry appears to be administrative in nature. The Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*November 22, 1989—K. Kissell*

4.80 Conference with J. Bryant regarding review of claims, review proofs of claim to determine if personal, household or family, regarding JWD, Money Store and J. Knight

This entry also appears to be administrative in nature. The Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*November 27, 1989—J. Bryant*

3.00 Money order verification of personal, family or household use

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*November 27, 1989—K. Kissell*

3.50 Review money orders to determine if personal; family or household regarding Money Store and J. Knights

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or

legal work. The Court will disallow this entry in its entirety.

*December 14, 1989—K. Kissell*

1.00 Conference with A. Bird regarding trustee's fees, partially draft application for allowing trustee's fees and notice, partially draft application for attorney's fees and notice, calculate operating expenses

This entry appears to be administrative in nature. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*January 14, 1990—C. Baker*

2.50 Review file

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*March 12, 1990—S. Durand*

.40 Telephone conference with Union National Bank regarding instructions for maturing investments, conference with A. Bird regarding same, telephone conference with Union National Bank to advise

This entry appears to be administrative in nature. The Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The Court will disallow this entry in its entirety.

*April 9, 1990—J. Bryant*

2.30 Go to bankruptcy clerk's office to find exhibits from 10/19/89 hearing—they had sent wrong ones

The error appears to be from the bankruptcy clerk's office, and not a result of any action by the Trustee or Rose Law Firm. The Court will allow this entry in its entirety.

*May 15, 1990—K. Kissell*

.50 Conference with J. Blanchard regarding Michigan Bond, conference with A. Bird regarding account, telephone conference with B. Thompson regarding setting up Michigan account

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. Further, this appears to be work on the state bond proceeds, which the Court held were not property of the estate. The Court will disallow this entry in its entirety.

*July 18, 1990—K. Kissell*

.50 Review application and notice

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow this entry in its entirety.

*December 1, 1997—Mr. Smith*

*December 2, 1997—Mr. Smith*

> 1.00 Review Arkansas Department of Finance and Administration letter; two office conferences with P. Scharmberg; telephone conference with state
>
> 2.20 Telephone conference with Department of Finance and Administration; draft reconciliation letter; conference with P. Scharmberg

These entries are vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entries do not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The entries do not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, actual, and necessary. The Court will disallow these entries in their entirety.

*February 20, 1998—Mr. Rosenthal*

> 0.05 Review Bakal property with A. Bird

This entry is vague and ambiguous, and the Court will not speculate whether the services provided were administrative matters of the trustee, ministerial tasks, or legal work. The entry does not meet the specificity requirements required by Federal Rule of Bankruptcy Procedure 2016. As a result, the Court cannot determine whether the services were reasonable, ac-

tual, and necessary. The entry does not distinguish with reasonable specificity the legal services from the administrative tasks. The burden is on the trustee to show that the services involved some necessary and actual legal service beyond the scope of the trustee's statutory duty. The Court will disallow this entry in its entirety.

*November 9, 1999 to February 2, 2000—Garland Garrett*

> 110.80 hours billed by Garrett between December 1, 1999, and February 2, 2000

Since December 1, 1999, the time entries of both the Rose Law Firm and Wright, Lindsey & Jennings LLP all relate to the trustee and pending litigation. It would be unjust and unduly burdensome for the estate to be forced to pay both firms for the trustee's representation in the litigation. Because of this, the Court will **disallow** all time billed by Garrett between December 1, 1999, and February 2, 2000, as duplicative of the services provided by the Wright Law Firm.

*December 2, 1999 to February 8, 2000—Connie Whitby*

> 30.35 hours billed by Whitby between December 2, 1999, and February 8, 2000

Likewise, the Court will **disallow** all time billed by Whitby between December 2, 1999, and February 8, 2000, as duplicative of the services provided by the Wright Law Firm.